**Brian W. Steffensen (3092)**
**STEFFENSEN ❖ LAW ❖ OFFICE**
PO Box 2279
Salt Lake City, Utah 84110
Telephone (801) 860-3707
Facsimile (866) 221-7980
Email brianwsteffensen@gmail.com
Attorneys for **Plaintiff**

## IN THE THIRD DISTRICT COURT
## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| **AAA Law PC, dba Steffensen Law Office; and Brian W. Steffensen**<br><br> **Plaintiffs,**<br><br>vs.<br><br>**Duffy Jay Williams, individually and dba CUT USA and Williams General, Inc.; CUT USA, a dissolved Utah Corporation; Williams General, Inc., a dissolved Utah Corporation; Scott Williams; Estate of Hugh Williams; Does 1 - 50.** | **First Amended Complaint** – ERRATA<br><br>**Civil No. 190905179**<br>**Judge James Gardner** |

For their claims for relief against the Defendants, Plaintiffs allege and aver as follows:

### Jurisdiction and Venue

1.  This Court has subject matter jurisdiction of the claims alleged below

    pursuant to the provisions of Section §78A-5-102(1), Utah Code.

2.  This Court has personal jurisdiction over Defendants pursuant to §78B-3-

**EXHIBIT**
**5**

205(1), Utah Code, in that Defendants transacted business within this State and claims arise from that transaction of business.

3.     Venue is properly laid before the Third Judicial District Court, Summit County, pursuant to the provisions of Section §78B-3-307(1)(a), Utah Code, in that the causes of action alleged below arose within said District's boundaries.

## GENERAL ALLEGATIONS

4.     AAA Law PC is a Utah professional corporation doing business as Steffensen Law and/or Steffensen Law Office ("AAA").

5.     Brian W. Steffensen is an individual residing in Salt Lake County, Utah.

6.     Duffy Jay Williams is an individual whose present address is unknown to the Plaintiffs, but who has been a resident of Utah when he has not been living in Uganda, Africa ("Williams").

7.     CUT USA is a dissolved Utah corporation ("CUT USA"). Due to its dissolution, all acts taken by Williams which purported to be for and on behalf of CUT USA were in actuality done by Williams dba CUT USA.

8.     Williams General, Inc. Is also a dissolved Utah corporation ("Williams General"). Due to its dissolution, all acts taken by Williams which purported to be for and on behalf of Williams General were in actuality

9:23-ap-09001-BPH   Doc#: 35-4   Filed: 11/15/23   Page 2 of 21

done by Williams dba Williams General.

9. Scott Williams is a resident of Salt Lake County, Utah and personal representative and/or trustee of the Estate of Hugh Williams ("Scott").

10. The Estate of Hugh Williams is the estate left upon the death of Hugh Williams and administered by Scott Williams (the "Estate").

11. Does 1-50 are liable to Plaintiffs but whose identifies and the details of their involvement are not presently known to the Plaintiffs. Plaintiffs will amend their Complaint as and when such information becomes available.

12. In approximately 2014, Steffensen was involved in a business whose address was near to the then business address of Williams – and the two became acquainted.

13. Williams informed Steffensen that Williams had spent a significant amount of time in African pursuing business ventures. Williams retained AAA and Steffensen to represent Williams in connection with an agreement from an individual who provided funds for Williams to return to Africa and to ostensibly start a gold buying and selling business.

14. Steffensen represented Williams and negotiated and drafted the agreements with this investment/ joint venture partner. Williams promised to pay AAA's and Steffensen's legal fees from the profits from the gold buying

9:23-ap-09001-BPH   Doc#: 35-4   Filed: 11/15/23   Page 3 of 21

and selling venture.

15. Williams then went to Africa and was gone for many months.

16. Williams was renting to own a property from James and Arlene Brannan located in Woods Cross, Utah (the "Brannan Woods Cross Property").

17. While Williams was gone, he obtained word that James Brannan was accessing Williams' rented portion of the Brannan Woods Cross Property and going through Williams' personal property found thereon – taking some, damaging others, etc.

18. Williams retained AAA and Steffensen to file a lawsuit in 2015 against James and Arlene Brannan, in the Second District Court, Civil No. 150700878 (the "Brannan Law Suit").

19. Williams represented to Steffensen and AAA that his businesses in Africa were very promising and that he could and would be able to pay AAA's and Steffensen's legal fees for handling the Brannan Law Suit.

20. The Brannan's counterclaimed for rent owed and tried to evict Williams. This was difficult to deal with because Williams was still in Africa and unable to handle things that needed to be done here.

21. The parties ultimately mediated and reached a settlement agreement.

22. Williams returned from Africa and informed Steffensen that Williams had

become acquainted with a young African girl who was homeless and that he was trying to adopt her and bring her to America.

23.     Williams had a business of buying various types of property at a deep discount and reselling it. The property in Woods Cross was full of such items. Williams told Steffensen that Williams would give Steffensen a UCC1 lien against all of that property and the like to secure the repayment of the attorneys fees and costs advanced owed by Williams to AAA and Steffensen. A UCC1 was then filed with the Utah Division of Corporations (he "AAA Lien").

24.     Williams told AAA and Steffensen that he could buy items in the United States and then ship them to Africa and sell them for a substantial profit. He represented and warranted that he could and would liquidate the items which he had and would pay Steffensen's and AAA's legal fees.

25.     Williams told Steffensen that Williams owned two government surplus trailers worth $17,000 each and asked Steffensen if Steffensen would be willing to buy them for $10,000 each. Williams said that Williams would then advertise them for sale and try to sell them for the full price of $17,000 and thereby help Steffensen make some money. Steffensen agreed and advanced $20,000 to Williams. However, Steffensen has subsequently

Page 5 of 21

learned that Williams never put title to any trailers in Steffensen's name and when Steffensen demanded the Williams sell them as he promised, Williams said that he tried but got no offers for more than $5,000 per trailer and those fell through. Clearly, Williams knew that the trailers were not in fact worth $17,000 each when he sold them to Steffensen.

26. When Steffensen inquired as to why the gold buying venture had not worked, Williams admitted that he had taken a substantial part of his partner's investment capital and used it to pay monies owed by Williams on some real estate and other obligations. This left the gold buying enterprise short of capital and it did not succeed. Williams admitted to Steffensen that when he told is investor that he would use the entire business capital for the gold buying business, Williams planned to in fact use part of those funds for the other purposes outlined above. Clearly, Williams committed fraud against that investor/ joint venture partner.

27. Williams assured Steffensen that he had multiple projects in Africa that would be successful.

28. Williams went back to Africa.

29. In order to stop the Brannan Lawsuit and ensure an orderly liquidation of Williams' assets, Williams retained Steffensen to file a bankruptcy petition.

30. Steffensen filed an initial bankruptcy petition for Williams. AAA and Steffensen emailed draft copies of the schedules and asked Williams to verify their accuracy. Williams did.

31. However, Williams was still in Africa when the time for his 341 hearing came. This forced Steffensen to file a motion to reschedule that hearing.

32. Williams indicated that he was still going to be unable to return to the United States.

33. So, Williams acquiesced in the dismissal of that first bankruptcy.

34. Because Williams owed AAA and Steffensen so much money for attorneys fees, AAA and Steffensen moved to withdraw as counsel in the Brannan Lawsuit – and were allowed to withdraw.

35. Later, Williams filed another bankruptcy pro se and prepared his own schedules. It appears to Steffensen that Williams used the schedules and forms which AAA had prepared previously for Williams.

36. Steffensen thereafter continued to communicate with Williams in an attempt to get payment for legal fees and other financial obligations.

37. During one or more of these conversations, Williams said that the monies that he diverted from the gold buying venture paid up (or off) certain very valuable real property in Africa that Williams said that he intended to sell

and repay his investor and AAA/ Steffensen. He represented that as soon as he sold that property, Williams would pay AAA's and Steffensen's fees and other obligations.

38. Steffensen continued to inquire about that status. Williams told Steffensen that Williams could not get the title in his name unless he paid certain funds. Williams said that if Steffensen advanced those funds, Williams would be able to get the real property fully titled in his name so that he could sell it, etc. Steffensen agreed to advance those funds with the promise from Williams that Williams would promptly market the property and pay AAA and Steffensen.

39. Williams then told Steffensen that the property was "perfect" for a hotel and that he was having plans drafted up. He said that with plans drafted, the property and plans together would sell for more money. Williams asked Steffensen to advance the monies to pay to complete the architectural plans and drawings for the hotel.

40. Williams also needed to return to the United States on two occasions for court matters and told Steffensen that Williams did not have the money to pay for his tickets back. Steffensen said that he could advance the funds but had to be repaid immediately because those were not "excess" funds, but

needed to pay current Steffensen obligations. Williams represented and warranted that he had property in Woods Cross that he could sell immediately upon his return to the U.S. and would pay Steffensen back immediately.

41. Williams did not sell the personal property in the United States and did not repay Steffensen.

42. Williams did not sell the African real property and pay AAA and Steffensen as promised – or if he did sell it, he hid that fact from Steffensen and spent the proceeds elsewhere – like he did with the gold buying business investor's funds.

43. Williams' father, Hugh Williams, recently passed away leaving an estate of which Williams is an heir.

44. Williams returned from another long stay in Africa to participate in the disposition of Hugh Williams' Estate.

45. Steffensen is informed that Williams stands to inherit several hundred thousand dollars. Williams indicated that he intended to take the money and return immediately to Africa. Williams, as always, told Steffensen that Williams had several great projects and would be able to pay Steffensen "$30,000 this summer."

46. Steffensen said he wanted not less than $100,000 (the total due is not less than $200,000). Williams refused to commit.

47. Steffensen asked Williams about the AAA Lien against the personalty in Woods Cross. Williams said that the lien was invalid because all of the property was owned by Williams General and not Williams personally. Clearly, Williams defrauded Steffensen via the representations and warranties relating to the AAA Lien.

48. Until Thursday, July 11, 2019, Williams had not answered any phone calls or emails from Steffensen during the past two months and his present whereabouts are unknown.

49. When this lawsuit was filed, Plaintiffs alleged that if Williams obtained his inheritance, Williams will do as he promised and immediately travel to Africa and fritter it away and AAA and Steffensen will be unable to collect.

50. Williams is a serial con artist – a very sympathetic appearing and convincing one – but a con artist nevertheless.

51. AAA and Steffensen have suffered actual damages as a result of the actions of Williams, CUT USA and Williams General, of not less than $200,000.00 for attorneys fees and costs advanced unpaid, and monies advanced and unpaid, all of which bears interest at 10% per annum from the date due until

paid in full.

52. Every representation/ promise made by Williams to AAA and to Steffensen were not then presently true and Williams knew that they were not true:

    a.    Williams knew that the Gold Buying business would not work because he intended to divert money away from it – so his representation to AAA and Steffensen that they would be paid for legal fees, costs advanced, etc., from that business were knowingly false. Williams knew that the business would fail – but went to Africa, upon information and belief, not to actually do that Gold Buying business, but to pay monies toward the real property referenced above.

    b.    When Williams represented to and promised AAA and Steffensen that they would have a UUC1 lien on all of the personal property in Woods Cross, Williams knew that he did not own that property such that the promised lien was a fraud.

    c.    Or, when AAA and Steffensen threatened to foreclose upon the AAA Lien, Williams falsely represented that the property was owned by Williams General in an attempt to thwart AAA's and Steffensen's collection efforts.

d.  When Williams made the representations about the monies needed to record title to the African property, and then regarding the architectural drawings, and that he would promptly sell that property and pay AAA and Steffensen were knowingly false because Williams had not present intention to do so.

e.  When Williams represented that he could and would be able to repay the monies advanced by Steffensen for airline tickets back to the United States, Williams knew that he could not in fact do so.

f.  All of Williams' representations about the purported sale to Steffensen of the two trailers were knowingly false.

53.  Williams therefore has defrauded AAA and Steffensen via knowing and/or at the very least negligent misrepresentations.

54.  AAA and Steffensen are entitled to a judgment against Williams, CUT and Williams General for the amount of monies owed for legal fees, costs advanced and other monies advanced, in amounts to be determined at trial, but not less than $200,000.00, plus interest thereon at 10% per annum, plus costs of suit, attorneys fees, and exemplary damages in an amount to be determined at trial but not less than three times actual damages.

55.  AAA is entitled to an order declaring that its AAA Lien is valid and

enforceable against the property named therein.

56.  AAA and Steffensen are entitled to an order declaring that they have an
     equitable lien against any and all real property owned by Williams, directly
     or indirectly, in Africa to secure the repayment of the funds owed.

57.  AAA and Steffensen are entitled to prejudgment writs of attachment and/or
     garnishment with respect to (a) Williams' anticipated inheritance from the
     Estate of Hugh Williams (Scott Williams trustee/ personal representative),
     (b) all personal property covered by the AAA Lien and ( c) the trailers
     which were supposedly sold to Steffensen as alleged above.

58.  Approximately two months ago, Steffensen met with Scott Williams at the
     old "Hugh's RV" business site. Scott informed Steffensen that the Estate
     was in the process of trying to sell that property (the old "Hugh's RV"
     business site) and negotiating a settlement with Hugh Williams' spouse.

59.  Steffensen told Scott that Williams owed AAA/ Steffensen a lot of money
     and that Steffensen was trying to get a settlement agreement with Williams.

60.  Steffensen asked when the sale of the property was scheduled. Scott told
     Steffensen it was scheduled for June 19, 2019.

61.  Steffensen asked Scott not to distribute Williams' share until Steffensen
     could either get a settlement agreement with Williams or a court order

Page 13 of 21

freezing the funds.  Scott said he would do so.

62.    On or about June 18, 2019, Steffensen talked to Scott and asked if the sale
       of the property was on. Scott said that he thought so.  Steffensen said he was
       emailing Williams trying to get a settlement agreement worked out, but
       Williams was ignoring Steffensen.

63.    Steffensen again asked Scott not to distribute Williams' share of the
       inheritance until Steffensen had a settlement agreement with Williams or a
       court order freezing Williams' share.  Scott again agreed and represented to
       Steffensen that he would do so.

64.    The next week, Steffensen again talked to Scott and was informed that the
       property had sold but that Scott was still working out how and when
       disbursements would be made.  Steffensen again asked Scott not to
       distribute Williams' share of the inheritance until Steffensen had a
       settlement agreement with Williams or a court order freezing Williams'
       share.  Scott again agreed and represented to Steffensen that he would do so.

65.    During the prior 30 days, Steffensen had explained to Scott that Steffensen had a very
       unique opportunity to invest in a crypto currency offering at a substantially discounted
       price that would result in an almost immediate 10x gain, which would then go up an
       additional 5x – for a total projected gain of 50x.

66.    Steffensen told Scott that Steffensen was going to use the settlement proceeds from

Williams to make this investment. Scott knew, therefore, that Steffensen would be damaged by being unable to make this investment if Scott failed to fulfil his promise and obligation not to distribute Williams' share of the Estate until either a settlement had been reached or Steffensen had obtained a court order freezing the funds.

67.     Steffensen offered to both Williams and Scott the opportunity to also invest in this crypto currency at the same advantageous rate. By doing so, Williams was projected to earn a multiple of the entire amount he expected to get from the Estate. It was projected to be more than a "win-win" for all concerned.

68.     In these conversations with Scott, Steffensen said that he did not want to file suit against Williams if he didn't have to and was delaying in an effort to get a consensual settlement agreement. Scott offered to talk to Williams and to encourage him to settle. Steffensen delayed filing suit and seeking a prejudgment writ in reliance upon Scott's representations and agreements referred to above.

69.     On Thursday, July 27, 2019, Steffensen talked to Scott and said that Williams had still not returned any of Steffensen's calls, emails or texts. Scott said that the disbursements had not been made yet. Steffensen told Scott that Steffensen would file suit and get an order freezing Williams' distribution and asked Scott not to distribute to Williams until the order could be obtained. Scott again agreed and said he would not.

70.     On the next day, Friday, June 28, 2019, Steffensen filed this lawsuit and a motion for prejudgment writ of garnishment.

71.     Steffensen emailed copies of the lawsuit, motion for prejudgment writ of garnishment and order granting motion for prejudgment writ of garnishment to Scott and asked Scott to

Page 15 of 21

call Steffensen.

72.  Steffensen finally reached Scott late Monday, July 1, 2019.  Scott told Steffensen that
     Scott had already made the distribution to Williams.  Steffensen was stunned and furious.
     Scott said that he made the distribution despite his promises and representations to
     Steffensen because he supposedly didn't know that Williams owed AAA/ Steffensen
     "that much money," and because Williams told Scott that Williams would "take care of"
     AAA/ Steffensen.

73.  Upon information and belief, Scott had told Williams that Steffensen was going to file a
     lawsuit and get an order freezing Williams' inheritance if Williams did not settle.
     Williams asked Scott to deliberately mislead Steffensen so that Steffensen would not file
     the lawsuit and stop the disbursement of the inheritance. Scott agreed to help Williams by
     making Steffensen believe that the distribution had not taken place and would not until
     Steffensen filed this lawsuit and obtained the prejudgment writ of garnishment.  Scott did
     not disclose this to Steffensen but rather knowingly and intentionally lied to Steffensen in
     order to help Williams escape to Africa with his inheritance.

74.  Steffensen then moved for an obtained a TRO barring Williams from spending the Estate
     money.

75.  Steffensen asked Scott to stop payment on the cashier's check given to Williams.  If the
     check had not yet been cashed, then technically the money was still under the Estate's
     control and the Estate was required by the Prejudgment Writ of Garnishment to stop
     payment.

76.  Scott then told Steffensen that the bank told Scott that Williams had immediately cashed

the cashier's check and gotten back several cashier's checks in exchange.

77. Steffensen then emailed Scott and asked for the name of the bank. Scott never responded.

78. Upon information and belief, Scott and the Estate still had possession of and/or control over the funds which constituted Williams' share of the inheritance. Scott and the Estate should have frozen those funds pursuant to the issued prejudgment writ of garnishment. They failed to do so, however. As a result, they are liable to plaintiffs for not complying with the prejudgment writ of garnishment.

79. On Thursday night, July 10, 2019, Williams sent Steffensen a text stating that the IRS was going to take all the money and that he could not give AAA/Steffensen any money.

80. On Friday, July 11, 2019, Williams texted that he could pay $16,000 but no more because of the IRS. Steffensen texted back that it would need to be $30,000.

81. Williams texted that he "didn't have it."

82. Steffensen texted back "how close can you get to $30,000?"

83. Williams texted back $23,000.

84. Steffensen responded that if Williams could do $25,000, AAA/Steffensen would take it.

85. Williams reiterated that the IRS was after him very aggressively and that he couldn't do it.

86. Williams then texted – during the hearing on the TRO – that he had a check at his attorney's office for "23,668.00."

87. Steffensen went to Theodore Kanell's office and learned that a cashier's check made payable to Steffensen for $25,000 was there and had been delivered to Kanell on July 8,

2019.

88. AAA/Steffensen agreed to settle for this $25,000 – less $500 to be paid to Kanell.

89. After the agreement was signed, Kanell told Steffensen that Williams was in Africa and had been "for some time."

90. Kanell told Steffensen that "some one else" – other than Williams – had delivered the $25,000 check to Kanell's office.

91. Kanell told Steffensen that he was not actually Williams' attorney, but rather was Scott Williams' and the Estate's attorney.

92. From the foregoing, it is clear that:

   a. Williams' representations about inability to pay AAA/ Steffensen were almost certainly false and fraudulent;

   b. Williams' representation that he only had $23,668.00 to pay Steffensen was knowingly false because the actual check to Steffensen had already been made for $25,000.

   c. Scott Williams was almost certainly the "other person" who delivered the $25,000 check to the Estate's attorney, Kanell, for Steffensen.

   d. Scott is also almost certainly in control of all or a significant portion of the rest of Williams' inheritance from the Estate.

93. Scott is liable personally, and as trustee/ personal representative of the Estate, to AAA and Steffensen for the damages suffered by AAA and Steffensen as a result of Scott's multiple fraudulent and negligent representations that Scott would not distribute Williams' share of the Estate until a settlement with Williams or a court order freezing

9:23-ap-09001-BPH   Doc#: 35-4   Filed: 11/15/23   Page 18 of 21

Williams' inheritance had been obtained; and as a result of Scott and the Estate not complying with the prejudgment writ of garnishment.

94.     Plaintiffs reasonably relied upon these representations and promises in delaying to file their lawsuit – thinking that an amicable settlement could be reached – which would be preferable.

95.     Scott's misrepresentations caused plaintiffs to in fact delay filing this lawsuit and obtaining the prejudgment writ of garnishment until after Scott disbursed Williams' share of the Estate.

96.     Scott, therefore, aided and abetted Williams in Williams' ongoing attempts to defraud plaintiffs with impunity.

97.     Because of Scott's fraudulent and/or negligent misrepresentations and conspiracy with Williams to deprive plaintiffs of any realistic ability to collect the monies owed to them, and the failure of Scott and the Estate to comply with the prejudgment writ of garnishment, plaintiffs have been damaged as follows:

   a.     The loss of recovery of the entire amount due – $250,000 – less the $24,500 actually received – or $225,500;

   b.     The loss of the investment return on these funds – not less than 10x $225,500, or $2,255,000 – which investment Scott and the Estate knew that the plaintiffs intended to make with the funds recovered from Williams.

98.     Plaintiffs are entitled to judgment against Scott and the Estate for their damages as proven at trial, but not less than $2,255,000, plus costs of suit and attorneys' fees.

Now, therefore, Plaintiffs pray for relief as follows:

Page 19 of 21

1.  For judgment against the Williams, Cut USA and Williams General, Inc., jointly and severally, for the amount of monies owed for legal fees, costs advanced and other monies advanced, in amounts to be determined at trial, but not less than $200,000.00, plus interest thereon at 10% per annum, plus costs of suit, attorneys fees, and exemplary damages in an amount to be determined at trial but not less than three times actual damages – but which relief has been waived via the settlement agreement (unless it turns out that said agreement was obtained by knowing and actual fraud in the inducement).

2.  AAA is entitled to an order declaring that its AAA Lien is valid and enforceable against the property named therein – again waived unless revived hereafter due to fraud in the inducement.

3.  AAA and Steffensen are entitled to an order declaring that they have an equitable lien against any and all real property owned by Williams, directly or indirectly, in Africa to secure the repayment of the funds owed – again waived unless revived hereafter due to fraud in the inducement.

4.  AAA and Steffensen are entitled to prejudgment writs of attachment and/or garnishment with respect to:

    (a)   Williams' anticipated inheritance from the Estate of Hugh Williams (Scott Williams trustee/ personal representative),

    (b)   All personal property covered by the AAA Lien and

    ( c)   The trailers which were supposedly sold to Steffensen as alleged above.;

Page 20 of 21

again, waived unless hereafter revived due to fraud in the inducement.

5.      For judgment against Scott Williams and the Estate of Hugh Williams, jointly and severally, for the damages suffered by plaintiffs as a result of the fraudulent and/or negligent misrepresentations made to plaintiffs, and as a result of their failure to comply with the prejudgment writ of garnishment and the TRO, in an amount to be determined at trial, but not less than $2,255,00.00; plus costs of suit and attorneys' fees.

6.      For such other relief as the Court deems just and appropriate under the circumstances.

Dated this 17th day of July, 2019.

*/s/ Brian W. Steffensen*