*In Re: Scott K. Williams, Debtor*

---

*October 12, 2023*

---

*Charles Fisher Court Reporting*

*442 East Mendenhall*

*Bozeman, MT  59715*

*(406) 587-9016*

*maindesk@fishercourtreporting.com*

Min-U-Script® with Word Index

EXHIBIT

130

**Page 1**

```
            UNITED STATES BANKRUPTCY COURT
            FOR THE DISTRICT OF MONTANA
_____
IN RE:

SCOTT K. WILLIAMS,          Case No. 9:22-bk-90147-BPH

          Debtor.
_____

            OFFICE OF THE U.S. TRUSTEE
            U.S. DEPT OF JUSTICE
            550 WEST FORT STREET
                ROOM 698
            BOISE, ID 83724


            TRANSCRIPT PROCEEDINGS

            341 CREDITOR MEETING

            HELD VIA ZOOM


            November 10, 2022
```

```
            HELD BEFORE:

            Richard J. Samson
            Bankruptcy Trustee
            310 W. Spruce Street
            Missoula, MT 59802
            Phone:  (406) 721-7772
```

**Page 3**

```
                    INDEX


                  TESTIMONY

WITNESS:                                          PAGE:

SCOTT L. WILLIAMS:
  Examination by Trustee Samson . . . . . . . . . . .   8
  Examination by Mr. Patten . . . . . . . . . . . .   25
  Examination by Mr. Duffy Williams . . . . . . . .   44
  Further Examination by Mr. Patten . . . . . . . .   63
  Further Examination by Mr. Duffy Williams . . . . .   63
  Examination by Mr. Kent Williams. . . . . . . . .   65
  Examination by Ms. Karen Priest . . . . . . . .   81
  Examination by Ms. Mary Ella Carter . . . . . . . .   84
```

Examination by Trustee Samson — 8
Examination by Mr. Patten — 25
Examination by Mr. Duffy Williams — 44
Further Examination by Mr. Patten — 63
Further Examination by Mr. Duffy Williams — 63
Examination by Mr. Kent Williams — 65
Examination by Ms. Karen Priest — 81
Examination by Ms. Mary Ella Carter — 84

**Page 2**

```
            APPEARANCE OF COUNSEL:


ATTORNEY APPEARING ON BEHALF OF DEBTOR:

Matthew F. Shimanek
Shimanek Law, PLLC
317 East Spruce Street
Missoula, MT 59802
Phone:  (406) 544-8049
Email:  matt@shimaneklaw.com

ATTORNEY APPEARING ON BEHALF OF THE DEBTOR'S SIBLINGS, KENT
WILLIAMS, DUFFY WILLIAMS, BRENDA HARBORS, KAREN PRIEST, and
MARY ELLA CARTER:

Eli J. Patten
Crowley Fleck, PLLP
490 North 31st Street
Billings, MT 59101
Phone:  (406) 252-3441
Email:  epatten@crowleyfleck.com

Siblings present:

Kent Williams
Duffy Williams
Brenda Harbors
Karen Priest
Mary Ella Carter
```

**Page 4**

(Audio began.)

**MR. PATTEN:** Sorry, sir. We have one sister that's not on here. Mary. Is Mary Williams on her? She should be on here.

**TRUSTEE SAMSON:** Hold on just for a second, okay? I might have missed her. Let me see if this is her.

**UNIDENTIFIED FEMALE:** Yes, that's her.

**TRUSTEE SAMSON:** Is that her? See if I can --

**UNIDENTIFIED FEMALE:** Yes.

**TRUSTEE SAMSON:** Let me see if I can get her in. I'll do this. Let me put her in the waiting room, and then see if I can get her in. Huh, now I'm not seeing her at all. Here she is.

Okay. I think this is the right one. Mary, can you hear me okay?

Does that appear to be Mary?

**UNIDENTIFIED FEMALE:** Yes, that is Mary.

**TRUSTEE SAMSON:** Okay. Mary, can you hear us? (Sounds) Gotta love this technology. Let me see if I can figure out what we got going on with Mary. There. Maybe, that's her. Mary, can you hear us? Huh. Let's try this, again.

**UNIDENTIFIED FEMALE 2:** Maybe -- maybe, if someone

1 can text her to -- maybe, her mute's on or her volume is
2 off.
3     **UNIDENTIFIED FEMALE:** Or, maybe, she could wave if
4 she can hear.  But we can't hear her answer.
5     **TRUSTEE SAMSON:** Yeah.  Let me try to admit her one
6 more time.  There she is.  I don't know why -- I can see her
7 talking.
8     Mary, can you hear us?
9     Huh.  Let me try this.  I'm not showing that she's
10 -- I -- huh.  Huh.  Mary, can you hear me now?
11     **UNIDENTIFIED FEMALE:** She just said she cannot
12 hear, so...
13     **TRUSTEE SAMSON:** Okay.  Yeah, I'm not seeing that
14 -- I'm not seeing the little microphone symbol, so I don't
15 know what's going on.
16     **MR. SCOTT WILLIAMS:** What -- I noticed, when you
17 sign in, it asks for audio, or not.  Maybe, she needs to
18 un-sign in, and re-sign in and ask for audio.  There's a
19 button for audio.
20     **MR. DUFFY WILLIAMS:** And if you're speaking, you
21 have to unmute it, and then mute it again.
22     **TRUSTEE SAMSON:** Yeah.
23     **MR. SCOTT WILLIAMS:** I like the beard, Duffy.
24     **TRUSTEE SAMSON:** Well, there she is.
25     **MR. KENT WILLIAMS:** I can see that it's unmuted.

1 And it says -- I can just mute it -- watch this.  Watch this.
2 And it says, where's your --
3     **TRUSTEE SAMSON:** We can hear ya.
4     **MR. PATTEN:** Yeah, we can hear you.
5     **TRUSTEE SAMSON:** We can hear you, Kent.
6     **MR. KENT WILLIAMS:** Well, mine's muted.  And, then,
7 when I hit mute, it -- you can't hear me.
8     **TRUSTEE SAMSON:** (Laughing)  Just leave it the way
9 it is so we can hear you, okay?
10     **MR. KENT WILLIAMS:** All right.  Well, I called Mary
11 and she didn't answer, but I did get her, and, at that time,
12 she could hear.  But, now, I don't know what's happening.
13     **TRUSTEE SAMSON:** Yeah, I don't know, either.  Yeah,
14 she, obviously, can't hear us, so...
15     **MR. PATTEN:** It looks like it's going in and out,
16 too.
17     **TRUSTEE SAMSON:** Yeah.  And I talked with her at
18 the end, when we first gathered at 9:30 I talked with her for
19 a second as we -- as everybody was leaving, and I could hear
20 her fine.
21     **MR. PATTEN:** She (audio cut out) her phone.  I
22 think we need to go without her.
23     **TRUSTEE SAMSON:** Yeah.  I -- I --
24     **MR. PATTEN:** (Inaudible)  We don't have -- we don't
25 have enough time.

1     **TRUSTEE SAMSON:** Yeah.  Okay.
2     Well, I'm going to go ahead and start, then.  Okay?
3 In fact, I've had my tape recorder running.
4     So, just for the record, this is the creditor
5 meeting scheduled in Bankruptcy Case Number 22-90147.  This
6 is Scott K. Williams.
7     I want the record to reflect that Mr. Williams is
8 appearing today via Zoom video, and he is accompanied by his
9 attorney, Matt Shimanek.  Okay?
10     Mr. Williams, could I start by having you state
11 your name for the record?
12     **THE DEBTOR:** Scott J. Williams.
13     **TRUSTEE SAMSON:** Thank you.
14     Mr. Williams, can you raise your right hand for me,
15 please?
16     **THE DEBTOR:** Yes.
17
18 (The debtor was duly sworn.)
19
20     **THE DEBTOR:** I do.
21     **TRUSTEE SAMSON:** Thank you very much.
22     Just a couple of preliminary questions.  And -- and
23 for those who have gathered today, there's -- there's a lot
24 of questions that I have to ask as part of this meeting that
25 are what I call "required questions."  So, I just ask you to

1 bear with me as I go through and -- and get through that
2 information.
3
4                 **EXAMINATION**
5 BY TRUSTEE SAMSON:
6 Q. Mr. Williams, when your case was filed, you showed a
7   mailing address on Spotted Fawn Lane in Bigfork, Montana.  Is
8   that still an accurate mailing address for you?
9 A. That's -- that's correct.  It's 11423 Spotted --
10 Q. Yeah.
11 A. -- Fawn Lane.
12 Q. Okay.  Thank you.
13     **TRUSTEE SAMSON:** And, for the record, in terms of
14 verification of identity, prior to the creditor meeting today
15 Mr. Shimanek had provided me with a copy of Mr. Williams'
16 Social Security card, and, also, his Montana driver's
17 license.
18     I can attest to the fact, based on the information that
19 I've reviewed prior to the case, that the Social Security
20 number provided to me does, in fact, match with the Social
21 Security number that was provided to the Bankruptcy Court.
22     And now that I've got Mr. Williams on the screen, I can
23 also verify that the picture on his Montana driver's license
24 does, in fact, match with Mr. Williams, who is appearing on
25 the screen.

1  BY TRUSTEE SAMSON:
2  Q. Thank you, Mr. Williams.
3  A. Yes.
4  Q. Mr. Williams, in all of these cases, it's always my
5     assumption that when you decided that you needed to file a
6     bankruptcy and you retained Mr. Shimanek for that purpose,
7     that Mr. Shimanek provided you with a list of documents and
8     information that he would need so he could accurately prepare
9     your bankruptcy petition and schedules.
10        Is that a fair assumption on my part?
11  A. Yes, and that he did.
12  Q. Okay.  And after Mr. Shimanek had completed the
13     preparation of the schedules and the Statement of Financial
14     Affairs for filing with the Bankruptcy Court, did you have an
15     opportunity to personally review that information for
16     accuracy?
17  A. Yes.
18  Q. Okay.  And you signed off on all of that information filed
19     with the Court as being true and accurate, correct?
20  A. Yes, I did.
21  Q. Okay.  Your case was filed right at the end of September,
22     on September 30th, 2022, so we're about, let's just say, six
23     weeks since your case was filed.  In that intervening time
24     period, from the date that your case was filed through the
25     creditor meeting today on November 10th, have you become

1     aware of any potential changes or corrections to any of the
2     information that you filed with the Court that you'd need to
3     advise me of today?
4  A. No, I don't believe so.
5  Q. Okay.  So, at this point in time, you believe your
6     bankruptcy paperwork, the schedules, Statement of Financial
7     Affairs, and other related documents, remain true and
8     accurate?
9  A. Yes.
10  Q. Okay.  At the time that you filed your bankruptcy case,
11     did you list and disclose all of your assets?
12  A. Yes.
13  Q. And to the best of your knowledge, did you also list and
14     include all of your creditors?
15  A. Yes.
16  Q. Okay.  Mr. Shimanek provided to me copies of your 2021
17     Federal and State Tax Returns that were filed with, either, I
18     believe, the State of Montana or the Internal Revenue
19     Service.
20  A. Yes.
21  Q. Are those true and accurate copies of -- of returns that
22     were filed with those entities?
23  A. Yes.
24  Q. Okay.  Have you previously filed for bankruptcy, either
25     here in Montana or in any other jurisdiction?

1  A. Yeah, in Utah a long time ago.
2  Q. Try to ballpark it for me.
3  A. Uhm, I'm thinking it was 2019 -- no, 19 -- 1999.  So, it
4     was about the time I got divorced.
5  Q. Do you recall, Mr. Williams, if that was a Chapter 7 case,
6     a Chapter 13?
7  A. Yeah.  7, yes.
8  Q. Say that, again?
9  A. 7.
10  Q. A Chapter 7?
11  A. I believe a 7, yes.
12  Q. Okay.  Do you recall if you got a discharge?
13  A. Yes, I did.
14  Q. Okay.  How long have you resided in the state of Montana?
15     For, uhm -- since December of 2019, I believe.
16  Q. Okay.  All right.
17        I'm going to start going through some of the information
18     in the schedules that were filed with the Court, Mr.
19     Williams.  I don't know if you have a copy of your schedules
20     available, or if you're looking at them?
21  A. I don't have it in front of me, but I, hopefully, can
22     remember it, or --
23  Q. Okay.  Okay.  That's fair.
24        The first question that I have is, your schedules
25     reflect that you currently don't have an ownership interest

1     in any real property.
2        Is that accurate?
3  A. Yes, it is.
4  Q. Have you had an ownership interest in any real property at
5     any time in the last four years?
6  A. No, sir.
7  Q. Does your spouse have an interest in real property?
8  A. Yes, sir.
9  Q. Can you briefly describe what her interests are?  For
10     example, the residence that you're residing in today, is that
11     owned by your spouse?
12  A. Yes, it is.
13  Q. Okay.  And, then, I noticed in a -- I was looking through
14     some of the tax returns and information that you've provided
15     to me, I was looking at your 2020 Federal Tax Return, and it
16     looked -- it looked like there was a mortgage, or something.
17        Is that the -- is that based on the residence that
18     you're currently in, or was it a previous residence that you
19     owned in Utah?
20  A. No, we never owned property in Utah.  It was just the --
21     she just owns this residence that's on Spotted Fawn.
22  Q. Okay.  Alrighty.  Thank you.
23        Your schedules reflect that you have an ownership
24     interest in a Ford F-250 Lariat, a 2008 F-250.
25  A. It's -- it's -- it is an F-350.  If -- if we look at the

9:23-ap-09001-BPH  Doc#: 13-48  Filed: 10/11/23  Page 4 of 36

1  title, and everything, it's an F-350.
2  Q. Yeah. And I had seen something when I was reviewing your
3    information that led me to believe it might have been a 350,
4    not a --
5  A. Yeah.
6  Q. -- 250. Okay.
7  A. Yeah, it is.
8  Q. Okay.
9  A. (Inaudible)
10  Q. How long have you owned that vehicle?
11  A. Since 2 -- I believe, about 2008 or '9.
12    No, no, no. It's a 2008 model, so it's about
13    2000-probably-'13, or -'14, I believe.
14  Q. Okay.
15  A. (Inaudible)
16  Q. Okay. Is that the only vehicle that you have an ownership
17    interest in?
18  A. Yes, uh-huh.
19  Q. I saw in some schedules, again looking through tax
20    returns, and, again, this, I believe, is taken from the 2020
21    return, --
22  A. Okay.
23  Q. -- there were some vehicles listed for estate and personal
24    property tax reasons. There was a 2014 Cadillac SRX.
25      Does that ring a bell?

1  A. Yeah. That's my wife, Candy's. Uh-huh.
2  Q. Only -- only titled in her name?
3  A. Yes.
4  Q. Uh, a 2015 Subaru Outback?
5  A. The same thing. That's hers, and it's titled in her name.
6  Q. And, then, there's a 2018 Rockwood, which I have no idea
7    what a "Rockwood" is.
8  A. A -- it's a camper trailer, and that's also hers.
9  Q. Okay. And you've never had an ownership interest in
10    those?
11  A. No.
12  Q. Did you make any financial contributions at the time that
13    she acquired those vehicles?
14  A. No.
15  Q. Okay. The Pace -- a 1989 American Pace. Is that another
16    utility trailer?
17  A. Yes. It's a utility trailer. Uh-huh. Like, I -- that's
18    in my name.
19  Q. Okay.
20  A. I believe in my name.
21  Q. How long have you owned that, Scott?
22  A. I believe, since about 2008 or '9, also.
23  Q. Okay. Excuse me for two seconds while I -- in your
24    schedules that were filed, you indicate that you only have an
25    interest in one bank account, and it's with U.S. Bank?

1  A. Yes. Uh-huh.
2  Q. Now, is that an account that's in your name, solely, or is
3    your wife on that?
4  A. My wife's name is on it, but, uhm, she hasn't used it.
5    And I don't know that she's ever used it. Maybe, but, uhm,
6    not for, at least, 10 years has she put money in, or taken
7    money out, or used it.
8  Q. Okay. And, at this point, your primary source of income
9    is Social Security, correct?
10  A. That's correct.
11  Q. So, the Social Security funds, do they go into the U.S.
12    Bank account?
13  A. Yes. Uh-huh.
14  Q. Okay. Are there any other bank accounts over which you
15    have signatory authority that aren't listed or disclosed?
16  A. Uhm, no. There -- there was the trust bank account, but
17    that's disclosed.
18  Q. Okay. Does your wife have bank accounts separate and
19    apart from yourself?
20  A. Yes. Uh-huh.
21  Q. Okay. Uhm, I was going to ask some questions on the
22    trust. I think what I'm going to do is get through some of
23    my other questions, then I'll circle back around.
24      Uhm, --
25  A. Okay.

1  Q. -- you understand the requirement, uh, that you provide me
2    with copies of tax returns in the year that you file your
3    case. So, tax returns for 2022.
4  A. Oh, okay.
5  Q. I'll need to see copies of those.
6  A. Yes.
7  Q. And I -- based on what I've seen, it looks like you file
8    joint returns with your spouse; is that correct?
9  A. Correct.
10  Q. Okay.
11  A. Yes. Uh-huh.
12  Q. Okay. You indicate in your schedules that you don't have
13    any secured debt, meaning that you don't owe anybody on a
14    home, anything like that; car.
15  A. Correct.
16  Q. Is that a fair statement?
17  A. Correct, yes.
18  Q. Who holds the lien on the residence that your wife owns?
19  A. The -- the name of the mortgage company for the --
20  Q. Yes.
21  A. Uhm, it's -- it was provided. It's U- -- I believe, it's
22    United Mortgage.
23  Q. Okay.
24      TRUSTEE SAMSON: Matt, where was that provided at?
25    Matt, you're muted.

1     **MR. SHIMANEK:** Sorry. Uhm, it -- it might have
2 been provided with the initial documents. But -- but the
3 debtor's name is not on the mortgage, nor on the property.
4     **TRUSTEE SAMSON:** No, I understand that. I was just
5 asking who -- who held the mortgage on the property.
6     **MR. SHIMANEK:** Yeah. I'm looking through the file
7 right now to see if I can find that.
8     **TRUSTEE SAMSON:** Okay.
9     **MR. SHIMANEK:** That is -- United Wholesale
10 Mortgage, is what I recall.
11     **TRUSTEE SAMSON:** Okay. Alrighty.
12     **MR. SHIMANEK:** Okay.
13     **TRUSTEE SAMSON:** I'm gathering some thoughts. Hold
14 on for a second, okay?
15 **BY TRUSTEE SAMSON:**
16 **Q. Scott, how long have you been receiving Social Security**
17 **payments?**
18 A. Uhm, this full year, and, I believe, about half of last
19 year.
20 **Q. Last year? Okay.**
21 A. Yeah.
22 **Q. Were you working last year up until the time that you**
23 **retired or started collecting --**
24 A. No.
25 **Q. -- Social Security?**

1 A. No.
2 **Q. Okay.**
3 A. I was not working, no.
4 **Q. When you worked, were you, uhm -- were you a W-2 employee,**
5 **or were you working for yourself?**
6 A. Uhm, when -- in -- what -- what -- when are we talking
7 about? My whole life I've been -- I've been both. I've
8 been --
9 **Q. What was --**
10 A. I'm -- I'm not --
11 **Q. What was --**
12 A. (Inaudible) The last time I worked, I've worked -- worked
13 my whole life. So...
14 **Q. Okay. Yeah.**
15     **So, let me come back. That was kind of a nebulous**
16 **question.**
17 A. Yeah.
18 **Q. When was the last time that you had W-2 income?**
19 A. In, uhm, 19- -- no. No. Let's see. In 20- -- 2007, I
20 believe.
21 **Q. Okay. And, then, since then, you primarily were**
22 **self-employed? Is that a fair statement?**
23 A. I -- I -- yeah, I've just worked for my dad since then.
24 That's -- I work for the Hugh's RV.
25 **Q. Okay. I'm looking at the Statement of Financial Affairs**

1 and I do have a question. It's in response to Question
2 Number 6. And I understand, Scott, that you don't have those
3 schedules in front of you, but the question has to do with
4 whom you have paid -- who -- who you've paid money to during
5 the 90 days before you filed for bankruptcy, "Did you pay any
6 creditor a total of $600, or more?"
7     And the response was that I think it's a law firm. I
8 think it's a law firm. It might be --
9 A. Yes, it is.
10 **Q. -- somebody else in, uh, Salt Lake. And you paid them**
11 **$9,153.33?**
12 A. That's correct, yes.
13 **Q. And when was that money paid to them?**
14 A. Uhm, end of August. It was the August bill.
15 **Q. Okay. Uhm, where did you come up with the money to pay**
16 **them?**
17 A. I paid it with credit cards. That's all I had.
18 **Q. Okay. At that point in time, did you have an**
19 **understanding that you might be filing for bankruptcy?**
20 A. No. What happened is we -- we exhausted the trust funds,
21 which I used for the arbitration. And then I got that bill,
22 and I partially paid it with trust funds. And there was the
23 $9,000 left, so I paid that with my credit card.
24     Then they asked me for another $60,000 in -- to do the
25 arbitration, and that's when I figured out I couldn't -- I

1 couldn't go on.
2 **Q. Okay.**
3 A. I didn't have the money to do that.
4 **Q. Okay. Uhm, I'm just going to, kind of -- kind of come**
5 **back around. So, you were the trustee -- you were the**
6 **trustee of your father's trust, the Hugh Williams Trust?**
7 A. Correct, yes.
8 **Q. When did your father pass away?**
9 A. In January of 2019.
10 **Q. Okay. And, then, how -- how soon after your -- your dad**
11 **passed away did you step into the role as the trustee of the**
12 **trust?**
13 A. Uhm, the day that I became trustee, I guess, would be
14 within 30 days.
15 **Q. Okay.**
16 A. I -- I'm not sure exactly how that worked. But I was
17 personal representative to the courts, --
18 **Q. Yeah.**
19 A. -- and the trustee was appointed after his death.
20 **Q. Yeah.**
21 A. But it was, probably, within 30 days, or so.
22 **Q. Okay.**
23     **TRUSTEE SAMSON:** And I want to apologize in advance
24 to everybody that's here. Uhm, you probably know this ten
25 times better than I do. I'm playing catch-up here. So, if

9:23-ap-09001-BPH Doc#: 35-48 Filed: 04/17/23 Page 6 of 36

1 some of the questions that I ask seem redundant, or very
2 obvious, I apologize, but I'm just going to -- I'm going to
3 go ahead and ask some of these questions and put them on the
4 record. Okay?
5     **MR. SCOTT WILLIAMS:** You know -- you know, uhm, let
6 me revise that. Because the trust -- I -- I would assume
7 that it became the trustee the day my dad died.
8 **BY TRUSTEE SAMSON:**
9 **Q. Yeah, probably.**
10 A. That would --
11 **Q. Yeah.**
12 A. Yes.
13 **Q. Yeah.**
14 A. Personal representative, and then went to the --
15 **Q. I'm just -- I'm just trying to get an --**
16 A. Yeah.
17 **Q. -- aerial view.**
18 A. Yeah.
19 **Q. So -- and I -- it's my understanding, and I've -- I've**
20 **looked briefly, I had requested some of the documents from**
21 **Mr. Shimanek. Mr. Shimanek had reached out to me shortly**
22 **after you filed and explained to me some of the circumstances**
23 **of what was going on. So, I -- I have a general idea, but I**
24 **don't have specifics.**
25 A. (Inaudible)

1 **Q. Scott, if you know, when your father passed away and you**
2 **became the trustee of the trust, how much money or property**
3 **was held in the trust?**
4 A. When he passed away, it was valued -- the property was
5 valued at about 3.2 million. He had a home; but the day he
6 died, that became his wi-- -- wife's, who was in the middle of
7 a divorce, and, uhm, some miscellaneous vehicles.
8     So, the value the day he died would have been 3.2
9 million in property, and, actually, like -- yeah, 3.2, I
10 think, was the real estate valuation. And --
11 **Q. Okay.**
12 A. -- some vehicles and equipment.
13 **Q. Maybe, you can help educate me a little bit here, Scott,**
14 **from your perspective. I heard you say that the property,**
15 **including the house, was valued at about 3.2 million?**
16 A. Yes.
17 **Q. Is that correct?**
18 A. Yes.
19 **Q. Uhm, what happened with the house? You mentioned that**
20 **there might have been an ongoing divorce, or a divorce?**
21 A. So -- yeah. So, they were in -- they were separated and
22 in the middle of a divorce. The house, by law, passed to her
23 -- into her name the day he died, because it was held in
24 joint tenancy, I believe.
25 **Q. Okay. Yeah.**

1 A. The house was (inaudible), it was theirs. The property,
2 uhm -- the property was -- we had a valuation within the
3 previous year, and I -- I'm quite sure it was under 3
4 million. And then I sold that property for 4.9 million by
5 getting them entitlements on it.
6 **Q. Okay. And I'm sure that some of the other people on this**
7 **screen know -- know a whole lot -- lot more than I do.**
8 A. Sure.
9 **Q. That $3.2 million valuation that you explained to me, did**
10 **that include the home that your father's wife ended up with?**
11 A. No.
12 **Q. No.**
13 A. No, no. No. No.
14 **Q. So --**
15 A. She --
16 (Phone interruption)
17 A. Yeah, no. It was -- the house that, uh, they lived in
18 became hers the minute he died. So, it wasn't part of the --
19 **Q. Okay.**
20 A. -- estate.
21 **Q. What did the other --**
22     **MR. SHIMANEK:** Maybe, Dick, just to help you out
23 here a little bit.
24     Scott, your -- your father owned a, uhm -- a business
25 property in Salt Lake; is that correct?

1     **THE DEBTOR:** Yeah. In Salt Lake City, Utah, yes.
2     **MR. SHIMANEK:** Yeah. And that business property,
3 the -- the real estate was an RV sales, or something
4 similar.
5     **THE DEBTOR:** Right.
6     **MR. SHIMANEK:** And -- and that's the real estate
7 that you are saying was worth, approximately, 3 million, plus
8 or minus?
9     **THE DEBTOR:** Yes. Sold as commercial real estate,
10 yes.
11     **TRUSTEE SAMSON:** Okay.
12     **MR. SHIMANEK:** Okay.
13     **TRUSTEE SAMSON:** Thank you, Matt.
14 **BY TRUSTEE SAMSON:**
15 **Q. And, then, Scott, I think I heard you say that -- as part**
16 **of your administration of the trust that you sold that**
17 **property?**
18 A. For 4.9 million, yes.
19 **Q. Okay. And when did that transaction occur? When was it**
20 **sold? When was it finalized?**
21 A. It was finalized, I believe, in June of 2019.
22 **Q. Okay.**
23 A. I believe that's correct, yes.
24 **Q. Okay. At that point in time, were you making**
25 **disbursements to the other heirs?**

1 A. Within about 30 days I disbursed most of the trust, yes.
2 So, within a -- I -- one disbursement within about 30 days
3 from the end of the sale.
4 Q. Okay.
5 A. So, most of the trust. It turns out all of the trust at
6 this point.
7 Q. Had been distributed to the other beneficiaries?
8 A. To all of us beneficiaries, yes.
9 Q. Okay. Alrighty.
10 You know, I -- rather than me trying to educate myself
11 at your expense, uhm, I think what I'm going to do, to try to
12 save some time here, because I've got other documents I can
13 look at, uhm, Eli, do you want to go ahead and start asking
14 some questions?
15 MR. PATTEN: Yeah. Thanks, Dick.
16
17 EXAMINATION
18 BY MR. PATTEN:
19 Q. Scott, my name is Eli Patten, and I'm an attorney with the
20 Crowley Fleck firm up in Billings, and I'm representing your
21 sibling side in this bankruptcy case.
22 A. Good to meet you.
23 Q. Nice to meet you.
24 I guess, the -- the first, sort of, sets of questions
25 that I have for you relates to Hugh's RV and the inventory.

1 A. Okay.
2 Q. And I understand there were four Shasta trailers? And
3 pardon me for not knowing what a "Shasta trailer" is, that
4 were on Hugh's RV lot and part of the inventory.
5 I understand Karen purchased one of those?
6 A. Yes, sir.
7 Q. Or, excuse me. There -- there were four, excluding the --
8 the one Karen had purchased. Where did the money go from the
9 sale of those Shasta trailers?
10 A. Into the Hugh's RV bank account. And that's been
11 documented. They have all of the copies of the checks and
12 the sales agreements.
13 Q. Okay. During the -- the course of your employment, or --
14 or work with Hugh's RV, did you create or own any entities,
15 operate any entities associated with repairs or sales, or of,
16 uh, inventory or -- or goods that were sold through Hugh's
17 RV?
18 A. No, sir.
19 Q. Uhm, you had mentioned the, uh, Rockwood fifth-wheel
20 travel trailer. Uhm, --
21 A. Uh-huh.
22 Q. -- were any of Hugh's RV's funds or trust funds used to
23 purchase that, that you then titled in your wife's name?
24 A. No. She -- she traded in a previous trailer that she had
25 and financed it separately. I was never on that. That's

1 what she wanted to do.
2 Q. Okay. Uhm, the 1989 Pace enclosed trailer that's
3 scheduled and was discussed briefly before here, uhm, --
4 A. Uh-huh.
5 Q. -- were -- is that the same trailer, uh, it's a red
6 trailer, I believe, that were in photographs from Hugh's RV's
7 storage yard that were discussed? Those photos were
8 discussed or circulated during the course of the arbitration.
9 A. I don't recall a picture. It -- it was kept down there,
10 so it's possible. I had a couple of vehicles, and a couple
11 of horse trailers, and some other things there. But I -- I
12 never saw it on a picture during the arbitration.
13 Q. Uhm, the vehicles and the trailers that you kept down
14 there, were those items that you owned, yourself?
15 A. Yes. Yes. I had a -- a car and a couple of horse
16 trailers, besides -- and a couple utility trailers, too.
17 Q. Were -- were those included as a part of Hugh's RV's
18 inventory, or were they --
19 A. Never. They were always mine, yeah.
20 Q. During the course of your deposition, I understand that
21 you testified regarding a jet boat, uh, that was in --
22 A. Uh-huh.
23 Q. -- Hugh's RV's storage yard?
24 A. Yes, sir.
25 Q. And do know where that boat is presently?

1 A. I don't.
2 Q. It -- is that an item you sold?
3 A. No. No. The -- when -- when the, uhm -- no. That's --
4 the -- the items that were left on the lot were not secured.
5 Okay? The -- even the gate was stolen. So, they were never
6 Hugh's RV inventory.
7 In fact, Duffy can attest that if we called the police
8 they wouldn't even talk to us, because they -- we didn't have
9 ownership to them. So, there was no -- there was nothing
10 down there that was Hugh's RV's, Hugh's, or the trust's, or
11 anything like that.
12 We were, in fact, trying to get rid of all that stuff.
13 And a lot of the stuff was stolen. But, basically, I made a
14 deal with the guy to clean up the lot, get rid of it, to save
15 the trust money.
16 Q. So, the -- what's the name of the individual, or the
17 gentleman that you had just mentioned that had cleaned up the
18 -- the lot there?
19 A. It -- it was in the last deposition we went through. His
20 name was Victor Smith.
21 Q. Do you believe that Victor has that boat, presently?
22 A. I don't -- I don't -- I don't think he does, no.
23 Q. Uhm, and it's my understanding that you were an
24 independent contractor then with Hugh's RV? Is that
25 correct?

1 A. Yeah. Yeah, I guess. I don't know. We -- we -- I wasn't
2 a 1099 employee, I wasn't a W-2 employee. I just worked for
3 my dad.
4 Q. Well, how -- how were you paid? Did you receive weekly
5 paychecks, or --
6 A. Yes, I --
7 Q. Yes?
8 A. -- I did. I'm just saying that I never received a 1099 or
9 a W-2, so...
10 Q. Uhm, and -- and I assume, then, that your personal tax
11 returns would reflect the income that -- that you had
12 earned --
13 A. Yeah.
14 Q. -- as compensation?
15 Had you filed every -- each year, over the course of the
16 last seven years?
17 A. Uhm, not every year, no.
18 Q. Why is it that you wouldn't file tax returns?
19 A. Because I had settled -- we had figured out how much I
20 totally earned. There was -- there was questions about how
21 Hugh's RV's accounting was done, so I couldn't, uhm, tell
22 exactly what I made. But we just figured out what I made
23 when we did the forensic auditing.
24 Q. Okay. So, have all of those tax years been -- or returns
25 for all of those years been filed at this point?

1 A. They've been settled, yes.
2 Q. And what do you mean by "settled"?
3 A. With the IRS.
4 Q. Uhm, would you be willing to provide me with copies of tax
5 returns over the course of the last seven years?
6 A. Uhm, I -- if -- I don't know. I don't believe so.
7 Q. Okay. And I -- I can chat a little bit further with your
8 attorney about that.
9 A. Yeah, the --
10 Q. So, just moving on here, uh, and moving towards the -- the
11 trust, itself, it's the Hugh L. Williams Family Trust? Is
12 that the correct trust we're talking about?
13 A. The Hugh, H-U-G-H. Hugh L. Williams Family Trust, yes.
14 Q. Okay. Were there any other trusts that had been
15 established or created upon your father's death?
16 A. No.
17 Q. Well, and we, uh, spoke briefly a little bit before Dick
18 had asked the question about the -- the, uh, payments you had
19 made to your attorneys. And you mentioned 60,000, is what
20 they had requested, or had you paid them 60,000 previously?
21 A. No. That -- that is what they -- they had requested --
22 the 60,000 that they asked for, I believe on the 1st of
23 September, was to continue with the arbitration and see that
24 through, see it finished. So, I could have borrowed money
25 from my son, or something, and I chose not to.

1 Q. Okay. Well --
2 A. And -- and the reason for that is simple. It's, like, the
3 -- the attorneys were quite sure we would win the
4 arbitration, but they said there was very little chance that
5 I would recover the funds. So, I'd be left with a big bill
6 either way.
7 Q. Okay. And it was my understanding, based on what you had
8 said before, trust funds were used to pay for your defense.
9 A. Yeah. As per the trust, yes.
10 Q. Okay. Why is it that you had distributed to yourself
11 approximately 75,000, or -- than you did to the other
12 beneficiaries?
13 A. Okay. As, uhm, part of the Hugh's RV, which rolled into
14 the trust, my dad had specifically said, and, I believe, at
15 least three of the other siblings witnessed him saying that I
16 should receive a severance, or he called it a "retirement,"
17 or something like that.
18 So, that was done right upfront, about -- you know, it
19 was done at the initial distribution. In front of everybody.
20 Everybody -- I'm not going to say that everybody signed off
21 on it, but everybody -- nobody complained to me about it.
22 Since then, I have found out that they complained about
23 it -- amongst themselves about it, but nobody made any
24 complaint to me, or to the trust, for years. Until the last
25 year, or so.

1 Q. Was that intention noted in writing or agreement, or is
2 there any documentation you have that would reflect your
3 father's intentions there with respect to that 75 grand?
4 A. No. But the reason I was able to do it was because the,
5 uhm -- three of my sisters had witnessed it. Otherwise, I
6 would have just asked for compensation for being the trustee
7 right upfront. Which I had not done. For selling the
8 property for 4.9 million, when it was worth considerably
9 less.
10 Q. My understanding is there was donations or tithing that
11 had been paid to the church following your father's death,
12 why is it that you continued doing that with trust funds
13 following his death?
14 A. Because those were his wishes. He -- he, uhm -- because
15 of his divorce, and his strained financial position before
16 his death, he did not pay his tithing as he had done in
17 previous years.
18 So, what I did is looked at his previous years, I've
19 provided those documents to Kent, and, basically, it's -- it
20 was just a matter of his wishes and what he considered a
21 debt. And I believed Dad considered it a debt, and that
22 what, in my discretion as trustee, was due to the church that
23 he normally would have paid during those years.
24 Q. Was there -- I'm sorry, go ahead.
25 A. Well, while it's -- it's -- it -- that's something I could

1  petition the church for and get returned to those who want
2  it. I feel it's a very legitimate wish of my father. And,
3  you know, it might not be a legal debt, but it's a debt that
4  he wanted to see paid.
5      So, if -- if -- if they want it, we could petition the
6  church and give their $800 each back.
7  Q. Okay. And similar to the question I had before regarding
8  that $75,000 payment that you made to yourself, is there
9  anything in writing reflecting your father's intentions with
10  respect to the tithing?
11  A. Uhm, no.
12  Q. So, that was done at -- based upon your judgment or
13  discretion?
14  A. No, based on his words to me.
15  Q. Uhm, moving on here a little bit. My understanding, in
16  your deposition -- we had taken a deposition during the
17  summer of -- just this past summer, correct?
18  A. Yes. Uh-huh.
19  Q. And there was some discussion about the commingling of
20  trust assets, Hugh's RV assets, and your wife's assets.
21      Do you recall that?
22  A. There was questions of it, yes.
23  Q. And my understanding is you admitted during the course of
24  that deposition that trust funds had been commingled with
25  your assets -- with your wife's assets, funds accounts, et

1  cetera?
2  A. Uhm, not with my wife's assets. That's -- that's
3  incorrect. They're -- they're talking about an American
4  Express card that I used for the business, and that was never
5  my wife's card. She was a -- she was a signer on it, but she
6  -- it was not hers.
7  Q. Okay. What -- "Candy" is your wife's name?
8  A. Candy, C-A-N-D-Y.
9  Q. Okay. And "Williams" is the last name?
10  A. Yes. Uh-huh.
11  Q. Uhm, in your schedules you had noted a claim or a debt to
12  your siblings at $130,715.67, how did you determine this
13  amount?
14  A. That's what they gave to me. That's the last, uhm --
15  that's the last statement of their atruity (sic) of what they
16  were claiming in the arbitration. So, they -- it's not a
17  judgment, it's not a valid debt, it's just that's what the
18  amount they were talking about. So, that's their amount.
19  Q. Okay. Uhm, and we had briefly touched on it, the
20  distribution of cash that you received from the trust, it
21  was, I believe, $476,747.71?
22  A. No.
23  Q. Is that right?
24  A. No.
25  Q. What -- what -- what is the figure?

1  A. I believe it's 426. I think you're just reading it wrong.
2  Q. Okay. Yeah, I may have -- the 7 and a 6 there, I
3  transposed it, I apologize.
4      When -- when did you receive those funds?
5  A. In -- I believe, in late June of 2019.
6  Q. Okay. And where have those funds gone? Have you spent
7  those -- those monies?
8  A. Yeah, at -- so I haven't worked since, uhm, 20 -- June of
9  2019, I haven't worked. I traveled a little bit, and paid
10  off my debt.
11  Q. What -- what debts? What --
12  A. Truck (audio distortion), and stuff like that.
13  Q. Okay. Did any of those funds go for the purchase of the
14  home in Bigfork?
15  A. No. No.
16  Q. What -- what was the source of the funds for that purchase
17  in -- uh, the house in Bigfork?
18  A. Candy just, uhm, bought it with -- on her credit.
19  Q. Was there any cash that had been paid as a -- a down
20  payment as a part of that purchase?
21  A. No.
22  Q. So -- all right.
23      Now, as -- as the trustee of -- of the trust, were you
24  responsible for filing Hugh's personal and business taxes?
25  A. Yes. Uh-huh.

1  Q. And it was your responsibility that those be accurate,
2  correct?
3  A. That they be accurate? Yes. And I assume that's correct,
4  yes.
5  Q. Uhm, and it's my understanding that there were funds that
6  had been set aside or were earmarked for payment of property
7  taxes that were either Hugh's RV funds or your father's
8  personal funds. I believe it was about $60,000, does that
9  sound accurate?
10  A. How -- how do you mean "set aside"? I don't -- I don't
11  understand the question. Now, he owed property taxes that
12  were deducted from the sale.
13  Q. And -- and there were no funds, to your memory, that were
14  set aside that were intended for --
15  A. There -- there was nothing set aside. We had two bank
16  accounts. And he had no credit, and no other funds.
17  Q. Okay. Would he maintain cash under the bed, for example,
18  or in a piggy bank?
19  A. None that we ever found.
20  Q. Uhm, you -- you had mentioned the U.S. Bank account here
21  earlier during Dick's questioning, uhm, --
22  A. Uh-huh.
23  Q. -- and my understanding, based on my conversations with
24  your siblings, is you had mentioned that you utilized various
25  methods to keep or -- or move money around, and can you

1  elaborate on -- on -- on that?  Have you moved money from
2  account to account --
3  A. I --
4  Q. -- to --
5  A. I don't recall, --
6  Q. -- (inaudible)?
7  A. -- Matt, that I -- that I moved money around.  But if
8  you're -- are -- you're talking about Hugh's RV and Hugh's
9  accounts?  Is that what you're saying?
10 Q. Well, just generally speaking.  Your personal -- business
11 and personal life?
12 A. My -- in my personal life, all's I did was charge stuff on
13 my credit cards, and paid those -- or, excuse me.  In -- as
14 far as my dad's business, I charged stuff on my credit card
15 for his expenses, and then paid those back.
16      In my personal life, I -- as far as the company goes, I
17 believe there were, uhm, times when I would not have enough
18 money in the business account, and may have written a check
19 for, like, $1,000 from my personal account to his business
20 account.
21      There were also times I didn't take my pay for weeks at
22 a time, because he didn't have the funds available.  But, no,
23 that's all it was.  If -- if it was it, I mean, I derived a
24 paycheck from them, and I got that, put it in my U.S. Bank
25 account.  But most of the time it was straight forward.

1  There was just a few times when I probably had to write a
2  check to cover something that -- that he didn't have money to
3  cover.
4  Q. Okay.  And -- and just to make sure I've got this clear,
5  the U.S. Bank account that you mentioned, that's the only
6  account you've maintained over the course of the last 10, or
7  so, years?
8  A. Yes.  Uh-huh.  Of my personal, yes, that's -- that's it.
9  Q. Uhm, moving on here to -- to your schedules, uhm, and I
10 noticed that there were no firearms or -- or guns referenced
11 there, do you own or possess any firearms?
12 A. I do not, no.
13 Q. Does your wife own or possess any firearms?
14 A. Uhm, yeah.  She has a -- yeah, she has a gun.
15 Q. Okay.  What is that?
16 A. It's a .9 milli- ---
17 Q. The model?
18 A. Uhm, it's a .9 millimeter, uhm, handgun.
19 Q. And you don't own or possess a -- an AR-15-style --
20 A. Never.  No.
21 Q. Do you own any Kawasaki motorcycles?
22 A. I actually, uhm, have a -- a Kawasaki junk motorcycle.
23 That's true, I do.  I have a -- a motorcycle that has been
24 sitting outside for about 20 to 25 years now.
25      It's, uhm, value is, probably, zero.  But I do, in fact,

1  own a Kawasaki motorcycle.  I don't even have title to it,
2  but I have possession of it.
3  Q. Do you know what the model is of that particular
4  motorcycle?
5  A. It's a KT250, 1975.
6  Q. Uh, and, then, I notice a reference to "Miscellaneous
7  tools and supplies," are there items that may not have been
8  scheduled or -- or referenced there in your schedules, or is
9  it fairly nominal?
10 A. No.  Or what -- what does it show in -- in tools?  I do
11 have some hand tools.  I don't know what we've put down
12 there.
13 Q. Any other specific items of equipment or -- or tools,
14 beyond just hand tools?
15 A. No.
16 Q. Uhm, are -- are there any other assets that you can think
17 of that may have come to mind here, since you've filled out
18 these schedules, that were not included, but should be
19 included?
20 A. No.  No.  There's nothing of any value.  And that Kawasaki
21 has no value.  It's rusted, and missing parts, and it's -- it
22 should be hauled off.
23 Q. Uhm, kinda taking a step back here a little bit.  The 4.9
24 million is what the Hugh's property sold for?
25 A. Yes.  Uh-huh.

1  Q. And do you recall what the net amount distributed to the
2  beneficiaries of the trust were, individually?
3  A. Each member of the trust got, uhm, 351,000.  So -- so, a
4  -- a large chunk of it went to his wife.  And, then, what was
5  left was, uhm, 300-and -- I believe it was 351,000, each.
6  And, on mine, I got the same, but with 75,000 for the
7  severance retirement.
8  Q. And -- and of that 426,000 that you mentioned, how much of
9  that do you have remaining in -- in your possession, or in an
10 account?
11 A. No.  None.
12 Q. So, in -- in the last two-and-a-half years, or so, you
13 spent all of that?
14 A. Yeah.
15 Q. Did you give of that -- those monies to your wife?
16 A. Uhm, no.
17 Q. Uh, do you believe your wife personally benefited or
18 utilized any of Hugh's RV's assets, or -- or the trust
19 assets?
20 A. Absolutely not, no.  No.
21 Q. And what does your wife do to -- for a living?
22 A. She's a -- works for mortgage company out of Salt Lake
23 City.
24 Q. What -- what is her position or title with that company?
25 A. Uhm, I believe it's payroll manager.  I'm not sure what

1 her exact title is, but that's what she does.
2 Q. Do you know how much the monthly mortgage obligations are
3 on the residence?
4 A. I -- not -- I -- I looked at that when I turned it in, but
5 I'm not sure. I think it's, like, 1,700 or 1,800 a month.
6 Q. What do you believe the value of the property to be
7 presently?
8 A. I -- I have no idea.
9 Q. And do you know what the purchase price was?
10 A. No.
11 Q. Uhm, is your wife obligated on any of the credit cards
12 that you had included as a part of the schedules of unsecured
13 creditors?
14 A. No. She has her own.
15 Q. And does your wife have her own American Express card,
16 then, too?
17 A. Yeah.
18 Q. And I'm kind of coming to the end of my list here. My
19 understanding is you purchased your father's dining room
20 table or tables for $1,500 from one of your siblings as a
21 keepsake, do you still --
22 A. Yeah.
23 Q. -- have that table?
24 A. Uhm, yes, I do.
25 Q. What do you consider its value to be?

1 A. Uhm, probably -- I -- I could sell it up here -- I don't
2 know what on, like, KSL.com in Salt Lake it would go for,
3 but, up here, I could probably sell it for 75 to $100. It's
4 -- it's pretty beat up on the top. It -- it's not, uhm, in
5 very good. But it's still a -- you know, it's -- I'm -- I'm
6 going to refinish it and keep it, because it's -- was my
7 dad's.
8 Q. Uhm --
9 A. Yes, it needs to be resurfaced, but I'm going to do that.
10 Q. And just one additional question here for ya. Uhm, on any
11 given year, uh, what was the -- the gross revenue for Hugh's
12 RV?
13 A. In any given year?
14 Q. Yeah. If you can give me an average or -- or an
15 approximate?
16 A. Uhm, that's -- I have no idea, other than the last, uhm,
17 20 -- well, actually, I don't even have that number in front
18 of me. I can't think of it off the top of my head.
19 But the revenue, uhm, he -- he barely broke even with
20 paying his mortgage payments for most of his life. And,
21 then, uhm, actually, the last two years we were profitable,
22 when we were in the most trouble. We made the most money in
23 the last couple of years, and we were profitable.
24 So, uhm, I don't -- I don't know. But they have all
25 that information. They have the taxes for the last few

1 years. Before that, I -- I have no idea, except that my dad,
2 basically, was lucky to break even yearly and have the
3 property paid for.
4 So... And that's what he always tried to do, is keep
5 the -- he always figured the value of the property would go
6 up, but -- and, uh, that's all he had to do was keep his
7 payments made and he'd -- he'd come out ahead.
8 Q. Can you elaborate a little bit? You just mentioned when
9 the business was "in the most trouble," what do you -- what
10 do you mean by that?
11 A. Well, he was in -- Hugh's wife, previous wife -- actually,
12 still wife, I guess, was -- got in financial trouble. He
13 kept loaning her money and trying to help her out, and that
14 kind of spiraled down to where he ruined his credit and --
15 and had no extra money in his business.
16 And got into financial trouble, and that lead to a
17 divorce. And, then, it was even worse, because we had
18 attorneys bills, and such.
19 Q. Uhm, for, uh, 2019, that was the last year you had worked
20 with Hugh's RV?
21 A. Yes. Uh-huh.
22 Q. And approximately how much did you take home that year?
23 A. Uhm, I believe -- I don't have -- I don't remember. I
24 don't have it in front of me. But it was, probably, like,
25 uhm -- I -- I don't know. I hate to say without looking at

1 it.
2 Q. Yeah. Can you give me an approximation? 200,000?
3 A. I -- I think the number we put on it was, like, 30,000.
4 Q. Okay.
5 A. That I was paid.
6 Q. How about for 2018, do you recall?
7 A. No, I don't, offhand.
8 Q. And -- but your tax returns would reflect --
9 A. Yeah. Yeah.
10 Q. Okay.
11 MR. PATTEN: I don't have anything further.
12 Dick, does that bring anything else to mind here?
13 TRUSTEE SAMSON: Not for me. I'm still playing
14 catch-up, Eli.
15 MR. PATTEN: I'm doing a little of the same myself
16 here, as well. So...
17 MR. DUFFY WILLIAMS: Is it possible for me to ask
18 any questions?
19 MR. PATTEN: Sure.
20 TRUSTEE SAMSON: Sure.
21
22 EXAMINATION
23 BY MR. DUFFY WILLIAMS:
24 Q. Scott, didn't you make about 70,000 a year? Isn't that
25 what you paid yourself the last years?

Charles Eisher Court Reporting
442 East Mendenhall, Bozeman MT 59715, (406) 587-9016

1 A. No. It was -- it was about 60, somewhere in there. But
2 when you --
3 Q. So, 5 -- 5 -- how much per month? 5,000?
4 A. I was paid --
5 Q. What was your -- what was your pay?
6 A. That's correct, I was paid 2,500 twice a month. So,
7 5,000. 60,0000. And, then, commission. But I didn't get
8 those commissions in those years, so... So, basically,
9 you're right, that was it.
10 Q. So -- so, do -- you live in a home with your wife, does it
11 come as a surprise to you that the value of your home listed
12 on Zillow is $1,070,000?
13     MR. SHIMANEK: That's not a question --
14     THE DEBTOR: And that's -- yeah, that's not --
15     MR. DUFFY WILLIAMS: Why isn't it a question?
16 How's it not a question? He said he --
17     TRUSTEE SAMSON: Well --
18     MR. DUFFY WILLIAMS: -- didn't know the value of
19 his -- the home that he's living in.
20     THE DEBTOR: That's -- it's -- Zillow is not --
21 Zillow, I doubt, is --
22 BY MR. DUFFY WILLIAMS:
23 Q. Okay. Okay. But it's not 300,000, right? It's a -- it's
24 a valuable home, right?
25 A. The home? It's -- I don't know. I don't know what we

1 based it on. I believe Matt based it on the tax, and I
2 believe it's at 450. And then (inaudible) --
3 Q. Okay. Well, let --
4 A. -- that.
5 Q. -- let me ask you another question.
6     Is the trailer that you listed on your bankruptcy
7 papers, it's not -- that red trailer is the trailer that was
8 in the inventory down at Hugh's RV?
9 A. No.
10     MR. SHIMANEK: I believe that's already asked
11 answered, too.
12     THE DEBTOR: Yeah, that's been answered.
13     TRUSTEE SAMSON: I just want to clarify.
14 Whoa. Slow down.
15     THE DEBTOR: Okay. Okay.
16     TRUSTEE SAMSON: Let's go back. What trailer are
17 we talking about?
18     THE DEBTOR: The utility trailer, he's asking
19 about.
20     TRUSTEE SAMSON: The '89 American Pace. Because I
21 -- if we're asking questions about assets that aren't on the
22 schedules, then it's -- it's -- it's hard. So, I want to
23 make sure, Duffy, that the question that you're asking is the
24 -- related to the 1989 Pace American utility trailer? Is
25 that correct?

1     MR. DUFFY WILLIAMS: Yes.
2     TRUSTEE SAMSON: Okay.
3     MR. DUFFY WILLIAMS: And my que- -- and my que- --
4 if I can, my question is, is that trailer that he listed the
5 red trailer that was in the storage at Hugh's RV? Is that
6 the same trailer that he's talking about on his -- that he
7 listed?
8     TRUSTEE SAMSON: Okay. Fair question.
9     THE DEBTOR: No. It's -- it was never in storage
10 at Hugh's RV.
11 BY MR. DUFFY WILLIAMS:
12 Q. So, the trailer that you listed on the thing is not red?
13 A. It is red, yes.
14 Q. Does it have a rack on the top?
15 A. No. There's no --
16 Q. There's no rack on top of the --
17 A. No.
18 Q. -- trailer?
19 A. No.
20 Q. So, where did you purchase that trailer?
21 A. Uhm, from an individual in about 2009, I believe.
22 (Inaudible)
23 Q. And you registered it in 2009 in your name?
24 A. No.
25 Q. Is it registered in your name now?

1 A. Yes.
2 Q. What year did you register it?
3 A. In 2000- -- uhm -- well, right before I moved up here.
4 Q. So, you registered it in about 2019, when Dad died?
5 A. Uhm, probably, 2020.
6 Q. So, you -- you purchased a trailer from somebody in 2009,
7 but you didn't register it until 2020?
8 A. That's correct.
9 Q. Why?
10 A. Because I didn't need it.
11 Q. So when you moved to Montana, you needed the trailer?
12 A. Uh, yes. That's what I used to move.
13 Q. So, if --
14     TRUSTEE SAMSON: Duffy, can I -- can I just
15 interject for a second, Duffy --
16     MR. DUFFY WILLIAMS: Sure.
17     TRUSTEE SAMSON: -- and -- and Scott? I was --
18 just to try to clarify, to try and, maybe -- I do have a copy
19 of that title to that trailer.
20     Now, the title that I'm looking at is a title,
21 Certificate of Title from the State of Montana. It looks
22 to me like the trailer was probably titled in Montana in May of
23 2020, and the title was issued by the Motor Vehicle Division
24 for Montana on July 10th of 2020.
25     I don't know if there was a -- what we call a -- a

1   previous title, like you say, out of the State of Utah. I --
2   I don't have that information on my screen.
3       **BY MR. DUFFY WILLIAMS:**
4   **Q. Can I -- is -- is this the trailer we're talking about?**
5   A. No. Huh-uh. That's -- no. It's --
6   **Q. So, the trailer -- so the trailer that's in this photo is**
7   **a different trailer than what you have?**
8   A. That's correct.
9   **Q. So what happened to this trailer, Scott?**
10  A. I don't know. As you -- as you recall there, you were
11  there, Duffy, there were several items that were stolen or
12  missing. Remember, there was a gray one that went missing,
13  too. And I don't know. That lot was not secure.
14  **Q. (Inaudible) But wasn't it the -- wasn't it the, uh,**
15  **responsibility of the trust to secure all of those items in**
16  **that yard?**
17  A. Uhm, I don't know how it would be. I think the
18  responsibility of the trust was to, uhm, clear the lot, so
19  that the sale could proceed. And, that, we did.
20  **Q. Well --**
21  A. And, after that, the -- the -- responsibility was to
22  get the property cleared up for -- that we rented from UDOT
23  and the City of North Salt Lake.
24  **Q. Okay. So -- so, let's be clear. So everybody**
25  **understands. Because I did take part in this.**

1   **So, --**
2   A. Yeah.
3   **Q. -- the property that was sold out of the trust for $4.9**
4   **million was cleared before the sale, and the -- all the items**
5   **were moved onto the leased portion at the end of the property**
6   **that the State of Utah owned.**
7   A. Correct.
8   **Q. Okay. So -- so, wasn't it the trust's responsibility to**
9   **secure all of our items that were in the trust; a Trooper,**
10  **cars, trailers, boats, my Kenworth truck, my forklift that**
11  **was down there being used?**
12  A. Well, hold on. You're saying that I'm responsible
13  because --
14  **Q. You don't see how this -- I'm saying --**
15  A. -- the --
16      **TRUSTEE SAMSON:** Let's everybody whoa. Let's just
17  everybody hold on for a second.
18      **THE DEBTOR:** Okay.
19      **TRUSTEE SAMSON:** Uhm, I'm not even sure -- I --
20  what I heard was a question that was asked by Duffy to Scott
21  about did you secure that property. Okay?
22      And, then, Scott, I think you're entitled to a chance to
23  respond to it, but I don't want people talking over each
24  other.
25      **THE DEBTOR:** Okay.

1       So -- so, your question was, was I responsible to secure
2   the property? I'm not sure that I was. It's -- none of the
3   property was the trust's, anybody's that I know that was
4   there. I -- I know your stuff was there.
5       So, you're saying that I was responsible to you to
6   secure your property, but the bottom line is, Duffy, we both
7   tried to secure the property, the -- the fence. And even the
8   fence was stolen by the time things got cleared out.
9       So, I -- we made, I would say, a reasonable effort to
10  secure everything, and it was an unsecurable location. I
11  mean, they stole, literally, the fence and the gate.
12      **BY MR. DUFFY WILLIAMS:**
13  **Q. Was Dad's personal Trooper in that property?**
14  A. Uhm, yes, it was.
15  **Q. So, wasn't that part of it, that you just said that --**
16  A. It --
17  **Q. -- there was no property of the trust, but wasn't all of**
18  **the property, on that State property, property of the trust,**
19  **or in care of the trust?**
20  A. No. No. You're right, the Trooper was listed as an item
21  in the trust. It had to be removed from Dad's garage, and we
22  put it there. It was of questionable valuable -- value when
23  we put it there. It was determined to be of no value,
24  because it had electrical problems that were more than the
25  value of the unit.

1       But we -- you and I both tried to secure it as best we
2   could. And I --
3   **Q. We both did.**
4   A. Yes. That you tried to secure it as much as anybody,
5   because you had your own personal vehicles there. Is that
6   correct?
7   **Q. What -- what did I have there?**
8       **TRUSTEE SAMSON:** Whoa. Whoa, whoa, whoa.
9       **THE DEBTOR:** (Inaudible)
10      **TRUSTEE SAMSON:** Scott? Scott?
11      **THE DEBTOR:** Yes. Okay.
12      **TRUSTEE SAMSON:** Okay. You've made your point.
13      **THE DEBTOR:** Okay.
14      **TRUSTEE SAMSON:** But, unfortunately, at this point,
15  you don't get to ask questions back to Duffy. I understand
16  this is kind of a heated matter, and I --
17      **THE DEBTOR:** Okay.
18      **TRUSTEE SAMSON:** And I appreciate everybody kind of
19  keeping their cool here. Uhm --
20      **MR. DUFFY WILLIAMS:** Yeah. So -- so, I'm -- sorry.
21  I'm just trying to ask some crucial questions. I mean,
22  wasn't the Trooper part of the trust, and he was the trustee
23  responsible to --
24      **THE DEBTOR:** The -- the Trooper was very,
25  obviously, part of the trust, and listed. At the time that I

1 checked on it, and -- and tried to figure out its value, I
2 valued it at $500. After I looked into it further, I -- it
3 was valued at zero. But we did everything reasonable to
4 secure it. It just wasn't a securable piece of property.
5     TRUSTEE SAMSON: Scott, can I ask a -- Scott, can I
6 ask a question?
7     THE DEBTOR: Yes.
8     TRUSTEE SAMSON: I understand that -- that the
9 Trooper, if that's what we're talking about, belonged to your
10 father, and it was included as trust property.
11     THE DEBTOR: Yes.
12     TRUSTEE SAMSON: I'm also hearing from the
13 conversation, or from the questions and answers, that there
14 were efforts made to try to secure it. However, what
15 ultimately happened to the Trooper? And, then, maybe, all of
16 the family members know the answer to that, but I don't.
17     THE DEBTOR: They do. They do. So -- so, it was
18 hauled -- it was towed at expense from his garage to the
19 property, the only other place we had to put it, which was
20 the leased property on the -- that was attached to the
21 commercial property that was sold.
22     That was secured by a fence and a gate. We locked the
23 gate. Okay? The -- in the meantime, after we sold the
24 property, I inspected the Trooper, tried to sell it and see
25 what it's worth, but it wouldn't even -- I -- I -- I got a

1 battery and tried to start it. I traced down where it had a
2 printed circuit prob- -- problem.
3     TRUSTEE SAMSON: Okay.
4     THE DEBTOR: So, the bottom line is it was of no
5 value at that point, so then I had it disposed of when I
6 cleaned the rest of the property.
7     TRUSTEE SAMSON: So --
8     MR. DUFFY WILLIAMS: Okay.
9     TRUSTEE SAMSON: Duffy, go ahead.
10 BY MR. DUFFY WILLIAMS:
11 Q. Do you remember me offering the trust $1,600 for the
12   Trooper?
13 A. No.
14 Q. Okay. Well, now, let's move on --
15     UNIDENTIFIED FEMALE: I offered to buy it, too.
16     TRUSTEE SAMSON: Okay.
17 BY MR. DUFFY WILLIAMS:
18 Q. Let's move on from the Trooper. What -- did your F-3 --
19   did your Ford F-350 have a brand new engine put in it?
20 A. Yes.
21 Q. What year?
22 A. In -- it's been -- I -- I don't know about that. I don't
23   know.
24 Q. I mean, isn't it --
25 A. That truck --

1 Q. Isn't it more like --
2 A. It still had the sticker on it -- the sticker on it when
3   it blew up.
4 Q. Okay, Scott, we've got a lot to get through, so just
5   answer the question.
6 A. Okay.
7 Q. Don't you -- don't you consider the value of your Ford
8   F-350 more -- to be more like 13, 14,000?
9 A. No. It's -- it's rusting out. It's got -- everything
10   else on it is going bad. It's -- I -- I got a -- I tried to
11   see -- I -- I took it to a dealership, they wouldn't even
12   give me anything for it. But I -- I took it to a Carvana
13   deal, they offered me $300.
14 Q. Yeah. Well, it pulls up on NABA as $14,000, roughly.
15 A. Yeah, and that's not correct.
16 Q. Okay. So, the -- the Kawasaki motorcycle that you talked
17   about, what parts is it missing? Because the last time I saw
18   it, it was, like, a complete motorcycle.
19 A. No. It's missing --
20 Q. And it was in great shape, and (inaudible) item.
21 A. You can have it. You can come and get it and have it.
22   It's --
23 Q. Okay.
24 A. It has no -- it has no --
25 Q. I'll -- I'll take it.

1 A. It's been sitting outside. It has rust in it.
2 Q. I'll take it. Enough said.
3 A. It has no value.
4 Q. It's an antique.
5     So, when -- when you were managing Hugh's RV,
6   didn't you tell the family members that you had set aside two
7   years' taxes for the property?
8 A. No.
9 Q. To hide from the (audio distortion)?
10 A. No. You had said that in the deposition, and I -- no.
11 Q. Well, you personally told me that, didn't you?
12 A. No.
13 Q. You never said that?
14 A. No. I -- I had no -- I mean, you knew that I was
15   borrowing money from (audio distortion).
16 Q. I -- I know, but I don't really buy that.
17     But, listen. So, out of the $426,000 that you received,
18   you don't have any of that money left?
19 A. No. I -- I haven't had a job since -- since then.
20 Q. And you have --
21 A. (Audio distortion)
22 Q. And you listed that you have $200 worth of clothes.
23 A. I -- I don't know what a piece of clothes is worth. I do
24   have some clothes, but I don't have anything of value. I
25   mean, this Car-- what's a Carhart worth, you know? I have

1 t-shirts and a few dress shirts. I have one suit.
2     **TRUSTEE SAMSON:** Let's -- let's move along some
3 more.
4     **UNIDENTIFIED FEMALE:** I have a question.
5     **MR. KENT WILLIAMS:** Richard? Richard? Richard?
6 Can I ask just a few questions?
7     **TRUSTEE SAMSON:** Well, let's let Duffy finish up,
8 first, okay?
9     **MR. KENT WILLIAMS:** Okay.
10 **BY MR. DUFFY WILLIAMS:**
11 **Q. So, uh, Scott, you said you didn't -- I mean, you're the**
12 **manager and the trustee, and you were -- you worked at Hugh's**
13 **RV for, uhm, 12 years, but you said you don't know what**
14 **Hugh's RV brought in. I mean, that's odd.**
15 A. No. There is --
16 **Q. But isn't it -- isn't that -- hold on, this is my**
17 **question.**
18     **Didn't it bring in $360,000 a year, plus?**
19 A. That -- I don't know where you're getting that number.
20 **Q. That's the last --**
21 A. (Audio distortion)
22 **Q. That's the last, uhm, statement that you gave paperwork on**
23 **the bank account's deposits.**
24 A. Okay.
25 **Q. In 2000-and -- in 2018.**

1 A. No, no. 2018? It brought in that much money you're
2 saying?
3 **Q. Yeah.**
4 A. Okay. So, then, what are the expenses?
5 **Q. Well, you had property -- I -- I guess, that would be**
6 **questions to you. But you had a property payment of between**
7 **6 and 7,500 a month.**
8 A. Yeah.
9 **Q. I mean, so the -- so, if you take 300-and -- just,**
10 **roughly, 360,000 divided by 12, that's 30,000 U.S. dollars a**
11 **month.**
12 A. Of income, you're saying, minus only the -- the --
13 **Q. Of gross income brought into Hugh's RV.**
14     **TRUSTEE SAMSON:** Well, look --
15     **THE DEBTOR:** You -- you -- Duffy, you have the
16 taxes for that year. Look at it. You have -- you have --
17     **TRUSTEE SAMSON:** The --
18     **THE DEBTOR:** You have --
19     **TRUSTEE SAMSON:** The --
20     **THE DEBTOR:** You have the general ledger --
21     **TRUSTEE SAMSON:** The tax returns will show what the
22 netting -- it'll show what the gross and what the net was.
23     **THE DEBTOR:** Yeah, they will.
24     **TRUSTEE SAMSON:** Are cop- -- are copies of tax
25 returns available?

1     **THE DEBTOR:** Yes. They -- they have them, in fact.
2     **TRUSTEE SAMSON:** Okay. Let's go to the next
3 question.
4     Has this all been handled through this, uhm, --
5     **THE DEBTOR:** Arbitration.
6     **TRUSTEE SAMSON:** -- arbitration?
7     **THE DEBTOR:** Yeah.
8     **MR. DUFFY WILLIAMS:** Okay. I just -- I just have
9 one -- I just have one question left, I think.
10     **TRUSTEE SAMSON:** Okay.
11     **MR. DUFFY WILLIAMS:** So, Scott's -- we're here, you
12 know, discussing the bankruptcy. So, the things that Scott
13 listed on his -- in the bankruptcy papers as the schedules is
14 he -- he listed five sibling, and he listed one attorney's
15 firm that we now have seen the checks from what he's paid the
16 attorney, and it's somewhere over $60,000 --
17     **THE DEBTOR:** That's et cetera.
18     **MR. DUFFY WILLIAMS:** -- out of the tr- -- out of
19 trust money that was our money. He, uhm -- he has listed
20 some of his credit cards that --
21 **BY MR. DUFFY WILLIAMS:**
22 **Q. My question to you, Scott, is, is your purpose in filing**
23 **Chapter 7 basically only to get out of what you took out of**
24 **the trust from the beneficiaries? Because you don't have --**
25 **you haven't listed a huge medical bill, you haven't listed a**

1 **detrimental thing that happened in your life.**
2     **So, Kent brought you to an arbitration, and, by the way,**
3 **you took over $60,000 of the trust money that was earmarked**
4 **for us as beneficiaries to pay lawyers' fees for questions**
5 **that you were obligated to answer under the trust to us, and**
6 **protected yourself using that money, under the protection of**
7 **the trust.**
8     **So, my question is, did you file Chapter 7 just for the**
9 **benefit of not paying the beneficiaries because we wanted**
10 **answers of where the balance of the money was and where it**
11 **was going?**
12     **I mean, do you have any hard --**
13 A. (Inaudible)
14 **Q. -- do you have any hardships, other than what the**
15 **arbitration had brought you to? Because you filed bankruptcy**
16 **the day before the arbitration.**
17 A. No. And it wasn't the day before the arbitration. But --
18 **Q. Two days.**
19 A. -- (inaudible) is the hardship was the cost of attorneys
20 to defend the trust from questions that had already been
21 answered ad nauseam. I very clearly, according to my
22 attorneys, would have won the arbitration, but --
23     **TRUSTEE SAMSON:** Was there a decision in the
24 arbitration?
25     **THE DEBTOR:** No.

1     **TRUSTEE SAMSON:** Oh, okay.

2     **THE DEBTOR:** We didn't -- we didn't get through the

3 arbitration.

4     **TRUSTEE SAMSON:** Okay.

5     **UNIDENTIFIED FEMALE:** There's been no answers in

6 the arbitration.

7     **THE DEBTOR:** There are -- all the answers are --

8 have been given in paperwork that Kent has. And I assume you

9 have them, because Kent has them.

10     **TRUSTEE SAMSON:** Okay.

11     **MR. DUFFY WILLIAMS:** Okay.

12     **THE DEBTOR:** So --

13     **TRUSTEE SAMSON:** Uhm --

14     **MR. DUFFY WILLIAMS:** One last question.

15     **THE DEBTOR:** So --

16     **TRUSTEE SAMSON:** This is your last one, and then

17 I'm moving on.

18     **MR. DUFFY WILLIAMS:** Okay. Fair enough. Fair

19 enough.

20 **BY MR. DUFFY WILLIAMS:**

21 Q. Was all of the money that was paid to McConkie for the --

22 the lawyer's fees to -- for this case? Because you paid over

23 $60,000, and we -- and our -- and our whole attorney bill to

24 this point is 11,000.

25 A. So, you -- you all have an attorney bill, that's each of

1 you?

2 Q. No. The total bill is 11,000, and yours is over 60,000.

3 Plus you're filing bankruptcy on 26,000 more. How is that

4 even possible? That's my question. How's that possible?

5 A. So, you're questioning the billing practices of Kirton

6 McConkie.

7 Q. I'm questioning you, as the trustee, how you spent over

8 $60,000 of trust money --

9 A. (Inaudible)

10 Q. -- (inaudible) just to represent you on this case?

11 A. Okay. First of all, there's two questions there. And I'm

12 not sure the exact amount. I've been locked out of the bank

13 account now. Apparently, you guys have -- have somehow,

14 without a court order, got into the bank account.

15 Q. Well, you -- you've been removed as the trustee, Scott.

16 A. By what? There's no --

17 Q. Well, right in the trust -- yeah. So, all of us voted --

18     **UNIDENTIFIED FEMALE:** Yeah, and we can do it.

19     **TRUSTEE SAMSON:** Okay.

20     **MR. DUFFY WILLIAMS:** (Inaudible)

21     **TRUSTEE SAMSON:** Okay.

22     **THE DEBTOR:** To answer your question, Duffy, yes,

23 all money went into the defense of the trust.

24     **MR. PATTEN:** I -- I do have a follow-up question,

25 Dick. Just one here.

1

2           **FURTHER EXAMINATION**

3 **BY MR. PATTEN:**

4 Q. Scott, was -- were any of those funds used to defend the

5 lawsuit that was brought against the trust against Duffy for

6 the fraud allegations?

7 A. I'm not sure about his number, where he's getting it, but

8 there was -- there was a fraud allegation against Duffy that

9 turned into an alleg- -- an allegation against me of the

10 trust that money was spent from trust funds to defend that

11 case, also.

12     **MR. DUFFY WILLIAMS:** Sorry -- sorry, Mr. Samson, I

13 realize we're not in a court of law. I -- I was finished,

14 but they brought up a point that involves me, so I have one

15 more question to Scott, if you'd allow it?

16     **TRUSTEE SAMSON:** You go right ahead.

17     **MR. DUFFY WILLIAMS:** Okay.

18

19           **FURTHER EXAMINATION**

20 **BY MR. DUFFY WILLIAMS:**

21 Q. Scott, in the defense of a bill and a debt that I owed,

22 did you not tell Brian, Mr. Anderson, my lawyer, that you

23 would pay him out of the trust the bill that I owed him,

24 which you had no right to do, and didn't you, by doing so,

25 bring that problem upon yourself?

1     That had not -- the prob- -- the -- the -- the lawsuit

2 that you took 4 -- $4,000 and paid that bill out of, that was

3 your problem, not my problem. Because hadn't I settled the

4 debt with, uh, Ander- -- uh, with -- with him before -- my

5 lawyer before that? How did you have the right to take money

6 out of the trust to protect yourself against something that

7 you personally brought on yourself?

8 A. I didn't bring anything on myself. I never made any

9 statement to your attorney that I would pay your bill for

10 you, ever. Didn't do anything like that. It all came from

11 you lying to --

12     **TRUSTEE SAMSON:** Okay. Okay. So, either, "Yes" --

13     **THE DEBTOR:** -- me about going --

14     **TRUSTEE SAMSON:** Okay. And part of the problem

15 here is that we are going to try to maintain some kind of

16 semblance of a legal proceeding.

17     **THE DEBTOR:** Yes.

18     **TRUSTEE SAMSON:** Albeit, a quasi-judicial at this

19 point. So, you guys can ask a question, and, Scott, you can

20 answer with a "yes" or a "no," or a further, but we're not

21 going to be telling --

22     **THE DEBTOR:** Right.

23     **TRUSTEE SAMSON:** -- somebody that they lied.

24 That's just not going to fly.

25     **THE DEBTOR:** I see.

1  MR. DUFFY WILLIAMS: Yeah. Because I held that
2  back, and I'm done (inaudible) --
3  TRUSTEE SAMSON: Okay. Thanks -- Thanks, Duffy.
4  MR. DUFFY WILLIAMS: -- and I appreciate it.
5  TRUSTEE SAMSON: Uhm, Kent, I think you had some
6  questions.
7  MR. KENT WILLIAMS: Thank you, Richard.
8
9  EXAMINATION
10  BY MR. KENT WILLIAMS:
11  Q. Scott, in the trust (inaudible) does it not say that his
12  wishes are all of his assets can be divided equally to all of
13  the (audio distortion)? Doesn't it not say that in the
14  trust?
15  A. That's one of (audio distortion), yes.
16  Q. And I'm -- I'm losing some of the audio, but --
17  A. Okay.
18  Q. -- you admit that the trust states that all of the
19  siblings are supposed to be paid equally, correct?
20  A. Yes. With certain caveats. It says taxes are to be paid,
21  lawyers are to be paid, all of those things. Debts are to be
22  paid. So, it's --
23  Q. But all -- but all of the assets that are left over are
24  supposed to be paid equally to all of the siblings, is that
25  not -- that's what the trust states.

1  look, they could find that in the trust document?
2  THE DEBTOR: Yes. Yes, we could.
3  TRUSTEE SAMSON: Okay.
4  Kent, do you have another question?
5  MR. KENT WILLIAMS: Yes, I do.
6  BY MR. KENT WILLIAMS:
7  Q. The other question is that in the accounting that you --
8  after we took -- after I took legal -- someone (inaudible)
9  for it from the trust we finally started to get some of the
10  accounting, you supplied us with a complete billing of the
11  Amex account which you used for your funds, the trust funds,
12  and Hugh's RV funds, is that -- you provided us that?
13  A. I provided an accounting of all accounting for Hugh's RV
14  and the trust, yes.
15  Q. Okay. And does -- isn't it clear that this trust fund
16  money is the RV's monies to pay off the Amex account? Is
17  that not clear?
18  A. It was used, yes, all through -- since 2015, the -- the
19  Amex card with -- my Am- -- personal Amex card was used for
20  the business, and payments were made directly to them.
21  Q. Okay. But isn't it clear in the trust that you were not
22  to intermingle personal funds or trust funds?
23  A. I -- I -- I understand that question, but -- but it had
24  already been being done for years and we had no choice. The
25  only other choice would have been to close the business. I

1  A. It says that, but you're taking it out of context. It
2  also says that you have to pay bills and debts.
3  Q. So, the balance is supposed to be (audio cut out) all of
4  the siblings; is that correct, Scott?
5  A. Yes. Every -- yes, that's -- it's -- everything has been
6  divided equally --
7  Q. Okay.
8  A. -- according to the trust.
9  Q. Okay. So, then, --
10  A. (Inaudible)
11  Q. -- where does it say in that trust that you can pay
12  yourself $5,000 more than any other sibling? Or state that
13  you can pay yourself out of the trust funds $75,000 (audio
14  cut out)?
15  A. It -- it clearly states that Hugh's RV rolled into the
16  trust the debts of Hugh's RV and were part of the estate.
17  Q. There is no debt in Hugh's RV to pay you $75,000; is that
18  correct?
19  TRUSTEE SAMSON: Are -- are there -- are there --
20  I'm just going to keep interjecting myself here, because
21  we're going to keep asking and answering the same question.
22  Are there any provisions in either the will or the trust
23  that the trustee is entitled to reasonable compensation?
24  THE DEBTOR: Yes.
25  TRUSTEE SAMSON: And that if somebody was going to

1  simply was propping up the business with my credit cards.
2  Q. So, isn't it clear that on that Amex account you
3  personally were charging funds? Isn't that clear?
4  A. Me using -- me using it, also? Yes, it is.
5  Q. Okay. Isn't it clear, also, that your wife, Candy, was
6  also using and charging funds in that account for travel, for
7  grocery payments?
8  A. She -- yeah, she was -- yes.
9  Q. So she was using that fund, correct?
10  A. We were both using it. Then we added Hugh's RV, when Hugh
11  lost his credit card. So, yes.
12  Q. Okay.
13  A. But -- but it wasn't her account --
14  Q. So, you -- so, you are admitting -- you're admitting that
15  Candy, your wife, was using the Amex credit card, and Hugh's
16  RV was paying the bill for the Amex credit card. Is that
17  not --
18  MR. SHIMANEK: Dick, I'd -- I'd like to -- the
19  audio is so messed up on my end, I'm not sure if it is for
20  everyone else, that I can't hear clearly if these are
21  allegations that the trust was paying the bill, or Hugh's,
22  the business entity, was paying the bill when the dad was
23  still alive. There's confusion --
24  TRUSTEE SAMSON: Yeah.
25  MR. SHIMANEK: -- from my standpoint. I -- I can't

1 pick it up with the audio --
2     MR. KENT WILLIAMS: Yeah, let me see if I turn this
3 down, the volume, if it helps.
4     TRUSTEE SAMSON: Yeah. And --
5     MR. KENT WILLIAMS: Is that clearer?
6     TRUSTEE SAMSON: And from -- let -- let me just
7 explain something. I -- I'm trying to give the parties more
8 leeway than they would ever have if they were sitting in a
9 courtroom with a judge. I'm trying to give you that leeway.
10 But when you ask a question, and it's answered, then we
11 need to move on. And I -- you guys are asking a whole bunch
12 of what I call "leading questions" that you'd never be able
13 to ask in a courtroom.
14     Again, I'm trying to give you some leeway. I understand
15 there's a lot of tension, and a lot of anxiety. So, if we
16 can kind of take it down a notch.
17     MR. KENT WILLIAMS: Okay.
18     TRUSTEE SAMSON: Try to ask a question without
19 assuming something at the beginning of the question, I'll --
20 I'll give you that opportunity.
21     MR. KENT WILLIAMS: Okay. So, I just --
22     THE DEBTOR: So, what was your question, Kent?
23 BY MR. KENT WILLIAMS:
24 Q. I just want to make it clear that your wife, Candy
25 Williams, was able to use trust funds and Hugh's RV funds to

1 personally pay the Amex card.
2     MR. SHIMANEK: Again, I think this question, --
3     TRUSTEE SAMSON: Yeah.
4     MR. SHIMANEK: -- though, Dick --
5     THE DEBTOR: That's -- yeah, that's not --
6     TRUSTEE SAMSON: Hey, Kent, part of the problem is
7 that when you're -- when you're talking, and for some reason
8 on the Zoom it's breaking up. And, so, I'm not going to have
9 a clean recording of the question.
10     I think what you're trying -- I think the fact that
11 you're trying to establish is that there was this Amex credit
12 card, and that if I heard Mr. -- Scott's testimony was that,
13 yeah, the Amex card was being used to pay a lot of expenses,
14 including some of his own personal expenses.
15     And, I think, Kent, what you're trying to establish
16 through your questioning is the fact that it looks like
17 Scott's wife, Candy, also had access to that credit card. Am
18 I anywhere close to being correct on my interpretation?
19     MR. KENT WILLIAMS: Exactly correct, is that Candy
20 Williams was (audio distortion) and financially from the
21 trust and from Hugh's RV.
22     TRUSTEE SAMSON: Okay. Okay. Alrighty.
23     MR. KENT WILLIAMS: Commingled funds.
24     TRUSTEE SAMSON: Yes.
25     MR. KENT WILLIAMS: (Inaudible)

1 BY MR. KENT WILLIAMS:
2 Q. Is that correct, Scott?
3 A. Dude, I'm not sure -- I'm lost of what you're saying
4 there. But here's the facts. I had a card in my name.
5 Candy is a co-cardholder. She was using the card, also.
6     Then I began using it, at Hugh's request, to prop up
7 Hugh's RV, because it's the only credit card with enough
8 credit limit to do the things we needed to do.
9     But, on top of that, I -- I also used a Chevron card
10 that was only mine and charged that up, and another part
11 place card that was only mine. So, Candy was a cardholder,
12 but there's no way to say she benefited from any of this.
13 Because, in the end, the trust still owes me $37,000.
14 Q. Okay. Let's move on here.
15     Scott, (inaudible) do this. In the revenue that was
16 coming into Hugh's RV there was a lot of cash trading hands.
17 For storage, but also in the rental revenue income. What
18 happened to that cash?
19 A. Okay. So, there's -- the rental revenue income that was
20 cash, I -- I'm not sure what you're saying, but any rentals
21 through, uhm -- Del Monte was the rental agency, and Budget
22 Truck, we had separate card swipes that went through their
23 particular things. So, that went directly to their bank, and
24 then they paid us back commissions.
25     Then you're saying that in the -- in the storage, there

1 was occasionally some cash, that's correct, but almost
2 everybody was on a credit card monthly deal, or prepaid by
3 check. So, there was very little cash. Although, it did
4 occasionally happen.
5     I kept a $200 cash on hand for that, and the money went
6 -- if we got cash, it was put into the bank. Occasionally,
7 we used it for gas, or something else.
8     TRUSTEE SAMSON: Can I -- can I just interject
9 something?
10     And, Scott, this is more of a question directed to you.
11     THE DEBTOR: Yes. Uh-huh.
12     TRUSTEE SAMSON: My experience is, and I -- I mean,
13 I'm sitting here today in the capacity as a trustee, --
14     THE DEBTOR: Yes.
15     TRUSTEE SAMSON: -- so I kind of have a general
16 idea of what a trustee's duties are. In relationship to the
17 Hugh Williams Trust, did there -- I'm assuming that the trust
18 had some kind of a provision that you were to account for
19 income and expenses of the trust on a regular basis.
20     Is that a fair assumption on my part?
21     THE DEBTOR: Yes, it's yearly.
22     TRUSTEE SAMSON: Okay. Did you have accountings
23 done by a professional accountant or someone other than
24 yourself? Did you have that accounting done on an annual
25 basis?

1 **THE DEBTOR:** Okay. Uhm, as far as --
2 **TRUSTEE SAMSON:** Just "yes" or "no." "Yes" or
3 "no."
4 **THE DEBTOR:** Uhm, yes, I believe. The trust was
5 only open for a year. It took us, uhm, almost a
6 year-and-a-half to get it done.
7 **TRUSTEE SAMSON:** Okay, Duffy.
8 Okay. So -- so, here's another follow-up question. Who
9 prepared the trust accountings?
10 **THE DEBTOR:** The CPA firm of Swift -- Swiftcurrent
11 in Kalispell, Montana.
12 **TRUSTEE SAMSON:** Okay. And are -- are copies of
13 those annual accountings available?
14 **THE DEBTOR:** They've all been given out over a year
15 ago.
16 **TRUSTEE SAMSON:** Was there a final accounting? You
17 mentioned that -- that the estate was closed, I'm assuming
18 that's what you mean?
19 **THE DEBTOR:** It is -- it's not closed. It's still
20 open, because --
21 **TRUSTEE SAMSON:** Okay. So has there been a final
22 accounting for 2021?
23 **THE DEBTOR:** For 2021? Yes, that's been given to
24 them.
25 **TRUSTEE SAMSON:** Okay. Does the -- does the --

1 does the trust have any income or expenses to report for
2 2022?
3 **THE DEBTOR:** No. Well -- well -- okay, no. Okay.
4 No income, but in 2022 we have legal bills and a few CPA
5 bills.
6 **TRUSTEE SAMSON:** Okay. And, then, prior to 2021,
7 was there an annual accounting completed?
8 **THE DEBTOR:** Yes.
9 **TRUSTEE SAMSON:** Okay. And have those been -- have
10 copies of those annual accountings been provided to the
11 beneficiaries of the trust?
12 **THE DEBTOR:** Yes.
13 **TRUSTEE SAMSON:** Okay.
14 **UNIDENTIFIED MALE:** Have any of you received any of
15 those accountings, any of the beneficiaries received those
16 accountings from Scott?
17 **UNIDENTIFIED FEMALE:** No.
18 **THE DEBTOR:** Yes. I can give you -- uhm, I can
19 give you copies of emails right now where we sent those.
20 **TRUSTEE SAMSON:** Okay. Just --
21 **THE DEBTOR:** And -- and, then, it's even deeper
22 than that, because of we've already been through this -- the
23 -- the beginnings of an arbitration, there's already been
24 depositions and (inaudible) --
25 **TRUSTEE SAMSON:** Well, it seems to me -- it seems

1 to me, Scott, and I'm sorry to interrupt ya, but my time is
2 running short. I've got another meeting. I have the
3 discretion, as the trust -- as the trustee, to either adjourn
4 or conclude the meeting.
5 My thought is -- Eli, is that this is a classic example
6 of where you need to notice up and conduct a Rule 2004
7 examination, which is, essentially, a function -- the
8 functional equivalent of a deposition, and then subpoena the
9 documents that your clients think that they need.
10 **MR. PATTEN:** Right.
11 **TRUSTEE SAMSON:** Matt, do you disagree with that?
12 **MR. SHIMANEK:** I don't disagree. And, Dick, I
13 think one of the issues becomes one of, again, the
14 questioning here.
15 **TRUSTEE SAMSON:** Yeah.
16 **MR. SHIMANEK:** I think we're talking about cash
17 coming into the business. Not into the trust, into the
18 business. So, that was prior to the establishment of the
19 trust. And, so, I -- I think that it's gotten so convoluted
20 as to what's being asked.
21 **TRUSTEE SAMSON:** Yeah. That -- and that's why I'm
22 asking if there was accountings done. I -- I -- if I
23 understand it, and this is a guess on my part, but it sounds
24 to me like, from 10,000 feet, what happened is Mr. Williams
25 passed away, the trust kicked in, but, in the meantime, the

1 business was still being operated until it could be sold.
2 And, so, I think that, under those circumstances, there
3 should be an accounting that would include all of the
4 business income from the time that the trust was created
5 until the time that the property was sold.
6 And -- and that's the trust information that the trustee
7 should have in his possession, or have it already compiled,
8 based on Scott's testimony.
9 **THE DEBTOR:** Yeah. And that's correct. Your
10 Honor, if I can -- if I can just say this. Basically,
11 everything has been emailed to each of them.
12 **TRUSTEE SAMSON:** Okay.
13 **THE DEBTOR:** It has been given to the attorneys.
14 And, in fact, at this point, if they -- I believe they have
15 already accessed the -- the only bank account, the trust bank
16 account.
17 So, I would say that they have in their hands
18 everything.
19 **TRUSTEE SAMSON:** Okay.
20 **THE DEBTOR:** They have, in fact, (inaudible) the
21 trust account. I sent you a --
22 **TRUSTEE SAMSON:** I -- I don't -- you know, I'm --
23 I'm not going to -- Scott, I'm not going to sit here and say
24 you -- I -- I can't agree whether you mailed or didn't mail
25 it, emailed it, however. That'll be a -- that's a -- that's

1 a disputed fact that will have to be determined.

2 **THE DEBTOR:** Yeah, we can (inaudible) 15 minutes --

3 **TRUSTEE SAMSON:** Kent --

4 **MR. KENT WILLIAMS:** Can I -- can I ask one more

5 question?

6 **TRUSTEE SAMSON:** Yes.

7 **BY MR. KENT WILLIAMS:**

8 **Q. Scott, you just stated that you had sent an (audio**

9 **distortion) --**

10 **TRUSTEE SAMSON:** Kent, we're having a problem with

11 you breaking up, again, and I'm not getting your --

12 **MR. KENT WILLIAMS:** Okay. Hold -- hold on.

13 **BY MR. KENT WILLIAMS:**

14 **Q. Scott, you have -- you just test- -- your testimony just**

15 **stated that you had an accounting for this -- every year the**

16 **trust was active; is that correct?**

17 A. Yeah, that's correct. Now, 2022 is not due yet.

18 **Q. No, no, no. Hold on. Hold on. I'm asking, --**

19 A. That's correct. Yeah, that's correct.

20 **Q. -- did you supply an accounting each year? You didn't**

21 **(audio cut out) anything. I know it was requested by an**

22 **attorney.**

23 **TRUSTEE SAMSON:** Kent? Kent, now --

24 **MR. KENT WILLIAMS:** (Inaudible)

25 **TRUSTEE SAMSON:** -- now you're taking your question

1 and you're twisting it in with facts that you think.

2 The question is --

3 **MR. KENT WILLIAMS:** Okay.

4 **TRUSTEE SAMSON:** -- did he or did he not provide a

5 trust accounting to the beneficiaries every year? He's

6 saying that he did.

7 Is that correct, Scott?

8 **THE DEBTOR:** No, no. Here -- here's what they're

9 saying. Okay? It's not that I did it every year, it's that

10 the first two or -- what? Two years were not -- were not

11 supplied until two years when the forensic accounting was

12 done.

13 **TRUSTEE SAMSON:** Okay.

14 **THE DEBTOR:** So, they have all of it. It wasn't

15 supplied timely at first because of the accounting problems

16 we had.

17 **TRUSTEE SAMSON:** Who -- who did the forensic

18 accounting? Who retained -- who retained the company to do

19 the forensic accounting?

20 **THE DEBTOR:** I did. The trust did.

21 **TRUSTEE SAMSON:** And -- and who did -- who

22 completed the forensic accounting?

23 **THE DEBTOR:** Swift -- Swiftcurrent in Kalispell,

24 Montana.

25 **TRUSTEE SAMSON:** Okay.

1 **MR. KENT WILLIAMS:** In what year? He refused the

2 accounting --

3 **MR. DUFFY WILLIAMS:** That was done last year,

4 Scott. That was just done last year.

5 **THE DEBTOR:** Finally, last year. Before that --

6 **TRUSTEE SAMSON:** Okay. Okay.

7 **MR. DUFFY WILLIAMS:** That was three-and-half-years

8 ago.

9 **TRUSTEE SAMSON:** And I -- and I fully understand

10 that there's a dispute between the beneficiaries and the

11 trustee as to whether or not this information was provided.

12 I also assume that's why this was headed to an arbitration.

13 And I think what's going to happen, as this thing goes

14 forward, depending on what the beneficiaries and their

15 counsel decide to do, some of these questions will be

16 answered. If the information is there, it's there, and it'll

17 be shared. But I don't think we're going to gain any ground

18 today by sitting here arguing during a creditor meeting

19 whether or not the information -- whether or not it was ever

20 provided.

21 **THE DEBTOR:** They have all --

22 **TRUSTEE SAMSON:** Or the timing of the information.

23 Duffy, you had one more question, I think?

24 **MR. DUFFY WILLIAMS:** Well, you guys mentioned --

25 **TRUSTEE SAMSON:** Now, when you say "you guys," who

1 do you mean, Duffy?

2 **MR. DUFFY WILLIAMS:** Well, you. You, sir. You,

3 sir, had mentioned that the business was still running after

4 my father died, and Scott was still receiving a paycheck

5 running the business, that I just want to mention that once

6 -- the day that my father died, the trust took over. And

7 Hugh's RV should have become part of the trust, and any and

8 all of that money and accounting should have been under the

9 trust.

10 Because the trust owned Hugh's RV the day he died.

11 **THE DEBTOR:** And I --

12 **MR. DUFFY WILLIAMS:** It was a DBA, and none, zero,

13 any money was ever deposited into the trust account. That

14 was an infraction by the trustee.

15 **TRUSTEE SAMSON:** Okay.

16 **THE DEBTOR:** The -- the --

17 **TRUSTEE SAMSON:** And, so --

18 **THE DEBTOR:** -- the bank accounts were assumed by

19 the trust. You're saying that I would have to go move the

20 credit card machines to -- from Hugh's RV to --

21 **MR. DUFFY WILLIAMS:** What credit cards? You're

22 saying that you had all of the credit cards.

23 **THE DEBTOR:** No. The credit cards --

24 **TRUSTEE SAMSON:** Okay. Okay. Okay.

25 Eli, I -- I think what we're going to do here, I know

1 Karen had a question, but I think what I'm going to do is
2 we're going to move ahead. Uhm, I'm going to go ahead and
3 adjourn the meeting. I -- I think you and your clients can
4 decide if you want to do a deposition or a Rule 2004 exam.
5 Otherwise, we're going to be sitting here all day
6 arguing over certain things. And I think I've given you and
7 your clients a lot of leeway here today.
8 **MR. PATTEN:** We -- we appreciate it, Dick. And,
9 certainly, we'll look forward to getting our hands on some of
10 these documents --
11 **TRUSTEE SAMSON:** Okay.
12 **MR. PATTEN:** -- and we'll follow the procedures.
13 **TRUSTEE SAMSON:** Can I -- Karen, I saw that you had
14 your hand raised. And if you want to ask a question, I want
15 to give you that opportunity.
16 **MS. PRIEST:** I have -- okay.
17 **MS. CARTER:** I have two questions, too.
18 **TRUSTEE SAMSON:** Okay.
19 **MR. PRIEST:** Mary Ella, I'll go ahead.
20
21 EXAMINATION
22 BY MS. PRIEST:
23 Q. Scott, on 5/24 of '21, last year, --
24 A. Okay.
25 Q. -- I spoke with you in reference to paying out the trust.

1 A. Okay.
2 **Q. You said we had monies in the trust --**
3 A. We did.
4 **Q. -- for (inaudible) for each of us that you could pay out**
5 **within a day, as soon as -- you could pay it out any time,**
6 **uhm, but you never did pay out that money. Now there's only**
7 **$100 in the trust.**
8 A. Right.
9 **Q. My questions to you, you could pay -- have paid it out,**
10 **you didn't pay it out. (Inaudible) had signed a document**
11 **that you had suggested we sign, which we did, which I now --**
12 A. (Inaudible)
13 **Q. Okay. But if this could have been. And I said, this**
14 **could have been done and over way over a year ago.**
15 A. You're (inaudible)
16 **Q. My question is, why are the monies now at zero, when you**
17 **--**
18 A. Because of --
19 **Q. -- had monies (inaudible)?**
20 A. Because of your tax on the trust. It's all attorney's
21 bills. I mean, it's all going to show. I mean, all's there
22 is the trust account. There are payments to McConkie, and
23 there are payments -- a few payments to the CPA in the last
24 year. It's all --
25 **Q. It's (inaudible) just a "yes" or no."**

1 **The next --**
2 A. (Inaudible)
3 **Q. The next question is, you stated in that conversation that**
4 **you had unlimited funds. You had attorneys that would not**
5 **charge you a dime, and you could, uhm, go as long as you**
6 **wanted to go. I said, "You know, this is a problem for us,**
7 **because you haven't paid out in a timely manner, and you say**
8 **it's there. It's less than we expected, but it's sitting**
9 **there." And you wouldn't pay it out.**
10 **So --**
11 A. The taxes were not paid yet. We had to --
12 **Q. No. No.**
13 A. -- (inaudible).
14 **Q. The taxes -- no.**
15 A. The taxes weren't paid.
16 **Q. You said everything -- nothing was -- you told me that**
17 **everything was taken care of and the only thing that was**
18 **needed was for your brothers to sign their forms. Which I**
19 **said --**
20 A. This -- this is not correct.
21 **Q. It is correct.**
22 **TRUSTEE SAMSON:** Okay. So, now, we have a dispute.
23 Karen is saying you said this, and you're denying it. Okay?
24 **THE DEBTOR:** Yeah.
25 **TRUSTEE SAMSON:** Alrighty?

1 **MS. PRIEST:** Sir, I have recorded information that
2 is exactly (inaudible).
3 **TRUSTEE SAMSON:** Yeah. And you can share that with
4 your attorney. Okay?
5 **MS. PRIEST:** Okay. All right.
6 **TRUSTEE SAMSON:** And just so that you understand,
7 this is -- these creditor meetings are kinda weird, in that
8 they give you an opportunity to ask questions, but I -- I'm
9 not -- I don't have a black robe. I just have to kinda use
10 my discretion.
11 Ultimately, some of those types of questions will be
12 presented, I assume, to a judge, and the judge can make that
13 decision.
14 **UNIDENTIFIED MALE:** Well, can I -- can I state
15 this, Scott? I want you to know that this is a Federal
16 Court, and this has been recorded. Okay? So, this is
17 Federal --
18 **TRUSTEE SAMSON:** Okay. Yeah.
19 **UNIDENTIFIED MALE:** Thank you.
20 **TRUSTEE SAMSON:** Mary, are you the person that's on
21 the phone that said you had a question?
22 **MS. CARTER:** Yeah. Uhm, I have a couple that are
23 related.
24 **TRUSTEE SAMSON:** And, so, you've heard all the
25 back-and-forth here, do you kinda understand what I'm trying

1 to avoid? Which is you ask the question, we let Scott
2 answer, and then we go from there, okay?
3     **MS. CARTER:** Yeah, this is good.
4     **TRUSTEE SAMSON:** Okay.
5
6              **EXAMINATION**
7 **BY MS. CARTER:**
8 **Q. Well, We have never heard the answer (inaudible) --**
9     **THE OPERATOR:** Please pardon the interruption.
10 Your conference contains less than three participants at this
11 time and will be disconnected in two minutes. If you would
12 like to continue, press Star 1 now, or the conference will be
13 terminated.
14 **BY MS. CARTER:**
15 **Q. -- and where was -- and where did the money go?**
16 A. Okay. So, the last one that was --
17     **THE OPERATOR:** You have activated the leader help
18 menu. Press Star 0 for technical assistance. Star 1 to
19 reinitiate this help menu. Star 2 for conference roll call.
20 Star 3 for a private roll call. Star 4 for --
21     **THE DEBTOR:** -- and your -- your text. I have
22 documented, and I documented to Kent and his attorney. Each
23 one of those was sold to an individual. Each check was
24 copied, and each check is deposited into the Hugh's RV bank
25 account. (Inaudible)

1 **BY MS. CARTER:**
2 **Q. I don't believe we ever saw the checks that were**
3 **deposited.**
4 A. I -- check your texts, because that's the information I --
5 I gave to the attorney, and you have that --
6     **TRUSTEE SAMSON:** Scott, can you excuse me for two
7 seconds? Is there anybody on the conference on the telephone
8 link?
9     **MR. KENT WILLIAMS:** Mary is.
10     **MS. CARTER:** I am on the --
11     **TRUSTEE SAMSON:** No, she's on the Zoom. I've got a
12 separate line here that --
13     **MS. PRIEST:** No, she's not on Zoom anymore, 'cause
14 I couldn't hear her on that one.
15     **MR. KENT WILLIAMS:** Mary is on the phone.
16     **TRUSTEE SAMSON:** Okay.
17     **THE DEBTOR:** I think she is. (Inaudible), Mary.
18     **TRUSTEE SAMSON:** Mary, Do you have any other
19 questions?
20     **THE DEBTOR:** She talked before, but --
21     **MS. CARTER:** I have one more. I have one more
22 question --
23     **TRUSTEE SAMSON:** Yes.
24     **THE DEBTOR:** Yes.
25     **MS. CARTER:** -- for you, Scott.

1 **BY MS. CARTER:**
2 **Q. Isn't it true that you created small businesses to divert**
3 **funds that should have been paid to Hugh's RV for maintenance**
4 **and repair of the RVs?**
5 A. Absolutely not true. The monies from repairs and -- and
6 the -- Del Monte and Budget, and everything, were deposited
7 directly into the bank account.
8     If I were to do, like, a repair for Del Monte, it gets
9 paid directly to Hugh's RV through wire transfer into his
10 bank account. I --
11 **Q. Okay.**
12     **TRUSTEE SAMSON:** Okay. Okay. Asked and answered.
13     **MS. CARTER:** Okay. I wanted to know that. Okay,
14 that's the end of my questions.
15     **TRUSTEE SAMSON:** Okay. So, here's what we're going
16 to do, folks. Uhm, I want to explain something to you, and I
17 want Mr. Shimanek and Eli to hear this.
18     While we've been in the middle of this conference, or on
19 this creditor meeting, I received an email from the Clerk of
20 the Bankruptcy Court telling me that this case had not been
21 properly noticed to creditors.
22     Uhm, I responded to the email and said, "Well, I'm in
23 the middle of a creditor meeting right now on this case, and
24 I've got about 10 people on the screen." So, I -- I guess,
25 what I'm going to do here is I am not going to conclude this

1 meeting.
2     I am going to adjourn this meeting, because it may be
3 that I may have to, in conjunction with the Clerk's Office,
4 notice up a continued meeting, because it was not properly
5 noticed to creditors. So, that just kind of adds a little
6 bit of insult to injury for everything that you've all been
7 through today.
8     But, so, what I'm going to do is I'm going to announce
9 that we are adjourning the meeting. It's not completed or
10 concluded. Okay? And if I have to reschedule another
11 meeting, then I'll make sure that Mr. Shimanek gets notice.
12 I'll make sure that Eli Patten gets notice. And then you can
13 let your respective clients know that we're going to have to
14 gather on another date and time for this meeting. Okay?
15     And I apologize. I'm not the one that notices up the
16 meetings to creditors.
17     **MR. KENT WILLIAMS:** None of us received notice.
18     **TRUSTEE SAMSON:** Really?
19     **MR. DUFFY WILLIAMS:** Yeah.
20     **THE DEBTOR:** That was the bank of -- the Court,
21 itself, the Court Clerk?
22     **MR. PATTEN:** That was -- yeah, that would have been
23 the Court, itself.
24     **TRUSTEE SAMSON:** Yeah. And I'll try to explain it
25 to everybody. Typically, in a case, any creditor that's

1  listed as a creditor, or as what -- what I call an
2  "interested party," should get notice. And as I understand
3  from the email that I received from the Clerk's Office today
4  is that for some reason on this particular case, and I've
5  seen it happen the last couple of weeks in some other cases,
6  cases did not get properly noticed. Meaning that you didn't
7  receive a notice in the mail telling you about this
8  bankruptcy.
9       So, I think the reason why the Court's now trying to
10 call me is they're probably saying, wait, you can't adjourn
11 this creditor meeting, because not everybody's had notice.
12 So, I just -- I apologize. I-- I -- I'm not the person in
13 charge of handling the noticing function -- functions.
14      So, anyway, Matt, I'll keep you and Eli posted, okay?
15      **MR. SHIMANEK:** Okay.
16      **TRUSTEE SAMSON:** And thank you guys for your
17 patience. But we're going to adjourn today. I've got
18 another meeting starting in about 15 minutes that I have to
19 get ready for.
20      Brenda and Karen and Duffy and Kent and Mary, thank you,
21 again.
22      **MR. DUFFY WILLIAMS:** Thank you, Richard.
23      **MR. KENT WILLIAMS:** Thank you.
24      **TRUSTEE SAMSON:** Okay.
25      **MR. KENT WILLIAMS:** We appreciate it.

1       **TRUSTEE SAMSON:** Scott, thank you for your time.
2       **THE DEBTOR:** Okay.
3       **TRUSTEE SAMSON:** Matt and Eli, thank you for your
4  time.
5       But you're all free to disconnect. Okay?
6       **MR. KENT WILLIAMS:** Hey, Eli? Can you please call
7  me, Eli?
8       **MR. PATTEN:** Yes, definitely.
9       **MR. KENT WILLIAMS:** Thank you.
10      **TRUSTEE SAMSON:** Thanks.
11
12            (Audio concluded.)
13
14
15
16
17
18
19
20
21
22
23
24
25

1                  CERTIFICATE
2
3       I, Julie L. DeLong, certify that the foregoing is a
4  correct transcription from the recording of proceedings in
5  the above-entitled matter to the best of my knowledge, skill,
6  and ability.
7
8       /s/ Julie L. DeLong                    11/06/2023
9  Julie L. DeLong                            Date
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## $

**$1,000 (1)**
37:19
**$1,070,000 (1)**
45:12
**$1,500 (1)**
41:20
**$1,600 (1)**
54:11
**$100 (2)**
42:3;82:7
**$130,715.67 (1)**
34:12
**$14,000 (1)**
55:14
**$200 (2)**
56:22;72:5
**$3.2 (1)**
23:9
**$300 (1)**
55:13
**$360,000 (1)**
57:18
**$37,000 (1)**
71:13
**$4,000 (1)**
64:2
**$4.9 (1)**
50:3
**$426,000 (1)**
56:17
**$476,747.71 (1)**
34:21
**$5,000 (1)**
66:12
**$500 (1)**
53:2
**$60,000 (6)**
19:24;36:8;59:16;
60:3;61:23;62:8
**$600 (1)**
19:6
**$75,000 (3)**
33:8;66:13,17
**$800 (1)**
33:6
**$9,000 (1)**
19:23
**$9,153.33 (1)**
19:11

## '

**'14 (1)**
13:13

## A

**able (3)**
32:4;69:12,25
**Absolutely (2)**
40:20;87:5
**access (1)**
70:17
**accessed (1)**
76:15
**accompanied (1)**
7:8
**according (2)**
60:21;66:8
**account (31)**
14:25;15:2,12,16;
26:10;36:20;37:2,2,18,
19,20,25;38:5,6;40:10;
62:13,14;67:11,16;
68:2,6,13;72:18;76:15,
16,21;80:13;82:22;
85:25;87:7,10
**accountant (1)**
72:23
**accounting (20)**
29:21;67:7,10,13,13;
72:24;73:16,22;74:7;
76:3;77:15,20;78:5,11,
15,18,19,22;79:2;80:8
**accountings (7)**
72:22;73:9,13;74:10,
15,16;75:22
**accounts (6)**
15:14,18;33:25;
36:16;37:9;80:18
**account's (1)**
57:23
**accuracy (1)**
9:16
**accurate (8)**
8:8;9:19;10:8,21;
12:2;36:1,3,9
**accurately (1)**
9:8
**acquired (1)**
14:13
**activated (1)**
85:17
**active (1)**
77:16
**actually (5)**
22:9;38:22;42:17,21;
43:11
**ad (1)**
60:21
**added (1)**
68:10
**additional (1)**
42:10
**address (2)**
8:7,8
**adds (1)**
88:5
**adjourn (5)**
75:3;81:3;88:2;
89:10,17
**adjourning (1)**
88:9

**administration (1)**
24:16
**admit (2)**
5:5;65:18
**admitted (1)**
33:23
**admitting (2)**
68:14,14
**advance (1)**
20:23
**advise (1)**
10:3
**aerial (1)**
21:17
**Affairs (3)**
9:14;10:7;18:25
**again (10)**
4:24;5:21;11:8;
13:19,20;69:14;70:2;
75:13;77:11;89:21
**against (5)**
63:5,5,8,9;64:6
**agency (1)**
71:21
**ago (4)**
11:1;73:15;79:8;
82:14
**agree (1)**
76:24
**agreement (1)**
32:1
**agreements (1)**
26:12
**ahead (10)**
7:2;21:3;25:13;
32:24;43:7;54:9;63:16;
81:2,2,19
**Albeit (1)**
64:18
**alive (1)**
68:23
**alleg- (1)**
63:9
**allegation (2)**
63:8,9
**allegations (2)**
63:6;68:21
**allow (1)**
63:15
**all's (2)**
37:12;82:21
**almost (2)**
72:1;73:5
**along (1)**
57:2
**Alrighty (5)**
12:22;17:11;25:9;
70:22;83:25
**Although (1)**
72:3
**always (4)**
9:4;27:19;43:4,5
**Am- (1)**

**67:19**
**American (5)**
14:15;34:3;41:15;
46:20,24
**Amex (10)**
67:11,16,19,19;68:2,
15,16;70:1,11,13
**amongst (1)**
31:23
**amount (5)**
34:13,18,18;40:1;
62:12
**Ander- (1)**
64:4
**Anderson (1)**
63:22
**announce (1)**
88:8
**annual (4)**
72:24;73:13;74:7,10
**answered (6)**
46:11,12;60:21;
69:10;79:16;87:12
**antique (1)**
56:4
**anxiety (1)**
69:15
**anymore (1)**
86:13
**apart (1)**
15:19
**apologize (5)**
20:23;21:2;35:3;
88:15;89:12
**Apparently (1)**
62:13
**appear (1)**
4:18
**appearing (2)**
7:8;8:24
**appointed (1)**
20:19
**appreciate (4)**
52:18;65:4;81:8;
89:25
**approximate (1)**
42:15
**approximately (3)**
24:7;31:11;43:22
**approximation (1)**
44:2
**AR-15-style (1)**
38:19
**arbitration (19)**
19:21,25;27:8,12;
30:23;31:4;34:16;59:5,
6;60:2,15,16,17,22,24;
61:3,6;74:23;79:12
**arguing (2)**
79:18;81:6
**around (4)**
15:23;20:5;36:25;
37:7

**aside (5)**
36:6,10,14,15;56:6
**assets (13)**
10:11;33:20,20,20,
25,25;34:2;39:16;
40:18,19;46:21;65:12,
23
**assistance (1)**
85:18
**associated (1)**
26:15
**assume (6)**
21:6;29:10;36:3;
61:8;79:12;84:12
**assumed (1)**
80:18
**assuming (3)**
69:19;72:17;73:17
**assumption (3)**
9:5,10;72:20
**atruity (1)**
34:15
**attached (1)**
53:20
**attest (2)**
8:18;28:7
**attorney (11)**
7:9;25:19;30:8;
59:16;61:23,25;64:9;
77:22;84:4;85:22;86:5
**attorneys (7)**
30:19;31:3;43:18;
60:19,22;76:13;83:4
**attorney's (2)**
59:14;82:20
**Audio (21)**
4:2;5:17,18,19;6:21;
35:12;56:9,15,21;
57:21;65:13,15,16;
66:3,13;68:19;69:1;
70:20;77:8,21;90:12
**auditing (1)**
29:23
**August (2)**
19:14,14
**authority (1)**
15:15
**available (4)**
11:20;37:22;58:25;
73:13
**average (1)**
42:14
**avoid (1)**
85:1
**aware (1)**
10:1
**away (5)**
20:8,11;22:1,4;75:25

## B

**back (10)**
15:23;18:15;20:5;

9:23-ap-09001-BPH    Doc# 35-48    Filed 03/11/23    Page 25 of 36

33:6;37:15;39:23;
46:16;52:15;65:2;
71:24
**back-and-forth (1)**
84:25
**bad (1)**
55:10
**balance (2)**
60:10;66:3
**ballpark (1)**
11:2
**bank (24)**
14:25,25;15:12,14,
16,18;26:10;36:15,18,
20;37:24;38:5;57:23;
62:12,14;71:23;72:6;
76:15,15;80:18;85:24;
87:7,10;88:20
**Bankruptcy (18)**
7:5;8:21;9:6,9,14;
10:6,10,24;19:5,19;
25:21;46:6;59:12,13;
60:15;62:3;87:20;89:8
**barely (1)**
42:19
**based (10)**
8:18;12:17;16:7;
31:7;33:12,14;36:23;
46:1,1;76:8
**basically (6)**
28:13;32:19;43:2;
45:8;59:23;76:10
**basis (2)**
72:19,25
**battery (1)**
54:1
**bear (1)**
8:1
**beard (1)**
5:23
**beat (1)**
42:4
**became (5)**
20:13;21:7;22:2,6;
23:18
**become (2)**
9:25;80:7
**becomes (1)**
75:13
**bed (1)**
36:17
**began (2)**
4:2;71:6
**beginning (1)**
69:19
**beginnings (1)**
74:23
**bell (1)**
13:25
**belonged (1)**
53:9
**beneficiaries (12)**
25:7,8;31:12;40:2;

59:24;60:4,9;74:11,15;
78:5;79:10,14
**benefit (1)**
60:9
**benefited (2)**
40:17;71:12
**besides (1)**
27:16
**best (2)**
10:13;52:1
**better (1)**
20:25
**beyond (1)**
39:14
**big (1)**
31:5
**Bigfork (3)**
8:7;35:14,17
**bill (14)**
19:14,21;31:5;59:25;
61:23,25;62:2;63:21,
23;64:2,9;68:16,21,22
**billing (2)**
62:5;67:10
**Billings (1)**
25:20
**bills (5)**
43:18;66:2;74:4,5;
82:21
**bit (9)**
22:13;23:23;30:7,17;
33:15;35:9;39:23;43:8;
88:6
**black (1)**
84:9
**blew (1)**
55:3
**boat (3)**
27:21,25;28:21
**boats (1)**
50:10
**borrowed (1)**
30:24
**borrowing (1)**
56:15
**both (5)**
18:7;51:6;52:1,3;
68:10
**bottom (2)**
51:6;54:4
**bought (1)**
35:18
**brand (1)**
54:19
**break (1)**
43:2
**breaking (2)**
70:8;77:11
**Brenda (1)**
89:20
**Brian (1)**
63:22
**briefly (5)**

12:9;21:20;27:3;
30:17;34:19
**bring (4)**
44:12;57:18;63:25;
64:8
**broke (1)**
42:19
**brothers (1)**
83:18
**brought (8)**
57:14;58:1,13;60:2,
15;63:5,14;64:7
**Budget (2)**
71:21;87:6
**bunch (1)**
69:11
**business (20)**
23:24;24:2;34:4;
35:24;37:10,14,18,19;
43:9,15;67:20,25;68:1,
22;75:17,18;76:1,4;
80:3,5
**businesses (1)**
87:2
**button (1)**
5:19
**buy (2)**
54:15;56:16

## C

**Cadillac (1)**
13:24
**call (8)**
7:25;48:25;69:12;
85:19,20;89:1,10;90:6
**called (3)**
6:10;28:7;31:16
**came (1)**
64:10
**camper (1)**
14:8
**can (67)**
4:10,12,14,16,20,22,
23;5:1,4,6,8,10,25;6:1,
3,4,5,9;7:14;8:18,22;
11:21;12:9;17:7;22:13;
25:12;28:7;30:7;36:25;
39:16;42:14;43:8;44:2;
47:4;48:14,14;49:4;
53:5,5;55:21,21;57:6;
62:18;64:19,19;65:12;
66:11,13;69:16;72:8,8;
74:18,18;76:10,10;
77:2,4,4;81:3,13;84:3,
12,14,14;86:6;88:12;
90:6
**Candy (10)**
34:7,8;35:18;68:5,
15;69:24;70:17,19;
71:5,11
**C-A-N-D-Y (1)**
34:8

**Candy's (1)**
14:1
**capacity (1)**
72:13
**car (2)**
16:14;27:15
**Car- (1)**
56:25
**card (23)**
8:16;19:23;34:4,5;
37:14;41:15;67:19,19;
68:11,15,16;70:1,12,
13,17;71:4,5,7,9,11,22;
72:2;80:20
**cardholder (1)**
71:11
**cards (8)**
19:17;37:13;41:11;
59:20;68:1;80:21,22,
23
**care (2)**
51:19;83:17
**Carhart (1)**
56:25
**cars (1)**
50:10
**CARTER (11)**
81:17;84:22;85:3,7,
14;86:1,10,21,25;87:1,
13
**Carvana (1)**
55:12
**Case (17)**
7:5;8:6,19;9:21,23,
24;10:10;11:5;16:3;
25:21;61:22;62:10;
63:11;87:20,23;88:25;
89:4
**cases (3)**
9:4;89:5,6
**cash (11)**
34:20;35:19;36:17;
71:16,18,20;72:1,3,5,6;
75:16
**catch-up (2)**
20:25;44:14
**cause (1)**
86:13
**caveats (1)**
65:20
**certain (2)**
65:20;81:6
**certainly (1)**
81:9
**Certificate (1)**
48:21
**cetera (2)**
34:1;59:17
**chance (2)**
31:4;50:22
**changes (1)**
10:1
**Chapter (5)**

11:5,6,10;59:23;60:8
**charge (3)**
37:12;83:5;89:13
**charged (2)**
37:14;71:10
**charging (2)**
68:3,6
**chat (1)**
30:7
**check (6)**
37:18;38:2;72:3;
85:23,24;86:4
**checked (1)**
53:1
**checks (3)**
26:11;59:15;86:2
**Chevron (1)**
71:9
**choice (2)**
67:24,25
**chose (1)**
30:25
**chunk (1)**
40:4
**church (4)**
32:11,22;33:1,6
**circle (1)**
15:23
**circuit (1)**
54:2
**circulated (1)**
27:8
**circumstances (2)**
21:22;76:2
**City (3)**
24:1;40:23;49:23
**claim (1)**
34:11
**claiming (1)**
34:16
**clarify (2)**
46:13;48:18
**classic (1)**
75:5
**clean (2)**
28:14;70:9
**cleaned (2)**
28:17;54:6
**clear (10)**
38:4;49:18,24;67:15,
17,21;68:2,3,5;69:24
**cleared (3)**
49:22;50:4;51:8
**clearer (1)**
69:5
**clearly (3)**
60:21;66:15;68:20
**Clerk (2)**
87:19;88:21
**Clerk's (2)**
88:3;89:3
**clients (4)**
75:9;81:3,7;88:13

Min-U-Script®  Charles Fisher Court Reporting  (93) back-and-forth - clients
442 East Mendenhall, Bozeman MT 59715, (406) 587-9016
9:23-ap-09001-BPH   Doc# 35-48   Filed 01/11/23   Page 26 of 36

**close (2)**
67:25;70:18
**closed (2)**
73:17,19
**clothes (3)**
56:22,23,24
**co-cardholder (1)**
71:5
**collecting (1)**
17:23
**coming (3)**
41:18;71:16;75:17
**commercial (2)**
24:9;53:21
**commingled (2)**
33:24;70:23
**commingling (1)**
33:19
**commission (1)**
45:7
**commissions (2)**
45:8;71:24
**company (3)**
16:19;37:16;40:22,
24;78:18
**compensation (3)**
29:14;32:6;66:23
**compiled (1)**
76:7
**complained (2)**
31:21,22
**complaint (1)**
31:24
**complete (2)**
55:18;67:10
**completed (4)**
9:12;74:7;78:22;
88:9
**conclude (2)**
75:4;87:25
**concluded (2)**
88:10;90:12
**conduct (1)**
75:6
**conference (5)**
85:10,12,19;86:7;
87:18
**confusion (1)**
68:23
**conjunction (1)**
88:3
**consider (2)**
41:25;55:7
**considerably (1)**
32:8
**considered (2)**
32:20,21
**contains (1)**
85:10
**context (1)**
66:1
**continue (2)**
30:23;85:12

**continued (2)**
32:12;88:4
**contractor (1)**
28:24
**contributions (1)**
14:12
**conversation (2)**
53:13;83:3
**conversations (1)**
36:23
**convoluted (1)**
75:19
**cool (1)**
52:19
**cop- (1)**
58:24
**copied (1)**
85:24
**copies (10)**
10:16,21;16:2,5;
26:11;30:4;58:24;
73:12;74:10,19
**copy (3)**
8:15;11:19;48:18
**corrections (1)**
10:1
**cost (1)**
60:19
**counsel (1)**
79:15
**couple (8)**
7:22;27:10,10,15,16;
42:23;84:22;89:5
**course (7)**
26:13;27:8,20;29:15;
30:5;33:23;38:6
**Court (12)**
8:21;9:14,19;10:2;
11:18;62:14;63:13;
84:16;87:20;88:20,21,
23
**courtroom (2)**
69:9,13
**courts (1)**
20:17
**Court's (1)**
89:9
**cover (2)**
38:2,3
**CPA (3)**
73:10;74:4;82:23
**create (1)**
26:14
**created (3)**
30:15;76:4;87:2
**credit (22)**
19:17,23;35:18;
36:16;37:13,14;41:11;
43:14;59:20;68:1,11,
15,16;70:11,17;71:7,8;
72:2;80:20,21,22,23
**creditor (11)**
7:4;8:14;9:25;19:6;

79:18;84:7;87:19,23;
88:25;89:1,11
**creditors (5)**
10:14;41:13;87:21;
88:5,16
**Crowley (1)**
25:20
**crucial (1)**
52:21
**currently (2)**
11:25;12:18
**cut (4)**
6:21;66:3,14;77:21

**D**

**dad (9)**
18:23;20:10;21:7;
29:3;31:14;32:21;43:1;
48:4;68:22
**dad's (4)**
37:14;42:7;51:13,21
**date (2)**
9:24;88:14
**day (11)**
20:13;21:7;22:5,8,
23;60:16,17;80:6,10;
81:5;82:5
**days (6)**
19:5;20:14,21;25:1,
2;60:18
**DBA (1)**
80:12
**deal (3)**
28:14;55:13;72:2
**dealership (1)**
55:11
**death (5)**
20:19;30:15;32:11,
13,16
**debt (11)**
16:13;32:21,21;33:3,
3;34:11,17;35:10;
63:21;64:4;66:17
**DEBTOR (81)**
7:12,16,18,20;24:1,5,
9;45:14,20;46:12,15,
18;47:9;50:18,25;52:9,
11,13,17,24;53:7,11,
17;54:4;58:15,18,20,
23;59:1,5,7,17;60:25;
61:2,7,12,15;62:22;
64:13,17,22,25;66:24;
67:2;69:22;70:5;72:11,
14,21;73:1,4,10,14,19,
23;74:3,8,12,18,21;
76:9,13,20;77:2;78:8,
14,20,23;79:5,21;
80:11,16,18,23;83:24;
85:21;86:17,20,24;
88:20;90:2
**debtor's (1)**
17:3

**debts (4)**
35:11;65:21;66:2,16
**December (1)**
11:15
**decide (2)**
79:15;81:4
**decided (1)**
9:5
**decision (2)**
60:23;84:13
**deducted (1)**
36:12
**deeper (1)**
74:21
**defend (3)**
60:20;63:4,10
**defense (3)**
31:8;62:23;63:21
**definitely (1)**
90:8
**Del (3)**
71:21;87:6,8
**denying (1)**
83:23
**depending (1)**
79:14
**deposited (4)**
80:13;85:24;86:3;
87:6
**deposition (8)**
27:20;28:19;33:16,
16,24;56:10;75:8;81:4
**depositions (1)**
74:24
**deposits (1)**
57:23
**derived (1)**
37:23
**describe (1)**
12:9
**determine (1)**
34:12
**determined (2)**
51:23;77:1
**detrimental (1)**
60:1
**Dick (9)**
23:22;25:15;30:17;
44:12;62:25;68:18;
70:4;75:12;81:8
**Dick's (1)**
36:21
**died (9)**
21:7;22:6,8,23;
23:18;48:4;80:4,6,10
**different (1)**
49:7
**dime (1)**
83:5
**dining (1)**
41:19
**directed (1)**
72:10

**directly (4)**
67:20;71:23;87:7,9
**disagree (2)**
75:11,12
**disbursed (1)**
25:1
**disbursement (1)**
25:2
**disbursements (1)**
24:25
**discharge (1)**
11:12
**disclose (1)**
10:11
**disclosed (2)**
15:15,17
**disconnect (1)**
90:5
**disconnected (1)**
85:11
**discretion (4)**
32:22;33:13;75:3;
84:10
**discussed (3)**
27:3,7,8
**discussing (1)**
59:12
**discussion (1)**
33:19
**disposed (1)**
54:5
**dispute (2)**
79:10;83:22
**disputed (1)**
77:1
**distortion (9)**
35:12;56:9,15,21;
57:21;65:13,15;70:20;
77:9
**distributed (3)**
25:7;31:10;40:1
**distribution (2)**
31:19;34:20
**divert (1)**
87:2
**divided (3)**
58:10;65:12;66:6
**Division (1)**
48:23
**divorce (6)**
22:7,20,20,22;32:15;
43:17
**divorced (1)**
11:4
**document (2)**
67:1;82:10
**documentation (1)**
32:2
**documented (3)**
26:11;85:22,22
**documents (8)**
9:7;10:7;17:2;21:20;
25:12;32:19;75:9;

81:10
**dollars (1)**
58:10
**donations (1)**
32:10
**done (16)**
29:21;31:18,19;32:7,
16;33:12;65:2;67:24;
72:23,24;73:6;75:22;
78:12;79:3,4;82:14
**doubt (1)**
45:21
**down (12)**
27:9,13;28:10;35:19;
39:11;43:14;46:8,14;
50:11;54:1;69:3,16
**dress (1)**
57:1
**driver's (2)**
8:16,23
**Dude (1)**
71:3
**due (2)**
32:22;77:17
**DUFFY (59)**
5:20,23;28:7;44:17,
23;45:15,18,22;46:23;
47:1,3,11;48:14,15,16;
49:3,11;50:20;51:6,12;
52:15,20;54:8,9,10,17;
57:7,10;58:15;59:8,11,
18,21;61:11,14,18,20;
62:20,22;63:5,8,12,17,
20;65:1,3,4;73:7;79:3,
7,23,24;80:1,2,12,21;
88:19;89:20,22
**duly (1)**
7:18
**during (10)**
19:4;26:13;27:8,12,
20;32:23;33:16,23;
36:21;79:18
**duties (1)**
72:16

**E**

**earlier (1)**
36:21
**earmarked (2)**
36:6;60:3
**earned (2)**
29:12,20
**educate (2)**
22:13;25:10
**effort (1)**
51:9
**efforts (1)**
53:14
**either (8)**
6:13;10:17,24;31:6;
36:7;64:12;66:22;75:3
**elaborate (2)**

37:1;43:8
**electrical (1)**
51:24
**Eli (11)**
25:13,19;44:14;75:5;
80:25;87:17;88:12;
89:14;90:3,6,7
**Ella (1)**
81:19
**else (5)**
19:10;44:12;55:10;
68:20;72:7
**email (1)**
87:19,22;89:3
**emailed (2)**
76:11,25
**emails (1)**
74:19
**employee (3)**
18:4;29:2,2
**employment (1)**
26:13
**enclosed (1)**
27:2
**end (9)**
6:18;9:21;19:14;
25:3;41:18;50:5;68:19;
71:13;87:14
**ended (1)**
23:10
**engine (1)**
54:19
**enough (6)**
6:25;37:17;56:2;
61:18,19;71:7
**entities (3)**
10:22;26:14,15
**entitled (2)**
50:22;66:23
**entitlements (1)**
23:5
**entity (1)**
68:22
**equally (4)**
65:12,19,24;66:6
**equipment (2)**
22:12;39:13
**equivalent (1)**
75:8
**essentially (1)**
75:7
**establish (2)**
70:11,15
**established (1)**
30:15
**establishment (1)**
75:18
**estate (8)**
13:23;22:10;23:20;
24:3,6,9;66:16;73:17
**et (2)**
33:25;59:17
**even (13)**

28:5,8;39:1;42:17,
19;43:2,17;50:19;51:7;
53:25;55:11;62:4;
74:21
**everybody (12)**
6:19;20:24;31:19,20,
20,21;49:24;50:16,17;
52:18;72:2;88:25
**everybody's (1)**
89:11
**everyone (1)**
68:20
**exact (3)**
41:1;62:12
**exactly (4)**
20:16;29:22;70:19;
84:2
**exam (1)**
81:4
**EXAMINATION (9)**
8:4;25:17;44:22;
63:2,19;65:9;75:7;
81:21;85:6
**example (3)**
12:10;36:17;75:5
**except (1)**
43:1
**excluding (1)**
26:7
**Excuse (4)**
14:23;26:7;37:13;
86:6
**exhausted (1)**
19:20
**expected (1)**
83:8
**expense (2)**
25:11;53:18
**expenses (6)**
37:15;58:4;70:13,14;
72:19;74:1
**experience (1)**
72:12
**explain (3)**
69:7;87:16;88:24
**explained (2)**
21:22;23:9
**Express (2)**
34:4;41:15
**extra (1)**
43:15

**F**

**F-250 (2)**
12:24,24
**F-3 (1)**
54:18
**F-350 (4)**
12:25;13:1;54:19;
55:8
**fact (13)**
7:3;8:18,20,24;28:7,

12;38:25;59:1;70:10,
16;76:14,20;77:1
**facts (2)**
71:4;78:1
**fair (8)**
9:10;11:23;16:16;
18:22;47:8;61:18,18;
72:20
**fairly (1)**
39:9
**Family (4)**
30:11,13;53:16;56:6
**far (3)**
37:14,16;73:1
**father (7)**
20:8;22:1;23:24;
33:2;53:10;80:4,6
**father's (8)**
20:6;23:10;30:15;
32:3,11;33:9;36:7;
41:19
**Fawn (3)**
8:7,11;12:21
**Federal (4)**
10:17;12:15;84:15,
17
**feel (1)**
33:2
**fees (2)**
60:4;61:22
**feet (1)**
75:24
**FEMALE (11)**
4:9,11,19,25;5:3,11;
54:15;57:4;61:5;62:18;
74:17
**fence (4)**
51:7,8,11;53:22
**few (6)**
38:1;42:25;57:1,6;
74:4;82:23
**fifth-wheel (1)**
26:19
**figure (3)**
4:22;34:25;53:1
**figured (4)**
19:25;29:19,22;43:5
**file (6)**
9:5;16:2,7;17:6;
29:18;60:8
**filed (17)**
8:6;9:18,21,23,24;
10:2,10,17,22,24;
11:18;14:24;19:5;
21:22;29:15,25;60:15
**filing (5)**
9:14;19:19;35:24;
59:22;62:3
**filled (1)**
39:17
**final (2)**
73:16,21
**finalized (2)**

24:20,21
**finally (2)**
67:9;79:5
**financed (1)**
26:25
**Financial (7)**
9:13;10:6;14:12;
18:25;32:15;43:12,16
**financially (1)**
70:20
**find (2)**
17:7;67:1
**fine (1)**
6:20
**finish (1)**
57:7
**finished (2)**
30:24;63:13
**firearms (3)**
38:10,11,13
**firm (5)**
19:7,8;25:20;59:15;
73:10
**first (7)**
6:18;11:24;25:24;
57:8;62:11;78:10,15
**five (1)**
59:14
**Fleck (1)**
25:20
**fly (1)**
64:24
**folks (1)**
87:16
**follow (1)**
81:12
**following (2)**
32:11,13
**follow-up (2)**
62:24;73:8
**Ford (1)**
12:24;54:19;55:7
**forensic (5)**
29:23;78:11,17,19,
22
**forklift (1)**
50:10
**forms (1)**
83:18
**forward (3)**
37:25;79:14;81:9
**found (2)**
31:22;36:19
**four (3)**
12:5;26:2,7
**fraud (2)**
63:6,8
**free (1)**
90:5
**front (5)**
11:21;19:3;31:19;
42:17;43:24
**full (1)**

17:18
**fully (1)**
79:9
**function (2)**
75:7;89:13
**functional (1)**
75:8
**functions (1)**
89:13
**fund (2)**
67:15;68:9
**funds (35)**
15:11;19:20,22;
26:22,22;31:5,8;32:12;
33:24,25;35:4,6,13,16;
36:5,7,8,13,16;37:22;
63:4,10;66:13;67:11,
11,12,22,22;68:3,6;
69:25,25;70:23;83:4;
87:3
**further (6)**
30:7;44:11;53:2;
63:2,19;64:20

### G

**gain (1)**
79:17
**garage (2)**
51:21;53:18
**gas (1)**
72:7
**gate (4)**
28:5;51:11;53:22,23
**gather (1)**
88:14
**gathered (2)**
6:18;7:23
**gathering (1)**
17:13
**gave (3)**
34:14;57:22;86:5
**general (3)**
21:23;58:20;72:15
**generally (1)**
37:10
**gentleman (1)**
28:17
**gets (3)**
87:8;88:11,12
**given (7)**
42:11,13;61:8;73:14,
23;76:13;81:6
**goes (2)**
37:16;79:13
**Good (3)**
25:22;42:5;85:3
**goods (1)**
26:16
**Gotta (1)**
4:21
**grand (1)**
32:3

gray (1)
49:12
**great (1)**
55:20
**grocery (1)**
68:7
**gross (3)**
42:11;58:13,22
**ground (1)**
79:17
**guess (7)**
20:13;25:24;29:1;
43:12;58:5;75:23;
87:24
**gun (1)**
38:14
**guns (1)**
38:10
**guy (1)**
28:14
**guys (6)**
62:13;64:19;69:11;
79:24,25;89:16

### H

**half (1)**
17:18
**hand (5)**
7:14;39:11,14;72:5;
81:14
**handgun (1)**
38:18
**handled (1)**
59:4
**handling (1)**
89:13
**hands (3)**
71:16;76:17;81:9
**happen (3)**
72:4;79:13;89:5
**happened (7)**
19:20;22:19;49:9;
53:15;60:1;71:18;
75:24
**happening (1)**
6:12
**hard (2)**
46:22;60:12
**hardship (1)**
60:19
**hardships (1)**
60:14
**hate (1)**
43:25
**hauled (2)**
39:22;53:18
**head (1)**
42:18
**headed (1)**
79:12
**hear (19)**
4:17,20,23;5:4,4,8,

10,12;6:3,4,5,7,9,12,14,
19;68:20;86:14;87:17
**heard (6)**
22:14;24:15;50:20;
70:12;84:24;85:8
**hearing (1)**
53:12
**heated (1)**
52:16
**heirs (1)**
24:25
**held (4)**
17:5;22:3,23;65:1
**help (5)**
22:13;23:22;43:13;
85:17,19
**helps (1)**
69:3
**here's (4)**
71:4;73:8;78:8;
87:15
**Hey (2)**
70:6;90:6
**hide (1)**
56:9
**hit (1)**
6:7
**Hold (9)**
4:7;17:13;50:12,17;
57:16;77:12,12,18,18
**holds (1)**
16:18
**home (10)**
16:14;22:5;23:10;
35:14;43:22;45:10,11,
19,24,25
**Honor (1)**
76:10
**hopefully (1)**
11:21
**horse (2)**
27:11,15
**house (6)**
22:15,19,22;23:1,17;
35:17
**How's (2)**
45:16;62:4
**huge (1)**
59:25
**Hugh (6)**
20:6;30:11,13,13;
68:10;72:17
**H-U-G-H (1)**
30:13
**Hugh's (52)**
18:24;25:25;26:4,10,
14,16,22;27:6,17,23;
28:6,10,10,24;29:21;
31:13;33:20;35:24;
36:7;37:8,8;39:24;
40:18;42:11;43:11,20;
46:8;47:5,10;56:5;
57:12,14;58:13;66:15,

16,17;67:12,13;68:10,
15,21;69:25;70:21;
71:6,7,16;80:7,10,20;
85:24;87:3,9
**Huh (5)**
4:14,23;5:9,10,10
**Huh-uh (1)**
49:5

### I

**I- (1)**
89:12
**idea (6)**
14:6;21:23;41:8;
42:16;43:1;72:16
**identity (1)**
8:14
**Inaudible (39)**
6:24;13:9,15;18:12;
21:25;23:1;37:6;46:2;
47:22;49:14;52:9;
55:20;60:13,19;62:9,
10,20;65:2,11;66:10;
67:8;70:25;71:15;
74:24;76:20;77:2,24;
82:4,10,12,15,19,25;
83:2,13;84:2;85:8,25;
86:17
**include (3)**
10:14;23:10;76:3
**included (5)**
27:17;39:18,19;
41:12;53:10
**including (2)**
22:15;70:14
**income (11)**
15:8;18:18;29:11;
58:12,13;71:17,19;
72:19;74:1,4;76:4
**incorrect (1)**
34:3
**independent (1)**
28:24
**indicate (2)**
14:24;16:12
**individual (3)**
28:16;47:21;85:23
**individually (1)**
40:2
**information (18)**
8:2,18;9:8,15,18;
10:2;11:17;12:14;13:3;
42:25;49:2;76:6;79:11,
16,19,22;84:1;86:4
**infraction (1)**
80:14
**initial (2)**
17:2;31:19
**injury (1)**
88:6
**inspected (1)**
53:24

16,17;67:12,13;68:10,
15,21;69:25;70:21;
71:6,7,16;80:7,10,20;
85:24;87:3,9
**insult (1)**
88:6
**intended (1)**
36:14
**intention (1)**
32:1
**intentions (2)**
32:3;33:9
**interest (7)**
11:25;12:4,7,24;
13:17;14:9,25
**interested (1)**
89:2
**interests (1)**
12:9
**interject (2)**
48:15;72:8
**interjecting (1)**
66:20
**intermingle (1)**
67:22
**Internal (1)**
10:18
**interpretation (1)**
70:18
**interrupt (1)**
75:1
**interruption (2)**
23:16;85:9
**intervening (1)**
9:23
**into (21)**
15:11;20:11;22:23;
26:10;31:13;43:16;
53:2;58:13;62:14,23;
63:9;66:15;71:16;72:6;
75:17,17,17;80:13;
85:24;87:7,9
**inventory (6)**
25:25;26:4,16;27:18;
28:6;46:8
**involves (1)**
63:14
**IRS (1)**
30:3
**issued (1)**
48:23
**issues (1)**
75:13
**item (3)**
28:2;51:20;55:20
**items (8)**
27:14;28:4;39:7,13;
49:11,15;50:4,9

### J

**January (1)**
20:9
**jet (1)**
27:21
**job (1)**
56:19

**joint (2)**
16:8;22:24
**judge (2)**
69:9;84:12,12
**judgment (2)**
33:12;34:17
**July (1)**
48:24
**June (3)**
24:21;35:5,8
**junk (1)**
38:22
**jurisdiction (1)**
10:25

**K**

**Kalispell (2)**
73:11;78:23
**Karen (6)**
26:5,8;81:1,13;
83:23;89:20
**Kawasaki (5)**
38:21,22;39:1,20;
55:16
**keep (7)**
36:25;42:6;43:4,6;
66:20,21;89:14
**keeping (1)**
52:19
**keepsake (1)**
41:21
**KENT (48)**
5:25;6:5,6,10;32:19;
57:5,9;60:2;61:8,9;
65:5,7,10;67:4,5,6;
69:2,5,17,21,22,23;
70:6,15,19,23,25;71:1;
77:3,4,7,10,12,13,23,
23,24;78:3;79:1;85:22;
86:9,15;88:17;89:20,
23,25;90:6,9
**Kenworth (1)**
50:10
**kept (4)**
27:9,13;43:13;72:5
**kicked (1)**
75:25
**kind (12)**
18:15;20:4,4;41:18;
43:14;52:16,18;64:15;
69:16;72:15,18;88:5
**kinda (4)**
39:23;84:7,9,25
**Kirton (1)**
62:5
**knew (1)**
56:14
**knowing (1)**
26:3
**knowledge (1)**
10:13
**KSLcom (1)**

42:2
**KT250 (1)**
39:5

**L**

**Lake (6)**
19:10;23:25;24:1;
40:22;42:2;49:23
**Lane (2)**
8:7,11
**large (1)**
40:4
**Lariat (1)**
12:24
**last (33)**
12:5;17:18,20,22;
18:12,18;28:19;29:16;
30:5;31:24;34:9,14,15;
38:6;40:12;42:16,21,
23,25;43:19;44:25;
55:17;57:20,22;61:14,
16;79:3,4,5;81:23;
82:23;85:16;89:5
**late (1)**
35:5
**Laughing (1)**
6:8
**law (4)**
19:7,8;22:22;63:13
**lawsuit (2)**
63:5;64:1
**lawyer (2)**
63:22;64:5
**lawyers (1)**
65:21
**lawyers' (1)**
60:4
**lawyer's (1)**
61:22
**lead (1)**
43:16
**leader (1)**
85:17
**leading (1)**
69:12
**leased (2)**
50:5;53:20
**least (2)**
15:6;31:15
**leave (1)**
6:8
**leaving (1)**
6:19
**led (1)**
13:3
**ledger (1)**
58:20
**leeway (4)**
69:8,9,14;81:7
**left (7)**
19:23;28:4;31:5;
40:5;56:18;59:9;65:23

**legal (4)**
33:3;64:16;67:8;
74:4
**legitimate (1)**
33:2
**less (3)**
32:9;83:8;85:10
**license (2)**
8:17,23
**lied (1)**
64:23
**lien (1)**
16:18
**life (7)**
18:7,13;37:11,12,16;
42:20;60:1
**limit (1)**
71:8
**line (3)**
51:6;54:4;86:12
**link (1)**
86:8
**list (4)**
9:7;10:11,13;41:18
**listed (17)**
13:23;15:15;45:11;
46:6;47:4,7,12;51:20;
52:25;56:22;59:13,14,
14,19,25,25;89:1
**listen (1)**
56:17
**literally (1)**
51:11
**little (13)**
5:14;22:13;23:23;
30:7,17;31:4;33:15;
35:9;39:23;43:8;44:15;
72:3;88:5
**live (1)**
45:10
**lived (1)**
23:17
**living (2)**
40:21;45:19
**loaning (1)**
43:13
**location (1)**
51:10
**locked (2)**
53:22;62:12
**long (6)**
11:1,14;13:10;14:21;
17:16;83:5
**look (6)**
12:25;25:13;58:14,
16;67:1;81:9
**looked (6)**
12:16,16;21:20;
32:18;41:4;53:2
**looking (8)**
11:20;12:13,15;
13:19;17:6;18:25;
43:25;48:20

**looks (4)**
6:15;16:7;48:21;
70:16
**losing (1)**
65:16
**lost (2)**
68:11;71:3
**lot (16)**
7:23;23:7,7;26:4;
28:4,13,14,18;49:13,
18;55:4;69:15,15;
70:13;71:16;81:7
**love (1)**
4:21
**lucky (1)**
43:2
**lying (1)**
64:11

**M**

**machines (1)**
80:20
**mail (2)**
76:24;89:7
**mailed (1)**
76:24
**mailing (2)**
8:7,8
**maintain (2)**
36:17;64:15
**maintained (1)**
38:6
**maintenance (1)**
87:3
**making (1)**
24:24
**MALE (3)**
74:14;84:14,19
**manager (2)**
40:25;57:12
**managing (1)**
56:5
**manner (1)**
83:7
**Mary (18)**
4:5,5,16,18,19,20,22,
23;5:3,8,10;6:10;81:19;
84:20;86:9,15,17,18;
89:20
**match (2)**
8:20,24
**Matt (9)**
7:9;16:24,25;24:13;
37:7;46:1;75:11;89:14;
90:3
**matter (2)**
32:20;52:16
**may (7)**
35:2;37:18;39:7,17;
48:22;88:2,3
**Maybe (11)**
4:23,25,25;5:1,3,17;

15:5;22:13;23:22;
48:18;53:15
**McConkie (3)**
61:21;62:6;82:22
**mean (18)**
30:2;36:10;37:23;
43:10;51:11;52:21;
54:24;56:14,25;57:11,
14;58:9;60:12;72:12;
73:18;80:1;82:21,21
**meaning (2)**
16:13;89:6
**meantime (1)**
53:23;75:25
**medical (1)**
59:25
**meet (2)**
25:22,23
**meeting (18)**
7:5,24;8:14;9:25;
75:2,4;79:18;81:3;
87:19,23;88:1,2,4,9,11,
14;89:11,18
**meetings (2)**
84:7;88:16
**member (1)**
40:3
**members (2)**
53:16;56:6
**memory (1)**
36:13
**mention (1)**
80:5
**mentioned (12)**
22:19;26:19;28:17;
30:19;36:20,24;38:5;
40:8;43:8;73:17;79:24;
80:3
**menu (2)**
85:18,19
**messed (1)**
68:19
**methods (1)**
36:25
**microphone (1)**
5:14
**middle (4)**
22:6,22;87:18,23
**might (7)**
4:8;13:3;17:1;19:8,
19;22:20;33:3
**milli- (1)**
38:16
**millimeter (1)**
38:18
**million (11)**
22:5,9,15;23:4,4,9;
24:7,18;32:8;39:24;
50:4
**mind (2)**
39:17;44:12
**mine (4)**
27:19;40:6;71:10,11

**mine's (1)**
6:6
**minus (2)**
24:8;58:12
**minute (1)**
23:18
**minutes (3)**
77:2;85:11;89:18
**miscellaneous (2)**
22:7;39:6
**missed (1)**
4:8
**missing (5)**
39:21;49:12,12;
55:17,19
**model (1)**
13:12;38:17;39:3
**money (37)**
15:6,7;19:4,13,15;
20:3;22:2;26:8;28:15;
30:24;36:25;37:1,7,18;
38:2;42:22;43:13,15;
56:15,18;58:1;59:19,
19;60:3,6,10;61:21;
62:8,23;63:10;64:5;
67:16;72:5;80:8,13;
82:6;85:15
**monies (5)**
35:7;40:15;67:16;
82:2,16,19;87:5
**Montana (12)**
8:7,16,23;10:18,25;
11:14;48:11,21,22,24;
73:11;78:24
**Monte (3)**
71:21;87:6,8
**month (5)**
41:5;45:3,6;58:7,11
**monthly (2)**
41:2;72:2
**more (17)**
5:6;19:6;23:7;51:24;
55:1,8,8;57:3;62:3;
63:15;66:12;69:7;
72:10;77:4;79:23;
86:21,21
**mortgage (9)**
12:16;16:19,22;17:3,
5,10;40:22;41:2;42:20
**most (7)**
25:1,5;37:25;42:20,
22,22;43:9
**Motor (1)**
48:23
**motorcycle (6)**
38:22,23;39:1,4;
55:16,18
**motorcycles (1)**
38:21
**move (9)**
36:25;48:12;54:14,
18;57:2;69:11;71:14;
80:19;81:2

**moved (5)**
37:1,7;48:3,11;50:5
**moving (5)**
30:10,10;33:15;38:9;
61:17
**much (9)**
7:21;22:2;29:19;
40:8;41:2;43:22;45:3;
52:4;58:1
**mute (3)**
5:21;6:1,7
**muted (2)**
6:6;16:25
**mute's (1)**
5:1
**myself (4)**
25:10;44:15;64:8;
66:20

## N

**NABA (1)**
55:14
**name (19)**
7:11;14:2,5,18,20;
15:2,4;16:19;17:3;
22:23;25:19;26:23;
28:16,20;34:7,9;47:23,
25;71:4
**nauseam (1)**
60:21
**nebulous (1)**
18:15
**need (8)**
6:22;9:8;10:2;16:5;
48:10;69:11;75:6,9
**needed (4)**
9:5;48:11;71:8;
83:18
**needs (2)**
5:17;42:9
**net (2)**
40:1;58:22
**netting (1)**
58:22
**new (1)**
54:19
**next (3)**
59:2;83:1,3
**Nice (1)**
25:23
**nobody (2)**
31:21,23
**nominal (1)**
39:9
**None (5)**
36:19;40:11;51:2;
80:12;88:17
**nor (1)**
17:3
**normally (1)**
32:23
**North (1)**

49:23
**notch (1)**
69:16
**noted (2)**
32:1;34:11
**notice (9)**
39:6;75:6;88:4,11,
12,17;89:2,7,11
**noticed (6)**
5:16;12:13;38:10;
87:21;88:5;89:6
**notices (1)**
88:15
**noticing (1)**
89:13
**November (1)**
9:25
**Number (8)**
7:5;8:20,21;19:2;
42:17;44:3;57:19;63:7

## O

**obligated (2)**
41:11;60:5
**obligations (1)**
41:2
**obvious (1)**
21:2
**obviously (2)**
6:14;52:25
**occasionally (3)**
72:1,4,6
**occur (1)**
24:19
**odd (1)**
57:14
**off (7)**
5:2;9:18;31:20;
35:10;39:22;42:18;
67:16
**offered (2)**
54:15;55:13
**offering (1)**
54:11
**offhand (1)**
44:7
**Office (2)**
88:3;89:3
**once (1)**
80:5
**one (29)**
4:4,16;5:5;14:25;
25:2;26:5,8;41:20;
42:10;49:12;57:1;59:9,
9,14;61:14,16;62:5;
63:14;65:15;75:13,13;
77:4;79:23;85:16,23;
86:14,21,21;88:15
**ongoing (1)**
22:20
**only (16)**
13:16;14:2,2,24;

38:5;53:19;58:12;
59:23;67:25;71:7,10,
11;73:5;76:15;82:6;
83:17
**onto (1)**
50:5
**open (2)**
73:5,20
**operate (1)**
26:15
**operated (1)**
76:1
**OPERATOR (2)**
85:9,17
**opportunity (4)**
9:15;69:20;81:15;
84:8
**order (1)**
62:14
**Otherwise (2)**
32:5;81:5
**out (43)**
4:22;6:15,21;15:7;
19:25;21:21;23:22;
25:5;29:19,22;31:22;
39:17;40:22;43:7,13;
49:1;50:3;51:8;53:1;
55:9;56:17;59:18,18,
23,23;62:12;63:23;
64:2,6;66:1,3,13,14;
73:14;77:21;81:25;
82:4,5,6,9,10;83:7,9
**Outback (1)**
14:4
**outside (2)**
38:24;56:1
**over (16)**
15:14;29:15;30:5;
38:6;50:23;59:16;60:3;
61:22;62:2,7;65:23;
73:14;80:6;81:6;82:14,
14
**owe (1)**
16:13
**owed (3)**
36:11;63:21,23
**owes (1)**
71:13
**own (10)**
26:14;38:11,13,19,
21;39:1;41:14,15;52:5;
70:14
**owned (9)**
12:11,19,20;13:10;
14:21;23:24;27:14;
50:6;80:10
**ownership (6)**
11:25;12:4,23;13:16;
14:9;28:9
**owns (2)**
12:21;16:18

## P

**Pace (5)**
14:15,15;27:2;46:20,
24
**paid (38)**
19:4,4,10,13,17,22,
23;29:4;30:20;32:11,
21,23;33:4;35:9,19;
37:13,15;43:3;44:5,25;
45:4,6;59:15;61:21,22;
64:2;65:19,20,21,22,
24;71:24;82:9;83:7,11,
15;87:3,9
**papers (2)**
46:7;59:13
**paperwork (3)**
10:6;57:22;61:8
**pardon (2)**
26:3;85:9
**part (20)**
7:24;9:10;23:18;
24:15;26:4;27:17;
31:13;35:20;41:12;
49:25;51:15;52:22,25;
64:14;66:16;70:6;
71:10;72:20;75:23;
80:7
**partially (1)**
19:22
**participants (1)**
85:10
**particular (3)**
39:3;71:23;89:4
**parties (1)**
69:7
**parts (2)**
39:21;55:17
**party (1)**
89:2
**pass (1)**
20:8
**passed (5)**
20:11;22:1,4,22;
75:25
**past (1)**
33:17
**patience (1)**
89:17
**PATTEN (19)**
4:4;6:4,15,21,24;
25:15,18,19;44:11,15,
19;62:24;63:3;75:10;
81:8,12;88:12,22;90:8
**pay (22)**
19:5,15;31:8;32:16;
37:21;45:5;60:4;63:23;
64:9;66:2,11,13,17;
67:16;70:1,13;82:4,5,6,
9,10;83:9
**paycheck (2)**
37:24;80:4

Min-U-Script®
9:23-ap-09001-BPH   Doc# 35-48   Filed 07/15/23   Page 31 of 36
Charles Fisher Court Reporting
442 East Mendenhall, Bozeman MT 59715, (406) 587-9016
(98) mine's - paycheck

**paychecks (1)**
29:5
**paying (6)**
42:20;60:9;68:16,21,
22;81:25
**payment (4)**
33:8;35:20;36:6;
58:6
**payments (9)**
17:17;30:18;42:20;
43:7;67:20;68:7;82:22,
23,23
**payroll (1)**
40:25
**people (3)**
23:6;50:23;87:24
**per (2)**
31:9;45:3
**period (1)**
9:24
**person (2)**
84:20;89:12
**personal (17)**
13:23;20:17;21:14;
29:10;35:24;36:8;
37:10,11,12,16,19;
38:8;51:13;52:5;67:19,
22;70:14
**personally (6)**
9:15;40:17;56:11;
64:7;68:3;70:1
**perspective (1)**
22:14
**petition (3)**
9:9;33:1,5
**phone (4)**
6:21;23:16;84:21;
86:15
**photo (1)**
49:6
**photographs (1)**
27:6
**photos (1)**
27:7
**pick (1)**
69:1
**picture (3)**
8:23;27:9,12
**piece (2)**
53:4;56:23
**piggy (1)**
36:18
**place (2)**
53:19;71:11
**playing (2)**
20:25;44:13
**please (3)**
7:15;85:9;90:6
**plus (3)**
24:7;57:18;62:3
**point (13)**
10:5;15:8;19:18;
24:24;25:6;29:25;

52:12,14;54:5;61:24;
63:14;64:19;76:14
**police (1)**
28:7
**portion (1)**
50:5
**position (2)**
32:15;40:24
**possess (3)**
38:11,13,19
**possession (3)**
39:2;40:9;76:7
**possible (4)**
27:10;44:17;62:4,4
**posted (1)**
89:14
**potential (1)**
10:1
**practices (1)**
62:5
**preliminary (1)**
7:22
**prepaid (1)**
72:2
**preparation (1)**
9:13
**prepare (1)**
9:8
**prepared (1)**
73:9
**presented (1)**
84:12
**presently (3)**
27:25;28:21;41:7
**press (2)**
85:12,18
**pretty (1)**
42:4
**previous (7)**
12:18;23:3;26:24;
32:17,18;43:11;49:1
**previously (2)**
10:24;30:20
**price (1)**
41:9
**PRIEST (6)**
81:16,19,22;84:1,5;
86:13
**primarily (1)**
18:21
**primary (1)**
15:8
**printed (1)**
54:2
**prior (4)**
8:14,19;74:6;75:18
**private (1)**
85:20
**prob- (2)**
54:2;64:1
**probably (11)**
20:21,24;21:9;38:1,
25;42:1,3;43:24;48:5,

22;89:10
**problem (8)**
54:2;63:25;64:3,3,
14;70:6;77:10;83:6
**problems (2)**
51:24;78:15
**procedures (1)**
81:12
**proceed (1)**
49:19
**proceeding (1)**
64:16
**professional (1)**
72:23
**profitable (2)**
42:21,23
**prop (1)**
71:6
**properly (3)**
87:21;88:4;89:6
**property (48)**
12:1,4,7,20;13:24;
17:3,5;22:2,4,9,14;
23:1,2,4,25;24:2,17;
32:8;36:6,11;39:24;
41:6;43:3,5;49:22;
50:3,5,21;51:2,3,6,7,
13,17,18,18,18;53:4,
10,19,20,21,24;54:6;
56:7;58:5,6;76:5
**propping (1)**
68:1
**protect (1)**
64:6
**protected (1)**
60:6
**protection (1)**
60:6
**provide (3)**
16:1;30:4;78:4
**provided (15)**
8:15,20,21;9:7;
10:16;12:14;16:21,24;
17:2;32:19;67:12,13;
74:10;79:11,20
**provision (1)**
72:18
**provisions (1)**
66:22
**pulls (1)**
55:14
**purchase (6)**
26:23;35:13,16,20;
41:9;47:20
**purchased (4)**
26:5,8;41:19;48:6
**purpose (2)**
9:6;59:22
**put (11)**
4:13;15:6;21:3;
37:24;39:11;44:3;
51:22,23;53:19;54:19;
72:6

### Q

**quasi-judicial (1)**
64:18
**que- (2)**
47:3,3
**questionable (1)**
51:22
**quite (2)**
23:3;31:3

### R

**rack (2)**
47:14,16
**raise (1)**
7:14
**raised (1)**
81:14
**rather (1)**
25:10
**reached (1)**
21:21
**reading (1)**
35:1
**ready (1)**
89:19
**real (7)**
12:1,4,7;22:10;24:3,
6,9
**realize (1)**
63:13
**really (2)**
56:16;88:18
**reason (5)**
31:2;32:4;70:7;89:4,
9
**reasonable (3)**
51:9;53:3;66:23
**reasons (1)**
13:24
**recall (9)**
11:5,12;17:10;27:9;
33:21;37:5;40:1;44:6;
49:10
**receive (4)**
29:4;31:16;35:4;
89:7
**received (8)**
29:8;34:20;56:17;
74:14,15;87:19;88:17;
89:3
**receiving (2)**
17:16;80:4
**record (5)**
7:4,7,11;8:13;21:4
**recorded (2)**
84:1,16
**recorder (1)**
7:3
**recording (1)**
70:9

**recover (1)**
31:5
**red (5)**
27:5;46:7;47:5,12,13
**redundant (1)**
21:1
**reference (2)**
39:6;81:25
**referenced (1)**
38:10;39:8
**refinish (1)**
42:6
**reflect (5)**
7:7;11:25;12:23;
29:11;32:2;44:8
**reflecting (1)**
33:9
**refused (1)**
79:1
**regarding (2)**
27:21;33:7
**register (2)**
48:2,7
**registered (1)**
47:23,25;48:4
**regular (1)**
72:19
**reinitiate (1)**
85:19
**related (3)**
10:7;46:24;84:23
**relates (1)**
25:25
**relationship (1)**
72:16
**remain (1)**
10:7
**remaining (1)**
40:9
**remember (4)**
11:22;43:23;49:12;
54:11
**removed (2)**
51:21;62:15
**rental (3)**
71:17,19,21
**rentals (1)**
71:20
**rented (1)**
49:22
**repair (2)**
87:4,8
**repairs (2)**
26:15;87:5
**report (1)**
74:1
**represent (1)**
62:10
**representative (2)**
20:17;21:14
**representing (1)**
25:20
**request (1)**

**71:**6
**requested (4)**
21:20;30:20,21;
77:21
**required (1)**
7:25
**requirement (1)**
16:1
**reschedule (1)**
88:10
**resided (1)**
11:14
**residence (6)**
12:10,17,18,21;
16:18;41:3
**residing (1)**
12:10
**re-sign (1)**
5:18
**respect (2)**
32:3;33:10
**respective (1)**
88:13
**respond (1)**
50:23
**responded (1)**
87:22
**response (2)**
19:1,7
**responsibility (5)**
36:1;49:15,18,21;
50:8
**responsible (5)**
35:24;50:12;51:1,5;
52:23
**rest (1)**
54:6
**resurfaced (1)**
42:9
**retained (3)**
9:6;78:18,18
**retired (1)**
17:23
**retirement (2)**
31:16;40:7
**Return (2)**
12:15;13:21
**returned (1)**
33:1
**Returns (14)**
10:17,21;12:14;
13:20;16:2,3,8;29:11,
18,24;30:5;44:8;58:21,
25
**Revenue (6)**
10:18;42:11,19;
71:15,17,19
**review (1)**
9:15
**reviewed (1)**
8:19
**reviewing (1)**
13:2

**revise (1)**
21:6
**Richard (5)**
57:5,5,5;65:7;89:22
**rid (2)**
28:12,14
**right (26)**
4:16;6:10;7:14;9:21;
11:16;17:7;24:5;31:18;
32:7;34:23;35:22;45:9,
23,24;48:3;51:20;
62:17;63:16,24;64:5,
22;74:19;75:10;82:8;
84:5;87:23
**ring (1)**
13:25
**robe (1)**
84:9
**Rockwood (3)**
14:6,7;26:19
**role (1)**
20:11
**roll (2)**
85:19,20
**rolled (2)**
31:13;66:15
**room (2)**
4:13;41:19
**roughly (2)**
55:14;58:10
**ruined (1)**
43:14
**Rule (2)**
75:6;81:4
**running (4)**
7:3;75:2;80:3,5
**rust (1)**
56:1
**rusted (1)**
39:21
**rusting (1)**
55:9
**RV (39)**
18:24;24:3;25:25;
26:4,10,14,17;28:6,24;
31:13;33:20;36:7;37:8;
42:12;43:20;46:8;47:5,
10;56:5;57:13,14;
58:13;66:15,16,17;
67:12,13;68:10,16;
69:25;70:21;71:7,16;
80:7,10,20;85:24;87:3,
9
**RVs (1)**
87:4
**RV's (8)**
26:22;27:6,17,23;
28:10;29:21;40:18;
67:16

**S**

**sale (5)**

25:3;26:9;36:12;
49:19;50:4
**sales (3)**
24:3;26:12,15
**Salt (6)**
19:10;23:25;24:1;
40:22;42:2;49:23
**same (6)**
14:5;27:5;40:6;
44:15;47:6;66:21
**SAMSON (155)**
4:7,10,12,20;5:5,13,
22,24;6:3,5,8,13,17,23;
7:1,13,21;8:5,13;9:1;
16:24;17:4,8,11,13,15;
20:23;21:8;24:11,13,
14;44:13,20;45:17;
46:13,16,20;47:2,8;
48:14,17;50:16,19;
52:8,10,12,14,18;53:5,
8,12;54:3,7,9,16;57:2,
7;58:14,17,19,21,24;
59:2,6,10;60:23;61:1,4,
10,13,16;62:19,21;
63:12,16;64:12,14,18,
23;65:3,5;66:19,25;
67:3;68:24;69:4,6,18;
70:3,6,22,24;72:8,12,
15,22;73:2,7,12,16,21;
25;74:6,9,13,20,25;
75:11,15,21;76:12,19,
22;77:3,6,10,23,25;
78:4,13,17,21,25;79:6,
9,22,25;80:15,17,24;
81:11,13,18;83:22,25;
84:3,6,18,20,24;85:4;
86:6,11,16,18,23;
87:12,15;88:18,24;
89:16,24;90:1,3,10
**save (2)**
25:12;28:14
**saw (5)**
13:19;27:12;55:17;
81:13;86:2
**saying (18)**
24:7;29:8;31:15;
37:9;50:12,14;51:5;
58:2,12;71:3,20,25;
78:6,9;80:19,22;83:23;
89:10
**scheduled (3)**
7:5;27:3;39:8
**schedules (18)**
9:9,13;10:6;11:18,
19,24;12:23;13:19;
14:24;16:12;19:3;
34:11;38:9;39:8,18;
41:12;46:22;59:13
**SCOTT (50)**
5:16,23;7:6,12;
14:21;17:16,19;2:21:5;
22:1,13;23:24;24:15;
25:19;44:24;48:17;

49:9;50:20,22;52:10,
10;53:5,5;55:4;57:11;
59:12,22;62:15;63:4,
15,21;64:19;65:11;
66:4;71:2,15;72:10;
74:16;75:1;76:23;77:8,
14;78:7;79:4;80:4;
81:23;84:15;85:1;86:6,
25;90:1
**Scott's (4)**
59:11;70:12,17;76:8
**screen (5)**
8:22,25;23:7;49:2;
87:24
**second (5)**
4:7;6:19;17:14;
48:15;50:17
**seconds (2)**
14:23;86:7
**securable (1)**
53:4
**secure (12)**
49:13,15;50:9,21;
51:1,6,7,10;52:1,4;
53:4,14
**secured (3)**
16:13;28:4;53:22
**Security (7)**
8:16,19,21;15:9,11;
17:16,25
**seeing (3)**
4:14;5:13,14
**seem (1)**
21:1
**seems (2)**
74:25,25
**self-employed (1)**
18:22
**sell (3)**
42:1,3;53:24
**selling (1)**
32:7
**semblance (1)**
64:16
**sent (3)**
74:19;76:21;77:8
**separate (3)**
15:18;71:22;86:12
**separated (1)**
22:21
**separately (1)**
26:25
**September (3)**
9:21,22;30:23
**Service (1)**
10:19
**set (5)**
36:6,10,14,15;56:6
**sets (1)**
25:24
**settled (4)**
29:19;30:1,2;64:3
**seven (2)**

29:16;30:5
**several (1)**
49:11
**severance (2)**
31:16;40:7
**shape (1)**
55:20
**share (1)**
84:3
**shared (1)**
79:17
**Shasta (3)**
26:2,3,9
**Shimanek (27)**
7:9;8:15;9:6,7,12;
10:16;17:1,6,9,12;
21:21,21;23:22;24:2,6,
12;45:13;46:10;68:18,
25;70:2,4;75:12,16;
87:17;88:11;89:15
**shirts (1)**
57:1
**short (1)**
75:2
**shortly (1)**
21:21
**show (4)**
39:10;58:21,22;
82:21
**showed (1)**
8:6
**showing (1)**
5:9
**sibling (3)**
25:21;59:14;66:12
**siblings (7)**
31:15;34:12;36:24;
41:20;65:19,24;66:4
**sic (1)**
34:15
**side (1)**
25:21
**sign (3)**
5:17;82:11;83:18
**signatory (1)**
15:15
**signed (3)**
9:18;31:20;82:10
**signer (1)**
34:5
**similar (2)**
24:4;33:7
**simple (1)**
31:2
**simply (1)**
68:1
**sister (1)**
4:4
**sisters (1)**
32:5
**sit (1)**
76:23
**sitting (7)**

38:24;56:1;69:8;
72:13;79:18;81:5;83:8
**six (1)**
9:22
**Slow (1)**
46:14
**small (1)**
87:2
**Smith (1)**
28:20
**Social (7)**
8:16,19,20;15:9,11;
17:16,25
**sold (13)**
23:4;24:9,16,20;
26:16;28:2;39:24;50:3;
53:21,23;76:1,5;85:23
**solely (1)**
15:2
**somebody (4)**
19:10;48:6;64:23;
66:25
**somehow (1)**
62:13
**someone (3)**
4:25;67:8;72:23
**somewhere (2)**
45:1;59:16
**son (1)**
30:25
**soon (2)**
20:10;82:5
**Sorry (7)**
4:4;17:1;32:24;
52:20;63:12,12;75:1
**sort (1)**
25:24
**sound (1)**
36:9
**Sounds (2)**
4:21;75:23
**source (2)**
15:8;35:16
**speaking (2)**
5:20;37:10
**specific (1)**
39:13
**specifically (1)**
31:14
**specifics (1)**
21:24
**spent (4)**
35:6;40:13;62:7;
63:10
**spiraled (1)**
43:14
**spoke (2)**
30:17;81:25
**Spotted (3)**
8:7,9;12:21
**spouse (3)**
12:7,11;16:8
**SRX (1)**

13:24
**standpoint (1)**
68:25
**Star (6)**
85:12,18,18,19,20,20
**start (5)**
7:2,10;11:17;25:13;
54:1
**started (2)**
17:23;67:9
**starting (1)**
89:18
**state (10)**
7:10;10:17,18;11:14;
48:21;49:1;50:6;51:18;
66:12;84:14
**stated (3)**
77:8,15;83:3
**Statement (8)**
9:13;10:6;16:16;
18:22,25;34:15;57:22;
64:9
**states (3)**
65:18,25;66:15
**step (2)**
20:11;39:23
**sticker (2)**
55:2,2
**still (12)**
8:8;41:21;42:5;
43:12;44:13;55:2;
68:23;71:13;73:19;
76:1;80:3,4
**stole (1)**
51:11
**stolen (4)**
28:5,13;49:11;51:8
**storage (6)**
27:7,23;47:5,9;
71:17,25
**straight (1)**
37:25
**strained (1)**
32:15
**stuff (6)**
28:12,13;35:12;
37:12,14;51:4
**Subaru (1)**
14:4
**subpoena (1)**
75:8
**suggested (1)**
82:11
**suit (1)**
57:1
**summer (2)**
33:17,17
**supplied (3)**
67:10;78:11,15
**supplies (1)**
39:7
**supply (1)**
77:20

**supposed (3)**
65:19,24;66:3
**sure (21)**
20:16;23:3,6,8;31:3;
38:4;40:25;41:5;44:19,
20;46:23;48:16;50:19;
51:2;62:12;63:7;68:19;
71:3,20;88:11,12
**surprise (1)**
45:11
**Swift (2)**
73:10;78:23
**Swiftcurrent (2)**
73:10;78:23
**swipes (1)**
71:22
**sworn (1)**
7:18
**symbol (1)**
5:14

## T

**table (2)**
41:20,23
**tables (1)**
41:20
**talk (1)**
28:8
**talked (4)**
6:17,18;55:16;86:20
**talking (13)**
5:7;18:6;30:12;34:3,
18;37:8;46:17;47:6;
49:4;50:23;53:9;70:7;
75:16
**tape (1)**
7:3
**Tax (16)**
10:17;12:14,15;
13:19,24;16:2,3;29:10,
18,24;30:4;44:8;46:1;
58:21,24;82:20
**taxes (10)**
35:24;36:7,11;42:25;
56:7;58:16;65:20;
83:11,14,15
**technical (1)**
85:18
**technology (1)**
4:21
**telephone (1)**
86:7
**telling (3)**
64:21;87:20;89:7
**ten (1)**
20:24
**tenancy (1)**
22:24
**tension (1)**
69:15
**terminated (1)**
85:13

**terms (1)**
8:13
**test- (1)**
77:14
**testified (1)**
27:21
**testimony (3)**
70:12;76:8;77:14
**texts (1)**
86:4
**Thanks (4)**
25:15;65:3,3;90:10
**That'll (1)**
76:25
**theirs (1)**
23:1
**thinking (1)**
11:3
**though (1)**
70:4
**thought (1)**
75:5
**thoughts (1)**
17:13
**three (3)**
31:15;32:5;85:10
**three-and-half-years (1)**
79:7
**timely (2)**
78:15;83:7
**times (4)**
20:25;37:17,21;38:1
**timing (1)**
79:22
**tithing (3)**
32:10,16;33:10
**title (10)**
13:1;39:1;40:24;
41:1;48:19,20,20,21,
23;49:1
**titled (4)**
14:2,5;26:23;48:22
**today (12)**
7:8,23;8:14;9:25;
10:3;12:10;72:13;
79:18;81:7;88:7;89:3,
17
**told (2)**
56:11;83:16
**took (9)**
55:11,12;59:23;60:3;
64:2;67:8,8;73:5;80:6
**tools (5)**
39:7,10,11,13,14
**top (5)**
42:4,18;47:14,16;
71:9
**total (2)**
19:6;62:2
**totally (1)**
29:20
**touched (1)**
34:19

**towards (1)**
30:10
**towed (1)**
53:18
**tr- (1)**
59:18
**traced (1)**
54:1
**traded (1)**
26:24
**trading (1)**
71:16
**trailer (30)**
14:8,16,17;26:3,20,
24;27:2,5,6;46:6,7,7,
16,18,24;47:4,5,6,12,
18,20;48:6,11,19,22;
49:4,6,6,7,9
**trailers (7)**
26:2,9;27:11,13,16,
16;50:10
**transaction (1)**
24:19
**transfer (1)**
87:9
**transposed (1)**
35:3
**travel (2)**
26:20;68:6
**traveled (1)**
35:9
**tried (8)**
43:4;51:7;52:1,4;
53:1,24;54:1;55:10
**Trooper (10)**
50:9;51:13,20;52:22,
24;53:9,15,24;54:12,18
**trouble (4)**
42:22;43:9,12,16
**Truck (4)**
35:12;50:10;54:25;
71:22
**true (6)**
9:19;10:7,21;38:23;
87:2,5
**trust (107)**
15:16,22;19:20,22;
20:6,6,12;21:6;22:2,3;
24:16;25:1,5,5;26:22;
28:15;30:11,11,12,13;
31:8,9,14,24;32:12;
33:20,24;34:20;35:23;
40:2,3,18;49:15,18;
50:3,9;51:17,18,19,21;
52:22,25;53:10;54:11;
59:19,24;60:3,5,7,20;
62:8,17,23;63:5,10,10,
23;64:6;65:11,14,18,
25;66:8,11,13,16,22;
67:1,9,11,14,15,21,22;
68:21;69:25;70:21;
71:13;72:17,17,19;
73:4,9;74:1,11;75:3,17,

19,25;76:4,6,15,21;
77:16;78:5,20;80:6,7,9,
10,13,19;81:25;82:2,7,
20,22
**TRUSTEE (174)**
4:7,10,12,20;5:5,13,
22,24;6:3,5,8,13,17,23;
7:1,13,21;8:5,13;9:1;
16:24;17:4,8,11,13,15;
20:5,6,11,13,19,23;
21:7,8;22:2;24:11,13,
14;32:6,22;35:23;
44:13,20;45:17;46:13,
16,20;47:2,8;48:14,17;
50:16,19;52:8,10,12,
14,18,22;53:5,8,12;
54:3,7,9,16;57:2,7,12;
58:14,17,19,21,24;
59:2,6,10;60:23;61:1,4,
10,13,16;62:7,15,19,
21;63:16;64:12,14,18,
23;65:3,5;66:19,23,25;
67:3;68:24;69:4,6,18;
70:3,6,22,24;72:8,12,
13,15,22;73:2,7,12,16,
21,25;74:6,9,13,20,25;
75:3,11,15,21;76:6,12,
19,22;77:3,6,10,23,25;
78:4,13,17,21,25;79:6,
9,11,22,25;80:14,15,
17,24;81:11,13,18;
83:22,25;84:3,6,18,20,
24;85:4;86:6,11,16,18,
23;87:12,15;88:18,24;
89:16,24;90:1,3,10
**trustee's (1)**
72:16
**trusts (1)**
30:14
**trust's (3)**
28:10;50:8;51:3
**try (11)**
4:23;5:5,9;11:2;
25:11;48:18,18;53:14;
64:15;69:18;88:24
**trying (13)**
21:15;25:10;28:12;
43:13;52:21;69:7,9,14;
70:10,11,15;84:25;
89:9
**t-shirts (1)**
57:1
**turn (1)**
69:2
**turned (2)**
41:4;63:9
**turns (1)**
25:5
**twice (1)**
45:6
**twisting (1)**
78:1
**two (12)**

14:23;36:15;42:21;
56:6;60:18;62:11;
78:10,10,11;81:17;
85:11;86:6
**two-and-a-half (1)**
40:12
**types (1)**
84:11
**Typically (1)**
88:25

## U

**U- (1)**
16:21
**UDOT (1)**
49:22
**Uh (22)**
14:4;16:1;19:10;
23:17;26:16,19;27:5,
21;30:10,17,18;35:17;
39:6;40:17;42:11;43:6,
19;48:12;49:14;57:11;
64:4,4
**Uhm (104)**
11:3,15;15:4,5,16,21,
24;16:21;17:1,18;18:4,
6,19;19:14,15;20:4,13,
24;21:5;22:7,19;23:2,
24;25:11,13;26:19,20;
27:2,3,13;28:3,23;
29:10,17,21;30:4,6;
31:13;32:5,14;33:11,
15;34:2,11,14,19;35:8,
18;36:5,20,21;37:17;
38:9,9,14,18,18,22,25;
39:16,23;40:3,5,16,25;
41:11,24;42:1,4,8,10,
16,16,19,21,24;43:19,
23,25;47:21;48:3,5;
49:17,18;50:19;51:14;
52:19;57:13,22;59:4,
19;61:13;65:5;71:21;
73:1,4,5;74:18;81:2;
82:6;83:5;84:22;87:16,
22
**ultimately (2)**
53:15;84:11
**under (6)**
23:3;36:17;60:5,6;
76:2;80:8
**understands (1)**
49:25
**unfortunately (1)**
52:14
**UNIDENTIFIED (14)**
4:9,11,19,25;5:3,11;
54:15;57:4;61:5;62:18;
74:14,17;84:14,19
**unit (1)**
51:25
**United (2)**
16:22;17:9

**unlimited (1)**
83:4
**unmute (1)**
5:21
**unmuted (1)**
5:25
**unsecurable (1)**
51:10
**unsecured (1)**
41:12
**un-sign (1)**
5:18
**up (26)**
17:22;19:15;23:10;
25:20;28:14,17;42:1,3,
4;43:6;48:3;49:22;
55:3,14;57:7;63:14;
68:1,19;69:1;70:8;
71:6,10;75:6;77:11;
88:4,15
**upfront (1)**
31:18;32:7
**upon (3)**
30:15;33:12;63:25
**use (2)**
69:25;84:9
**used (16)**
15:4,5,7;19:21;
26:22;31:8;34:4;48:12;
50:11;63:4;67:11,18,
19;70:13;71:9;72:7
**using (9)**
60:6;68:4,4,6,9,10,
15;71:5,6
**Utah (6)**
11:1;12:19,20;24:1;
49:1;50:6
**utility (5)**
14:16,17;27:16;
46:18,24
**utilized (2)**
36:24;40:18

## V

**valid (1)**
34:17
**valuable (2)**
45:24;51:22
**valuation (3)**
22:10;23:2,9
**value (17)**
22:8;38:25;39:20,21;
41:6,25;43:5;45:11,18;
51:22,23,25;53:1;54:5;
55:7;56:3,24
**valued (5)**
22:4,5,15;53:2,3
**various (1)**
36:24
**vehicle (3)**
13:10,16;48:23
**vehicles (7)**

13:23;14:13;22:7,12;
27:10,13;52:5
**verification (1)**
8:14
**verify (1)**
8:23
**via (1)**
7:8
**Victor (2)**
28:20,21
**video (1)**
7:8
**view (1)**
21:17
**volume (2)**
5:1;69:3
**voted (1)**
62:17

## W

**W-2 (4)**
18:4,18;29:2,9
**wait (1)**
89:10
**waiting (1)**
4:13
**Watch (2)**
6:1,1
**wave (1)**
5:3
**way (5)**
6:8;31:6;60:2;71:12;
82:14
**weekly (1)**
29:4
**weeks (3)**
9:23;37:21;89:5
**weird (1)**
84:7
**weren't (1)**
83:15
**what's (6)**
5:15;6:12;28:16;
56:25;75:20;79:13
**where's (1)**
6:2
**Whoa (6)**
46:14;50:16;52:8,8,
8,8
**whole (5)**
18:7,13;23:7;61:23;
69:11
**Wholesale (1)**
17:9
**wi- (1)**
22:6
**wife (20)**
14:1;15:3,18;16:18;
23:10;38:13;40:4,15,
17,21;41:11,15;43:11,
11,12;45:10;68:5,15;
69:24;70:17

**wife's (8)**
15:4;22:6;26:23;
33:20,25;34:2,5,7
**Williams (95)**
4:5;5:16,20,23,25;
6:6,10;7:6,7,10,12,14;
8:6,22,24;9:2,4;11:5,
19;20:6,21,5;30:11,13;
34:9;44:17,23;45:15,
18,22;47:1,3,11;48:16;
49:3;51:12;52:20;54:8,
10,17;57:5,9,10;59:8,
11,18,21;61:11,14,18,
20;62:20;63:12,17,20;
65:1,4,7,10;67:5,6;
69:2,5,17,21,23,25;
70:19,20,23,25;71:1;
72:17;75:24;77:4,7,12,
13,24;78:3;79:1,3,7,24;
80:2,12,21;86:9,15;
88:17,19;89:22,23,25;
90:6,9
**Williams' (1)**
8:15
**willing (1)**
30:4
**win (1)**
31:3
**wire (1)**
87:9
**wish (1)**
33:2
**wishes (3)**
32:14,20;65:12
**within (7)**
20:14,21;23:2;25:1,
2,2;82:5
**without (4)**
6:22;43:25;62:14;
69:18
**witnessed (2)**
31:15;32:5
**won (1)**
60:22
**words (1)**
33:14
**work (2)**
18:24;26:14
**worked (11)**
18:4,12,12,12,23;
20:16;29:2;35:8,9;
43:19;57:12
**working (3)**
17:22;18:3,5
**works (1)**
40:22
**worse (1)**
43:17
**worth (6)**
24:7;32:8;53:25;
56:22,23,25
**write (1)**
38:1

Charles Eisher Court Reporting
442 East Mendenhall, Bozeman MT 59715, (406) 587-9016

**writing (2)**
32:1;33:9
**written (1)**
37:18
**wrong (1)**
35:1

### Y

**ya (3)**
6:3;42:10;75:1
**yard (3)**
27:7,23;49:16
**year (31)**
16:2;17:18,19,20,22;
23:3;29:15,17;31:25;
42:11,13;43:19,22;
44:24;48:2;54:21;
57:18;58:16;73:5,14;
77:15,20;78:5,9;79:1,3,
4,5;81:23;82:14,24
**year-and-a-half (1)**
73:6
**yearly (2)**
43:2;72:21
**years (22)**
12:5;15:6;29:16,24,
25;30:5;31:24;32:17,
18,23;38:7,24;40:12;
42:21,23;43:1;44:25;
45:8;57:13;67:24;
78:10,11
**years' (1)**
56:7

### Z

**zero (4)**
38:25;53:3;80:12;
82:16
**Zillow (3)**
45:12,20,21
**Zoom (4)**
7:8;70:8;86:11,13

### 0

**0 (1)**
85:18

### 1

**1 (2)**
85:12,18
**1,700 (1)**
41:5
**1,800 (1)**
41:5
**10 (3)**
15:6;38:6;87:24
**10,000 (1)**
75:24
**1099 (2)**

29:2,8
**10th (2)**
9:25;48:24
**11,000 (2)**
61:24;62:2
**11423 (1)**
8:9
**12 (2)**
57:13;58:10
**13 (2)**
11:6;55:8
**14,000 (1)**
55:8
**15 (2)**
77:2;89:18
**19 (1)**
11:3
**19- (1)**
18:19
**1975 (1)**
39:5
**1989 (3)**
14:15;27:2;46:24
**1999 (1)**
11:3
**1st (1)**
30:22

### 2

**2 (3)**
4:25;13:11;85:19
**2,500 (1)**
45:6
**20 (3)**
35:8;38:24;42:17
**20- (1)**
18:19
**200,000 (1)**
44:2
**2000- (1)**
48:3
**2000-and (1)**
57:25
**2000-probably-'13 (1)**
13:13
**2004 (2)**
75:6;81:4
**2007 (1)**
18:19
**2008 (4)**
12:24;13:11,12;
14:22
**2009 (3)**
47:21,23;48:6
**2014 (1)**
13:24
**2015 (2)**
14:4;67:18
**2018 (4)**
14:6;44:6;57:25;
58:1
**2019 (8)**

11:3,15;20:9;24:21;
35:5,9;43:19;48:4
**2020 (6)**
12:15;13:20;48:5,7,
23,24
**2021 (4)**
10:16;73:22,23;74:6
**2022 (5)**
9:22;16:3;74:2,4;
77:17
**21 (1)**
81:23
**22-90147 (1)**
7:5
**25 (1)**
38:24
**250 (1)**
13:6
**26,000 (1)**
62:3

### 3

**3 (3)**
23:3;24:7;85:20
**3.2 (4)**
22:5,8,9,15
**30 (4)**
20:14,21;25:1,2
**30,000 (2)**
44:3;58:10
**300,000 (1)**
45:23
**300-and (2)**
40:5;58:9
**30th (1)**
9:22
**350 (1)**
13:3
**351,000 (2)**
40:3,5
**360,000 (1)**
58:10

### 4

**4 (2)**
64:2;85:20
**4.9 (4)**
23:4;24:18;32:8;
39:23
**426 (1)**
35:1
**426,000 (1)**
40:8
**450 (1)**
46:2

### 5

**5 (2)**
45:3,3
**5,000 (2)**

45:3,7
**5/24 (1)**
81:23

### 6

**6 (3)**
19:2;35:2;58:7
**60 (1)**
45:1
**60,000 (4)**
30:19,20,22;62:2
**60,0000 (1)**
45:7

### 7

**7 (8)**
11:5,7,9,10,11;35:2;
59:23;60:8
**7,500 (1)**
58:7
**70,000 (1)**
44:24
**75 (2)**
32:3;42:3
**75,000 (2)**
31:11;40:6

### 8

**89 (1)**
46:20

### 9

**9 (4)**
13:11;14:22;38:16,
18
**9:30 (1)**
6:18
**90 (1)**
19:5