*In Re: Scott K. Williams Debtor 12.09.2022*

---

*October 12, 2023*

---

*Charles Fisher Court Reporting*
*442 East Mendenhall*
*Bozeman, MT 59715*
*(406) 587-9016*
*maindesk@fishercourtreporting.com*

**Min-U-Script® with Word Index**

EXHIBIT
131

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

IN RE:

SCOTT K. WILLIAMS, Case No. 9:22-bk-90147-BPH

Debtor.

OFFICE OF THE U.S. TRUSTEE
U.S. DEPT OF JUSTICE
550 WEST FORT STREET
ROOM 698
BOISE, ID 83724

TRANSCRIPT OF PROCEEDINGS

341 CREDITOR MEETING (Continued)

HELD VIA ZOOM

December 9, 2022

HELD BEFORE:

Richard J. Samson
Bankruptcy Trustee
310 W. Spruce Street
Missoula, MT 59802
Phone: (406) 721-7772
Email: rjs@CSBlawoffice.com

APPEARANCE OF COUNSEL:

ATTORNEY APPEARING ON BEHALF OF DEBTOR:

Matthew F. Shimanek
Shimanek Law, PLLC
317 East Spruce Street
Missoula, MT 59802
Phone: (406) 544-8049
Email: matt@shimaneklaw.com

ATTORNEY APPEARING ON BEHALF OF THE DEBTOR'S SIBLINGS, KENT WILLIAMS, DUFFY WILLIAMS, BRENDA HARBORS, KAREN PRIEST, and MARY ELLA CARTER:

Eli J. Patten
Crowley Fleck, PLLP
490 North 31st Street
Billings, MT 59101
Phone: (406) 252-3441
Email: epatten@crowleyfleck.com

Siblings present:

Kent Williams
Duffy Williams
Brenda Harbors
Karen Priest
Mary Ella Carter

INDEX

TESTIMONY

| WITNESS: | PAGE: |
| --- | --- |
| SCOTT L. WILLIAMS: | |
| Examination by Mr. Patten . . . . . . . . . . . . . . | 5 |
| Examination by Trustee Samson . . . . . . . . . . . . | 14 |

(Audio began.)

**TRUSTEE SAMSON:** Okay. This is the, uh, creditor meeting -- continued meeting of creditors for Scott K. Williams. This is Case Number 22-90147.

Just by way of background, we -- we did what we thought was the creditor meeting back in November, and, actually, during the course of the creditor meeting I received an email from the Clerk's Office of the Bankruptcy Court explaining to me that the case had not been properly noticed by them, and that not all creditors, apparently, had been notified of the bankruptcy filing by Scott.

So, we agreed to continue this meeting and start again today. I still have the transcript -- or the record from the last creditor meeting. Uhm, some of the -- one of the things I have requested from both Mr. Patten and from Mr. Shimanek is that any questioning that takes place today, that it be done by the attorneys, to try to move this matter along, I guess.

So, Scott, I would start by just asking you, once again, to raise your right hand.

(The debtor was duly sworn.)

9:23-ap-09001-BPH Doc#: 35-49 Filed: 11/15/23 Page 2 of 11

**THE DEBTOR:** (Inaudible)
**TRUSTEE SAMSON:** I need you to speak up just a little bit, Scott.
**THE DEBTOR:** I do.
**TRUSTEE SAMSON:** Okay. Can you get closer, or turn up your volume -- volume, because I'm having a hard time hearing ya.
**THE DEBTOR:** Is that better?
**TRUSTEE SAMSON:** Yeah, that is better. Thank you very much.
Scott, I went through a series of questions with you, uhm, last month. Uhm, I might have some other questions for you, but I -- I think what I'm going to do today is I'm going to turn it over to Mr. Patten, and to let him start by asking questions. Understanding that we still have the record of your answers from last month.
So, Eli, if you want to go ahead, if you have any questions to ask today, why don't you go ahead. And, then, I might come back in with a few follow-up questions for Mr. Williams, and then from Mr. Shimanek. Okay?
**MR. PATTEN:** Sure. Well, thanks -- thanks, Dick.

**EXAMINATION**
**BY MR. PATTEN:**
**Q. Mr. Williams, you know, my name is Eli Patten, and we**

**spoke here about a month or so ago at the first 341 Meeting, uhm, and my questions for you today are related to the distribution you received from your father's estate, or from the trust.**
A. Okay.
**Q. By way of a little bit of background for you here, uh, I -- I have copies, a fairly extensive series of records related to the trust, to the bank accounts that the trust had maintained, Hugh's RV had maintained, and, so, I've got part of the picture here.**
**But I understand that you had received -- or initiated a transfer to yourself by way of a -- a check that was issued from Hugh -- to Hugh's RV's account, or the trust account of -- in an amount of about approximately a-hundred-and -- or, excuse me, 425, $426,000; is that right?**
A. Yeah, I think -- yes, that's close. Yeah.
**Q. Okay. Now, do you recall, was that transfer -- or was that initiated by way of a check, or was it a wire transfer within Zions bank? Do -- do you remember?**
A. I believe it was -- it was a check. Yeah, it would be a check, I believe.
**Q. Okay. And following the issuance of -- of the check from -- from the bank, and -- and, actually, let me take a step back here.**
**Was -- was it a cashier's check, or an official check**

**that had been issued to you?**
A. I think they did a cashier's check, yes.
**Q. Okay. And after that check was issued, uh, did you deposit that within Zions Bank, or another institutions, do you recall?**
A. Uhm, I don't recall what I did after that, how I did it. I -- I believe I held it in a -- I -- I don't -- I don't remember. I honestly don't remember at that point.
**Q. Okay. In -- in terms of bank accounts, or checking accounts, do you still maintain bank accounts in the state of Utah?**
A. Uhm, no, I don't.
**Q. And during your -- I guess, prior to -- to your move to Montana, at what financial institutions did you maintain account?**
A. Uhm, well, what I had is a -- I still have the same account. It would be U.S. Bank, but it was based in Montana.
**Q. Okay. Uhm --**
A. I believe that account I opened, like, in 20 -- I -- I don't remember. I -- it -- it was -- I had it for a long time, but it was a Utah account.
**Q. Okay.**
A. I mean, it was the one, and the account that I just used it in Utah the whole time.
**Q. So, was that the only account you were using during the**

**time period of 2018 to 2021?**
A. Yes.
**Q. Okay. So, more than likely, you probably deposited the -- that check into that U.S. Bank account?**
A. (Audio cut out - inaudible)
**TRUSTEE SAMSON:** Would you say that -- would you repeat your answer there, Scott? I didn't hear it.
**THE DEBTOR:** (Audio interruption - inaudible).
**TRUSTEE SAMSON:** Say it one more time?
**THE DEBTOR:** I don't recall how I did that.
**TRUSTEE SAMSON:** Okay.
**THE DEBTOR:** What I did.
**TRUSTEE SAMSON:** Thank you.
**BY MR. PATTEN:**
**Q. And -- and I'm -- I'm just trying to get an idea, so we know, I guess, who to ask for -- for records here, uhm, is -- is the reason I'm asking you questions about that.**
**So, it -- and I just wanted to confirm, so it's unlikely that you went and cashed the check and received $425,000 in cash.**
A. I -- I -- yeah, I don't -- no, I didn't do that, I'm sure. I don't think I walked around with 425,000 cash, no.
**Q. That would probably be (inaudible). So, okay.**
**Now, and -- and, granted, it's -- it's been a little bit of time here, but, uh -- and it's a fairly significant sum,**

9:23-ap-09001-BPH Doc#: 35-49 Filed: 11/15/23 Page 3 of 11

Page 9

$426,753.71, and my memory is, when we talked last month, that you said that you had spent it on a variety of -- of things, but didn't have a definite recollection as to exactly what it is.

Now, with the passage of time, and, maybe, an opportunity to think about that, do you have a general idea as to where those funds went?

A. Well, I actually haven't thought about it at all since then. No, I -- I don't remember exactly what I did. Like I -- Like I answered before, we traveled. We did some -- uhm, yeah, I don't know. We just went through it.

Q. So -- so, it's your testimony that those funds have been spent?

A. Yes. Uh-huh.

Q. Okay. So that U.S. Bank account that -- that -- that we were talking about before, are you the only owner, or the only individual that has access to -- to that account?

A. My wife, Candy, is on it, but she hasn't used it, I think, ever, since 2008 or '9. I mean, she's never deposited into it, or written checks out of it, or anything like that.

And I'm pretty sure we separated everything when I -- in about 2008 or '9, just because she didn't want to be involved with the loans, and stuff, that I was doing for Hugh's RV to Hugh.

Q. Okay.

Page 10

A. So she kept her money separate.

Q. Okay. Uhm, some questions for you about the home that you reside in, which I understand to be 11423 Spotted Fawn Lane in Bigfork. Is that --

A. Right. Yes.

Q. And, again, they have done a little bit of research here, so I've gone through real property records, reviewed a variety of public record sources, and my understanding is that Viking Investments, LLC., initially purchased that property.

So, my questions for you are about Viking Investments, LLC., are you familiar with that entity?

A. I don't have anything to do with that, no.

Q. Yeah. But are you familiar with it?

A. (Inaudible)

Q. I'm sorry, it -- it broke up there. What was that?

A. I am familiar with it, but I don't -- I'm not part of it.

Q. Okay. What -- what is Viking Investments, LLC.?

A. I wouldn't -- I don't know. It's an LLC.

Q. Okay.

A. Yep.

Q. Uhm, and you're aware that Candy, your wife, is the registered agent? Is she -- yeah, I guess, do you have any, uh, understanding or background as to her role or involvement with that entity?

Page 11

A. I -- I know that, uh, it's hers, but I don't -- (inaudible) involved with it, whatsoever. So...

Q. Okay.

A. (Inaudible)

Q. And the management creation, et cetera, isn't something that you spoke with Candy about from 2018 to present?

A. No.

Q. Are you aware of who -- or how that entity was created? No, I don't recall anything about that.

Q. Okay. And -- and, again, we -- we'll have the ability to -- to track down information, in terms of bank records, accountancy, et cetera, have you contributed any funds to Viking Investments, LLC., personally?

A. I -- I don't recall doing anything like that, no.

Q. Have you ever maintained any position in -- executive, or otherwise, with Viking Investments, LLC.?

A. No.

Q. And, so, in terms of -- of its formation or creation, do you have any understanding or background as to why the entity was created?

A. I have -- I have nothing to do with it.

Q. So, Candy is the one that we need to talk to about that.

A. Yes.

Q. And a question for you, and as part of my research I discovered an assumed business name for Glacier Travel Stops.

Page 12

Are you familiar with Glacier Travel Stops?

A. No.

Q. Never heard of it.

A. Well, I -- I've heard of it, but I'm not familiar with it. I don't -- again, I don't know what it -- yeah.

Q. So, you -- you don't have any involvement with a business or an enterprise with that name.

A. No.

Q. Uhm, going back to -- to the Spotted Fawn Lane residence, do you recall approximately when you moved into that home?

A. Yeah, in December of 2019, as I recall. And, uhm, I still had a lease (inaudible) on a home until June of 2020. So, I would have gotten -- yeah, I -- basically, I moved in up there about December of 2019, is what -- the end of December of 2019.

And that was around when COVID was starting in, too. So, yeah, I'm just trying to think of when it was. But that's right, around COVID.

Q. And did Candy reside there prior to -- to you moving in, then?

A. Uhm, no, I don't think so. I -- she traveled back-and-forth a few times, but she still worked in Salt Lake. So, I don't believe that she -- you know, I don't -- I don't know what the residency rules would be, if she was a dual resident, or what, but her job was still in Salt Lake at

9:23-ap-09001-BPH Doc#: 35-49 Filed: 11/15/23 Page 4 of 11

that time.

**Q. Were you living together in Salt Lake during that period of time?**

A. In -- yeah. Back-and-forth, but, yeah.

**Q. And I know we touched on the issue about, uh, a mortgage, or -- or -- or the purchase. Have you contributed any funds since your -- since December of 2019 to the payment of the mortgage for that home?**

A. No.

**Q. And, so, Candy's bank records would indicate that the payments are going directly from her to --**

A. Oh, yes.

**Q. Okay. I apologize here. Just checking my notes.**

**Scott, have you, or an entity that you are associated with, ever owned property in Wyoming?**

A. No.

**Q. Have -- have you ever leased property in Wyoming?**

A. No.

**Q. Were you involved in any development, real estate development-type -- type of activity in Wyoming?**

A. No.

**MR. PATTEN:** Uhm, those -- those are the questions I had, Dick. Uh --

**TRUSTEE SAMSON:** Okay. Scott, I've got a couple of follow-up questions for you.

**EXAMINATION**

**BY TRUSTEE SAMSON:**

**Q. I want to clarify a couple of things with you on the record. My understanding is that your testimony is that you have a bank account with U.S. Bank, correct?**

A. That's correct, yeah.

**Q. Would it be a fair statement to say that you actually have two bank accounts with U.S. Bank, one in --**

A. No.

**Q. -- one in your name, solely, and one in which you and Candy, apparently, are joint holders on the account?**

A. Only if it is one that -- a savings. If that's considered differently. I have $100 in a savings account. Which I don't know how that works.

**Q. Okay. So, let me just -- let me shoot you some numbers. I'm looking -- based on -- based on bank statements that Mr. Shimanek had provided to me, I'm seeing an account with U.S. Bank that ends in 3336, and I'm assuming that that might be the savings account?**

A. It would be the savings. Yeah, it's got to be that. There's a separate statement for savings, and one for --

**Q. Yeah. And, then, the second account ends in 0794, and it looks to me like that's you and Candy.**

A. That's correct.

**Q. Okay. Now, the name on that account is "Candy Willden." Where does that --**

A. That --

**Q. -- where does that come from?**

A. Account right before we got married, and we just never got in to change it, because she never uses it. So, that was her previous name.

**Q. Okay. Do you know if your wife has bank accounts separately in her name with any other bank?**

A. Uhm, if she has accounts of her own? Yes. Uh-huh.

**Q. Okay. Can you --**

A. I'm not sure she -- I don't know what all she has at this point, but she has bank accounts in her --

**Q. Separate -- separate accounts that are only in her name, correct?**

A. Yeah, that's true.

**Q. Is that a fair statement?**

A. Uh-huh.

**Q. Okay. Do you know where they're at?**

A. No, I don't -- I haven't seen anything on her bank accounts since we left Utah. So, I don't know -- I don't know what she's got right now.

**Q. Okay.**

A. I don't.

**Q. Okay. Uhm, is Candy still self-employed?**

A. No. No. She -- she works for a mortgage company out of Utah. She works remotely here from Utah.

**Q. What's the name of the mortgage company that she works for? I think you may have mentioned this last time, but I didn't write it down.**

A. PRMI in Salt Lake City. PRMI.

**Q. BRMI?**

A. P like in Peter, R like in Roger, M like in Mary, I like in interesting.

**Q. Okay.**

**MR. SHIMANEK:** That -- that, uh -- that employer's listed, Dick, on Schedule I for the spouse. So, it's --

**Q. Oh, okay.**

**MR. SHIMANEK:** (Inaudible)

**TRUSTEE SAMSON:** Okay.

**BY TRUSTEE SAMSON:**

**Q. When your case was filed, Scott, and -- and pursuant to our local rules, Mr. Shimanek provided me with copies of tax returns for 2020 and 2021.**

A. Okay.

**Q. Do you still have copies of your 2019 tax returns?**

A. Uhm, yeah, I'm -- I'm sure I do somewhere. You bet.

**Q. Could I secure a copy of your Federal Tax Return for 2019, as well as any state returns? I don't -- I'm hearing from your testimony that, maybe, in 2019 you were still living in**

**Salt Lake, so I don't know if there's a state return with Montana involved. But if the -- but wherever you filed a state return, I'd like to see that for 2019, as well.**
A. Okay.
**Q. Is the home that you live in currently encumbered by a mortgage?**
A. Yes. Uhm, that -- that information's been provided. I believe, I remember it's about 280,000 on the mortgage. But you'd have to check that number.
**Q. Okay. And -- and that mortgage is -- is in Candy's name, correct?**
A. Uh-huh.
**Q. Do you know who the mortgage company is?**
A. Uhm, that was also provided. It's United-something. I -- I don't have it in front of me, but it's United-something. But --
**Q. Okay?**
**MR. SHIMANEK:** It's United Wholesale Mortgage, Dick, out of New Jersey.
**TRUSTEE SAMSON:** Okay. Thank you.
**BY TRUSTEE SAMSON:**
**Q. I just want to go back and I want to clarify something. Mr. Patten asked you, one of the initial questions was a distribution from the estate funds.**
A. Yes.

**Q. And that came out of Zions Bank, as I understand it, and we think it's in the form of a cashier's check?**
A. I believe so.
**Q. And you don't know where that money was deposited?**
A. I -- I -- I can't remember what I did. I know I split it up, but I can't remember what I did with it. I'd -- I'd have to look at it and see.
**Q. Okay.**
A. I -- I don't --
**Q. Other -- other than U.S. Bank, are there any other banks where you had an account where you would have deposited that money?**
A. No.
**Q. So, if it's there, --**
A. (Inaudible)
**Q. -- it would go into -- if you deposited it, it --**
A. Correct.
**Q. -- it would go into a U.S. Bank account?**
A. Correct.
**Q. Okay. Do you still have copies, or do you -- could you have access to copies of your U.S. Bank account statements from, say, --**
A. (Inaudible)
**Q. -- July of 2019, coming forward?**
A. '22. I believe I could do that. I think so. Yeah, I --

I'd have to get on the app and make sure they go back that far, but I assume they would.
**Q. Okay. If -- if I could get, at the very least, copies of the bank account statements from July of 2019, through, probably, let's just say, February or March of 2020, that would help.**
A. March of 2020. Okay.
**Q. And I think that's all I have. But I'd like to see those documents.**
A. Okay.
**Q. And it would still be into the same account, either the savings account or the joint account with Candy?**
A. Uhm, the -- the -- yeah, that's the two accounts that I have, basically, yes.
**Q. So, I guess, just to clarify, if you would provide me copies with statements? Because, as I understand it from your testimony, the savings account is a separate statement.**
A. It sounds like it.
**Q. Yeah. So, if I could get copies from July through, let's just say, February of 2020. From July of '19 through 2020.**
A. Okay.
**Q. Okay? On both accounts.**
A. All right.
**Q. Yeah. And also a copy of the 2019 Federal and State Tax Returns that were filed.**

A. All right. Okay. Will do.
**Q. Okay.**
**TRUSTEE SAMSON:** Eli, did you have any more questions?
**MR. PATTEN:** I don't.
Matt, I'm going to give you a call this afternoon. There are some, kind of, clean-up items we have with respect to the trust, and I figured that we could do that offline here. So, I'll be giving you a call.
**MR. SHIMANEK:** You bet. That sounds good. That sounds fine, Eli. I might be stuck, I've got some hearings with Christy Brandon this afternoon, but --
**MR. PATTEN:** (Inaudible)
**MR. SHIMANEK:** Yeah, we can touch base Monday.
**MR. PATTEN:** Yeah, that sounds good.
**TRUSTEE SAMSON:** Okay, folks. Thank you very much. Everyone is free to disconnect. Okay?
**MR. PATTEN:** Okay, thanks.
**TRUSTEE SAMSON:** Okay. Thank you. The meeting is adjourned.

(Audio concluded.)

CERTIFICATE

I, Julie L. DeLong, certify that the foregoing is a correct transcription from the recording of proceedings in the above-entitled matter to the best of my knowledge, skill, and ability.

/s/ Julie L. DeLong — 11/06/2023

Julie L. DeLong — Date

9:23-ap-09001-BPH Doc#: 35-49 Filed: 11/15/23 Page 7 of 11

## $

**$100 (1)** 14:14
**$425,000 (1)** 8:19
**$426,000 (1)** 6:15
**$426,753.71 (1)** 9:1

## A

**ability (1)** 11:10
**access (2)** 9:17;18:21
**account (27)** 6:13,13;7:15,17,19,21,23,25;8:4;9:15,17;14:6,12,14,18,20,23;15:1,5;18:11,18,21;19:4,11,12,12,17
**accountancy (1)** 11:12
**accounts (12)** 6:8;7:9,10,10;14:9;15:8,10,13,14,21;19:13,22
**activity (1)** 13:20
**actually (4)** 4:8;6:23;9:8;14:8
**adjourned (1)** 20:20
**afternoon (2)** 20:6,12
**again (5)** 4:14,21;10:6;11:10;12:5
**agent (1)** 10:23
**ago (1)** 6:1
**agreed (1)** 4:14
**ahead (2)** 5:17,18
**a-hundred-and (1)** 6:14
**along (1)** 4:19
**amount (1)** 6:14
**answered (1)** 9:10
**apologize (1)** 13:13
**app (1)** 19:1
**apparently (2)** 4:12;14:12
**approximately (2)** 6:14;12:10
**around (3)** 8:22;12:16,18
**associated (1)** 13:14
**assume (1)** 19:2
**assumed (1)** 11:25
**assuming (1)** 14:19
**attorneys (1)** 4:19
**Audio (4)** 4:2;8:5,8;20:22
**aware (2)** 10:22;11:8

## B

**back (6)** 4:8;5:19;6:24;12:9;17:22;19:1
**back-and-forth (2)** 12:22;13:4
**background (4)** 4:7;6:6;10:24;11:19
**bank (26)** 6:8,19,23;7:4,9,10,17;8:4;9:15;11:11;13:10;14:6,6,9,9,17,19;15:8,9,13,20;18:1,10,18,21;19:4
**Bankruptcy (2)** 4:10,13
**banks (1)** 18:10
**base (1)** 20:14
**based (3)** 7:17;14:17,17
**basically (2)** 12:13;19:14
**began (1)** 4:2
**bet (2)** 16:22;20:10
**better (2)** 5:8,9
**Bigfork (1)** 10:4
**bit (4)** 5:3;6:6;8:24;10:6
**both (2)** 4:17;19:22
**Brandon (1)** 20:12
**BRMI (1)** 16:7
**broke (1)** 10:16
**business (2)** 11:25;12:6

## C

**call (2)** 20:6,9
**came (1)** 18:1
**Can (3)** 5:5;15:11;20:14
**Candy (10)** 9:18;10:22;11:6,22;12:19;14:12,24;15:1,25;19:12
**Candy's (2)** 13:10;17:10
**Case (3)** 4:6,11;16:17
**cash (2)** 8:20,22
**cashed (1)** 8:19
**cashier's (3)** 6:25;7:2;18:2
**cetera (2)** 11:5,12
**change (1)** 15:6
**check (13)** 6:12,18,20,21,22,25,25;7:2,3;8:4,19;17:9;18:2
**checking (2)** 7:9;13:13
**checks (1)** 9:20
**Christy (1)** 20:12
**City (1)** 16:6
**clarify (3)** 14:4;17:22;19:15
**clean-up (1)** 20:7
**Clerk's (1)** 4:10
**close (1)** 6:16
**closer (1)** 5:5
**coming (1)** 18:24
**company (3)** 16:1,3;17:13
**concluded (1)** 20:22
**confirm (1)** 8:18
**considered (1)** 14:13
**continue (1)** 4:14
**continued (1)** 4:5
**contributed (2)** 11:12;13:6
**copies (8)** 6:7;16:18,21;18:20,21;19:3,16,19
**copy (2)** 16:23;19:24
**couple (2)** 13:24;14:4
**course (1)** 4:9
**Court (1)** 4:10
**COVID (2)** 12:16,18
**created (2)** 11:8,20
**creation (2)** 11:5,18
**creditor (4)** 4:4,8,9,16
**creditors (2)** 4:5,12
**currently (1)** 17:5
**cut (1)** 8:5

## D

**debtor (7)** 4:24;5:1,4,8;8:8,10,12
**December (4)** 12:11,14,14;13:7
**definite (1)** 9:3
**deposit (1)** 7:4
**deposited (5)** 8:3;9:19;18:4,11,16
**development (1)** 13:19
**development-type (1)** 13:20
**Dick (4)** 5:21;13:23;16:12;17:19
**differently (1)** 14:14
**directly (1)** 13:11
**disconnect (1)** 20:17
**discovered (1)** 11:25
**distribution (2)** 6:3;17:24
**documents (1)** 19:9
**done (2)** 4:19;10:6
**down (2)** 11:11;16:5
**dual (1)** 12:25
**duly (1)** 4:24
**during (4)** 4:9;7:13,25;13:2

## E

**either (1)** 19:11
**Eli (4)** 5:17,25;20:3,11
**email (1)** 4:9
**employer's (1)** 16:11
**encumbered (1)** 17:5
**end (1)** 12:14
**ends (2)** 14:19,23
**enterprise (1)** 12:7
**entity (5)** 10:12,25;11:8,19;13:14
**estate (3)** 6:3;13:19;17:24
**et (2)** 11:5,12
**Everyone (1)** 20:17
**exactly (2)** 9:3,9
**EXAMINATION (2)** 5:23;14:2
**excuse (1)** 6:15
**executive (1)** 11:15
**explaining (1)** 4:10
**extensive (1)** 6:7

## F

**fair (2)** 14:8;15:17
**fairly (2)** 6:7;8:25
**familiar (5)** 10:12,14,17;12:1,4
**far (1)** 19:2
**father's (1)** 6:3
**Fawn (2)** 10:3;12:9

9:23-ap-09001-BPH Doc#: 35-49 Filed: 11/15/23 Page 8 of 11

**February (2)** 19:5,20
**Federal (2)** 16:23;19:24
**few (2)** 5:19;12:22
**figured (1)** 20:8
**filed (3)** 16:17;17:2;19:25
**filing (1)** 4:13
**financial (1)** 7:14
**fine (1)** 20:11
**first (1)** 6:1
**folks (1)** 20:16
**following (1)** 6:22
**follow-up (2)** 5:19;13:25
**form (1)** 18:2
**formation (1)** 11:18
**forward (1)** 18:24
**free (1)** 20:17
**front (1)** 17:15
**funds (5)** 9:7,12;11:12;13:6;17:24

**G**

**general (1)** 9:6
**giving (1)** 20:9
**Glacier (2)** 11:25;12:1
**good (2)** 20:10,15
**granted (1)** 8:24
**guess (5)** 4:20;7:13;8:16;10:23;19:15

**H**

**hand (1)** 4:22
**hard (1)** 5:6
**hear (1)** 8:7
**heard (2)** 12:3,4
**hearing (2)** 5:7;16:24
**hearings (1)** 20:11
**held (1)** 7:7
**help (1)** 19:6
**holders (1)** 14:12
**home (5)** 10:2;12:10,12;13:8;17:5
**honestly (1)** 7:8
**Hugh (2)** 6:13;9:24
**Hugh's (3)** 6:9,13;9:23

**I**

**idea (2)** 8:15;9:6
**Inaudible (12)** 5:1;8:5,8,23;10:15;11:2,4;12:12;16:14;18:15,23;20:13
**indicate (1)** 13:10
**individual (1)** 9:17
**information (1)** 11:11
**information's (1)** 17:7
**initial (1)** 17:23
**initially (1)** 10:9
**initiated (2)** 6:11,18
**institutions (2)** 7:4,14
**interesting (1)** 16:9
**interruption (1)** 8:8
**into (6)** 8:4;9:19;12:10;18:16,18;19:11
**Investments (5)** 10:9,11,18;11:13,16
**involved (4)** 9:22;11:2;13:19;17:2
**involvement (2)** 10:24;12:6
**issuance (1)** 6:22
**issue (1)** 13:5
**issued (3)** 6:12;7:1,3
**items (1)** 20:7

**J**

**Jersey (1)** 17:19
**job (1)** 12:25
**joint (2)** 14:12;19:12
**July (4)** 18:24;19:4,19,20
**June (1)** 12:12

**K**

**kept (1)** 10:1
**kind (1)** 20:7

**L**

**Lake (5)** 12:23,25;13:2;16:6;17:1
**Lane (2)** 10:3;12:9
**last (5)** 4:16;5:12,16;9:1;16:4
**lease (1)** 12:12
**leased (1)** 13:17
**least (1)** 19:3
**left (1)** 15:21
**likely (1)** 8:3
**listed (1)** 16:12
**little (4)** 5:3;6:6;8:24;10:6
**live (1)** 17:5
**living (2)** 13:2;16:25
**LLC (6)** 10:9,12,18,19;11:13,16
**loans (1)** 9:23
**local (1)** 16:18
**long (1)** 7:20
**look (1)** 18:7
**looking (1)** 14:17
**looks (1)** 14:24

**M**

**maintain (2)** 7:10,14
**maintained (3)** 6:9,9;11:15
**management (1)** 11:5
**March (2)** 19:5,7
**married (1)** 15:5
**Mary (1)** 16:8
**Matt (1)** 20:6
**matter (1)** 4:19
**may (1)** 16:4
**maybe (2)** 9:5;16:25
**mean (2)** 7:23;9:19
**meeting (8)** 4:5,5,8,9,14,16;6:1;20:20
**memory (1)** 9:1
**mentioned (1)** 16:4
**might (4)** 5:12,19;14:19;20:11
**Monday (1)** 20:14
**money (3)** 10:1;18:4,12
**Montana (3)** 7:14,17;17:2
**month (4)** 5:12,16;6:1;9:1
**more (3)** 8:3,9;20:3
**mortgage (9)** 13:5,8;16:1,3;17:6,8,10,13,18
**move (2)** 4:19;7:13
**moved (2)** 12:10,13
**moving (1)** 12:19
**much (2)** 5:10;20:16

**N**

**name (10)** 5:25;11:25;12:7;14:11;15:1,7,9,14;16:3;17:10
**need (2)** 5:2;11:22
**New (1)** 17:19
**notes (1)** 13:13
**noticed (1)** 4:11
**notified (1)** 4:12
**November (1)** 4:8
**Number (2)** 4:6;17:9
**numbers (1)** 14:16

**O**

**Office (1)** 4:10
**official (1)** 6:25
**offline (1)** 20:8
**once (1)** 4:21
**one (10)** 4:16;7:23;8:9;11:22;14:9,11,11,13,22;17:23
**only (5)** 7:25;9:16,17;14:13;15:14
**opened (1)** 7:19
**opportunity (1)** 9:6
**otherwise (1)** 11:16
**out (5)** 8:5;9:20;16:1;17:19;18:1
**over (1)** 5:14
**own (1)** 15:10
**owned (1)** 13:15
**owner (1)** 9:16

**P**

**part (3)** 6:9;10:17;11:24
**passage (1)** 9:5
**Patten (12)** 4:17;5:14,21,24,25;

8:14;13:22;17:23;20:5,
13,15,18
**payment (1)**
13:7
**payments (1)**
13:11
**period (2)**
8:1;13:2
**personally (1)**
11:13
**Peter (1)**
16:8
**picture (1)**
6:10
**place (1)**
4:18
**point (2)**
7:8;15:13
**position (1)**
11:15
**present (1)**
11:6
**pretty (1)**
9:21
**previous (1)**
15:7
**prior (2)**
7:13;12:19
**PRMI (2)**
16:6,6
**probably (3)**
8:3,23;19:5
**properly (1)**
4:11
**property (4)**
10:7,10;13:15,17
**provide (1)**
19:15
**provided (4)**
14:18;16:18;17:7,14
**public (1)**
10:8
**purchase (1)**
13:6
**purchased (1)**
10:9
**pursuant (1)**
16:17

**R**

**raise (1)**
4:22
**real (2)**
10:7;13:19
**reason (1)**
8:17
**recall (8)**
6:17;7:5,6;8:10;11:9,
14;12:10,11
**received (4)**
4:9;6:3,11;8:19
**recollection (1)**
9:3
**record (4)**
4:15;5:15;10:8;14:5
**records (5)**
6:7;8:16;10:7;11:11;
13:10
**registered (1)**
10:23
**related (2)**
6:2,8
**remember (8)**
6:19;7:8,8,20;9:9;
17:8;18:5,6
**remotely (1)**
16:2
**repeat (1)**
8:7
**requested (1)**
4:17
**research (2)**
10:6;11:24
**reside (2)**
10:3;12:19
**residence (1)**
12:9
**residency (1)**
12:24
**resident (1)**
12:25
**respect (1)**
20:7
**Return (3)**
16:23;17:1,3
**returns (4)**
16:19,21,24;19:25
**reviewed (1)**
10:7
**right (8)**
4:22;6:15;10:5;
12:18;15:5,22;19:23;
20:1
**Roger (1)**
16:8
**role (1)**
10:24
**rules (2)**
12:24;16:18
**RV (2)**
6:9;9:23
**RV's (1)**
6:13

**S**

**Salt (5)**
12:22,25;13:2;16:6;
17:1
**same (2)**
7:16;19:11
**SAMSON (17)**
4:4;5:2,5,9;8:6,9,11,
13;13:24;14:3;16:15,
16;17:20,21;20:3,16,19
**savings (7)**
14:13,14,20,21,22;
19:12,17
**Schedule (1)**
16:12
**Scott (9)**
4:5,13,21;5:3,11;8:7;
13:14,24;16:17
**second (1)**
14:23
**secure (1)**
16:23
**seeing (1)**
14:18
**self-employed (1)**
15:25
**separate (5)**
10:1;14:22;15:14,14;
19:17
**separated (1)**
9:21
**separately (1)**
15:9
**series (2)**
5:11;6:7
**Shimanek (9)**
4:17;5:20;14:18;
16:11,14,18;17:18;
20:10,14
**shoot (1)**
14:16
**significant (1)**
8:25
**solely (1)**
14:11
**somewhere (1)**
16:22
**sorry (1)**
10:16
**sounds (4)**
19:18;20:10,11,15
**sources (1)**
10:8
**speak (1)**
5:2
**spent (2)**
9:2,13
**split (1)**
18:5
**spoke (2)**
6:1;11:6
**Spotted (2)**
10:3;12:9
**spouse (1)**
16:12
**start (3)**
4:14,21;5:14
**starting (1)**
12:16
**state (5)**
7:10;16:24;17:1,3;
19:24
**statement (4)**
14:8,22;15:17;19:17
**statements (4)**
14:17;18:21;19:4,16
**step (1)**
6:23
**still (12)**
4:15;5:15;7:10,16;
12:11,22,25;15:25;
16:21,25;18:20;19:11
**Stops (2)**
11:25;12:1
**stuck (1)**
20:11
**stuff (1)**
9:23
**sum (1)**
8:25
**Sure (6)**
5:21;8:21;9:21;
15:12;16:22;19:1
**sworn (1)**
4:24

**T**

**talk (1)**
11:22
**talked (1)**
9:1
**talking (1)**
9:16
**tax (4)**
16:18,21,23;19:24
**terms (3)**
7:9;11:11,18
**testimony (4)**
9:12;14:5;16:25;
19:17
**thanks (3)**
5:21,21;20:18
**thought (2)**
4:7;9:8
**times (1)**
12:22
**today (5)**
4:15,18;5:13,18;6:2
**together (1)**
13:2
**touch (1)**
20:14
**touched (1)**
13:5
**track (1)**
11:11
**transcript (1)**
4:15
**transfer (3)**
6:12,17,18
**Travel (2)**
11:25;12:1
**traveled (2)**
9:10;12:21
**true (1)**
15:16
**trust (5)**
6:4,8,8,13;20:8
**TRUSTEE (17)**
4:4;5:2,5,9;8:6,9,11,
13;13:24;14:3;16:15,
16;17:20,21;20:3,16,19
**try (1)**
4:19
**trying (2)**
8:15;12:17
**turn (2)**
5:5,14
**two (2)**
14:9;19:13
**type (1)**
13:20

**U**

**uh (9)**
4:4;6:6;7:3;8:25;
10:24;11:1;13:5,23;
16:11
**Uhm (22)**
4:16;5:12,12;6:2;7:6,
12,16,18;8:16;9:10;
10:2,22;12:9,11,21;
13:22;15:10,25;16:22;
17:7,14;19:13
**United (1)**
17:18
**United-something (2)**
17:14,15
**unlikely (1)**
8:18
**up (5)**
5:2,6;10:16;12:13;
18:6
**used (2)**
7:23;9:18
**uses (1)**
15:6
**using (1)**
7:25
**Utah (6)**
7:11,21,24;15:21;
16:2,2

**V**

**variety (2)**
9:2;10:8
**Viking (5)**
10:9,11,18;11:13,16
**volume (2)**
5:6,6

**W**

**walked (1)**
8:22
**way (4)**

4:7;6:6,12,18
**What's (1)**
16:3
**whatsoever (1)**
11:2
**wherever (1)**
17:2
**whole (1)**
7:24
**Wholesale (1)**
17:18
**wife (3)**
9:18;10:22;15:8
**Willden (1)**
15:1
**Williams (3)**
4:6;5:20,25
**wire (1)**
6:18
**within (2)**
6:19;7:4
**worked (1)**
12:22
**works (4)**
14:15;16:1,2,3
**write (1)**
16:5
**written (1)**
9:20
**Wyoming (3)**
13:15,17,20

**Y**

**ya (1)**
5:7
**Yep (1)**
10:21

**Z**

**Zions (3)**
6:19;7:4;18:1

**0**

**0794 (1)**
14:23

**1**

**11423 (1)**
10:3
**19 (1)**
19:20

**2**

**20 (1)**
7:19
**2008 (2)**
9:19,22
**2018 (2)**
8:1;11:6
**2019 (11)**
12:11,14,15;13:7;16:21,23,25;17:3;18:24;19:4,24
**2020 (6)**
12:12;16:19;19:5,7,20,20
**2021 (2)**
8:1;16:19
**22 (1)**
18:25
**22-90147 (1)**
4:6
**280,000 (1)**
17:8

**3**

**3336 (1)**
14:19
**341 (1)**
6:1

**4**

**425 (1)**
6:15
**425,000 (1)**
8:22

**9**

**9 (2)**
9:19,22

9:23-ap-09001-BPH Doc#: 35-49 Filed: 11/15/23 Page 11 of 11