UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

IN RE:                          )
                                )
SCOTT K. WILLIAMS,              )
                                )
            Debtor.             ) CAUSE NO.
_____  ) 9:22-bk-90147-BPH
                                )
RICHARD J. SAMSON, AS           )
CHAPTER 7 TRUSTEE OF THE        )
ESTATE OF SCOTT K. WILLIAMS,    )
                                )
            Plaintiff,          )
                                )
        -vs-                    )
                                )
CANDY WILLIAMS AND VIKING       )
INVESTMENTS, LLC,               )
                                )
            Defendants.         )


Taken at 310 West Spruce Street
Missoula, Montana
Thursday, September 14, 2023 - 1:00 P.M.


D E P O S I T I O N

OF

SCOTT WILLIAMS


Reported by Terra Rohlfs, RPR, Jeffries Court Reporting,
Inc., 1015 Mount Avenue, Suite B, Missoula, Montana
59801, (406)721-1143, Freelance Court Reporter and
Notary Public for the State of Montana, residing in
Hamilton, Montana, jcrcourt@montana.com

EXHIBIT
132

**Page 2**

1
2
3              A P P E A R A N C E S
3  Trent M. Gardner, Esq.
   Hannah S. Willstein, Esq.
4  Goetz, Geddes & Gardner, P.C.
   The Ketterer Building, 35 North Grand
5  P.O. Box 6580
   Bozeman, Montana  59771-6580
6  tgardner@goetzlawfirm.com
   Associated Staff:
7  hwillstein@goetzlawfirm.com
      appearing on behalf of Plaintiff, Richard J.
8     Samson, as Chapter 7 Trustee of the Estate of
      Scott K. Williams.
9
10
   Edward "Rusty" A. Murphy, Esq.
11 Murphy Law Offices, PLLC
   127 North Higgins, Suite 310
12 Missoula, Montana  59802
   rusty@murphylawoffices.net
13    appearing on behalf of Defendant Candy Williams
      and Viking Investments, LLC.
14
15
   Matt Shimanek, Esq.
16 Shimanek Law PLLC
   317 East Spruce Street
17 Missoula, Montana  59802
   matt@shimaneklaw.com
18    appearing on behalf of Debtor Scott K. Williams.
19
20 Also appearing:  Richard J. Samson and Candy
   Williams
21
22
23
24
25

**Page 3**

1
2              I N D E X
3  WITNESS:                          PAGE:
   SCOTT WILLIAMS
4
5  Examination by Mr. Gardner          5
6  Stipulations                        4
7  EXHIBITS:
8  Deposition Exhibit Number 1
      U.S. Bank Statement 6/19/19-7/17/19     28
9  Deposition Exhibit Number 2
      Photo of Receipt and Release By Sworn
10     Statement of Brenda Lee Harbers in Probate
       No. 193700250                          40
11 Deposition Exhibit Number 3
      Order Granting Plaintiff's Ex Parte
12     Emergency Motion for Temporary Restraining
       Order Without Hearing; and Notice of
13     Hearing in Cause No. 190905179         47
   Deposition Exhibit Number 4
14    Summons for Scott Williams in Cause
       No. 190905179                          49
15 Deposition Exhibit Number 5
      First Amended Complaint in Cause
16     No. 190905179                          49
   Deposition Exhibit Number 6
17    Payments to Scott spreadsheet           58
   Deposition Exhibit Number 7
18    Zions Bank Statement 6/26/19            59
   Deposition Exhibit Number 8
19    Zions Bank Statement 7/31/19            62
   Deposition Exhibit Number 9
20    Photo of Zions Bank canary's check      63
   Deposition Exhibit Number 10
21    Zions Bank checks and withdrawal slips  64
   Deposition Exhibit Number 11
22    Exhibit A, Answers and Documents Produced 67
   Deposition Exhibit Number 12
23    U.S. Bank Statement 7/18/19-8/16/19     70
24 Certificate of Witness                     72
   Certificate of Court Reporter              73
25 Read and Sign Letter                       74
   Release Letter                             75

**Page 4**

1              S T I P U L A T I O N S
2
3        It was stipulated by and between counsel for
4  the respective parties that the deposition be taken
5  by Terra Rohlfs, RPR, Freelance Court Reporter and
6  Notary Public for the State of Montana, residing in
7  Hamilton, Montana.
8
9        It was further stipulated and agreed by and
10 between counsel for the respective parties that the
11 deposition be taken in accordance with the Montana
12 Rules of Civil Procedure.
13
14       It was further stipulated and agreed by and
15 between counsel for the respective parties that all
16 objections except as to form would be reserved
17 until time of trial, and that said objections would
18 have the same force and effect as if interposed at
19 the time of taking the deposition.
20
21       It was further stipulated and agreed by and
22 between counsel for the respective parties and the
23 witness that the reading and signing of the
24 deposition would be expressly reserved.
25

**Page 5**

1        THURSDAY, SEPTEMBER 14, 2023
2  Thereupon,
3              SCOTT WILLIAMS,
4  a witness of lawful age, having been first duly
5  sworn to tell the truth, the whole truth and
6  nothing but the truth, testified upon his oath as
7  follows:
8              EXAMINATION
9  BY MR. GARDNER:
10     **Q.  Could you state your name and address for**
11 **the record.**
12     A.  Scott Williams.  11423 Spotted Fawn Lane,
13 Bigfork, Montana 59911.
14     **Q.  Okay.  And Mr. Williams, my name is Trent**
15 **Gardner, you understand that I represent your**
16 **bankruptcy trustee --**
17     A.  Yes, I do.
18     **Q.  -- Richard Samson?**
19     A.  Uh-huh.
20     **Q.  Okay.  Just a couple of quick ground**
21 **rules.  I know you'll know what my question is a**
22 **lot of times, but if you could wait for me to**
23 **finish before you answer, that will help us get a**
24 **clear record, and I'll try to do the same with you.**
25     **And we also need verbal answers --**

IN RE: WILLIAMS, DEBTOR                9/14/2023                SCOTT WILLIAMS

Page 6

1    A. Okay.
2    Q. -- instead of nods or shakes.
3      Have you ever been deposed before?
4    A. Yeah.
5    Q. How many times?
6    A. A couple.
7    Q. When were you deposed?
8    A. Last -- in the last year in this case
9  with my brother, and I don't remember the date off
10 hand, but in the last year.  And then like 30 years
11 ago probably, I was -- I managed a motorhome
12 business, a guy talked me into driving his
13 motorhome for him home after hours, I got hit.  The
14 guy was an attorney, didn't have insurance, so he
15 just played it out until all the insurance
16 companies involved, the company, mine, the
17 employer's, everybody just paid for it.
18   Q. Any other times you've ever been deposed?
19   A. No.
20   Q. Have you ever been involved in any other
21 litigation?
22   A. Just the litigation that is part of this
23 case that was originally with my brother, a
24 different brother, Duffy Williams.  And then
25 with -- and then that turned on to me and the

Page 7

1  trust.
2    Q. Okay.  That litigation with Duffy --
3    A. Yes.
4    Q. -- tell me about that litigation.
5    A. Okay.  So Duffy had an attorney who he
6  owed money, the amount was always in question, I
7  never knew the exact amount, I heard different
8  numbers from different people, I always thought it
9  was about $2500, the attorney sued him for
10 $250,000.  Duffy -- Duffy told him that he was in
11 Africa, which he had done before, he's been in
12 Africa, so the guy settled for I think about
13 $23,000, but then came after me because Duffy told
14 him, or he assumed, I think, that I was helping him
15 out in some way.
16   Q. Okay.  And was that back in like
17 June/July of 2019?
18   A. Yeah, his was in June or July, yes, and
19 then it flipped over to me and the trust on
20 July 21st of that year, yeah.
21   Q. Okay, okay.  Briefly tell me about your
22 education history.
23   A. High school, a little bit of college.
24   Q. Okay.  And are you currently employed?
25   A. No.

Page 8

1    Q. When was the last time you were employed?
2    A. In 2019, I guess.
3    Q. Okay.  And how were you employed in 2019?
4    A. It's kind of questionable whether I was
5  employed or just kind of helping out my father, but
6  I did stuff for my father, his business, but...
7    Q. And your father's business was what?
8    A. Hugh's RV is what it was called.
9    Q. Okay.  Do you recall whether you received
10 W-2s?
11   A. Never did, no.
12   Q. And the last time you did that was in
13 2019?
14   A. Actually my dad died in 2019, so
15 technically I guess it was 2018, and I was still
16 there in 2019, but...
17   Q. Okay.  And we'll get to that in a minute.
18     But since that 2018/early 2019 have you
19 been employed in any other way?
20   A. No.
21   Q. Have you had any other source of income
22 since 2019?
23   A. Social Security starting in I believe
24 2021.
25   Q. Okay.

Page 9

1    A. I'm not sure of that date exactly, but I
2  believe 2021.
3    Q. Okay.
4    A. Yeah, 2021 it was.
5    Q. So from 2019 to whenever the Social
6  Security started in 2021, you didn't have any
7  income?
8    A. No, huh-uh.
9    Q. You mentioned the case with your brother
10 where you were deposed last year, is that the
11 arbitration proceeding?
12   A. Yes, yes.
13   Q. And who were the plaintiffs in that case?
14   A. Just Kent Williams.
15   Q. Okay.  Were any of your other siblings
16 involved?
17   A. No.
18   Q. What is that case about?
19   A. I guess their claims were I paid my
20 father's tithing after he died.  I -- he questioned
21 a $75,000 payment to me after he had already --
22 everybody had already signed off on it, accepting
23 their money, knowing full well I was getting that
24 payment.  I believe there's a claim for fuel, a
25 claim for food, and a claim for American Express

Page 10

1  payments.
2      Q.  Okay.  The -- when was that $75,000
3  payment to you made?
4      A.  On -- the siblings all got their --
5  basically got their notification before that, but
6  we had a meeting at the attorney's office on
7  June 26th, I believe, of 2019.
8      Q.  Okay.
9      A.  I didn't pay myself that day, I waited --
10 I think until July 7th -- July 1st, I believe it
11 was.
12     Q.  Okay.  And when you -- what was the
13 $75,000 for?
14     A.  My dad called it retirement severance.  I
15 don't know.  He told three of my sisters, he may
16 have told my brothers, but they never admitted it,
17 basically he was going to give me money if the
18 business ever sold or closed down.  And it all came
19 from, he was originally in 2015 -- 2014 had an
20 agreement to sell the property -- or not sell the
21 property, but to build apartments and a development
22 agreement with some other people.
23     Q.  Okay.
24     A.  So that's when it instituted.  And then
25 he told -- unbeknownst to me, he told my sisters

Page 11

1  all about it, and so it was included in the
2  disbursement.
3      Q.  Okay.  And so prior to that June 26th,
4  2019 meeting you gave your siblings a
5  spreadsheet --
6      A.  A payout, yes, yes.
7      Q.  -- showing what the distribution would
8  be?
9      A.  Right, exactly.
10     Q.  And it showed that you were to get
11 $75,000 more than they were?
12     A.  Yes.  Listed as a severance, yes.
13     Q.  Okay.  And at that time did Kent dispute
14 that you were entitled to that?
15     A.  No.
16     Q.  He never raised an issue?
17     A.  Absolutely not.
18     Q.  Did he raise any issues at that time?
19     A.  The agreement that was signed that day,
20 that the three girls signed, the three sisters --
21 you have a copy of it -- it shows final payment
22 received in full, which I wouldn't have signed, you
23 know, the lawyer made it up, I didn't see it until
24 the night before we went to the lawyer's office,
25 taxes need to be paid out of -- out of the estate,

Page 12

1  and I can't remember everything else without
2  looking at it.
3      Q.  Okay.
4      A.  But that was his objection at the time is
5  that it said final payment, which like I said, I
6  wouldn't have signed that.
7      Q.  Okay.  So when did Kent start raising
8  issues about the 75,000?
9      A.  The first time I heard any problem was in
10 the lawyer's letter that he sent in 2021.
11     Q.  Okay.  When did Kent initiate the
12 litigation?
13     A.  So he did the lawyer's letter in 2021, I
14 answered it, the lawyer answered back, and at that
15 point I decided I'd better get an attorney.  So I
16 got an attorney and then it went back and forth for
17 months, if not a year or two.
18     Q.  And that ultimately went into an
19 arbitration; right?
20     A.  Yes, the trust required it be an
21 arbitration.
22     Q.  Yeah, I think you said Kent was the only
23 plaintiff --
24     A.  Yes.
25     Q.  -- in that arbitration?

Page 13

1      Are any of -- Kent's making a claim
2  against you in this bankruptcy, correct, related to
3  that arbitration?
4      A.  I believe all of the siblings are.  Three
5  of them have already signed a release.  But I guess
6  on advice of counsel, I listed them all because I
7  didn't know if that would, you know, absolve the
8  whole thing for all of them or if they could all
9  individually come back to me or what.  So I'm the
10 one who listed all of the siblings.
11     Q.  Okay.  What did you do to prepare for
12 today's deposition?
13     A.  I said my prayers, I read this, I --
14 actually, Candy prepared this, which was a timeline
15 just because we wanted -- I mean, it's based on
16 factual things that we can nail down because it's
17 all so old from 2019, that it's hard to remember
18 exactly on what date what happened and what --
19     Q.  Can I see that document?
20     A.  Right now?
21     Q.  Yes.
22     MR. SHIMANEK:  I don't see any reason why
23 you --
24     A.  Yeah, it's just a listing of a date, what
25 happened and how she figured out how to do it, I

Page 14

1 mean, the proof of what we're doing, so it
2 wasn't -- it's not a guess, it's -- there's
3 something tied to it.
4    Q.  (BY MR. GARDNER)  Okay.  And what else
5 did you look at?  Are those just copies -- more
6 copies of this?
7    A.  No, this is the payments that Candy has
8 made on my behalf towards anything that was
9 transferred to her.
10    Q.  Okay.  What else did you do to prepare?
11    A.  That's it.
12    Q.  Okay.
13    A.  I didn't know what your questions would
14 be, so I didn't really have a lot to go on.
15    Q.  Okay.  Can I see the second one?
16    A.  Uh-huh.
17    Q.  Is this the same document that you
18 produced to us in discovery?
19        MS. WILLIAMS:  We did.  Oh, sorry.
20    A.  I believe she did, yes.  The only
21 difference is I understand it may have been updated
22 to the current date.
23    Q.  (BY MR. GARDNER)  Okay.  When we're on a
24 break I'm just going to make copies --
25    A.  Sure.

Page 15

1    Q.  -- of those two.
2        Okay.  Have you ever filed bankruptcy
3 before?
4    A.  Yes, uh-huh.
5    Q.  When did you file bankruptcy?
6    A.  I'm not sure of the date, I knew it
7 before, I don't -- off the top of my head, I don't
8 know.  But 20 years ago or so, somewhere in there.
9    Q.  Early 2000s, roughly?
10    A.  Yeah, seems like it was earlier than
11 that, like the end of the '90s, but somewhere in
12 there, yeah.
13    Q.  And where was that bankruptcy filed?
14    A.  Salt Lake City, yeah, Salt Lake City.
15    Q.  Okay.  How long did you work for Hugh's
16 RV?
17    A.  From 2007, I believe.
18    Q.  Okay.  What type of work did you do for
19 Hugh's RV?
20    A.  He got a -- it's called El Monte RV, a
21 motorhome rental company, so he had that
22 opportunity, so he -- so I basically rented out
23 someone else's motorhomes is what it reduced to.
24    Q.  Okay.  Were you involved in sales of
25 motorhomes at all?

Page 16

1    A.  No.
2    Q.  Prior to working for Hugh's RV what did
3 you do?
4    A.  I was mostly in the floor covering
5 industry.
6    Q.  So when your dad died, you were the
7 personal representative of the --
8    A.  Yes.
9    Q.  -- estate; correct?
10    A.  Still am, to the best of my knowledge,
11 yes.
12    Q.  Has that estate been closed?
13    A.  No.
14    Q.  Is that one of Kent and your other
15 siblings' complaints that the estate hasn't been
16 closed?
17    A.  They haven't complained about it anywhere
18 in writing that I'm aware of.  Yes, they want it
19 closed, but it was from 2019, it was a $5 million
20 estate and my dad hadn't paid his taxes for a
21 couple years, so we had to get that handled, and
22 there has to be some time limit of making sure
23 there aren't any problems with that.  So there's no
24 reason to be in a hurry, that I'm aware of, except
25 they all wanted their money.

Page 17

1    Q.  Okay.  What all was in your dad's estate?
2    A.  He had -- I assume his home was in his
3 estate, it automatically went to his wife the day
4 he died, but he had a home.  He had five pieces
5 of -- parcels of property contiguous in one -- in
6 one lot that he had in north Salt Lake.  And then
7 his personal effects.  Well, actually, there's a
8 few -- there's a list of vehicles and stuff there
9 that are on the list.
10    Q.  So briefly --
11    A.  So that's all.
12    Q.  Okay.  So briefly describe what you did
13 as the PR to deal with the estate.
14    A.  Okay.  So first thing, he was in a
15 divorce with his ex-wife, so we got that stopped
16 because it was moot.  I worked with his ex-wife's
17 son-in-law, who was also at this point her
18 attorney, to get the house sold and the personal
19 effects out of it and divided up.
20        And then I sold the property, the
21 property was valued at 2.7 million on the appraisal
22 in 2018, I sold it for 4.9 million, as if it had
23 entitlements, although it didn't.  And with no
24 attorney -- or no attorney or real estate agent
25 involved.

IN RE: WILLIAMS, DEBTOR          9/14/2023                    SCOTT WILLIAMS

---

Page 18

1     And oversaw the closing down of his
2 estate there or -- yeah, the estate, and the
3 several vehicles that were listed as assets.
4     Q.  How long have you and Candy been married?
5     A.  Since 2014.
6     Q.  Okay.  And did you -- I assume you lived
7 in Salt Lake at that time?
8     A.  Yeah, Cottonwood Heights in Utah, yes.
9     Q.  Did you own a home in Utah?
10    A.  No.
11    Q.  Did you ever own any real property in
12 Utah?
13    A.  Yes, yes, I had three homes with a
14 previous marriage in Utah, yes.
15    Q.  And when was the last time you that you
16 owned a home?
17    A.  I believe 1992.
18    Q.  Okay.  And since then you didn't own --
19    A.  No.
20    Q.  -- any real estate --
21    A.  No, never.
22    Q.  -- in Utah?
23    COURT REPORTER:  So will you do me a
24 favor, Scott?
25    THE WITNESS:  Yes.

---

Page 19

1     COURT REPORTER:  And wait until he's
2 finished asking the question before you answer,
3 it's really hard for met to get you both talking at
4 the same time.
5     THE WITNESS:  Yes.
6     A.  Technically we had another lot that me
7 and my daughter bought in 1992, also, I believe,
8 just a vacant lot that we were going to build a
9 home on and then we discovered water in it, and
10 sold it quickly.
11    Q.  (BY MR. GARDNER)  Okay.  So you and Candy
12 rented a home after you got married?
13    A.  Yes.
14    Q.  You never owned a home in Utah?  After
15 you and Candy got married --
16    A.  Oh, no, her and I never owned a home, no.
17    Q.  Okay.  So you rented.  And when did you
18 move to Montana?
19    A.  In -- Okay.  So our lease expired in end
20 of June in 2020, but -- and I don't know when
21 technically I would've moved -- I guess I had an
22 open lease in Utah until then, but I was up here
23 from February -- well, I was back and forth, I was
24 up here trying to get carpet out of this other home
25 earlier than that, but tech -- I don't know,

---

Page 20

1 technically, when I would've been a resident of
2 Montana.
3     Q.  Okay.  And I'm not --
4     A.  But we physically moved at the end of
5 2020 -- or the end of June in 2020.
6     Q.  Okay.  And was Candy in Utah with you up
7 until that point or did --
8     A.  Yes.
9     Q.  -- she move out earlier?
10    A.  Yes, no, she had a job there and stayed
11 in the house.
12    Q.  Okay.  And whose name was your lease in
13 Utah in?
14    A.  I don't positively -- I assume it was in
15 both our names.  I think in Utah any -- any
16 occupants over 18 have to be on there, so it
17 might've been in my name, her name and her
18 daughter's, who stayed with us for quite a while,
19 but I'm not positive, I haven't looked at it.
20    Q.  Okay.  So we were -- did you and Candy
21 own any -- after you moved to Montana, own any real
22 estate?
23    A.  No.
24    Q.  Okay.  Did Candy own any real estate?
25    A.  Yes.

---

Page 21

1     Q.  And what real estate?
2     A.  The 11423 Spotted Fawn Lane property.
3     Q.  Any other real estate that Candy owned?
4     A.  No.
5     Q.  Okay.  Do you have any ownership in any
6 entities?
7     A.  No.
8     Q.  I have seen an address used for Candy
9 in --
10    (Slight disturbance, discussion held off
11 the record.)
12    Q.  (BY MR. GARDNER)  I've seen reference to
13 an address in Columbia Falls for Candy in 2019, do
14 you know what that is?
15    A.  2019?  The only thing I'm aware of is
16 that her mother has homesteaded property in
17 Columbia Falls from the 1800s, I believe.
18    Q.  Okay.  So back to your dad's estate.  In
19 June of 20 -- June 26th of 2019, when you had that
20 meeting --
21    A.  Yes.
22    Q.  -- approximately how much money was there
23 to divide up between the heirs?
24    A.  Between the heirs, between the
25 beneficiaries, we paid Hugh's wife first, so she

---

Page 22

1 wasn't a beneficiary, I guess, but she was an heir,
2 and after the beneficiaries were left, I believe it
3 was 2 point -- guessing, 2.2 million. I can tell
4 you the amounts of each person -- well, I guess I
5 don't know exactly.
6      Q. Okay. How many siblings do you have?
7      A. Six.
8      Q. Including you?
9      A. Yes, so actually seven, sorry, seven.
10     Q. Were they all beneficiaries?
11     A. No.
12     Q. Okay. How many were beneficiaries?
13     A. Six.
14     Q. And what are their names?
15     A. Mary Williams, Kent Williams -- Mary
16 Carter, excuse me, her married name, Mary Carter,
17 Kent Williams, Karen Priest, Brenda Harbers, and
18 Duffy Williams.
19     Q. And so did all of the siblings receive
20 the same amount except for you?
21     A. Yes.
22     Q. Okay.
23     A. Just to add in there, because of the way
24 it was on the thing, one sibling, Mary, bought a
25 truck or took a truck out the estate, so that

Page 23

1 amount was deducted. Duffy wanted a tractor, and
2 that amount was deducted and went back into the
3 amount to be divided.
4      Q. Okay. At that time, in June of 2019, was
5 there any dissension among the siblings as to your
6 handling of the estate?
7      A. No, they were all happy as could be.
8      Q. Okay.
9      A. We all considered it pretty much a
10 miracle that we got through this and got any money.
11     Q. Okay. Did Kent ever press you for an
12 accounting in June of 2019?
13     A. I don't believe so. An accounting? No,
14 huh-uh, no. He wanted to be sure that he got his
15 money by the end of August, but that's all that he
16 ever pressed me for, he wanted to make sure that he
17 got the rest of his money by the end of August.
18 And, you know, I just said, we'll do what we can,
19 but it was in probate, so it wasn't -- he thought
20 the day the probate ended, it would be over, but I
21 didn't see it that way.
22     Q. Around the time of this meeting did Kent
23 ever tell you that if he thought you mishandled it,
24 he would come after you?
25     A. No.

Page 24

1      Q. Okay. So what was the total amount that
2 you ended up getting?
3      A. 426,000-some-odd, I don't remember the
4 exact amount.
5      Q. Okay. And how were you paid that money?
6      A. I went to the bank and wrote myself a
7 check.
8      Q. Explain that to me.
9      A. Okay. So the other siblings, I had
10 written their checks out before the meeting and had
11 them there at the meeting for them, but I didn't do
12 mine. And I think the next -- well, day or two, I
13 went and had a cashier's check made.
14     Q. Okay. To you?
15     A. To myself, yeah.
16     Q. For the full amount?
17     A. Yes, 426,000, I believe, yes.
18     Q. One cashier's check?
19     A. Yes.
20     Q. And what did you -- First off, why didn't
21 you do your check in advance of the meeting the
22 same way you did your siblings?
23     A. I didn't see any hurry to do it.
24     Q. Okay. What did you do with that
25 cashier's check?

Page 25

1      A. Took it home and put it in one of those
2 little safes.
3      Q. You didn't do anything -- and that was
4 about July 1st; right?
5      A. I believe so, yes.
6      Q. Okay. You didn't do anything with it at
7 that time?
8      A. No.
9      Q. Okay. What's the next thing you did with
10 it?
11     A. At some point, and I believe it was -- I
12 think I've given it to you so you have copies of
13 it, but I went and broke out that cashier's check
14 into another one, and put 25,000 to myself and
15 deposited that in my U.S. Bank account to pay
16 bills.
17     Q. What do you mean you went and broke it
18 out into another one? Describe that.
19     A. I had one cashier's check at home, I took
20 it to the bank, had them make a cashier's check for
21 I believe 401,000, something like that, and 25,000
22 even, I believe, went into a cashier's check which
23 I ran right over to U.S. Bank.
24     Q. So you had a $426,000 cashier's check?
25     A. Uh-huh.

Page 26

1    Q.  You didn't take it to a bank and deposit
2 it; correct?
3    A.  No.
4    Q.  You took it home and then you took it
5 back to the bank, and rather than depositing it --
6    A.  Split it out.
7    Q.  -- you traded it in for two more
8 cashier's check?
9    A.  Yes, yeah.
10    Q.  Why didn't you deposit it in the bank?
11    A.  I was concerned that if I put it in my
12 bank account it would start to get flittered away.
13 That's all I had in the world and I just didn't
14 want to start -- you know, I didn't want to put it
15 in a bank account that I had that I could draw on
16 and start using money.
17    Q.  Okay.  So that 426,000 that you got from
18 the estate, that was your money; right?
19    A.  Yeah, uh-huh.
20    Q.  And that was pretty much all the money
21 you had in the world?
22    A.  Yes, other than what was -- whatever
23 change was in my bank accounts and savings and such
24 there, yes, that's the only large amount of cash I
25 had.

Page 27

1    Q.  And that was your only asset of any real
2 substance; right?
3    A.  Yes, other than, you know, trucks and a
4 couple of trailers and stuff like that, yes, of any
5 substance, I think you're right.
6    Q.  And so now you've got two cashier's
7 checks, one for 401,000 and one for 25,000?
8    A.  It was in the bank the same day, I
9 believe.
10    Q.  Okay.  And so the 25,000 went into a
11 joint checking account that you and Candy had at
12 U.S. Bank?
13    A.  It's not a joint account.
14    Q.  It's not a joint account?
15    A.  No.
16    Q.  Okay.  That's your sole account?
17    A.  Yes.
18    Q.  And what was that 25,000 used for?
19    A.  We've looked at it since then, I believe
20 $17,000 I paid on an American Express bill and the
21 rest went to whatever bills, credit cards, may have
22 gone to rent, I don't know.
23    COURT REPORTER:  May have gone to what?
24    THE WITNESS:  May have gone to rent.
25    COURT REPORTER:  Thank you.

Page 28

1    A.  But it went for bills, basically.  Went
2 into my checking account and was used for bills and
3 what have you.
4    Q.  (BY MR. GARDNER)  The Amex, the $17,000
5 paid to American Express, was that American Express
6 account solely or was that a joint American
7 Express account with Candy?
8    A.  It's solely mine.
9    Q.  I'm going to hand you what we'll mark as
10 Exhibit 1.
11 EXHIBITS:
12    (Deposition Exhibit Number 1 marked for
13 identification.)
14    A.  Thank you.
15    Q.  (BY MR. GARDNER)  And that is a U.S. Bank
16 statement; correct?
17    A.  Yes, yes.
18    Q.  And the account is Scott K. Williams and
19 Candy L. Willden; correct?
20    A.  That's what it says, correct.
21    Q.  Okay.  And you see down where it says
22 Deposits/Credits, there's a $25,000 credit?
23    A.  Oh yes, okay, yes.
24    Q.  Yeah, July 1 there's deposit of
25 $25,000 --

Page 29

1    A.  Yes.
2    Q.  -- that's the $25,000 you just talked
3 about where you took your money and got a $25,000
4 cashier's check --
5    A.  Correct.
6    Q.  -- and put it into a U.S. Bank account;
7 correct?
8    A.  Yeah, my U.S. Bank account.
9    Q.  And it's this U.S. Bank account --
10    A.  Yes.
11    Q.  -- which is in the name of Scott Williams
12 and Candy Williams -- or Willden?
13    A.  Problem there, when we got married that
14 became my account only because she can't use it
15 with her married name.
16    MS. WILLIAMS:  It's a different last
17 name.
18    MR. GARDNER:  Pardon me, you'll have your
19 chance.
20    MS. WILLIAMS:  Sorry.
21    Q.  (BY MR. GARDNER)  The name of this
22 account is both you and Candy; correct?
23    A.  That's what this printed paper says, but
24 she cannot use that account with that name, making
25 it only my account.  Does that make sense to you?

Page 30

1    Q.  I understand what you're saying --
2    A.  Okay, all right.
3    Q.  -- yes.
4        And you can leave those there.
5    A.  Oh, okay.
6    Q.  So you have another cashier's check for
7 about $401,000?
8    A.  Yes, uh-huh.
9    Q.  What did you do with that check?
10   A.  Okay.  So, again, I had that at my house.
11 On, I believe, August 3rd, I went to Zions Bank,
12 put that -- or put -- with that cashier's check,
13 made a cashier's check out to Viking Investments
14 LLC for $400,000.  I to this day cannot remember
15 the thousand-dollar difference, I assume I got that
16 in cash, but I think I would remember putting
17 $1,000-something cash in my pocket, but that's the
18 only thing I could've done, is get cash, I don't
19 think there's any -- I don't know what else I
20 would've done except that.
21       So I took that
22 401-something-thousand-dollar check on I believe
23 August 3rd, made it into a $400,000 cashier's check
24 to Viking Investments, and I believe pocketed the
25 cash difference; that's what I believe.

Page 31

1    Q.  Okay.  And what is Viking Investments
2 LLC?
3    A.  It is Candy's LLC that she had just
4 opened up, I don't know, before that, a month
5 before, I believe.
6    Q.  Why had Candy opened up Viking
7 Investments LLC?
8    A.  Because our plan was to move to Montana
9 after my father died, we had planned -- she's from
10 here, she -- we'd planned on moving back for years.
11 I didn't have a job, she would have had to give up
12 her job.  She had, for years, been looking at maybe
13 doing a coffee shop or something up here.  I had
14 been looking at a gas station to buy for months
15 before that.  And she was thinking about putting a
16 coffee shop up, so she had opened up I guess a bank
17 account and stuff -- a bank account, a business and
18 the whole thing.
19       I didn't have time to come up here to
20 look at stuff all the time, but bottom line is she
21 had plans, things that -- she had irons in the
22 fire, I had one iron in the fire and it died.
23   Q.  That potential gas station, what was the
24 name of that?  Was it Glacier Travel Stop?
25   A.  I don't know if that's the name of it.

Page 32

1 It's a Cenex right there as you go up to -- no, no,
2 it's not Glacier Travel Stop, that was the -- that
3 was the name of what her coffee company was going
4 to be.  It's a Cenex right there at the
5 intersection of -- going up to the park and where
6 the highway comes from Bigfork up to intersect
7 with --
8    Q.  Columbia Falls?
9    A.  Yeah, exactly.
10   Q.  Columbia Falls Heights?
11   A.  Yeah, Columbia Falls Heights.
12   Q.  Okay.  So what is Glacier Travel Stop?
13   A.  I believe that's the name of her -- a dba
14 that she had that she was gonna use for a coffee
15 stand if we got that gas station.
16   Q.  Okay.  So you took your $400,000 --
17   A.  Uh-huh.
18   Q.  -- traded in the cashier's check that you
19 had already traded in once and got a new cashier's
20 check to Viking Investments LLC?
21   A.  Exactly.
22   Q.  For $400,000?
23   A.  Yes.
24   Q.  And Viking Investments LLC is owned
25 solely by Candy; correct?

Page 33

1    A.  Yes.
2    Q.  Why did you put your $400,000 into
3 Viking's account and not your account?
4    A.  Because I had been for months planning to
5 possibly purchase that gas station, by the time I
6 got up there and looked at it and actually had an
7 appointment with them, I went in and got their
8 books and saw how much it was losing, I still
9 considered it because it was such a good deal as
10 far as the property, the property alone was worth
11 what they were doing.  But when I saw how much they
12 were losing, how much -- how many hours it would
13 take to turn it around, and one of the key things I
14 saw was it would take $10,000 to fill their gas
15 tanks, I think I -- I think the price was $395,000,
16 but I didn't feel like it made sense.  I didn't --
17 I didn't want to bite that off, and work 24/7
18 again.
19   Q.  When was that that you were looking at
20 the gas station?
21   A.  Let me look at the date we actually went
22 there.  I had looked at it for months, told all my
23 siblings , talked about it, but had not actually
24 been able to go up there until then.  Did I give
25 you the timeline?

Page 34

```
1      Q.  The timeline is on the back of that first
2   one, I think, or the last few pages of that first
3   one.
4      A.  Okay.  Okay, so basically -- Okay.  So we
5   were there on 7/24 looking for a venue for her
6   daughter's wedding.  I actually went and physically
7   saw the gas station for the first time, got the
8   books, and on 7/24 basically I had ruled it out
9   after seeing the books and knowing what it would
10  take to do.  So that was the only thing I had been
11  planning on for months, and I just -- I didn't have
12  another plan.
13     Q.  Okay.  And so the plan changed from
14  buying a business in your own name to putting all
15  of the money into an account owned by an LLC that
16  you had no interest in?
17     A.  Correct.
18     Q.  Why?
19     A.  I think I just explained, I didn't have
20  anything else that I was ready to do, and she had a
21  business set up and she had plans that she'd had
22  for not months, years, and I didn't have any other
23  options.
24     Q.  Okay.  So you gave the money to Viking,
25  what did Viking give to you?
```

Page 35

```
1      A.  I didn't give it to Viking.  Give like in
2   gift it?  I transferred it, I believe is the proper
3   word, but I didn't give her anything.
4      Q.  Okay.  So you transferred it --
5      A.  Yes.
6      Q.  -- into Viking's bank account?
7      A.  Yes.
8      Q.  Did you have control over Viking's bank
9   account?
10     A.  No.
11     Q.  So then did you have control over the
12  $400,000?
13     A.  No.
14     Q.  Then you gave it to Candy; correct?
15     A.  Not gave, gave is a gift with nothing
16  coming back.
17     Q.  Okay.
18     A.  We basically had an agreement because I
19  had no income --
20     Q.  Okay.
21     A.  -- so we basically had an agreement that
22  she would pay my bills, which she started doing
23  almost immediately.  She would, as soon as she
24  could, pay off my credit cards, any debt that I
25  have, and then we would go from there.
```

Page 36

```
1      Q.  Okay.  So take the gift out of it, you
2   transferred it to Viking?
3      A.  Right.
4      Q.  And in return, Viking said it would pay
5   off your credit cards?
6      A.  And give me my money back, my 400,000
7   back, yes.
8      Q.  Okay.  Was this agreement in writing
9   anywhere?
10     A.  No, huh-uh.
11     Q.  Okay.  If you had -- you had tens of
12  thousands of dollars in credit card bills; correct?
13     A.  You have that, I assume that's correct,
14  yeah.
15     Q.  Yes.  And you got the $25,000 cashier's
16  check?
17     A.  Yeah.
18     Q.  And you used 17,000 of that --
19     A.  Yes.
20     Q.  -- to pay off a credit card.  And you
21  didn't use any of that other money to pay off your
22  credit cards at that time, did you?
23     A.  At that time, no.
24     Q.  You transferred it to Viking instead?
25     A.  Correct.
```

Page 37

```
1      Q.  And you could've used it to pay off all
2   those?
3      A.  I could've, yes.
4      Q.  Okay.  But instead you gave it to Viking
5   Investments LLC?
6      A.  Transferred it to Viking Investments LLC.
7      Q.  Okay.  You transferred it to Viking
8   Investments LLC, you got no money in return;
9   correct?
10     A.  I immediately, within days I think,
11  started getting money back.  The agreement was she
12  had to pay the bills that we were doing -- the
13  household bills.  I had paid all the household
14  bills before, the lease, the water bill, any kind
15  of utilities, she immediately began paying my
16  bills, any credit card bill that came due, lease,
17  rent, whatever, cell phone.
18     Q.  Here's what I'm struggling with, you had
19  the $400,000?
20     A.  Right.
21     Q.  You had debts you owed, but instead of
22  paying those or paying your own bills, you
23  transferred it to somebody else and you then had no
24  control over it; correct?
25     A.  Correct.
```

IN RE: WILLIAMS, DEBTOR          9/14/2023          SCOTT WILLIAMS

Page 38

1    Q.  Okay.  At the time you transferred it was
2 the idea in place to buy a home with that money?
3    A.  Not necessarily.  I think she had looked
4 at several homes, but we -- I don't think we'd even
5 seen the home that she bought by that date.
6    Q.  Okay.  Do you have a written agreement
7 with Viking that in return for giving them this
8 money, Viking would then pay all of your bills?
9    A.  No, didn't need one, it's my wife.
10   Q.  Okay.  Viking is basically your wife;
11 correct?
12   A.  Yes.
13   Q.  Candy?
14   A.  Yes.
15   Q.  Okay.  And so once you transferred that
16 $400,000, you had no more than 1,000 or $2,000 to
17 your name; correct?
18   A.  Yeah, my truck was paid off, I had a
19 couple of vehicles, but yeah, correct.
20   Q.  And you had a truck that you have valued
21 in the bankruptcy at 3 or 4 thousand dollars now;
22 correct?
23   A.  Yeah, what, four years later, yeah.
24   Q.  Yeah.  And no other liquid assets?
25   A.  Except for the money she was paying me

Page 39

1 back, yeah.
2    Q.  Yeah, so you transferred the $400,000,
3 you didn't have control over it?
4    A.  Right.
5    Q.  And you relied on her to give it back to
6 you if you needed it?
7    A.  Yes.
8    Q.  Okay.  And you had no other investments;
9 correct?
10   A.  No.
11   Q.  And you had no gold, no silver, no money
12 in PayPal or Venmo accounts?
13   A.  No.
14   Q.  Nothing like that?
15   A.  No.
16   Q.  So you had no way of paying your living
17 expenses?
18   A.  Of course I did, we show she paid all of
19 my living expenses --
20   Q.  Okay.
21   A.  -- by agreement.
22   Q.  Okay.  And you had no way, without Candy
23 giving you money back, to pay your credit card
24 debts at that time?
25   A.  No, besides Candy, no, unless I went and

Page 40

1 got a job, I guess.
2    Q.  Okay.  And likewise, if your siblings
3 made a stink about what you did in managing the
4 your father's estate, you had no way of paying any
5 of that money back; correct?
6    A.  If they had made a stink, yeah, but there
7 was no stink.  There was nothing but
8 congratulations and thank-yous at this time.
9    Q.  Okay.  I think you talked about this
10 earlier, so I'm going to mark this as Deposition
11 Exhibit Number 2.
12 EXHIBITS:
13       (Deposition Exhibit Number 2 marked for
14 identification.)
15   A.  Thank you.
16   Q.  (BY MR. GARDNER)  Is this the release we
17 were talking about earlier?
18   A.  Yes.
19   Q.  And I think your testimony was this is
20 the release that you tried to require each of your
21 siblings to sign before they received their money?
22   A.  I don't believe I said that.
23   Q.  Okay.
24   A.  The attorney in his office did that, I
25 didn't require anything.

Page 41

1    Q.  Okay.  You didn't ask the attorney to
2 prepare this?
3    A.  No.
4    Q.  You were --
5    A.  No, no, I was quite surprised when I got
6 this the night before because the -- it literally
7 says Accepts such property in full payment and
8 satisfaction, and this was -- they got almost all
9 the money, but it wasn't a complete distribution at
10 that time.
11   Q.  And you reviewed this the night before?
12   A.  I got it -- yeah, I got it the night
13 before.
14   Q.  And you didn't tell the attorney to not
15 try to --
16   A.  No, I didn't know the difference.  He's
17 an attorney, I'm a layperson, I trusted him, I
18 guess.
19   Q.  All right.  So you said you trusted him,
20 but you looked at this and you knew it was wrong --
21   A.  I looked at it and said I --
22   Q.  Can you let me finish?
23   A.  Sorry.
24   Q.  So you looked at it, you knew it was
25 wrong and --

Page 42

1    A.  I didn't know it was wrong --
2    Q.  Well, you knew --
3    A.  -- I just said I wouldn't sign it.
4    Q.  You just said Accept such property in
5 full payment and satisfaction of the undersigned
6 interest, you knew that wasn't accurate; right?
7        MR. SHIMANEK:  I think he's answered the
8 question, Trent.
9        MR. GARDNER:  Okay.
10    Q.  (BY MR. GARDNER)  Also under number 4
11 this includes a statement that it waives any
12 accounting required under the Utah Uniform Probate
13 Code; correct?
14    A.  It does, yes.
15    Q.  And that is one of the things that your
16 siblings are now complaining about, is that there's
17 been no accounting done for the estate; correct?
18    A.  No, it's been completely done and the
19 taxes have been paid.
20    Q.  Okay.  And number 5, there's a provision
21 that also releases the personal representative of
22 the estate from any and all liability in connection
23 with the undersigned interest in the estate?
24    A.  And that, to me, looked like a
25 standard -- something that you would standardly put

Page 43

1 on there, I would assume.
2    Q.  Did you ask your attorney if it was
3 standard?
4    A.  No.
5    Q.  Okay.  The personal representative is
6 you; correct?
7    A.  Yes, yes.
8    Q.  And so this release is releasing any
9 claims against you for what you did with the
10 estate?
11    A.  Right.
12    Q.  Including if there was something improper
13 for the extra $75,000 you took?
14    A.  I assume, I don't know.  I'm not a
15 lawyer, I don't -- sometimes, as I've seen over the
16 last years, what you believe the law says is not
17 what it means.  I don't know.
18    Q.  Fair enough.
19    A.  All right.
20    Q.  I've seen that many times in my career.
21    A.  Yes.
22    Q.  How many of your siblings signed this?
23    A.  So as you can see, this was signed on the
24 28th, so two sisters signed it in the office, this
25 was emailed to my sister who lives -- this is

Page 44

1 Brenda --
2    Q.  Okay.
3    A.  -- who lives in Missouri, I believe, and
4 she emailed it back on the 28th, so three of the
5 six.
6    Q.  Okay.
7    A.  And I didn't sign it, I don't know if I
8 ever needed to sign it.  I didn't even get a copy
9 with my name on it, as I recall.
10    Q.  Did you ask the attorney?
11    A.  No.
12    Q.  Okay.  Did Duffy sign it?
13    A.  No, Duffy -- Duffy was paid I believe the
14 day before, the 26th.  He had -- the guy who bought
15 the house of Hugh's, really doing us a favor buying
16 that house, we didn't own it, but my dad was livid
17 that Lois not live in that house and get remarried
18 in the same neighborhood.  So Lois's son-in-law
19 lawyer basically turned over to me the showing of
20 the house and we found the guy who was actually a
21 friend and a landlord of Duffy's who bought the
22 house, okay?
23        So Duffy owed him $20,000, he was
24 hounding him for it.  Because of that, I went to
25 the bank the day before, got him his money so he

Page 45

1 could pay that guy, with a promise that he would
2 sign this the next day at the meeting; he didn't
3 show up at the meeting.
4    Q.  Okay.
5    A.  So this was not ready when Duffy got his
6 money.  He promised me it would be the next day and
7 he didn't show up.
8    Q.  And Kent was at the meeting?
9    A.  Kent was at the meeting.
10    Q.  And Kent looked at this; correct?
11    A.  Yeah, Kent looked at this talked to the
12 attorney and said, I'll get back to you later, I'm
13 not sure what he talked to the attorney about
14 exactly.
15    Q.  Did you have any conversation with Kent
16 about any release?
17    A.  Not on that date, no.
18    Q.  Did you have a conversation with him
19 about it later?
20    A.  Yeah, he said I don't like the taxes of
21 the -- I don't recall exactly because I didn't
22 really care what he said.  Basically he went home,
23 cut this off and typed up what he wanted on there.
24 And I didn't care, I wasn't signing it.  He just
25 typed it up and did something different.  I don't

Page 46

1 know what his conversations were with the attorney,
2 but it -- you know, I just --
3    Q. So within a couple days --
4    A. -- I didn't care.
5    Q. -- Kent went home and typed up something
6 different?
7    A. Yes.
8    Q. And gave that to you; correct?
9    A. Yes.
10    Q. And what he gave you did not include a
11 release of you; correct?
12    A. I don't have a copy of it, so I don't
13 know exactly what it had, I just remember the taxes
14 was the main thing. Because I remember thinking
15 that's not legal anyway, so it doesn't matter. I
16 believed that the beneficiaries would all -- or the
17 trust had to pay the taxes, so the beneficiaries
18 were responsible for that if they got too much
19 money. And I reserved money so I didn't think it
20 was a problem.
21    Q. When you say the beneficiaries have to
22 pay the taxes, explain that to me.
23    A. Okay. For some reason I have been -- I
24 believe I've been told by counsel, I don't know,
25 but any taxes that are estate taxes obviously come

Page 47

1 out of the estate and aren't part of the
2 distribution to beneficiaries, so they would be
3 owed and be deducted from the estate before the
4 beneficiaries were divided six ways.
5    Q. Okay. So when the beneficiaries get the
6 distribution, they don't have to pay more taxes on
7 it?
8    A. Yeah, well, it would be the -- it would
9 be the -- if the estate had taxes due, I didn't
10 want to give them more money than we had, and I
11 didn't know what the taxes would be, and that's
12 what I understood.
13    Q. Okay. I'm going to hand you what we'll
14 mark as Exhibit 3.
15    Oh, if you need a break at any time, just
16 let me know.
17    A. Sure.
18 EXHIBITS:
19    (Deposition Exhibit Number 3 marked for
20 identification.)
21    Q. (BY MR. GARDNER) Do you recognize that
22 document?
23    A. Yes, I believe this is a copy of the -- I
24 don't know if this is what I supplied to you,
25 without looking at it directly.

Page 48

1    Q. This did come from you.
2    A. It did?
3    Q. Yes.
4    A. Okay. So basically what I believe was a
5 $2500 bill to this attorney, he's claiming it's a
6 $250,000 bill. And he's saying that -- as you can
7 see, this was issued on July 1st, well, I'd already
8 given Duffy his money, so I -- I believe I answered
9 this myself, didn't even run it through the trust
10 attorney, just filed it out and said I don't have
11 any of Duffy's money, it's already been
12 distributed, and filed it with the court, this
13 court.
14    Q. Okay. So this is that lawsuit you were
15 talking about --
16    A. Yes.
17    Q. -- earlier with the former attorney --
18    A. Yeah.
19    Q. -- suing Duffy?
20    A. Right.
21    Q. And then he brought you into it?
22    A. And then he brought me into it, exactly.
23    Q. So this was an order granting a TRO that
24 was issued on July 1st, 2019; correct?
25    A. Yes.

Page 49

1    Q. And you were aware of this when it was
2 issued, it was brought to your knowledge?
3    A. Yeah, he emailed it directly to me.
4    Q. Okay. And then after that, on July 17 or
5 sometime around there --
6    A. It was 17th, yes.
7    Q. Okay. So I'm handing you what we'll mark
8 as Exhibit 4.
9    A. Right.
10 EXHIBITS:
11    (Deposition Exhibit Number 4 marked for
12 identification.)
13    Q. (BY MR. GARDNER) And this is a copy of a
14 summons out of your file. And that is a summons to
15 you to answer the lawsuit; correct?
16    A. Yes.
17    Q. And so that's 4. And now I'll hand you
18 Exhibit 5.
19 EXHIBITS:
20    (Deposition Exhibit Number 5 marked for
21 identification.)
22    Q. (BY MR. GARDNER) And Exhibit 5 is a copy
23 of a First Amended Complaint --
24    A. Okay.
25    Q. -- adding you as a defendant in that

IN RE: WILLIAMS, DEBTOR       9/14/2023       SCOTT WILLIAMS

1 **lawsuit; correct?**
2     A. Yes.
3     **Q. Okay. And this document is dated**
4 **July 17, the same date as the summons; correct?**
5     A. Yeah, yeah.
6     **Q. Okay. And if you can turn to page 19,**
7 **second to the last page. And actually you can just**
8 **turn to the very last page, if you would, page 21**
9 **of 21, in paragraph 5 he's asking for a judgment**
10 **against you of 2.5 --**
11     A. 2.55 million, that's pretty good.
12     **Q. Yeah, this is on July 17, 2019?**
13     A. Yeah.
14     **Q. And you've had litigation filed against**
15 **you seeking over $2 million; correct?**
16     A. Yeah.
17     **Q. And at this point you're still in**
18 **possession of the $400,000; correct?**
19     A. Yeah, uh-huh.
20     **Q. Okay. Who came up with the idea of**
21 **Viking Investments LLC?**
22     A. Candy, she's always been a fan of the
23 Minnesota Vikings.
24     **Q. Okay. So she came up with the name, who**
25 **came up with the idea of forming an entity?**

1     A. She did. She had -- she had -- I don't
2 know what year it was, but she had an entity with
3 her mom called Western Explorer Travel that was an
4 entity filed in Nevada, I believe, with her mother,
5 she was going to do a travel company. And she just
6 always wanted to get into business because the job
7 she's in I guess is -- you know, she'd rather be
8 doing something on her own, I guess, so she's
9 always been trying to hustle to do a different
10 business, I guess.
11     **Q. Okay. So the idea to form Viking**
12 **Investments LLC was Candy's and it wasn't your?**
13     A. No.
14     **Q. Did you have any involvement in the**
15 **formation of Viking Investments LLC?**
16     A. I don't know. I had researched it in
17 Montana because of the gas station, so I don't know
18 if I advised her on anything, but I don't think I
19 needed to. I think she'd had an LLC before, I
20 think she knew everything she needed to do.
21     **Q. What was the other LLC she had?**
22     A. Western Explorer Travel in Nevada.
23     **Q. Okay. So you weren't involved in putting**
24 **the LLC together or filing the documents?**
25     A. No, like I said, I don't recall if we

1 talked about anything, but she was ready to go with
2 it. In fact she had already -- she had already
3 opened a mailbox, I believe, a couple months before
4 that.
5     **Q. In Viking Investments?**
6     A. Yes.
7     **Q. Viking Investments LLC didn't exist a**
8 **couple months before that.**
9     A. Yeah, I don't know, I thought she had
10 already gotten a post office box or something.
11     **Q. Do you know when Viking Investments was**
12 **created?**
13     A. Yeah, I can tell you, I believe it's on
14 here. I believe on July 25th.
15     **Q. Okay.**
16     A. Or July -- I'm not positive of this, but
17 around the end of July, yeah.
18     **Q. Okay.**
19     A. And again, we lived in Utah, so she
20 probably did it on a trip when we were up here. Oh
21 yeah, it would be the same day that we were looking
22 at the gas station, yeah, same trip.
23     **Q. Okay.**
24     A. And scouting a location for her
25 daughter's wedding.

1     **Q. Okay. And your testimony is the**
2 **formation of Viking Investments had nothing to do**
3 **with wanting to buy a house?**
4     A. No, we -- that was a possibility of
5 something she was looking at, but we had no plan to
6 do anything on that date. I mean, she had multiple
7 options she was pursuing. And I had one, and it
8 fell through.
9     **Q. Why aren't you a member of Viking**
10 **Investments LLC?**
11     A. I guess I didn't want to be associated, I
12 just wanted the money back. We've always been kind
13 of independent, all her -- the only account we ever
14 had joint, I believe, is that one that became
15 un-joint when we got married. And she's always
16 been independent.
17     **Q. Okay. So you wanted Viking Investments**
18 **to be completely separate from you?**
19     A. No, I didn't say that.
20     **Q. You didn't want to be a part of it, a**
21 **member; correct?**
22     A. I didn't have a desire to be a part of it
23 or not be a part of it, she just did it on her own.
24     **Q. Okay. Do you remember whether you**
25 **prepared any of the formation documents for Viking**

Page 54

1 Investments?
2      A.  I don't believe so.  I don't recall.  I
3 mean, I think it's all online, so I don't --
4      Q.  Okay.  Were you involved in the purchase
5 of the property at 11423 Spotted Fawn Lane?
6      A.  I went with her to look at it, but that's
7 about all I can recall.  I don't believe so.  I
8 don't recall anything other than going to look at
9 it.
10      Q.  Did you have any conversations with her
11 about it?
12      A.  Yeah, yeah, we talked about it.  I don't
13 remember the figure they were originally asking for
14 it, but I thought that's all of the money that
15 you've got to do something with.  And we thought we
16 could do a quick flip.  It mostly -- it was the
17 property, I mean, it's 10 acres.  I mean, we talked
18 about it, but I don't think I was particularly for
19 it, I thought it was too high priced.
20      Q.  Did you have any other place to live in
21 Montana?
22      A.  No, huh-uh, but we had still six
23 months -- well, nine months on a lease in Utah.
24      Q.  Okay.  So it wasn't your decision whether
25 or not to purchase the home at Spotted Fawn?

Page 55

1      A.  No, huh-uh.
2      Q.  And you live in that home now; correct?
3      A.  Yes.
4      Q.  And you've lived there ever since you
5 moved to Montana?
6      A.  Yes.
7      Q.  Okay.  How was that home at Spotted Fawn
8 purchased?
9      A.  How was it purchased?
10      Q.  Yes, was cash used?  Was it financed?
11      A.  I don't believe they'll accept cash at
12 the place.
13      Q.  When I say cash, I mean did Viking
14 Investments LLC pay for it right there or did it
15 finance it?  Did it obtain a loan?
16      A.  Oh, I believe she paid for it, yeah, I'm
17 sorry, cash/check, I believe it was a check.
18      Q.  So Viking Investments LLC paid for it and
19 it paid for it with the money that you had
20 transferred to Viking Investments LLC a month or
21 two before; correct?
22      A.  If -- yes, if you look at it like that, I
23 guess.  I transferred the money to her and she did
24 what she wanted with it.
25      Q.  Okay.  Do you know whether Viking

Page 56

1 Investments LLC has ever been involved in any other
2 businesses or done anything else besides buying
3 that house?
4      A.  Yes, when the -- she also, I believe,
5 wants to be in the consulting business, which what
6 she does right now is mortgage payroll and such, so
7 I think she's -- her job is precarious.  And at the
8 time we didn't know what it would be with the
9 mortgage business, obviously half of her company's
10 been laid off, so she's always been ready to do
11 something else.
12      Q.  Okay.  That wasn't my question.
13          In the past, other than buying the
14 house --
15      A.  Uh-huh.
16      Q.  -- and paying some of your bills, Viking
17 Investments LLC has never done anything else;
18 correct?
19      A.  I don't believe so.  I don't know that
20 she -- I guess I wouldn't know for sure, it's her
21 business.
22      Q.  Okay.  A few months after the purchase,
23 the home was transferred to Candy individually,
24 were you a part of that?
25      A.  Was I a part of it?  No, it's her house,

Page 57

1 her business.
2      Q.  Did you have knowledge it was being
3 transferred to her individually?
4      A.  Yes, she wanted to pay off my credit
5 cards, as agreed.  And I think at that time she
6 also had gotten into the house a little more and
7 realized that we needed more money to put into it.
8 When we looked at it we thought it was a
9 carpet-and-paint kind of thing, but it turns out
10 the floor covering was rotten underneath.  And the
11 biggest problems is it had -- it had been -- the
12 guy who was there was elderly and died, and there
13 were animals in the house and it took me -- me and
14 her probably months to get the smell out of it,
15 replacing floorboards and baseboard and ripping
16 stuff apart and chemically getting the smell out.
17      Q.  Do you have personal knowledge of what
18 Candy did with the money that she got out of when
19 she put the mortgage on the property or am I better
20 asking Candy that?
21      A.  You're probably better asking Candy.  I
22 have an idea, but Candy is very detail oriented and
23 has all of that.  I was just making sure my bills
24 got paid and I had lights, I guess.
25      Q.  I might have asked you this already, but

Page 58

1  did you have access to Viking's bank accounts?
2      A.  No.
3      Q.  Do you have access to any of Candy's bank
4  accounts?
5      A.  No.
6      MR. GARDNER:  We've been going about an
7  hour, let's take a break.
8      THE WITNESS:  Okay.
9      (Whereupon, the proceedings were in
10  recess at 2:04 p.m. and subsequently reconvened at
11  2:26 p.m., and the following proceedings were
12  entered of record:)
13  EXHIBITS:
14      (Deposition Exhibit Number 6 marked for
15  identification.)
16      Q.  (BY MR. GARDNER)  Mr. Williams, we're
17  back on the record.
18      A.  Thank you.
19      Q.  I'm going to hand you what we'll mark as
20  Deposition Exhibit 6.
21      A.  All right.
22      Q.  And that is a copy of one of the
23  documents you brought today; correct?
24      A.  Yes, okay, uh-huh.
25      Q.  And that is a list of various payments

Page 59

1  and a timeline at the end; correct?
2      A.  Yes.
3      Q.  Who prepared this?
4      A.  Candy Williams.
5      Q.  Did you have any involvement in preparing
6  it?
7      A.  I probably gave her some dates from out
8  of my cell phone or something like that or whatever
9  I had, but I believe she did the rest.  I think she
10  had all the information to do that because she was
11  making the payments, so she had a record of it.
12      Q.  Okay.  You can just put that one in the
13  pile so that you don't walk off with that one,
14  you've got your original copy there.
15      A.  Uh-huh.
16      Q.  I'm going to hand you what we'll mark as
17  Exhibit 7.
18      A.  Okay.
19  EXHIBITS:
20      (Deposition Exhibit Number 7 marked for
21  identification.)
22      Q.  (BY MR. GARDNER)  And that is a Zions
23  Bank statement for the Hugh L. Williams Family
24  Trust, that's the bank account for your dad's
25  trust?

Page 60

1      A.  Yes.
2      Q.  And that's the estate that you were the
3  PR for; correct?
4      A.  Yes.
5      Q.  Okay.  If you look at the first page of
6  that there's a deposit credit of
7  2,134,000-and-some-dollars; do you see that?
8      A.  Yes, uh-huh.
9      Q.  Was that the payment in from the sale of
10  the property?
11      A.  Yeah, that was the proceeds from the
12  property sale.
13      Q.  And then out of those funds, that's where
14  the funds were distributed to your siblings?
15      A.  Yes.
16      Q.  And if you look on the very last page, at
17  the bottom left it looks like there's a check to
18  Duffy Williams for --
19      A.  Yes.
20      Q.  -- 350,000?
21      A.  Yes.
22      Q.  And that's his distribution; correct?
23      A.  Yes.
24      Q.  And then on the top right there's a
25  checking account withdrawal sheet --

Page 61

1      A.  Yeah.
2      Q.  -- or document that's Zions Bank, Scott
3  Williams, 1,052,000-some-dollars; do you see that?
4      A.  Yes, uh-huh.
5      Q.  So is that the type of form they do when
6  you do a cashier's check?
7      A.  I don't know.  Yeah, I don't know.  I
8  guess what they did is that would be four cashier's
9  checks for four of the siblings should add up to
10  that amount, and that's I guess what they did.
11      Q.  Three?
12      A.  Three of the siblings, right.  I believe
13  it's -- oh, yeah, it would be three, you're
14  correct, you're correct.
15      Q.  Okay.
16      A.  Yeah, Brenda's was wired, yeah.
17      Q.  Okay.  So that would be the three of them
18  and those three siblings you got cashier's checks
19  from Zions Bank --
20      A.  Right.
21      Q.  -- and gave those to your siblings;
22  correct?
23      A.  Yes, uh-huh.
24      Q.  Okay.  I'm going to hand you what we'll
25  mark as Deposition Exhibit 8.

Page 62

1  EXHIBITS:
2        (Deposition Exhibit Number 8 marked for
3  identification.)
4        Q.  (BY MR. GARDNER)  And that is a bank
5  statement from the same bank account for the
6  following month, June to July of 2019; correct?
7        A.  Yes.
8        Q.  Okay.  And if you turn to the last page
9  there's a -- one of those similar checking account
10 withdrawal slips for $426,753.71; correct?
11       A.  Yes.
12       Q.  And that's the money you took out on
13 July 1, 2019 in two cashier's checks?
14       A.  I believe it's one cashier's check still.
15       Q.  Oh, okay.
16       A.  Okay, I believe it is.  I'm not positive,
17 but I think I -- I think I took this check home and
18 then -- and I might be wrong, I don't know.
19       Q.  That's why we're going through the
20 documents --
21       A.  Okay, yeah.
22       Q.  -- so that neither of us makes a mistake.
23       A.  Okay.  I guess we -- yeah, I don't know.
24       Q.  So I have documents from you from Zions
25 Bank pertaining to these, and then I also

Page 63

1  subpoenaed Zions Bank for the actual copies so
2  we'll have the actual copies --
3        A.  Okay.
4        Q.  -- so we have the actual copies.
5        I'm going to hand you what we'll mark as
6  9.
7  EXHIBITS:
8        (Deposition Exhibit Number 9 marked for
9  identification.)
10       A.  Oh, it was the 1st, okay.
11       Q.  (BY MR. GARDNER)  And so this is a photo
12 of a document you produced; correct?
13       A.  This one?  Yes.
14       Q.  Okay.  And that shows two cashier's
15 checks on July --
16       A.  You're correct, yes.
17       Q.  -- July 1, 2019 to Scott Williams from
18 the Hugh L. Williams Family Trust; correct?
19       A.  Correct.
20       Q.  And one is $25,000 and one is
21 $401,747.71 --
22       A.  Okay.
23       Q.  -- right?
24       A.  Yes, uh-huh.
25       Q.  Okay.  And so that -- that would be the

Page 64

1  first time you got the funds --
2        A.  Yes, so --
3        Q.  -- directly -- directly from the Hugh --
4        A.  Yes, I distributed to myself on July 1st,
5  correct.
6        Q.  Now I'm going to hand you what we'll mark
7  as Deposition Exhibit 10.
8  EXHIBITS:
9        (Deposition Exhibit Number 10 marked for
10 identification.)
11       Q.  (BY MR. GARDNER)  And these are the
12 documents that we got directly from Zions Bank.
13       A.  Okay.
14       Q.  And so I think this will give us the
15 complete process.  And the first page looks like a
16 withdrawal on -- checking account withdrawal on
17 7/1/19 for $426,753.71, and that matches up with
18 the amount we just looked at on the Hugh Williams
19 Trust account; correct?
20       A.  Correct.
21       Q.  Now, these are somewhat out of order, I
22 should've put these in a better order.  So if you
23 go back to the fourth page there is a cashier's
24 check to you from the Hugh Williams Family Trust
25 for 25,000; correct?

Page 65

1        A.  Yes.
2        Q.  Okay.  And that went -- that is the check
3  you got on July 1st that went to the U.S. Bank --
4        A.  Correct.
5        Q.  -- checking account?
6        Okay.  And then if you go back a couple
7  more pages, there's another cashier's check from
8  the trust to you for $401,747.71; correct?
9        A.  Yes.
10       Q.  And that's on July 1?
11       A.  Right.
12       Q.  And that's the check you testified you
13 took home?
14       A.  I took home and put in the -- yes.
15       Q.  And did nothing with it for some time?
16       A.  Right, right.
17       Q.  Okay.  Then if you turn to the very last
18 page there's another copy of that check, and
19 there's a stamp on it that says Not Used For
20 Purpose Intended.  Is your understanding that
21 that's because you brought that actual check back
22 in to the bank?
23       A.  Right, exactly.
24       Q.  Okay.  And you brought that actual check
25 back in to the bank on August 2nd of 2019, if you

IN RE: WILLIAMS, DEBTOR          9/14/2023          SCOTT WILLIAMS

Page 66

1 turn back to the second page of this Exhibit 10?
2      A. Yeah, correct.
3      Q. Okay.
4      A. Yes, I thought it was the 3rd, but it was
5 in fact the 2nd.
6      Q. So on August 2nd you brought that
7 $401,000 check to you back to the bank and
8 essentially traded it to them for a check to Viking
9 Investments LLC for $400,000; correct?
10      A. Plus apparently some cash, correct.
11      Q. Yeah, so the extra $1100 you took out
12 in --
13      A. Mystery solved, yeah.
14      Q. Okay, all right. And so other than that
15 25,000, none of these funds ever went into any of
16 your actual bank accounts, they were just in the
17 form --
18      A. Right.
19      Q. -- of a cashier's check?
20      A. Right.
21      Q. Okay. I'd like to hand you what we'll
22 mark as Deposition Exhibit 11.
23 EXHIBITS:
24      (Deposition Exhibit Number 11 marked for
25 identification.)

Page 67

1      Q. (BY MR. GARDNER) And Deposition
2 Exhibit 11 is titled Exhibit A, and we received
3 that when you responded to our subpoena back in
4 June, do you recall that?
5      A. Yes, uh-huh.
6      Q. Did you prepare this document?
7      A. Yes, uh-huh.
8      Q. Okay. I just wanted to confirm what it
9 was and who prepared it. And let me see if I had
10 any questions on it.
11      On h. on that document --
12      A. Okay.
13      Q. -- you say Beneficiaries Kent and Duffy
14 Williams were attempting to assume part of Hugh's
15 business interests for themselves.
16      A. Yes.
17      Q. Tell me about that.
18      A. Okay. So there were two things that they
19 were after, Hugh had a storage yard where items
20 were stored, both of them, Kent and Duffy both,
21 were attempting to take those storage customers and
22 move them to their own properties or obtain
23 properties or lease property and take over the
24 storage customers.
25      Okay. Then the other thing was the

Page 68

1 El Monte RV that we talked about earlier, the
2 motorhome rental business, both of them considered
3 taking that business, I had no interest in either
4 of them. And both of them asked questions about,
5 you know, the income that came from them, the
6 people's names. I gave them contact information on
7 how to get ahold of El Monte, I gave them the
8 contacts of the people in the storage unit, and I
9 guess whatever information I had about those two
10 businesses.
11      Q. Okay. Did they ever take any action
12 trying to get those interests?
13      A. Kent called El Monte, El Monte called me
14 back and said we would never do business with that
15 asshole, okay? {Laughter.} Duffy, I don't know
16 whether --
17      Q. Is that a direct quote?
18      A. That's a direct quote.
19      Duffy -- Duffy, I know he tried to lease
20 land nearby to -- Okay, let me rephrase that. I
21 don't know if he tried to, this is what he told me,
22 that he was trying to lease land a few miles down
23 the road and take the storage customers and start a
24 storage business down there.
25      Kent did the same thing. Kent told me he

Page 69

1 was trying to buy property to do this, but I found
2 out later that they were both trying to lease the
3 same land. So Kent had told me that he was -- had
4 these big multimillion-dollar property deals
5 waiting for me to tell him, you know, what kind of
6 income and names and people and whatever. I later
7 found out they were both after the same piece of
8 open land to store on.
9      And it got to the point where that's the
10 one fight Kent and I had is he kept asking for
11 information. I had extended the El Monte for I
12 think two months while he was trying to figure out
13 if he would work out something to take that. And I
14 was busy as could be by myself in May and June in
15 the El Monte motorhome rental business, and I
16 finally had to tell him go to hell, I'm not here to
17 set you up in business, I'm here to, you know, do
18 what's best for the trust, and it's not help you
19 out in business, so that's where it went to.
20      MR. GARDNER: Let's go off the record for
21 a minute.
22      (Discussion held off the record.)
23      MR. GARDNER: Let's go back on the
24 record.
25      I'm going to hand you what we'll mark as

IN RE: WILLIAMS, DEBTOR                9/14/2023                SCOTT WILLIAMS

---

Page 70

1  Exhibit 12.
2  EXHIBITS:
3        (Deposition Exhibit Number 12 marked for
4  identification.)
5        Q.  (BY MR. GARDNER)  And that is another
6  bank statement from that U.S. Bank account we
7  talked about earlier; correct?
8        A.  Yes.
9        Q.  Okay.  And that statement's from July
10 through August of 2019; correct?
11       A.  Uh-huh.
12       Q.  And other than this bank account at that
13 time, the only other bank account was a savings
14 account?
15       A.  Attached to this, yes.
16       Q.  At U.S. Bank that had 100 bucks in it?
17       A.  It had $100 in it for years.
18       Q.  Okay.  So the ending balance on
19 August 16th of 2018 was 1800 bucks; correct?  If
20 you look on the first page --
21       A.  First page.
22       Q.  -- there's an ending balance.
23       A.  Okay, yeah, 1,809.23, correct.
24       Q.  Okay.  Now, on July 24 it says there was
25 an ATM deposit of $4,000.

---

Page 71

1        A.  Uh-huh.
2        Q.  Do you know what was that?
3        A.  Yeah, that was a check from my brother
4  Duffy, paying me back for money I loaned him a year
5  or two before.
6        Q.  Okay.  And other than that and it looks
7  like a $200 return for fraud, you had no other
8  money going into your account; correct?
9        A.  Yeah.
10       MR. GARDNER:  I don't have any more
11 questions, Mr. Williams.  Thank you.
12       MR. SHIMANEK:  Okay, thank you.
13       MR. MURPHY:  I don't have any questions.
14       MR. SHIMANEK:  I'm not going to have any
15 redirect on that, either.
16       (Deposition concluded at 2:46 p.m.
17 Witness excused, signature reserved.)
18                 * * *
19
20
21
22
23
24
25

---

Page 72

1              CERTIFICATE OF WITNESS
2
3  PAGE    LINE
4
5
6
7
8
9
10       I hereby certify that this is a true and
11 correct copy of my testimony, together with any
12 changes I have made on this and any subsequent
13 pages attached hereto.
14
15 Dated on this the_____ day of _____, 2023.
16
17       _____
17              SCOTT WILLIAMS, Deponent.
18
19
20
21
22
23
24
25

---

**JEFFRIES COURT REPORTING, INC.**
**(406) 721-1143**

1                C E R T I F I C A T E

2

3  STATE OF Montana     )
                        :   ss.
4  County of Missoula   )

5              I, Terra Rohlfs, RPR, Freelance Court
   Reporter and Notary Public for the State of
6  Montana, residing in Hamilton, Montana, do hereby
   certify:

7
               That I was duly authorized to swear in
8  the witness and did report the deposition of SCOTT
   WILLIAMS in this cause;

9
               That the reading and signing of the
10 deposition by the witness have been expressly
   reserved;

11
               That the foregoing pages of this
12 deposition constitute a true and accurate
   transcription of my stenotype notes of the
13 testimony of said witness.

14             I further certify that I am not an
   attorney nor counsel of any of the parties; nor a
15 relative or employee of any attorney or counsel
   connected with the action, nor financially
16 interested in the action.

17             IN WITNESS WHEREOF, I have hereunto set
   my hand and seal on this the 20th day of September, 2023.

18

19

20                      Terra Rohlfs, RPR,
                        Freelance Court Reporter
21                      Notary Public, State of Montana
                        Residing in Hamilton, Montana
22                      My Commission expires: 11/4/23

23

24

25

1 September 20th, 2023

2
  Edward "Rusty" A. Murphy, Esq.
3 Murphy Law Offices, PLLC
  127 North Higgins, Suite 310
4 Central Square Building
  Missoula, Montana 59802

5

6 Re:  IN RE: SCOTT K. WILLIAMS, DEBTOR
  Deposition of SCOTT WILLIAMS

7
  Dear Counsel,
8
  Please find attached your copy of the deposition
9 mentioned above.  I have also attached a
  "CORRECTIONS TO DEPOSITION" page following this
10 page.  Have the deponent read and sign the
  deposition, noting any corrections on the page
11 provided, and have it sent back to me.

12 You have 30 days to accomplish reading.  After that
  we will note on the release letter that the witness
13 has waived the right to read the deposition, and we
  will deliver the Original to the ordering party.

14
  If you have any questions, please feel free to give
15 me a call.

16 Sincerely,

17 JEFFRIES COURT REPORTING, INC.

18

19 Rona Chenoweth, Office Manager

20

21
  cc:  Trent M. Gardner, Esq.
22       Hannah S. Willstein, Esq.

23

24 Attachment

25

1  Trent M. Gardner, Esq.
   Hannah S. Willstein, Esq.
2  Goetz, Geddes & Gardner, P.C.
   The Ketterer Building, 35 North Grand
3  P.O. Box 6580
   Bozeman, Montana 59771-6580
4

5  Re:  IN RE: SCOTT K. WILLIAMS, DEBTOR
6

7  PLEASE ATTACH TO YOUR COPY OF THE DEPOSITION OF:
8                    SCOTT WILLIAMS
              THURSDAY, SEPTEMBER 14, 2023
9

10         _____  Please find enclosed the Original
   deposition in the above-named case.  It has been
11 read and signed.  We are now delivering it to you
   since you were the ordering party.
12

13 _____  The time for reading and signing has passed,
   and we are delivering the Original to you since you
14 were the ordering party.
15

16 Rona Chenoweth, Office Manager

17 Date: _____

18

19 cc:  Edward "Rusty" A. Murphy, Esq.
20

21

22

23

24

25

## A

able 33:24
above-named 75:10
Absolutely 11:17
absolve 13:7
accept 42:4, 55:11
accepting 9:22
Accepts 41:7
access 58:1, 58:3
accomplish 74:12
account 25:15
  26:12, 26:15, 27:11
  27:13, 27:14, 27:16
  28:2, 28:6, 28:7
  28:18, 29:6, 29:8
  29:9, 29:14, 29:22
  29:24, 29:25, 31:17
  31:17, 33:3, 33:3
  34:15, 35:6, 35:9
  53:13, 59:24, 60:25
  62:5, 62:9, 64:16
  64:19, 65:5, 70:6
  70:12, 70:13, 70:14
  71:8
accounting 23:12
  23:13, 42:12, 42:17
accounts 26:23
  39:12, 58:1, 58:4
  66:16
accurate 42:6
  73:12
acres 54:17
action 68:11, 73:15
  73:16
actual 63:1, 63:2
  63:4, 65:21, 65:24
  66:16
add 22:23, 61:9
adding 49:25
address 5:10, 21:8
  21:13
admitted 10:16
advance 24:21
advice 13:6
advised 51:18
Africa 7:11, 7:12
age 5:4
agent 17:24
ago 6:11, 15:8

agreed 4:9, 4:14
  4:21, 57:5
agreement 10:20
  10:22, 11:19, 35:18
  35:21, 36:8, 37:11
  38:6, 39:21
ahold 68:7
Amended 3:15
  49:23
American 9:25
  27:20, 28:5, 28:5
  28:6
Amex 28:4
amount 7:6, 7:7
  22:20, 23:1, 23:2
  23:3, 24:1, 24:4
  24:16, 26:24, 61:10
  64:18
amounts 22:4
animals 57:13
answer 5:23, 19:2
  49:15
answered 12:14
  12:14, 42:7, 48:8
answers 3:21, 5:25
anyway 46:15
apart 57:16
apartments 10:21
apparently 66:10
appearing 2:7, 2:13
  2:18, 2:20
appointment 33:7
appraisal 17:21
approximately
  21:22
arbitration 9:11
  12:19, 12:21, 12:25
  13:3
asked 57:25, 68:4
asking 19:2, 50:9
  54:13, 57:20, 57:21
  69:10
asset 27:1
assets 18:3, 38:24
asshole 68:15
associated 2:6
  53:11
assume 17:2, 18:6
  20:14, 30:15, 36:13
  43:1, 43:14, 67:14

assumed 7:14
ATM 70:25
ATTACH 75:7
attached 70:15
  72:13, 74:8, 74:9
Attachment 74:24
attempting 67:14
  67:21
attorney 6:14, 7:5
  7:9, 12:15, 12:16
  17:18, 17:24, 17:24
  40:24, 41:1, 41:14
  41:17, 43:2, 44:10
  45:12, 45:13, 46:1
  48:5, 48:10, 48:17
  73:14, 73:15
attorney's 10:6
August 23:15
  23:17, 30:11, 30:23
  65:25, 66:6, 70:10
  70:19
authorized 73:7
automatically 17:3
Avenue 1:23
aware 16:18, 16:24
  21:15, 49:1

## B

back 7:16, 12:14
  12:16, 13:9, 19:23
  21:18, 23:2, 26:5
  31:10, 34:1, 35:16
  36:6, 36:7, 37:11
  39:1, 39:5, 39:23
  40:5, 44:4, 45:12
  53:12, 58:17, 64:23
  65:6, 65:21, 65:25
  66:1, 66:7, 67:3
  68:14, 69:23, 71:4
  74:11
balance 70:18
  70:22
bank 3:8, 3:17, 3:18
  3:19, 3:20, 3:22
  24:6, 25:15, 25:20
  25:23, 26:1, 26:5
  26:10, 26:12, 26:15
  26:23, 27:8, 27:12
  28:15, 29:6, 29:8

29:9, 30:11, 31:16
  31:17, 35:6, 35:8
  44:25, 58:1, 58:3
  59:23, 59:24, 61:2
  61:19, 62:4, 62:5
  62:25, 63:1, 64:12
  65:3, 65:22, 65:25
  66:7, 66:16, 70:6
  70:6, 70:12, 70:13
  70:16
bankruptcy 1:1
  5:16, 13:2, 15:2
  15:5, 15:13, 38:21
baseboard 57:15
based 13:15
basically 10:5
  10:17, 15:22, 28:1
  34:4, 34:8, 35:18
  35:21, 38:10, 44:19
  45:22, 48:4
began 37:15
behalf 2:7, 2:13
  2:18, 14:8
believe 8:23, 9:2
  9:24, 10:7, 10:10
  13:4, 14:20, 15:17
  18:17, 19:7, 21:17
  22:2, 23:13, 24:17
  25:5, 25:11, 25:21
  25:22, 27:9, 27:19
  30:11, 30:22, 30:24
  30:25, 31:5, 32:13
  35:2, 40:22, 43:16
  44:3, 44:13, 46:24
  47:23, 48:4, 48:8
  51:4, 52:3, 52:13
  52:14, 53:14, 54:2
  54:7, 55:11, 55:16
  55:17, 56:4, 56:19
  59:9, 61:12, 62:14
  62:16
believed 46:16
beneficiaries 21:25
  22:2, 22:10, 22:12
  46:16, 46:17, 46:21
  47:2, 47:4, 47:5
  67:13
beneficiary 22:1
best 16:10, 69:18
better 12:15, 57:19

57:21, 64:22
big 69:4
Bigfork 5:13, 32:6
biggest 57:11
bill 27:20, 37:14
  37:16, 48:5, 48:6
bills 25:16, 27:21
  28:1, 28:2, 35:22
  36:12, 37:12, 37:13
  37:14, 37:16, 37:22
  38:8, 56:16, 57:23
bit 7:23
bite 33:17
books 33:8, 34:8
  34:9
bottom 31:20
  60:17
bought 19:7, 22:24
  38:5, 44:14, 44:21
box 2:5, 52:10
  75:3
Bozeman 2:5, 75:3
break 14:24, 47:15
  58:7
Brenda 3:9, 22:17
  44:1
Brenda's 61:16
briefly 7:21, 17:10
  17:12
broke 25:13, 25:17
brother 6:9, 6:23
  6:24, 9:9, 71:3
brothers 10:16
brought 48:21
  48:22, 49:2, 58:23
  65:21, 65:24, 66:6
bucks 70:16, 70:19
build 10:21, 19:8
Building 2:4, 74:4
  75:2
business 6:12, 8:6
  8:7, 10:18, 31:17
  34:14, 34:21, 51:6
  51:10, 56:5, 56:9
  56:21, 57:1, 67:15
  68:2, 68:3, 68:14
  68:24, 69:15, 69:17
  69:19
businesses 56:2
  68:10

busy 69:14
buy 31:14, 38:2
  53:3, 69:1
buying 34:14
  44:15, 56:2, 56:13

C

call 74:15
called 8:8, 10:14
  15:20, 51:3, 68:13
  68:13
Candy 1:10, 2:13
  2:20, 13:14, 14:7
  18:4, 19:11, 19:15
  20:6, 20:20, 20:24
  21:3, 21:8, 21:13
  27:11, 28:7, 28:19
  29:12, 29:22, 31:6
  32:25, 35:14, 38:13
  39:22, 39:25, 50:22
  56:23, 57:18, 57:20
  57:21, 57:22, 59:4
Candy's 31:3, 51:12
  58:3
card 36:12, 36:20
  37:16, 39:23
cards 27:21, 35:24
  36:5, 36:22, 57:5
care 45:22, 45:24
  46:4
career 43:20
carpet 19:24
carpet-and-paint
  57:9
Carter 22:16, 22:16
case 6:8, 6:23, 9:9
  9:13, 9:18, 75:10
cash 26:24, 30:16
  30:17, 30:18, 30:25
  55:10, 55:11, 55:13
  66:10
cash/check 55:17
cashier's 3:19
  24:13, 24:18, 24:25
  25:13, 25:19, 25:20
  25:22, 25:24, 26:8
  27:6, 29:4, 30:6
  30:12, 30:13, 30:23
  32:18, 32:19, 36:15

61:6, 61:8, 61:18
  62:13, 62:14, 63:14
  64:23, 65:7, 66:19
cause 1:4, 3:12
  3:13, 3:15, 73:8
cc 74:21, 75:19
cell 37:17, 59:8
Cenex 32:1, 32:4
Central 74:4
Certificate 3:23
  3:24, 72:1
certify 72:10, 73:6
  73:14
chance 29:19
change 26:23
changed 34:13
changes 72:12
Chapter 1:6, 2:8
check 3:19, 24:7
  24:13, 24:18, 24:21
  24:25, 25:13, 25:19
  25:20, 25:22, 25:24
  26:8, 29:4, 30:6
  30:9, 30:12, 30:13
  30:22, 30:23, 32:18
  32:20, 36:16, 55:17
  60:17, 61:6, 62:14
  62:17, 64:24, 65:2
  65:7, 65:12, 65:18
  65:21, 65:24, 66:7
  66:8, 66:19, 71:3
checking 27:11
  28:2, 60:25, 62:9
  64:16, 65:5
checks 3:20, 24:10
  27:7, 61:9, 61:18
  62:13, 63:15
chemically 57:16
Chenoweth 74:19
  75:16
City 15:14, 15:14
Civil 4:12
claim 9:24, 9:25
  9:25, 13:1
claiming 48:5
claims 9:19, 43:9
clear 5:24
closed 10:18, 16:12
  16:16, 16:19
closing 18:1

Code 42:13
coffee 31:13, 31:16
  32:3, 32:14
college 7:23
Columbia 21:13
  21:17, 32:8, 32:10
  32:11
come 13:9, 23:24
  31:19, 46:25, 48:1
comes 32:6
coming 35:16
Commission 73:22
companies 6:16
company 6:16
  15:21, 32:3, 51:5
company's 56:9
complained 16:17
complaining 42:16
Complaint 3:15
  49:23
complaints 16:15
complete 41:9
  64:15
completely 42:18
  53:18
concerned 26:11
concluded 71:16
confirm 67:8
congratulations
  40:8
connected 73:15
connection 42:22
considered 23:9
  33:9, 68:2
constitute 73:12
consulting 56:5
contact 68:6
contacts 68:8
contiguous 17:5
control 35:8, 35:11
  37:24, 39:3
conversation 45:15
  45:18
conversations 46:1
  54:10
copies 14:5, 14:6
  14:24, 25:12, 63:1
  63:2, 63:4
copy 11:21, 44:8
  46:12, 47:23, 49:13

49:22, 58:22, 59:14
  65:18, 72:11, 74:8
  75:7
correct 13:2, 16:9
  26:2, 28:16, 28:19
  28:20, 29:5, 29:7
  29:22, 32:25, 34:17
  35:14, 36:12, 36:13
  36:25, 37:9, 37:24
  37:25, 38:11, 38:17
  38:19, 38:22, 39:9
  40:5, 42:13, 42:17
  43:6, 45:10, 46:8
  46:11, 48:24, 49:15
  50:1, 50:4, 50:15
  50:18, 53:21, 55:2
  55:21, 56:18, 58:23
  59:1, 60:3, 60:22
  61:14, 61:14, 61:22
  62:6, 62:10, 63:12
  63:16, 63:18, 63:19
  64:5, 64:19, 64:20
  64:25, 65:4, 65:8
  66:2, 66:9, 66:10
  70:7, 70:10, 70:19
  70:23, 71:8, 72:11
corrections 74:9
  74:10
Cottonwood 18:8
could've 30:18
  37:1, 37:3
counsel 4:3, 4:10
  4:15, 4:22, 13:6
  46:24, 73:14, 73:15
  74:7
County 73:4
couple 5:20, 6:6
  16:21, 27:4, 38:19
  46:3, 52:3, 52:8
  65:6
course 39:18
court 1:1, 1:23
  1:24, 3:24, 4:5
  18:23, 19:1, 27:23
  27:25, 48:12, 48:13
  73:5, 73:20, 74:17
covering 16:4
  57:10
created 52:12
credit 27:21, 28:22

35:24, 36:5, 36:12
  36:20, 36:22, 37:16
  39:23, 57:4, 60:6
current 14:22
currently 7:24
customers 67:21
  67:24, 68:23
cut 45:23

D

dad 8:14, 10:14
  16:6, 16:20, 44:16
dad's 17:1, 21:18
  59:24
date 6:9, 9:1, 13:18
  13:24, 14:22, 15:6
  33:21, 38:5, 45:17
  50:4, 53:6, 75:17
dated 50:3, 72:15
dates 59:7
daughter 19:7
daughter's 20:18
  34:6, 52:25
day 10:9, 11:19
  17:3, 23:20, 24:12
  27:8, 30:14, 44:14
  44:25, 45:2, 45:6
  52:21, 72:15, 73:17
days 37:10, 46:3
  74:12
dba 32:13
deal 17:13, 33:9
deals 69:4
Dear 74:7
debt 35:24
Debtor 1:4, 2:18
  74:6, 75:5
debts 37:21, 39:24
decided 12:15
decision 54:24
deducted 23:1, 23:2
  47:3
defendant 2:13
  49:25
Defendants 1:11
deliver 74:13
delivering 75:11
  75:13
deponent 72:17

74:10
deposed 6:3, 6:7
  6:18, 9:10
deposit 26:1, 26:10
  28:24, 60:6, 70:25
deposited 25:15
depositing 26:5
deposition 3:7, 3:8
  3:10, 3:13, 3:14
  3:16, 3:17, 3:18
  3:19, 3:20, 3:21
  3:22, 4:4, 4:11
  4:19, 4:24, 13:12
  28:12, 40:10, 40:13
  47:19, 49:11, 49:20
  58:14, 58:20, 59:20
  61:25, 62:2, 63:8
  64:7, 64:9, 66:22
  66:24, 67:1, 70:3
  71:16, 73:8, 73:10
  73:12, 74:6, 74:8
  74:9, 74:10, 74:13
  75:7, 75:10
Deposits/Credits
  28:22
describe 17:12
  25:18
desire 53:22
detail 57:22
development 10:21
died 8:14, 9:20
  16:6, 17:4, 31:9
  31:22, 57:12
difference 14:21
  30:15, 30:25, 41:16
different 6:24, 7:7
  7:8, 29:16, 45:25
  46:6, 51:9
direct 68:17, 68:18
directly 47:25, 49:3
  64:3, 64:3, 64:12
disbursement 11:2
discovered 19:9
discovery 14:18
discussion 21:10
  69:22
dispute 11:13
dissension 23:5
distributed 48:12
  60:14, 64:4

distribution 11:7
  41:9, 47:2, 47:6
  60:22
DISTRICT 1:1
disturbance 21:10
divide 21:23
divided 17:19, 23:3
  47:4
divorce 17:15
document 13:19
  14:17, 47:22, 50:3
  61:2, 63:12, 67:6
  67:11
documents 3:21
  51:24, 53:25, 58:23
  62:20, 62:24, 64:12
doing 14:1, 31:13
  33:11, 35:22, 37:12
  44:15, 51:8
dollars 36:12, 38:21
draw 26:15
driving 6:12
due 37:16, 47:9
Duffy 6:24, 7:2, 7:5
  7:10, 7:10, 7:13
  22:18, 23:1, 44:12
  44:13, 44:13, 44:23
  45:5, 48:8, 48:19
  60:18, 67:13, 67:20
  68:15, 68:19, 68:19
  71:4
Duffy's 44:21
  48:11
duly 5:4, 73:7

### E

earlier 15:10, 19:25
  20:9, 40:10, 40:17
  48:17, 68:1, 70:7
Early 15:9
East 2:16
education 7:22
Edward 2:10, 74:2
  75:19
effect 4:18
effects 17:7, 17:19
either 68:3, 71:15
El 15:20, 68:1, 68:7
  68:13, 68:13, 69:11

69:15
elderly 57:12
else's 15:23
emailed 43:25, 44:4
  49:3
Emergency 3:11
employed 7:24, 8:1
  8:3, 8:5, 8:19
employee 73:15
employer's 6:17
enclosed 75:10
ended 23:20, 24:2
entered 58:12
entities 21:6
entitled 11:14
entitlements 17:23
entity 50:25, 51:2
  51:4
Esq 2:3, 2:3, 2:10
  2:15, 74:2, 74:21
  74:22, 75:1, 75:1
  75:19
essentially 66:8
estate 1:7, 2:8
  11:25, 16:9, 16:12
  16:15, 16:20, 17:1
  17:3, 17:13, 17:24
  18:2, 18:2, 18:20
  20:22, 20:24, 21:1
  21:3, 21:18, 22:25
  23:6, 26:18, 40:4
  42:17, 42:22, 42:23
  43:10, 46:25, 47:1
  47:3, 47:9, 60:2
everybody 6:17
  9:22
Ex 3:11
ex-wife 17:15
ex-wife's 17:16
exact 7:7, 24:4
exactly 9:1, 11:9
  13:18, 22:5, 32:9
  32:21, 45:14, 45:21
  46:13, 48:22, 65:23
Examination 3:4
  5:8
excuse 22:16
excused 71:17
Exhibit 3:7, 3:8
  3:10, 3:13, 3:14

3:16, 3:17, 3:18
  3:19, 3:20, 3:21
  3:21, 3:22, 28:10
  28:12, 40:11, 40:13
  47:14, 47:19, 49:8
  49:11, 49:18, 49:20
  49:22, 58:14, 58:20
  59:17, 59:20, 61:25
  62:2, 63:8, 64:7
  64:9, 66:1, 66:22
  66:24, 67:2, 67:2
  70:1, 70:3
EXHIBITS 3:6
  28:11, 40:12, 47:18
  49:10, 49:19, 58:13
  59:19, 62:1, 63:7
  64:8, 66:23, 70:2
exist 52:7
expenses 39:17
  39:19
expired 19:19
expires 73:22
explain 24:8, 46:22
explained 34:19
Explorer 51:3
  51:22
Express 9:25, 27:20
  28:5, 28:5, 28:7
expressly 4:24
  73:10
extended 69:11
extra 43:13, 66:11

### F

fact 52:2, 66:5
factual 13:16
Fair 43:18
Falls 21:13, 21:17
  32:8, 32:10, 32:11
Family 59:23
  63:18, 64:24
fan 50:22
far 33:10
father 8:5, 8:6, 31:9
father's 8:7, 9:20
  40:4
favor 18:24, 44:15
Fawn 5:12, 21:2
  54:5, 54:25, 55:7

February 19:23
feel 33:16, 74:14
fell 53:8
fight 69:10
figure 54:13, 69:12
figured 13:25
file 15:5, 49:14
filed 15:2, 15:13
  48:12, 50:14, 51:4
filing 51:24
fill 33:14
filled 48:10
final 11:21, 12:5
finally 69:16
finance 55:15
financed 55:10
financially 73:15
find 74:8, 75:10
finish 5:23, 41:22
finished 19:2
fire 31:22, 31:22
first 3:15, 5:4, 12:9
  17:14, 21:25, 24:20
  34:1, 34:2, 34:7
  49:23, 60:5, 64:1
  64:15, 70:20, 70:21
five 17:4
flip 54:16
flipped 7:19
flittered 26:12
floor 16:4, 57:10
floorboards 57:15
following 58:11
  62:6, 74:9
follows 5:7
food 9:25
force 4:18
foregoing 73:11
form 4:16, 51:11
  61:5, 66:17
formation 51:15
  53:2, 53:25
former 48:17
forming 50:25
forth 12:16, 19:23
found 44:20, 69:1
  69:7
four 38:23, 61:8
  61:9
fourth 64:23

fraud 71:7
free 74:14
Freelance 1:24, 4:5
  73:5, 73:20
friend 44:21
fuel 9:24
full 9:23, 11:22
  24:16, 41:7, 42:5
funds 60:13, 60:14
  64:1, 66:15
further 4:9, 4:14
  4:21, 73:14

## G

Gardner 2:3, 2:4
  3:4, 5:9, 5:15, 14:4
  14:23, 19:11, 21:12
  28:4, 28:15, 29:18
  29:21, 40:16, 42:9
  42:10, 47:21, 49:13
  49:22, 58:6, 58:16
  59:22, 62:4, 63:11
  64:11, 67:1, 69:20
  69:23, 70:5, 71:10
  74:21, 75:1, 75:2
gas 31:14, 31:23
  32:15, 33:5, 33:14
  33:20, 34:7, 51:17
  52:22
Geddes 2:4, 75:2
getting 9:23, 24:2
  37:11, 57:16
gift 35:2, 35:15
  36:1
girls 11:20
give 10:17, 31:11
  33:24, 34:25, 35:1
  35:1, 35:3, 36:6
  39:5, 47:10, 64:14
  74:14
given 25:12, 48:8
giving 38:7, 39:23
Glacier 31:24, 32:2
  32:12
go 14:14, 32:1
  33:24, 35:25, 52:1
  64:23, 65:6, 69:16
  69:20, 69:23
Goetz 2:4, 75:2

going 10:17, 14:24
  19:8, 28:9, 32:3
  32:5, 40:10, 47:13
  51:5, 54:8, 58:6
  58:19, 59:16, 61:24
  62:19, 63:5, 64:6
  69:25, 71:8, 71:14
gold 39:11
gonna 32:14
good 33:9, 50:11
gotten 52:10, 57:6
Grand 2:4, 75:2
granting 3:11
  48:23
ground 5:20
guess 8:2, 8:15
  9:19, 13:5, 14:2
  19:21, 22:1, 22:4
  31:16, 40:1, 41:18
  51:7, 51:8, 51:10
  53:11, 55:23, 56:20
  57:24, 61:8, 61:10
  62:23, 68:9
guessing 22:3
guy 6:12, 6:14
  7:12, 44:14, 44:20
  45:1, 57:12

## H

half 56:9
Hamilton 1:25, 4:7
  73:6, 73:21
hand 6:10, 28:9
  47:13, 49:17, 58:19
  59:16, 61:24, 63:5
  64:6, 66:21, 69:25
  73:17
handing 49:7
handled 16:21
handling 23:6
Hannah 2:3, 74:22
  75:1
happened 13:18
  13:25
happy 23:7
Harbers 3:9, 22:17
hard 13:17, 19:3
head 15:7
heard 7:7, 12:9

Hearing 3:12, 3:12
Heights 18:8, 32:10
  32:11
heir 22:1
heirs 21:23, 21:24
held 21:10, 69:22
hell 69:16
help 5:23, 69:18
helping 7:14, 8:5
hereto 72:13
hereunto 73:17
Higgins 2:11, 74:3
high 7:23, 54:19
highway 32:6
history 7:22
hit 6:13
home 6:13, 17:2
  17:4, 18:9, 18:16
  19:9, 19:12, 19:14
  19:16, 19:24, 25:1
  25:19, 26:4, 38:2
  38:5, 45:22, 46:5
  54:25, 55:2, 55:7
  56:23, 62:17, 65:13
  65:14
homes 18:13, 38:4
homesteaded 21:16
hounding 44:24
hour 58:7
hours 6:13, 33:12
house 17:18, 20:11
  30:10, 44:15, 44:16
  44:17, 44:20, 44:22
  53:3, 56:3, 56:14
  56:25, 57:6, 57:13
household 37:13
  37:13
Hugh 59:23, 63:18
  64:3, 64:18, 64:24
  67:19
Hugh's 8:8, 15:15
  15:19, 16:2, 21:25
  44:15, 67:14
huh-uh 9:8, 23:14
  36:10, 54:22, 55:1
hurry 16:24, 24:23
hustle 51:9
hwillstein@goetzla...
  2:7

## I

idea 38:2, 50:20
  50:25, 51:11, 57:22
identification 28:13
  40:14, 47:20, 49:12
  49:21, 58:15, 59:21
  62:3, 63:9, 64:10
  66:25, 70:4
immediately 35:23
  37:10, 37:15
improper 43:12
include 46:10
included 11:1
includes 42:11
Including 22:8
  43:12
income 8:21, 9:7
  35:19, 68:5, 69:6
independent 53:13
  53:16
individually 13:9
  56:23, 57:3
industry 16:5
information 59:10
  68:6, 68:9, 69:11
initiate 12:11
instituted 10:24
insurance 6:14
  6:15
Intended 65:20
interest 34:16, 42:6
  42:23, 68:3
interested 73:16
interests 67:15
  68:12
interposed 4:18
intersect 32:6
intersection 32:5
investments 1:10
  2:13, 30:13, 30:24
  31:1, 31:7, 32:20
  32:24, 37:5, 37:6
  37:8, 39:8, 50:21
  51:12, 51:15, 52:5
  52:7, 52:11, 53:2
  53:10, 53:17, 54:1
  55:14, 55:18, 55:20
  56:1, 56:17, 66:9
involved 6:16, 6:20

9:16, 15:24, 17:25
  51:23, 54:4, 56:1
involvement 51:14
  59:5
iron 31:22
irons 31:21
issue 11:16
issued 48:7, 48:24
  49:2
issues 11:18, 12:8
items 67:19

## J

jcrcourt@montana....
  1:25
Jeffries 1:23, 74:17
job 20:10, 31:11
  31:12, 40:1, 51:6
  56:7
joint 27:11, 27:13
  27:14, 28:6, 53:14
judgment 50:9
July 7:18, 7:20
  10:10, 10:10, 25:4
  28:24, 48:7, 48:24
  49:4, 50:4, 50:12
  52:14, 52:16, 52:17
  62:6, 62:13, 63:15
  63:17, 64:4, 65:3
  65:10, 70:9, 70:24
June 7:18, 10:7
  11:3, 19:20, 20:5
  21:19, 21:19, 23:4
  23:12, 62:6, 67:4
  69:14
June/July 7:17

## K

Karen 22:17
Kent 9:14, 11:13
  12:7, 12:11, 12:22
  16:14, 22:15, 22:17
  23:11, 23:22, 45:8
  45:9, 45:10, 45:11
  45:15, 46:5, 67:13
  67:20, 68:13, 68:25
  68:25, 69:3, 69:10
Kent's 13:1

kept 69:10
Ketterer 2:4, 75:2
key 33:13
kind 8:4, 8:5, 37:14
  53:12, 57:9, 69:5
knew 7:7, 15:6
  41:20, 41:24, 42:2
  42:6, 51:20
know 5:21, 5:21
  10:15, 11:23, 13:7
  13:7, 14:13, 15:8
  19:20, 19:25, 21:14
  22:5, 23:18, 26:14
  27:3, 27:22, 30:19
  31:4, 31:25, 41:16
  42:1, 43:14, 43:17
  44:7, 46:1, 46:2
  46:13, 46:24, 47:11
  47:16, 47:24, 51:2
  51:7, 51:16, 51:17
  52:9, 52:11, 55:25
  56:8, 56:19, 56:20
  61:7, 61:7, 62:18
  62:23, 68:5, 68:15
  68:19, 68:21, 69:5
  69:17, 71:2
knowing 9:23, 34:9
knowledge 16:10
  49:2, 57:2, 57:17

L

laid 56:10
Lake 15:14, 15:14
  17:6, 18:7
land 68:20, 68:22
  69:3, 69:8
landlord 44:21
Lane 5:12, 21:2
  54:5
large 26:24
Laughter 68:15
law 2:11, 2:16
  43:16, 74:3
lawful 5:4
lawsuit 48:14
  49:15, 50:1
lawyer 11:23, 12:14
  43:15, 44:19
lawyer's 11:24

12:10, 12:13
layperson 41:17
lease 19:19, 19:22
  20:12, 37:14, 37:16
  54:23, 67:23, 68:19
  68:22, 69:2
leave 30:4
Lee 3:9
left 22:2, 60:17
legal 46:15
letter 3:24, 3:25
  12:10, 12:13, 74:12
liability 42:22
lights 57:24
likewise 40:2
limit 16:22
line 31:20, 72:3
liquid 38:24
list 17:8, 17:9
  58:25
listed 11:12, 13:6
  13:10, 18:3
listing 13:24
literally 41:6
litigation 6:21, 6:22
  7:2, 7:4, 12:12
  50:14
little 7:23, 25:2
  57:6
live 44:17, 54:20
  55:2
lived 18:6, 52:19
  55:4
lives 43:25, 44:3
livid 44:16
living 39:16, 39:19
LLC 1:10, 2:13
  30:14, 31:2, 31:3
  31:7, 32:20, 32:24
  34:15, 37:5, 37:6
  37:8, 50:21, 51:12
  51:15, 51:19, 51:21
  51:24, 52:7, 53:10
  55:14, 55:18, 55:20
  56:1, 56:17, 66:9
loan 55:15
loaned 71:4
location 52:24
Lois 44:17
Lois's 44:18

long 15:15, 18:4
look 14:5, 31:20
  33:21, 54:6, 54:8
  55:22, 60:5, 60:16
  70:20
looked 20:19, 27:19
  33:6, 33:22, 38:3
  41:20, 41:21, 41:24
  42:24, 45:10, 45:11
  57:8, 64:18
looking 12:2, 31:12
  31:14, 33:19, 34:5
  47:25, 52:21, 53:5
looks 60:17, 64:15
  71:6
losing 33:8, 33:12
lot 5:22, 14:14
  17:6, 19:6, 19:8

M

mailbox 52:3
main 46:14
making 13:1, 16:22
  29:24, 57:23, 59:11
managed 6:11
Manager 74:19
  75:16
managing 40:3
mark 28:9, 40:10
  47:14, 49:7, 58:19
  59:16, 61:25, 63:5
  64:6, 66:22, 69:25
marked 28:12
  40:13, 47:19, 49:11
  49:20, 58:14, 59:20
  62:2, 63:8, 64:9
  66:24, 70:3
marriage 18:14
married 18:4, 19:12
  19:15, 22:16, 29:13
  29:15, 53:15
Mary 22:15, 22:15
  22:16, 22:24
matches 64:17
Matt 2:15
matt@shimanekla...
  2:17
matter 46:15
mean 13:15, 14:1

25:17, 53:6, 54:3
  54:17, 54:17, 55:13
means 43:17
meeting 10:6, 11:4
  21:20, 23:22, 24:10
  24:11, 24:21, 45:2
  45:3, 45:8, 45:9
member 53:9, 53:21
mentioned 9:9, 74:9
met 19:3
might've 20:17
miles 68:22
million 16:19
  17:21, 17:22, 22:3
  50:11, 50:15
mine 6:16, 24:12
  28:8
Minnesota 50:23
minute 8:17, 69:21
miracle 23:10
mishandled 23:23
Missoula 1:14, 1:23
  2:12, 2:17, 73:4
  74:4
Missouri 44:3
mistake 62:22
mom 51:3
money 7:6, 9:23
  10:17, 16:25, 21:22
  23:10, 23:15, 23:17
  24:5, 26:16, 26:18
  26:20, 29:3, 34:15
  34:24, 36:6, 36:21
  37:8, 37:11, 38:2
  38:8, 38:25, 39:11
  39:23, 40:5, 40:21
  41:9, 44:25, 45:6
  46:19, 46:19, 47:10
  48:8, 48:11, 53:12
  54:14, 55:19, 55:23
  57:7, 57:18, 62:12
  71:4, 71:8
Montana 1:1, 1:14
  1:23, 1:24, 1:25
  2:5, 2:12, 2:17, 4:6
  4:7, 4:11, 5:13
  19:18, 20:2, 20:21
  31:8, 51:17, 54:21
  55:5, 73:3, 73:6
  73:6, 73:21, 73:21

74:4, 75:3
Monte 15:20, 68:1
  68:7, 68:13, 68:13
  69:11, 69:15
month 31:4, 55:20
  62:6
months 12:17
  31:14, 33:4, 33:22
  34:11, 34:22, 52:3
  52:8, 54:23, 54:23
  56:22, 57:14, 69:12
moot 17:16
mortgage 56:6, 56:9
  57:19
mother 21:16, 51:4
Motion 3:11
motorhome 6:11
  6:13, 15:21, 68:2
  69:15
motorhomes 15:24
  15:25
Mount 1:23
move 19:18, 20:9
  31:8, 67:22
moved 19:21, 20:4
  20:21, 55:5
moving 31:10
multimillion-dollar
  69:4
multiple 53:6
Murphy 2:10, 2:11
  71:13, 74:2, 74:3
  75:19
Mystery 66:13

N

nail 13:16
name 5:10, 5:14
  20:12, 20:17, 20:17
  22:16, 29:11, 29:15
  29:17, 29:21, 29:24
  31:24, 31:25, 32:3
  32:13, 34:14, 38:17
  44:9, 50:24
names 20:15, 22:14
  68:6, 69:6
nearby 68:20
necessarily 38:3
need 5:25, 11:25

38:9, 47:15
needed 39:6, 44:8
  51:19, 51:20, 57:7
neighborhood 44:18
neither 62:22
Nevada 51:4, 51:22
never 7:7, 8:11
  10:16, 11:16, 18:21
  19:14, 19:16, 56:17
  68:14
new 32:19
night 11:24, 41:6
  41:11, 41:12
nine 54:23
nods 6:2
north 2:4, 2:11
  17:6, 74:3, 75:2
Notary 1:24, 4:6
  73:5, 73:21
note 74:12
notes 73:12
Notice 3:12
notification 10:5
noting 74:10
number 3:7, 3:8
  3:10, 3:13, 3:14
  3:16, 3:17, 3:18
  3:19, 3:20, 3:21
  3:22, 28:12, 40:11
  40:13, 42:10, 42:20
  47:19, 49:11, 49:20
  58:14, 59:20, 62:2
  63:8, 64:9, 66:24
  70:3
numbers 7:8

O

oath 5:6
objection 12:4
objections 4:16
  4:17
obtain 55:15, 67:22
obviously 46:25
  56:9
occupants 20:16
office 10:6, 11:24
  40:24, 43:24, 52:10
  74:19, 75:16
Offices 2:11, 74:3

oh 14:19, 19:16
  28:23, 30:5, 47:15
  52:20, 55:16, 61:13
  62:15, 63:10
okay 5:14, 5:20, 6:1
  7:2, 7:5, 7:16, 7:21
  7:21, 7:24, 8:3, 8:9
  8:17, 8:25, 9:3
  9:15, 10:2, 10:8
  10:12, 10:23, 11:3
  11:13, 12:3, 12:7
  12:11, 13:11, 14:4
  14:10, 14:12, 14:15
  14:23, 15:2, 15:15
  15:18, 15:24, 17:1
  17:12, 17:14, 18:6
  18:18, 19:11, 19:17
  19:19, 20:3, 20:6
  20:12, 20:20, 20:24
  21:5, 21:18, 22:6
  22:12, 22:22, 23:4
  23:8, 23:11, 24:1
  24:5, 24:9, 24:14
  24:24, 25:6, 25:9
  26:17, 27:10, 27:16
  28:21, 28:23, 30:2
  30:5, 30:10, 31:1
  32:12, 32:16, 34:4
  34:4, 34:4, 34:13
  34:24, 35:4, 35:17
  35:20, 36:1, 36:8
  36:11, 37:4, 37:7
  38:1, 38:6, 38:10
  38:15, 39:8, 39:20
  39:22, 40:2, 40:9
  40:23, 41:1, 42:9
  42:20, 43:5, 44:2
  44:6, 44:12, 44:22
  45:4, 46:23, 47:5
  47:13, 48:4, 48:14
  49:4, 49:7, 49:24
  50:3, 50:6, 50:20
  50:24, 51:11, 51:23
  52:15, 52:18, 52:23
  53:1, 53:17, 53:24
  54:4, 54:24, 55:7
  55:25, 56:12, 56:22
  58:8, 58:24, 59:12
  59:18, 60:5, 61:15
  61:17, 61:24, 62:8

62:15, 62:16, 62:21
  62:23, 63:3, 63:10
  63:14, 63:22, 63:25
  64:13, 65:2, 65:6
  65:17, 65:24, 66:3
  66:14, 66:21, 67:8
  67:12, 67:18, 67:25
  68:11, 68:15, 68:20
  70:9, 70:18, 70:23
  70:24, 71:6, 71:12
old 13:17
once 32:19, 38:15
online 54:3
open 19:22, 69:8
opened 31:4, 31:6
  31:16, 52:3
opportunity 15:22
options 34:23, 53:7
order 3:11, 3:12
  48:23, 64:21, 64:22
ordering 74:13
  75:11, 75:14
oriented 57:22
original 59:14
  74:13, 75:10, 75:13
originally 6:23
  10:19, 54:13
oversaw 18:1
owed 7:6, 37:21
  44:23, 47:3
owned 18:16, 19:14
  19:16, 21:3, 32:24
  34:15
ownership 21:5

P

P.C 2:4, 75:2
p.m 1:15, 58:10
  58:11, 71:16
P.O 2:5, 75:3
page 3:2, 50:6, 50:7
  50:8, 50:8, 60:5
  60:16, 62:8, 64:15
  64:23, 65:18, 66:1
  70:20, 70:21, 72:3
  74:9, 74:10, 74:10
pages 34:2, 65:7
  72:13, 73:11
paid 6:17, 9:19

11:25, 16:20, 21:25
  24:5, 27:20, 28:5
  37:13, 38:18, 39:18
  42:19, 44:13, 55:16
  55:18, 55:19, 57:24
paper 29:23
paragraph 50:9
parcels 17:5
Pardon 29:18
park 32:5
part 6:22, 47:1
  53:20, 53:22, 53:23
  56:24, 56:25, 67:14
Parte 3:11
particularly 54:18
parties 4:4, 4:10
  4:15, 4:22, 73:14
party 74:13, 75:11
  75:14
passed 75:13
pay 10:9, 25:15
  35:22, 35:24, 36:4
  36:20, 36:21, 37:1
  37:12, 38:8, 39:23
  45:1, 46:17, 46:22
  47:6, 55:14, 57:4
paying 37:15, 37:22
  37:22, 38:25, 39:16
  40:4, 56:16, 71:4
payment 9:21, 9:24
  10:3, 11:21, 12:5
  41:7, 42:5, 60:9
payments 3:16
  10:1, 14:7, 58:25
  59:11
payout 11:6
PayPal 39:12
payroll 56:6
people 7:8, 10:22
  68:8, 69:6
people's 68:6
person 22:4
personal 16:7, 17:7
  17:18, 42:21, 43:5
  57:17
pertaining 62:25
phone 37:17, 59:8
photo 3:9, 3:19
  63:11
physically 20:4

34:6
piece 69:7
pieces 17:4
pile 59:13
place 38:2, 54:20
  55:12
plaintiff 1:8, 2:7
  12:23
Plaintiff's 3:11
plaintiffs 9:13
plan 31:8, 34:12
  34:13, 53:5
planned 31:9, 31:10
planning 33:4
  34:11
plans 31:21, 34:21
played 6:15
please 74:8, 74:14
  75:7, 75:10
PLLC 2:11, 2:16
  74:3
Plus 66:10
pocket 30:17
pocketed 30:24
point 12:15, 17:17
  20:7, 22:3, 25:11
  50:17, 69:9
positive 20:19
  52:16, 62:16
positively 20:14
possession 50:18
possibility 53:4
possibly 33:5
post 52:10
potential 31:23
PR 17:13, 60:3
prayers 13:13
precarious 56:7
prepare 13:11
  14:10, 41:2, 67:6
prepared 13:14
  53:25, 59:3, 67:9
preparing 59:5
press 23:11
pressed 23:16
pretty 23:9, 26:20
  50:11
previous 18:14
price 33:15
priced 54:19

Priest 22:17
printed 29:23
prior 11:3, 16:2
probably 6:11
  52:20, 57:14, 57:21
  59:7
probate 3:9, 23:19
  23:20, 42:12
problem 12:9
  29:13, 46:20
problems 16:23
  57:11
Procedure 4:12
proceeding 9:11
proceedings 58:9
  58:11
proceeds 60:11
process 64:15
produced 3:21
  14:18, 63:12
promise 45:1
promised 45:6
proof 14:1
proper 35:2
properties 67:22
  67:23
property 10:20
  10:21, 17:5, 17:20
  17:21, 18:11, 21:2
  21:16, 33:10, 33:10
  41:7, 42:4, 54:5
  54:17, 57:19, 60:10
  60:12, 67:23, 69:1
  69:4
provided 74:11
provision 42:20
Public 1:24, 4:6
  73:5, 73:21
purchase 33:5, 54:4
  54:25, 56:22
purchased 55:8
  55:9
Purpose 65:20
pursuing 53:7
put 25:1, 25:14
  26:11, 26:14, 29:6
  30:12, 30:12, 33:2
  42:25, 57:7, 57:19
  59:12, 64:22, 65:14
putting 30:16

  31:15, 34:14, 51:23

Q

question 5:21, 7:6
  19:2, 42:8, 56:12
questionable 8:4
questioned 9:20
questions 14:13
  67:10, 68:4, 71:11
  71:13, 74:14
quick 5:20, 54:16
quickly 19:10
quite 20:18, 41:5
quote 68:17, 68:18

R

raise 11:18
raised 11:16
raising 12:7
ran 25:23
read 3:24, 13:13
  74:10, 74:13, 75:11
reading 4:23, 73:9
  74:12, 75:13
ready 34:20, 45:5
  52:1, 56:10
real 17:24, 18:11
  18:20, 20:21, 20:24
  21:1, 21:3, 27:1
realized 57:7
really 14:14, 19:3
  44:15, 45:22
reason 13:22, 16:24
  46:23
recall 8:9, 44:9
  45:21, 51:25, 54:2
  54:7, 54:8, 67:4
Receipt 3:9
receive 22:19
received 8:9, 11:22
  40:21, 67:2
recess 58:10
recognize 47:21
reconvened 58:10
record 5:11, 5:24
  21:11, 58:12, 58:17
  59:11, 69:20, 69:22
  69:24

redirect 71:15
reduced 15:23
reference 21:12
related 13:2
relative 73:15
release 3:9, 3:25
  13:5, 40:16, 40:20
  43:8, 45:16, 46:11
  74:12
releases 42:21
releasing 43:8
relied 39:5
remarried 44:17
remember 6:9, 12:1
  13:17, 24:3, 30:14
  30:16, 46:13, 46:14
  53:24, 54:13
rent 27:22, 27:24
  37:17
rental 15:21, 68:2
  69:15
rented 15:22, 19:12
  19:17
rephrase 68:20
replacing 57:15
report 73:8
Reported 1:23
Reporter 1:24, 3:24
  4:5, 18:23, 19:1
  27:23, 27:25, 73:5
  73:20
Reporting 1:23
  74:17
represent 5:15
representative 16:7
  42:21, 43:5
require 40:20
  40:25
required 12:20
  42:12
researched 51:16
reserved 4:16, 4:24
  46:19, 71:17, 73:10
resident 20:1
residing 1:24, 4:6
  73:6, 73:21
respective 4:4, 4:10
  4:15, 4:22
responded 67:3
responsible 46:18

rest 23:17, 27:21
  59:9
Restraining 3:11
retirement 10:14
return 36:4, 37:8
  38:7, 71:7
reviewed 41:11
Richard 1:6, 2:7
  2:20, 5:18
right 11:9, 12:19
  13:20, 25:4, 25:23
  26:18, 27:2, 27:5
  30:2, 32:1, 32:4
  36:3, 37:20, 39:4
  41:19, 42:6, 43:11
  43:19, 48:20, 49:9
  55:14, 56:6, 58:21
  60:24, 61:12, 61:20
  63:23, 65:11, 65:16
  65:16, 65:23, 66:14
  66:18, 66:20, 74:13
ripping 57:15
road 68:23
Rohlfs 1:23, 4:5
  73:5, 73:20
Rona 74:19, 75:16
rotten 57:10
roughly 15:9
RPR 1:23, 4:5, 73:5
  73:20
ruled 34:8
rules 4:12, 5:21
run 48:9
Rusty 2:10, 74:2
  75:19
rusty@murphylaw...
  2:12
RV 8:8, 15:16
  15:19, 15:20, 16:2
  68:1

S

safes 25:2
sale 60:9, 60:12
sales 15:24
Salt 15:14, 15:14
  17:6, 18:7
Samson 1:6, 2:8
  2:20, 5:18

satisfaction 41:8
  42:5
savings 26:23
  70:13
saw 33:8, 33:11
  33:14, 34:7
saying 30:1, 48:6
says 28:20, 28:21
  29:23, 41:7, 43:16
  65:19, 70:24
school 7:23
Scott 1:3, 1:7, 1:20
  2:8, 2:18, 3:3, 3:13
  3:16, 5:3, 5:12
  18:24, 28:18, 29:11
  61:2, 63:17, 72:17
  73:8, 74:6, 74:6
  75:5, 75:8
scouting 52:24
seal 73:17
second 14:15, 50:7
  66:1
Security 8:23, 9:6
see 11:23, 13:19
  13:22, 14:15, 23:21
  24:23, 28:21, 43:23
  48:7, 60:7, 61:3
  67:9
seeing 34:9
seeking 50:15
seen 21:8, 21:12
  38:5, 43:15, 43:20
sell 10:20, 10:20
sense 29:25, 33:16
sent 12:10, 74:11
separate 53:18
September 1:15, 5:1
  73:17, 74:1, 75:8
set 34:21, 69:17
  73:17
settled 7:12
seven 22:9, 22:9
severance 10:14
  11:12
shakes 6:2
she'd 34:21, 51:7
  51:19
sheet 60:25
Shimanek 2:15
  2:16, 13:22, 42:7

71:12, 71:14
shop 31:13, 31:16
should've 64:22
show 39:18, 45:3
    45:7
showed 11:10
showing 11:7
    44:19
shows 11:21, 63:14
sibling 22:24
siblings 9:15, 10:4
    11:4, 13:4, 13:10
    16:15, 22:6, 22:19
    23:5, 24:9, 24:22
    33:23, 40:2, 40:21
    42:16, 43:22, 60:14
    61:9, 61:12, 61:18
    61:21
sign 3:24, 40:21
    42:3, 44:7, 44:8
    44:12, 45:2, 74:10
signature 71:17
signed 9:22, 11:19
    11:20, 11:22, 12:6
    13:5, 43:22, 43:23
    43:24, 75:11
signing 4:23, 45:24
    73:9, 75:13
silver 39:11
similar 62:9
Sincerely 74:16
sister 43:25
sisters 10:15, 10:25
    11:20, 43:24
six 22:7, 22:13
    44:5, 47:4, 54:22
Slight 21:10
slips 3:20, 62:10
smell 57:14, 57:16
Social 8:23, 9:5
sold 10:18, 17:18
    17:20, 17:22, 19:10
sole 27:16
solely 28:6, 28:8
    32:25
solved 66:13
somebody 37:23
somewhat 64:21
son-in-law 17:17
    44:18

soon 35:23
sorry 14:19, 22:9
    29:20, 41:23, 55:17
source 8:21
Split 26:6
Spotted 5:12, 21:2
    54:5, 54:25, 55:7
spreadsheet 3:16
    11:5
Spruce 1:14, 2:16
Square 74:4
ss 73:3
Staff 2:6
stamp 65:19
stand 32:15
standard 42:25
    43:3
standardly 42:25
start 12:7, 26:12
    26:14, 26:16, 68:23
started 9:6, 35:22
    37:11
starting 8:23
state 1:24, 4:6, 5:10
    73:3, 73:5, 73:21
statement 3:8, 3:9
    3:17, 3:18, 3:22
    28:16, 42:11, 59:23
    62:5, 70:6
statement's 70:9
STATES 1:1
station 31:14, 31:23
    32:15, 33:5, 33:20
    34:7, 51:17, 52:22
stayed 20:10, 20:18
stenotype 73:12
stink 40:3, 40:6
    40:7
stipulated 4:3, 4:9
    4:14, 4:21
Stipulations 3:5
Stop 31:24, 32:2
    32:12
stopped 17:15
storage 67:19
    67:21, 67:24, 68:8
    68:23, 68:24
store 69:8
stored 67:20
Street 1:14, 2:16

struggling 37:18
stuff 8:6, 17:8, 27:4
    31:17, 31:20, 57:16
subpoena 67:3
subpoenaed 63:1
subsequent 72:12
subsequently 58:10
substance 27:2
    27:5
sued 7:9
suing 48:19
Suite 1:23, 2:11
    74:3
summons 3:13
    49:14, 49:14, 50:4
supplied 47:24
sure 9:1, 14:25
    15:6, 16:22, 23:14
    23:16, 45:13, 47:17
    56:20, 57:23
surprised 41:5
swear 73:7
sworn 3:9, 5:5

T

take 26:1, 33:13
    33:14, 34:10, 36:1
    58:7, 67:21, 67:23
    68:11, 68:23, 69:13
taken 1:14, 4:4
    4:11
talked 6:12, 29:2
    33:23, 40:9, 45:11
    45:13, 52:1, 54:12
    54:17, 68:1, 70:7
talking 19:3, 40:17
    48:15
tanks 33:15
taxes 11:25, 16:20
    42:19, 45:20, 46:13
    46:17, 46:22, 46:25
    46:25, 47:6, 47:9
    47:11
tech 19:25
technically 8:15
    19:6, 19:21, 20:1
tell 5:5, 7:4, 7:21
    22:3, 23:23, 41:14
    52:13, 67:17, 69:5

69:16
Temporary 3:11
tens 36:11
Terra 1:23, 4:5
    73:5, 73:20
testified 5:6, 65:12
testimony 40:19
    53:1, 72:11, 73:13
tgardner@goetzla...
    2:6
thank 27:25, 28:14
    40:15, 58:18, 71:11
    71:12
thank-yous 40:8
thing 13:8, 17:14
    21:15, 22:24, 25:9
    30:18, 31:18, 34:10
    46:14, 57:9, 67:25
    68:25
things 13:16, 31:21
    33:13, 42:15, 67:18
think 7:12, 7:14
    10:10, 12:22, 20:15
    24:12, 25:12, 27:5
    30:16, 30:19, 33:15
    33:15, 34:2, 34:19
    37:10, 38:3, 38:4
    40:9, 40:19, 42:7
    46:19, 51:18, 51:19
    51:20, 54:3, 54:18
    56:7, 57:5, 59:9
    62:17, 62:17, 64:14
    69:12
thinking 31:15
    46:14
thought 7:8, 23:19
    23:23, 52:9, 54:14
    54:15, 54:19, 57:8
    66:4
thousand 38:21
thousand-dollar
    30:15
thousands 36:12
three 10:15, 11:20
    11:20, 13:4, 18:13
    44:4, 61:11, 61:12
    61:13, 61:17, 61:18
Thursday 1:15, 5:1
    75:8
tied 14:3

time 4:17, 4:19, 8:1
    8:12, 11:13, 11:18
    12:4, 12:9, 16:22
    18:7, 18:15, 19:4
    23:4, 23:22, 25:7
    31:19, 31:20, 33:5
    34:7, 36:22, 36:23
    38:1, 39:24, 40:8
    41:10, 47:15, 56:8
    57:5, 64:1, 65:15
    70:13, 75:13
timeline 13:14
    33:25, 34:1, 59:1
times 5:22, 6:5
    6:18, 43:20
tithing 9:20
titled 67:2
today 58:23
today's 13:12
told 7:10, 7:13
    10:15, 10:16, 10:25
    10:25, 33:22, 46:24
    68:21, 68:25, 69:3
top 15:7, 60:24
total 24:1
tractor 23:1
traded 26:7, 32:18
    32:19, 66:8
trailers 27:4
transcription 73:12
transferred 14:9
    35:2, 35:4, 36:2
    36:24, 37:6, 37:7
    37:23, 38:1, 38:15
    39:2, 55:20, 55:23
    56:23, 57:3
travel 31:24, 32:2
    32:12, 51:3, 51:5
    51:22
Trent 2:3, 5:14
    42:8, 74:21, 75:1
trial 4:17
tried 40:20, 68:19
    68:21
trip 52:20, 52:22
TRO 48:23
truck 22:25, 22:25
    38:18, 38:20
trucks 27:3
true 72:10, 73:12

trust 7:1, 7:19
    12:20, 46:17, 48:9
    59:24, 59:25, 63:18
    64:19, 64:24, 65:8
    69:18
trusted 41:17, 41:19
trustee 1:6, 2:8
    5:16
truth 5:5, 5:5, 5:6
try 5:24, 41:15
trying 19:24, 51:9
    68:12, 68:22, 69:1
    69:2, 69:12
turn 33:13, 50:6
    50:8, 62:8, 65:17
    66:1
turned 6:25, 44:19
turns 57:9
two 12:17, 15:1
    24:12, 26:7, 27:6
    43:24, 55:21, 62:13
    63:14, 67:18, 68:9
    69:12, 71:5
type 15:18, 61:5
typed 45:23, 45:25
    46:5

U

uh-huh 5:19, 14:16
    15:4, 25:25, 26:19
    30:8, 32:17, 50:19
    56:15, 58:24, 59:15
    60:8, 61:4, 61:23
    63:24, 67:5, 67:7
    70:11, 71:1
ultimately 12:18
un-joint 53:15
unbeknownst 10:25
underneath 57:10
undersigned 42:5
    42:23
understand 5:15
    14:21, 30:1
understanding
    65:20
understood 47:12
Uniform 42:12
unit 68:8
UNITED 1:1

updated 14:21
use 29:14, 29:24
    32:14, 36:21
Utah 18:8, 18:9
    18:12, 18:14, 18:22
    19:14, 19:22, 20:6
    20:13, 20:15, 42:12
    52:19, 54:23
utilities 37:15

V

vacant 19:8
valued 17:21, 38:20
various 58:25
vehicles 17:8, 18:3
    38:19
Venmo 39:12
venue 34:5
verbal 5:25
Viking 1:10, 2:13
    30:13, 30:24, 31:1
    31:6, 32:20, 32:24
    34:24, 34:25, 35:1
    36:2, 36:4, 36:24
    37:4, 37:6, 37:7
    38:7, 38:8, 38:10
    50:21, 51:11, 51:15
    52:5, 52:7, 52:11
    53:2, 53:9, 53:17
    53:25, 55:13, 55:18
    55:20, 55:25, 56:16
    66:8
Viking's 33:3, 35:6
    35:8, 58:1
Vikings 50:23
vs 1:9

W

W-2s 8:10
wait 5:22, 19:1
waited 10:9
waiting 69:5
waived 74:13
waives 42:11
walk 59:13
want 16:18, 26:14
    26:14, 33:17, 47:10
    53:11, 53:20

wanted 13:15
    16:25, 23:1, 23:14
    23:16, 45:23, 51:6
    53:12, 53:17, 55:24
    57:4, 67:8
wanting 53:3
wants 56:5
water 19:9, 37:14
way 7:15, 8:19
    22:23, 23:21, 24:22
    39:16, 39:22, 40:4
ways 47:4
We've 27:19, 53:12
    58:6
wedding 34:6
    52:25
went 11:24, 12:16
    12:18, 17:3, 23:2
    24:6, 24:13, 25:13
    25:17, 25:22, 27:10
    27:21, 28:1, 28:1
    30:11, 33:7, 33:21
    34:6, 39:25, 44:24
    45:22, 46:5, 54:6
    65:2, 65:3, 66:15
    69:19
West 1:14
Western 51:3
    51:22
WHEREOF 73:17
wife 17:3, 21:25
    38:9, 38:10
Willden 28:19
    29:12
Williams 1:3, 1:7
    1:10, 1:20, 2:8
    2:13, 2:18, 2:20
    3:3, 3:13, 5:3, 5:12
    5:14, 6:24, 9:14
    14:19, 22:15, 22:15
    22:17, 22:18, 28:18
    29:11, 29:12, 29:16
    29:20, 58:16, 59:4
    59:23, 60:18, 61:3
    63:17, 63:18, 64:18
    64:24, 67:14, 71:11
    72:17, 73:8, 74:6
    74:6, 75:5, 75:8
Willstein 2:3, 74:22
    75:1

wired 61:16
withdrawal 3:20
    60:25, 62:10, 64:16
    64:16
witness 3:2, 3:23
    4:23, 5:4, 18:25
    19:5, 27:24, 58:8
    71:17, 72:1, 73:8
    73:10, 73:13, 73:17
    74:12
word 35:3
work 15:15, 15:18
    33:17, 69:13
worked 17:16
working 16:2
world 26:13, 26:21
worth 33:10
would've 19:21
    20:1, 30:20
writing 16:18, 36:8
written 24:10, 38:6
wrong 41:20, 41:25
    42:1, 62:18
wrote 24:6

Y

yard 67:19
yeah 6:4, 7:18, 7:20
    9:4, 12:22, 13:24
    15:10, 15:12, 15:14
    18:2, 18:8, 24:15
    26:9, 26:19, 28:24
    29:8, 32:9, 32:11
    36:14, 36:17, 38:18
    38:19, 38:23, 38:23
    38:24, 39:1, 39:2
    40:6, 41:12, 45:11
    45:20, 47:8, 48:18
    49:3, 50:5, 50:5
    50:12, 50:13, 50:16
    50:19, 52:9, 52:13
    52:17, 52:21, 52:22
    54:12, 54:12, 55:16
    60:11, 61:1, 61:7
    61:13, 61:16, 61:16
    62:21, 62:23, 66:2
    66:11, 66:13, 70:23
    71:3, 71:9
year 6:8, 6:10, 7:20

9:10, 12:17, 51:2
    71:4
years 6:10, 15:8
    16:21, 31:10, 31:12
    34:22, 38:23, 43:16
    70:17

Z

Zions 3:17, 3:18
    3:19, 3:20, 30:11
    59:22, 61:2, 61:19
    62:24, 63:1, 64:12

1

1 3:7, 28:10, 28:12
    28:24, 62:13, 63:17
    65:10
1,000 38:16
1,000-something
    30:17
1,052,000-some-do...
    61:3
1,809.23 70:23
1:00 1:15
10 3:20, 54:17
    64:7, 64:9, 66:1
10,000 33:14
100 70:16, 70:17
1015 1:23
11 3:21, 66:22
    66:24, 67:2
11/4/23 73:22
1100 66:11
11423 5:12, 21:2
    54:5
12 3:22, 70:1, 70:3
127 2:11, 74:3
14 1:15, 5:1, 75:8
16th 70:19
17 49:4, 50:4
    50:12
17,000 27:20, 28:4
    36:18
17th 49:6
18 20:16
1800 70:19
1800s 21:17
19 50:6

190905179 3:12
  3:14, 3:15
193700250 3:10
1992 18:17, 19:7
1st 10:10, 25:4
  48:7, 48:24, 63:10
  64:4, 65:3

**2**

2 3:8, 22:3, 40:11
  40:13, 50:15
2,000 38:16
2,134,000-and-som...
  60:7
2.2 22:3
2.5 50:10
2.55 50:11
2.7 17:21
2:04 58:10
2:26 58:11
2:46 71:16
20 15:8, 21:19
20,000 44:23
200 71:7
2000s 15:9
2007 15:17
2014 10:19, 18:5
2015 10:19
2018 8:15, 17:22
  70:19
2018/early 8:18
2019 7:17, 8:2, 8:3
  8:13, 8:14, 8:16
  8:18, 8:22, 9:5
  10:7, 11:4, 13:17
  16:19, 21:13, 21:15
  21:19, 23:4, 23:12
  48:24, 50:12, 62:6
  62:13, 63:17, 65:25
  70:10
2020 19:20, 20:5
  20:5
2021 8:24, 9:2, 9:4
  9:6, 12:10, 12:13
2023 1:15, 5:1
  72:15, 73:17, 74:1
  75:8
20th 73:17, 74:1
21 50:8, 50:9

21st 7:20
23,000 7:13
24 70:24
24/7 33:17
25,000 25:14, 25:21
  27:7, 27:10, 27:18
  28:22, 28:25, 29:2
  29:3, 36:15, 63:20
  64:25, 66:15
250,000 7:10, 48:6
2500 7:9, 48:5
25th 52:14
26th 10:7, 11:3
  21:19, 44:14
28 3:8
28th 43:24, 44:4
2nd 65:25, 66:5
  66:6

**3**

3 3:10, 38:21
  47:14, 47:19
30 6:10, 74:12
310 1:14, 2:11
  74:3
317 2:16
35 2:4, 75:2
350,000 60:20
395,000 33:15
3rd 30:11, 30:23
  66:4

**4**

4 3:5, 3:13, 38:21
  42:10, 49:8, 49:11
  49:17
4,000 70:25
4.9 17:22
40 3:10
400,000 30:14
  30:23, 32:16, 32:22
  33:2, 35:12, 36:6
  37:19, 38:16, 39:2
  50:18, 66:9
401,000 25:21, 27:7
  30:7, 66:7
401,747.71 63:21
  65:8

401-something-tho...
  30:22
406)721-1143 1:24
426,000 24:17
  25:24, 26:17
426,000-some-odd
  24:3
426,753.71 62:10
  64:17
47 3:12
49 3:14, 3:15

**5**

5 3:4, 3:14, 16:19
  42:20, 49:18, 49:20
  49:22, 50:9
58 3:16
59 3:17
59771-6580 2:5
  75:3
59801 1:24
59802 2:12, 2:17
  74:4
59911 5:13

**6**

6 3:16, 58:14
  58:20
6/19/19-7/17/19 3:8
6/26/19 3:17
62 3:18
63 3:19
64 3:20
6580 2:5, 75:3
67 3:21

**7**

7 1:6, 2:8, 3:17
  59:17, 59:20
7/1/19 64:17
7/18/19-8/16/19
  3:22
7/24 34:5, 34:8
7/31/19 3:18
70 3:22
72 3:23
73 3:24

74 3:24
75 3:25
75,000 9:21, 10:2
  10:13, 11:11, 12:8
  43:13
7th 10:10

**8**

8 3:18, 61:25, 62:2

**9**

9 3:19, 63:6, 63:8
9:22-bk-90147-BPH
  1:5
90s 15:11