UNITED STATES BANKRUPTCY COURT FOR THE
DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**SCOTT K. WILLIAMS**,<br><br>Debtor. | Case No. **9:22-bk-90147-BPH** |
| **RICHARD J. SAMSON, AS CHAPTER 7 TRUSTEE OF THE ESTATE OF SCOTT K. WILLIAMS,**<br><br>Plaintiff,<br><br>v.<br><br>**CANDY WILLIAMS and VIKING INVESTMENTS, LLC**,<br><br>Defendants. | Adversary No. **9:23-ap-09001-BPH** |

Plaintiff Richard J. Samson, as Chapter 7 Trustee of the Estate of Debtor, filed a complaint alleging the fraudulent transfer of $400,000.00 by Debtor to Defendants Candy Williams ("Candy") and Viking Investments, LLC ("Viking"). Plaintiff seeks to avoid the transfer pursuant to 11 U.S.C. § 544(b) and 550(a) and Mont. Code Ann. §§ 31-2-333(1)(a) and (b), and 31-2-334 (2023).[1]

The Court conducted a trial on December 6, 2023. Appearances were noted on the record. Brenda L. Harbers, Scott K. Williams, Candy L. Williams, and Kent P. Williams testified. Exhibits 1, 3, 5, 8, 12-17, 19, 20, 24, 100-103, 105, 108, 110, 114, 119, 123, 125, 127, and 134 were admitted. Based on the record developed before this Court, the following constitutes findings of fact and conclusions of law to the extent required by Rules 7052 and 9014.

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

# JURISDICTION[2]

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b). This is a core proceeding to determine, avoid, or recover fraudulent conveyances under 28 U.S.C. § 157(b)(2)(H).

# BACKGROUND[3]

This case stems from the transfer of $400,000.00 from Debtor to Viking in 2019 ("Transfer") and Viking's subsequent purchase and transfer of real property to Candy. Candy is Debtor's wife and the sole member of Viking.

In 2019, Debtor acted as the trustee of the Hugh L. Williams Family Trust ("Trust"). As the trustee, Debtor was responsible for distributing funds from the Trust after his father's death and closing his estate. Debtor was also a beneficiary under the Trust. The Trust has since filed a proof of claim in the amount of $410,516.03 ("Claim").[4] Debtor identified the Claim as undisputed on Schedule F of his Petition.

In July 2019, Debtor distributed funds from the Trust to the beneficiaries, including himself. Debtor drew and kept an additional $75,000.00 from the Trust. Altogether, Debtor received a distribution of $426,753.71. This distribution was split into two cashiers' checks: one in the amount of $25,000.00 and the other in the amount of $401,747.71.

Shortly after the funds were distributed, on July 19, 2019, Debtor was served with a complaint, alleging that Debtor made fraudulent and negligent representations and failed to comply with a prejudgment writ of garnishment and temporary restraining order. The complaint sought $2,500,000.00 in damages.[5] Six days later, Candy formed Viking. Candy was (and is) the sole member of Viking. One day after Viking was formed, Candy opened a bank account on behalf of Viking at Glacier Bank.

In August 2019, Debtor took the second cashier's check in the amount of $401,747.71 to Zion's Bank and exchanged it for another cashier's check, this time payable to Viking in the amount of $400,000.00. Debtor took the remaining balance in cash. No loan agreement or other instrument exists that contemplates Viking providing Debtor with any consideration in exchange for the $400,000.00.

Upon receipt of the $400,000.00, Viking deposited the check in its Glacier Bank account. Viking used a portion of the funds to acquire the real property at 11423 Spotted Fawn Lane,

---

[2] The parties each consented to this Court exercising jurisdiction over this adversary proceeding at ECF Nos. 16 and 17.

[3] These facts are uncontested. See Parties' Amended Pre-Trial Memorandum at ECF No. 43.

[4] Claim No. 10 on the Claims Register in Debtor's underlying bankruptcy.

[5] This lawsuit was later dismissed with prejudice.

Bigfork, MT 59911-7335 ("Bigfork Home"). It entered a contract and delivered $10,000.00 in earnest money on August 26, 2019, and completed the purchase on September 27, 2019, for a total price of $359,716.48. On December 26, 2019, Viking executed a Quitclaim Deed to Candy, conveying the Bigfork Home to Candy for no consideration.

Immediately after Viking quitclaimed the Bigfork Home to Candy, she obtained a $200,000.00 loan from United Wholesale Mortgage and encumbered the property with a Deed of Trust in United Wholesale Mortgage's favor. In April of 2021, Candy refinanced her loan and obtained a new loan in the amount of $285,000.00, secured by the Bigfork Home. Debtor and Candy currently reside in the Bigfork Home. Debtor filed his Chapter 7 bankruptcy petition on September 30, 2022.

## SUMMARY OF ARGUMENTS

**I.     Plaintiff's Allegations.**

Plaintiff alleges that he has the right to assert a fraudulent transfer claim under applicable law pursuant to § 544(b). In this case, Plaintiff argues that the applicable law is Montana state law, specifically Mont. Code Ann. §§ 31-2-333(a) and (b), and 31-2-334 which govern fraudulent transfer actions. Plaintiff further alleges the Transfer constitutes actual and constructive fraudulent transfer of assets, for the purpose of hindering creditors. As a result, Plaintiff may avoid the Transfer pursuant to § 550 and recover the property transferred for the benefit of the estate. Under this theory, Plaintiff argues a constructive trust on the Bigfork Home arose in his favor, and, further, Defendants are not entitled to any sort of equitable offset. Plaintiff requests judgment in his favor that:

(1) The $400,000.00 payment from Debtor to Viking is avoided as fraudulent;
(2) The Bigfork Home is held in a constructive trust in favor of Plaintiff and must be transferred to Plaintiff; and
(3) A money judgment against Viking and Candy for the current outstanding balance of the $280,000.00 loan which encumbers the Bigfork Home.

**II.     Defendant's Response.**

Defendants argues that Debtor received funds from Candy and Viking after the Transfer. Further, Viking and Candy paid Debtor's debts and continued to do so and as a result, he is not insolvent as defined by Mont. Code Ann. § 31-2-329. Defendants further argue that the claims asserted by the Trust are meritless and the $2,500,000.00 lawsuit against Debtor was filed in bad faith. Defendants finally assert that the Transfer was not made with fraudulent intent.

# ANALYSIS

To prevail under § 544(b), Plaintiff must first establish the existence of a triggering unsecured creditor. If such a triggering creditor exists, Plaintiff may then pursue non-bankruptcy claims on behalf of the estate. In this case, these non-bankruptcy claims are governed by state law.

Montana law provides that a transfer may be avoided as fraudulent as to present or future creditor if it was made with actual intent to hinder, delay, or defraud creditors of a debtor under Mont. Code Ann. § 31-2-333(1)(a). Alternatively, a transfer may be avoided as constructively fraudulent if it was made without receiving reasonably equivalent value in exchange for the transfer or obligation and the debtor:

> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Mont. Code Ann. § 31-2-333(1)(b). Finally, a transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation. Mont. Code Ann. § 31-2-334.[6]

If a court concludes that a plaintiff has successfully proven that a fraudulent transfer exists under non-bankruptcy law, § 550(a) enables the plaintiff to recover the property or the value of the property. The court has discretion in fashioning the appropriate remedy.

As discussed below, the IRS exists as a triggering creditor. As a result, Plaintiff may pursue a fraudulent transfer claim under Montana law. In that regard, Defendants' case relies heavily upon the testimony of Debtor and Candy. The Court did not find their testimony credible and affords it little weight. *See Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it."). Despite Debtor and Candy's statements otherwise, the circumstances and series of transactions surrounding the Transfer suggest only one outcome – that Debtor and Defendants intended to place the $400,000.00 beyond the reach of Debtor's creditors.

Since Plaintiff has met his burden in proving the Transfer was fraudulent as to present or future creditors as it was made with actual intent to hinder, delay, or defraud creditors of Debtor under Mont. Code Ann. § 31-2-333(1)(a), the Court will not further analyze whether Plaintiff has proved constructive fraud under Mont. Code Ann. § 31-2-333(1)(b). Finally, the Court finds that

---

[6] During the trial, Plaintiff indicated he would not be pursuing this claim.

the imposition of a constructive trust in favor of Plaintiff is the appropriate remedy under § 550 and Defendants are not entitled to any equitable offsets.

I. **Plaintiff may utilize § 544(b) to pursue a fraudulent transfer action under Montana law.**

Section 544(b) places the trustee in "the overshoes" of the debtor's unsecured creditors. *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 809 (9th Cir. 1994). Section 544(b) provides:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

In short, if a creditor holding an unsecured claim allowable under § 502 of the Code can also avoid a voidable transfer of an interest of the debtor in property under applicable law, the trustee has standing under § 544(b) to pursue avoidance for the benefit of the estate. *Zazzali v. United States (In re DBSI, Inc.)*, 869 F.3d 1004, 1006 (9th Cir. 2017). Absent this "triggering creditor," the trustee may not proceed under § 544(b). *Id.* (citing 5 Collier on Bankruptcy ¶ 544.01 (16th ed. 2017)).

As the Court concluded in its prior Order denying summary judgment,[7] multiple "triggering creditors" exist. The Court identified the Internal Revenue Service and American Express as two such creditors.[8] As a result, Plaintiff may pursue an avoidance action under applicable state law for the benefit of the estate. The applicable state law in this instance is Mont. Code Ann. §§ 31-2-333(1)(a).

II. **The Transfer is fraudulent pursuant to Mont. Code Ann. § 31-2-333(1)(a) because it was made with the intent to hinder, defraud, or delay the creditors.**

Mont. Code Ann. § 31-2-333(1)(a) states:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) with actual intent to hinder, delay, or defraud any creditor of the debtor.

---

[7] Order issued on November 29, 2023, at ECF No. 58.

[8] At trial, Defendants agreed that the Internal Revenue Service was a qualifying creditor for purposes of § 544(b).

A transfer consists of "every mode. . . of disposing of or parting with an asset or interest in an asset and includes payment of money . . ." Mont. Code Ann. § 31-2-328(12). Judgment may be entered against the first transferee of the asset or any subsequent transferee other than a good faith transferee. Mont. Code Ann. § 31-2-340(2).

In determining actual intent under this subsection, the statute provides a non-exclusive list of factors to consider, including: (a) the transfer or obligation was to an insider; (b) the debtor retained possession or control of the property transferred after the transfer; (c) the transfer or obligation was disclosed or concealed; (d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (e) the transfer was of substantially all the debtor's assets; (f) the debtor absconded; (g) the debtor removed or concealed assets; (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (j) the transfer occurred shortly before or shortly after a substantial debt was incurred; or (k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. Mont. Code Ann. § 31-2-333(2)(a)-(k). These "badges of fraud," if found, do not "necessarily constitute fraud per se, but instead merely afford grounds of inference from which the court or jury are authorized to conclude that a transaction surrounded by them is fraudulent." *O'Connor v. Lewis*, 776 P.2d 1228, 1233 (Mont. 1989). The Court will analyze these factors below.

      a.      **Candy is an insider.**

Candy is an insider under Montana law - Candy and Debtor are married. If the debtor is an individual, an insider is, in part, a relative of the debtor. Mont. Code Ann. § 31-2-329(7)(a)(i). A relative includes a spouse. Mont. Code Ann. § 31-2-329(11)(b). A transfer made by a debtor to an insider may be indicia of fraud. Mont. Code Ann. § 31-2-333(2)(a).

Both Debtor and Candy testified that they married in 2016, three years prior to the Transfer. Although the Transfer was made to Viking, Candy's testimony established that she was the only member of Viking, and she was named as such in its Operating Agreement.[9] Candy further testified that Viking never engaged in any business activities.

Although Viking is ostensibly a separate entity and not an insider, the circumstances surrounding Viking's existence demonstrate it was established to aid in the fraud and served no legitimate purpose. Instead, Viking acted as an intermediate transferee of assets destined for Candy for future use by Debtor. Candy, as its sole member, caused Viking to quitclaim the Bigfork Home to herself.[10] Thus, through the Transfer, Candy ultimately ended up with the Bigfork Home in her name. Further, she used the remaining funds in the Viking account, and the

---

[9] Ex. 14.

[10] Ex. 16.

loan proceeds for Debtor's benefit.[11] Accordingly, the Court finds that the Transfer was made to an insider.

### b. Debtor retained control of the property after the Transfer.

Debtor's testimony indicated that he remained in control of the $400,000.00 after the Transfer to Viking. Whether the debtor retained possession or control of the property after the transfer is the next consideration in the Court's analysis. Mont. Code Ann. § 31-2-333(2)(b). Debtor testified that, while he did not have the ability to pay off debts, he simply needed to ask Candy and either she – or Viking – would pay off Debtor's debts as necessary. Although Candy testified Viking was formed to further her business ventures, her uncontradicted testimony established that since its establishment, Viking has only quitclaimed the Bigfork Home to Debtor and provided Debtor payments for his debts. Candy, in her interrogatories, attached a table she created showing the various times she or Viking had paid of Debtor's credit card debt or otherwise supplied payment to Debtor.[12] The attached spread sheet shows that Viking made at least nine separate payments to Debtor in 2019. Candy further testified that after the Transfer, she considered the money to be Debtor's. Accordingly, the Court finds that Debtor retained control of the $400,000.00 after the Transfer.

### c. Debtor attempted to conceal the Transfer.

Debtor's actions surrounding the Transfer support a finding that Debtor and Defendants meant to conceal the Transfer. Under Mont. Code Ann. § 31-2-333(2)(c), the Court considers whether the transfer or obligation was disclosed or concealed. On July 1, 2019, Debtor testified he withdrew money from the Trust's bank account at Zion's Bank and divided it into two cashiers' checks.[13] The first check totaled $25,000.00.[14] The second check totaled approximately $401,000.00.[15] Debtor retained possession of these cashier's checks for approximately two weeks.

Around July 19, 2019, Debtor received notice that he was being sued.[16] Debtor testified that, on July 25, 2019, while in Montana for a wedding, Candy formed Viking.[17] Candy testified that she opened a bank account the next day at Glacier Bank in Kalispell.[18] Debtor stated that he

---

[11] Ex. 127.

[12] *Id.*

[13] Ex. 8; Ex. 100.

[14] Ex. 100.

[15] *Id.*

[16] Ex. 5.

[17] Ex. 13.

[18] Ex. 108.

had "studied" what it took to open a business in Montana and that he "may have" helped her form Viking. Candy did so on Debtor's laptop in their hotel room in Columbia Falls and utilized Montana's one hour expedited handling option to form Viking.[19] Debtor and Candy then returned to Utah.

On August 2, 2019, approximately two weeks after discovering he was a defendant in a pending suit, Debtor traded his $401,000.00 cashier's check at Zion's Bank for a different cashier's check made out to Viking from Debtor.[20] This cashier's check was in the amount of $400,000.00. Debtor testified that, while he could not remember for certain, he believed he took the remaining balance as cash. Debtor further testified that he did not have a personal bank account at Zion's Bank. Debtor and Candy proceeded to drive back to Kalispell and deposited the cashier's check into Viking's Glacier Bank on August 5, 2019.[21] Viking closed on the Bigfork Home on September 27, 2019.[22] Within two months, on December 26, 2019, Viking conveyed the Bigfork Home to Candy.[23]

It is undisputed that within 30 days of Debtor discovering he was a defendant in a pending action, Candy formed a new entity, and Debtor transferred the $400,000.00 into its account. At trial, Debtor conceded that the various cashier's checks and the ultimate deposit of the funds in Viking's account made it difficult to discover the Transfer and disposition of the funds.[24] Debtor further testified that no party could look at the Zion's Bank account statements and understand two separate cashier's checks had been issued.[25]

Debtor's initial testimony at his 341 Meeting was less than candid. Debtor stated the following, under oath, at his 341 Meeting:[26]

> Q. What -- what was the source of the funds for that purchase in -- uh, the house in Bigfork?
> A. Candy just, uhm, bought it with -- on her credit.

---

[19] Ex. 13.

[20] *Id.*

[21] Ex. 108. At trial, Debtor agreed he could have accomplished the same result by placing the money in his personal account at U.S. Bank and wiring it to Viking's account at Glacier Bank.

[22] *Id.*

[23] Ex. 16.

[24] When asked if there was any way a party could review Debtor's bank records and understand that he held an additional $400,000.00, Debtor responded "I hope not."

[25] Ex. 8.

[26] Ex. 130, Scott Dep. 35:16-21.

> Q. Was there any cash that had been paid as a -- a down payment as a part of that purchase?
> A. No.

Debtor further stated:[27]

> Q. And -- and of that 426,000 that you mentioned, how much of that do you have remaining in -- in your possession, or in an account?
> A. No. None.
> Q. So, in -- in the last two-and-a-half years, or so, you spent all of that?
> A. Yeah.
> Q. Did you give of that -- those monies to your wife?
> A. Uhm, no.

When pressed on these answers at trial, Debtor attempted to parse the language he used, arguing that he had not given the money to Candy, but rather Viking. He also admitted that Candy purchasing the Bigfork Home on her credit was not an "accurate" answer and agreed that he never disclosed that he transferred $400,000.00 to Viking during his prior depositions. As a result of the inconsistent testimony, Debtor's testimony or explanation surrounding the circumstances of the Transfer is not credible.

In short, Debtor and Candy's testimony shows multiple transactions occurring in a short time period, the sole purpose of which was to conceal the Transfer from Creditor. Neither Candy nor Debtor could provide an adequate explanation for the formation of Viking, Viking's conveyance of the Bigfork Home to Candy, Candy's loans secured by the Bigfork Home, and Debtor's ability to direct Candy to pay his bills, or otherwise dictate how Candy disposed of funds in Viking's accounts or her loan proceeds. From the evidence and testimony, the Court can only conclude that Debtor and Defendants intended to conceal the $400,000.00 from any creditor.

### d. Debtor was sued shortly before the Transfer.

There is no dispute Debtor was sued shortly before the Transfer occurred. A transfer made or obligation incurred after a debtor has been sued or threatened with suit may be indicia of fraud. Mont. Code Ann. § 31-2-333(2)(d). Debtor received notice he was being sued on July 19, 2019, a week prior to his transfer of $400,000.00 to Viking.[28] Defendants argue that the underlying Complaint was filed in bad faith and point to the suit's dismissal with prejudice. However, Debtor testified that while he was "not concerned" about the lawsuit, he was "concerned" the money he withdrew from the Trust would be in danger and that he considered "doing something with" the money. However, after discussions with his attorney, his concerns regarding the lawsuit were assuaged and "he felt no hurry to move anything" because he concluded the claims were frivolous.

---

[27] *Id.*, Scott Dep. 40:8-16.

Regardless of whether the lawsuit was meritless, the Montana legislature did not carve out an exception for whether a debtor believes a suit against him will ultimately end in no judgment. Importantly, Debtor testified that he was concerned about his "money" during the temporal period following notice of the suit. Further, the rapidity with which the events that transpired after Debtor testified he was "concerned" about the money suggests that the lawsuit caused Debtor to make the Transfer. Even if it did not do so, the record indicates that a week after Debtor was served notice of the suit against him, he transferred $400,000.00 to Viking.

e. **Debtor's $400,000.00 transfer to Viking was essentially all of his assets.**

The $400,000.00 in the Transfer consisted of essentially all of Debtor's assets. Accordingly, whether the transfer of substantially all of the debtor's assets is the next factor the Court considers. Mont. Code Ann. § 31-2-333(2)(e). Here, it is undisputed that Debtor's transfer of $400,000.00 to Viking left Debtor with nothing of value. Debtor testified that he transferred all of the cash he had to Viking and had no other real assets.[29] Further, Debtor testified that he was unemployed at the time of the Transfer. As Debtor's income now consists solely of social security payments that began in 2021, and he relied on Viking and Candy to pay his debts as they become due, the Transfer consisted of essentially all of Debtor's assets.

f. **Debtor did not abscond.**

Next, the Court considers whether Debtor absconded. Mont. Code Ann. § 31-2-333(2)(f). Black's Law Dictionary defines "abscond" as "[t]o depart secretly or suddenly esp. to avoid arrest, prosecution, or service of process." Black's Law Dictionary (11th ed. 2019). Here, Debtor has not departed or hidden himself. This badge of fraud is not present.

g. **Debtor concealed assets.**

Debtor concealed the $400,000.00 through the Transfer and subsequent agreement with Candy. Whether a debtor removed or concealed assets is the next consideration in the Court's analysis. Mont. Code Ann. § 31-2-333(2)(g). Here, Debtor testified that he transferred all of his cash to Viking. In exchange, Debtor received what he characterized as a "promise" or "agreement" with Candy. In this agreement, Debtor would retain no assets but could ask Candy for payment as necessary. Per the testimony of Debtor and Candy, this agreement was never formalized in writing. Consistent with their agreement that although the Transfer caused funds and property to be held by Viking and Candy, Candy further testified that she considered the money to be Debtor's. Nothing in Debtor's schedules or petition shows the Transfer occurred, identifies the Bigfork Home, or indicates that Debtor had a right to collect the $400,000.00 from Candy per the oral agreement.[30] Debtor also testified that he never disclosed at his depositions that he had transferred $400,000.00 to Viking.

---

[29] Ex. 1. Debtor and Candy's bank account at the time of the Transfer contained approximately $3,000.00.

[30] Ex. 114.

Debtor and Candy's testimony suggests that the agreement between the two served the singular purpose of shielding Debtor's assets from creditors. Despite Debtor, Viking and Candy's machinations, as a practical matter Debtor controlled the disposition of his property prior to the Transfer and after the Transfer. Debtor transferred $400,000.00 to a recently formed entity, Viking.[31] Viking acquired real property, the Bigfork Home.[32] Viking conveyed the real property to its sole member, Debtor's wife, Candy.[33] Candy obtained loans secured by the real property, and the loan proceeds were subject to her agreement with Debtor, which required Candy to use the funds for the benefit of Debtor.[34] This same outcome could have been achieved if Debtor had acquired the Bigfork Home and obtained a loan and maintained bank accounts in his name. The singular difference is that assets in Debtor's name would be subject to creditor's claims. Accordingly, Debtor concealed the $400,000.00 through the Transfer and subsequent agreement with Candy.

### h. Debtor did not receive any consideration for the Transfer.

Debtor did not receive any sort of consideration or value for the transfer. Under the eighth badge of fraud, the Court considers whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred. Mont. Code Ann. § 31-2-333(2)(h). Value is:

> given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made other than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

Mont. Code Ann. § 31-2-330(1).

Here, Debtor argues that he received value – Candy promised him that she would pay his debts as they came due in exchange for the $400,000.00. However, value given in exchange for a transfer does not include an "unperformed promise made." At the time of the Transfer, the promise to pay Debtor's bills as they came due was unperformed. The statutory language explicitly excludes this sort of promise from its definition of value. Thus, Debtor did not receive value – let alone reasonably equivalent value – for the Transfer.

### i. Debtor was insolvent shortly after the Transfer.

Debtor became insolvent as a result of the Transfer. Under Mont. Code Ann. § 31-2-333(2)(i), the Court considers whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred. A debtor is insolvent if their debts exceed

---

[31] Ex. 13.

[32] Ex. 108.

[33] Ex. 23.

[34] Ex. 20; Ex. 24.

all their property, and the debtor is generally not paying their debts as they become due. Mont. Code Ann. § 31-2-329(1).

Here, the statute requires both elements to be met. First, Debtor's debts exceeded his available assets at the time of the Transfer, as he had substantial credit card debt in relation to his few remaining assets.[35] Second, as Candy and Debtor testified, in exchange for the Transfer, it was Candy (or Viking), and not Debtor, who would pay Debtor's debts as they became due.[36] As a result, the second element of Mont. Code Ann. § 31-2-329(1) is met, and Debtor was insolvent after the Transfer.

### j. The Transfer did not occur shortly before or shortly after a substantial debt was incurred.

The evidence did not conclusively establish whether the Transfer occurred shortly before or after a substantial debt was incurred. Mont. Code Ann. § 31-2-333(2)(j). Debt means liability on a claim. Mont. Code Ann. § 31-2-329(5). A claim means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, legal, equitable, secured, or unsecured. Mont. Code Ann. § 31-2-329(3).

Here, the testimony did not conclusively establish whether the Transfer occurred shortly before or after a substantial debt was incurred. Although Debtor has indicated he disputes the Claim, the Claim has not been objected to by the Trustee and is entitled to prima facie validity at this stage of this case. [37] If Claim is allowed, the Court could conclude a substantial debt existed at the time of the Transfer. Conversely, if the Claim is objected to and not allowed, a substantial debt did not exist at the time of the Transfer. The Court will not speculate about the merits of the Claim here. Instead, the Court will consider the merits of the Claim if an objection to it is filed. As a result, consideration of this factor in the Court's analysis is neutral, weighing neither in favor nor against a fraudulent transfer finding.

### k. Debtor did not transfer the essential assets of a business to a lienor who transferred the assets to an insider of the debtor.

Next, the Court considers whether the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. Mont. Code Ann. § 31-2-333(2)(k). Debtor is an individual, not a business, so this factor is inapplicable.

---

[35] Ex. 134.

[36] Ex. 127.

[37] Proofs of claim are entitled to prima facie validity. Rule 3001(f). A timely proof of claim is allowed unless a party in interest objects. § 502(a). If such objection to a claim is made, "the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount . . ." § 502(b). Absent an objection, however, any claim is deemed valid and a review of the docket in the underlying bankruptcy shows that no objections to the Claim have been filed.

m. Conclusion.

The Montana legislature identified eleven non-exclusive badges of fraud for a court to consider when determining whether a debtor transferred property with the intent to hinder, defraud, or delay the creditors. Debtor meets the criteria of eight of these badges of fraud. As the testimony and exhibits establish, upon discovering he was a defendant in a lawsuit, Debtor was "concerned" about his money. Debtor and Defendants then went to great lengths to conceal the Transfer (and Debtor's assets) from creditors. While the badges of fraud do not establish "per se" fraud, the Court has little trouble concluding that their presence here indicates the Transfers were made with actual intent to hinder, delay, or defraud creditors.

### III. Plaintiff is entitled to a recovery of $400,000.00 from Defendants.

Upon determining the trustee has a right under § 544(b) to avoid transfer, the trustee's right to recovery "is governed by [§] 550(a), which enables [the trustee] to pursue section 544(b) actions where recovery will accrue for the benefit of the estate." *In re Acequia*, 34 F.3d at 811. Under § 550, the concepts of avoiding a transfer and recovering from the transferee are distinct and separate. *Id.* at 809. The purpose of § 550(a) is "to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred." *Id.*

Section 550(a) states:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.

Thus, "the bankruptcy court may award the trustee (1) the actual property, or (2) the value of the property. The statute does not explain when a court should award the trustee recovery of the actual property and when it should, in the alternative, award the trustee recovery of the value of the property." *USAA Fed. Sav. Bank v. Thacker (In re Taylor)*, 599 F.3d 880, 890 (9th Cir. 2010). As a result, it is within the court's discretion to award the trustee recovery of the property transferred or the value of the property transferred. *Id.*

In doing so, "[a] bankruptcy court ordinarily determines the value of the property to be the value at the time of the transfer, but has discretion on how to value the property so as to put the estate in its pre-transfer position." *Id.* A court may award a judgment that involves recovery of the actual property and value of the property as long as it does not result in double recovery for the estate. *Aalfs v. Wirum (In re Straightline Invs., Inc.)*, 525 F.3d 870, 883 n.3 (9th Cir. 2008) (affirming award of a monetary judgment and all uncollected accounts receivable to the trustee under § 550).

Under § 550(a)(2), "a [t]rustee can . . . recover from any immediate or mediate transferee of the initial transferee who does not take in good faith, for value, and without knowledge." *In re Bullion Reserve of North America*, 922 F.2d 544, 548 (9th Cir. 1991). While the Code does not define "transferee," "it is widely accepted that a transferee is one who, at a minimum, has dominion over the money or other asset, the right to put the money to one's own purposes." *Schafer v. Las Vegas Hilton Corp. (In re Video Depot)*, 127 F.3d 1195, 1198 (9th Cir. 1997) (internal citations omitted). The trustee can recover from any combination of the initial transferee and any immediate or mediate transferee, subject to the limitation of a single satisfaction. 5 Collier on Bankruptcy P 550.02 (16th ed. 2023).

Here, Plaintiff established a right to avoid the transfer under § 544(b). In this case, Candy, as the immediate transferee and sole member of the initial transferee, Viking, colluded with Debtor to hinder, delay and defraud creditors of Debtor. As a result, Plaintiff may recover the actual property or the value of the property from the initial transferee (Viking) or the immediate transferee (Candy). It is within the Court's discretion to fashion the appropriate remedy to restore the estate to the position it would have enjoyed if the Transfer had not occurred.

### IV. A constructive trust is the appropriate remedy.

Whether a constructive trust exists and will be enforced in bankruptcy is determined by applicable state law. *In re Bruce Farley Corp.*, 612 F.2d 1197, 1200 (9th Cir. 1980). A constructive trust instead arises when a person holding title to property "is subject to an equitable duty to convey it to another on the ground that the person holding title would be unjustly enriched if he were permitted to retain it." *In re Est. of McDermott*, 51 P.3d 486, 491 (Mont. 2002). Generally, a constructive trust may be imposed because the title holder obtained title by "fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act," but a constructive trust may also be imposed pursuant to Mont Code Ann. § 72-33-219 "in cases where a title holder innocently obtained title but would be unjustly enriched if they were allowed to retain the title." *Id*. When proceeds of a fraudulent transfer are used to purchase real property, other courts have found the imposition of a constructive trust an appropriate remedy under § 550. *See, e.g., Sanders v. Quan Ky Hang (In re Hoa Ky Hang)*, 2007 Bankr. LEXIS 2836, at *17-18 (Bankr. E.D. Cal. 2007) ("Where property is improperly used, the innocent party such as a bankruptcy trustee can choose either to enforce a lien on the property for the value of the estate's funds or to enforce a constructive trust on the property.").

Here, applicable state law allows the imposition of a constructive trust. As discussed above, the Court has found that the Transfer constituted actual fraud. As fraud is a basis upon which a constructive trust may be imposed under Montana law, the Court employs the broad discretion afforded to it to impose a constructive trust on the Bigfork Home in favor of Plaintiff.

### V. Defendants are not entitled to any equitable offsets.

At the trial, Plaintiff argued that a constructive remedy is the only appropriate remedy for the fraudulent transfer in this case, because absent the imposition of a constructive trust, the parties would be required to litigate pre-judgment interest and equitable offset. Further a

judgment for the value of the property, $400,000.00, followed by execution may not put the estate in the position it would have enjoyed had the Transfer not occurred.

Under applicable state law, enforcing a judgment by means of execution against real property employs an antiquated procedural approach, is cumbersome and entitles those with an interest in the property a one year right of redemption. Mont. Code Ann. § 25-13-802. Such a right would delay the administration of this case and force upon the creditors and other interested parties a year of delay. Instead, a constructive trust would permit Plaintiff to liquidate the Bigfork Home promptly through a marketing and sales process, ensuring the value is maximized, and administer the proceeds in accord with the Code. Defendants argued that imposing a constructive trust without equitable offset would result in a windfall for the estate.

While Defendants may be correct that a constructive trust in favor of Plaintiff without any sort of offset may generate a windfall to the estate, such a result is appropriate where the estate has a greater equitable claim than a defendant under § 550. *In re Straightline Invs.*, 525 F.3d at 884 (internal citations omitted). As the Ninth Circuit explained:

> [T]he Bankruptcy Code contains no provision which would allow [a transferee] to set off the amount he paid for the [avoidably transferred property] against the value of the [property]. That is exactly what [Defendant] is attempting to do here -- set off the amount he paid for the accounts receivable against the value of the accounts. The only exceptions to recovery under § 550(a) are made for (1) good faith transferees who took property subsequent to the initial transferee and (2) non-insider prepetition transferees who receive property originally transferred for the benefit of an insider. Even a good faith transferee is not protected beyond a possible lien on the property, and he is only protected if he is the initial transferee. Section 550 is thus substantially less protective of transferees than it is of the estate.

*Id.*; *see also In re Acequia*, 34 F.3d at 812 ("[E]ven if the recovery did constitute a windfall, [Debtor] has a greater equitable claim to the transferred [estate] funds than does [Defendant], the wrongdoer.").

Defendants and Debtor worked in concert to conceal the Transfer and Debtor's assets from creditors. As such, Plaintiff, working on behalf of the estate, has a greater equitable claim than Defendants. While this may result in a windfall for Plaintiff, the equities favor the estate and its creditors, not those who the Court has determined participated in fraud. The concerns of the transferees are less important than the estate under § 550. Accordingly, the Court finds that Defendants are not entitled to any equitable offsets. Instead, the Bigfork Home shall be subject to a constructive trust, marketed and sold by Plaintiff, and the funds administered by Plaintiff and distributed in accordance with the Code. To the extent a surplus remains, Candy, Viking and Debtor will be afforded an opportunity at that time to stake out their respective positions regarding who is entitled to any surplus.

### VI. Conclusion

Debtor transferred $400,000.00 to his wife's LLC, Viking. This $400,000.00 constituted nearly all of the assets Debtor held, and the transfer was accomplished in such a way as to obscure it, and the subsequent purchase of the Bigfork Home, from any of Debtor's creditors. As such, the Court concludes Debtor's transfer of $400,000.00 to Viking was made with actual intent to hinder, delay, or defraud creditors pursuant to Mont. Code Ann. § 31-2-333(1)(a). Accordingly, Plaintiff is entitled to recovery pursuant to § 544 and § 550, with a constructive trust imposed in his favor on the Bigfork Home. An Order will be entered separately.

Dated January 8, 2024.

BY THE COURT:

Hon. Benjamin P. Hursh
United States Bankruptcy Court
District of Montana